1

```
1              UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                    ORLANDO DIVISION

3
    - - - - - - - - - - - - - - - X
4                                 :
                                  :
5   JEFFREY BRISEBOIS,            :  Case No.:
                                  :  6:16-cv-01589-GAP-GJK
6           Plaintiff,           :
                                  :
7                                 :  Orlando, Florida
    vs.                           :  June 13, 2018
8                                 :  9:03 a.m.
                                  :
9   UNITED STATES OF AMERICA,     :
                                  :
10          Defendant.           :
                                  :
11                                :
                                  :
12  - - - - - - - - - - - - - - - X

13          TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
         BEFORE THE HONORABLE GREGORY A. PRESNELL
14             UNITED STATES DISTRICT JUDGE

15
    APPEARANCES:
16

17   Counsel for Plaintiff:      Michael Keith Bailey
                                  Fay O. Pappas
18
     Counsel for Defendant:      Julie Posteraro
19

20

21  Proceedings recorded by mechanical stenography.
    Transcript produced by computer-aided transcription.
22

23  Court Reporter:  Heather Jewett, RPR, FCRR
                     Federal Official Court Reporter
24                   401 West Central Boulevard, Suite 4600
                     Orlando, Florida 32801
25                   e-mail: heatherjewett.focr@gmail.com
```

*2*

1
T A B L E   O F   C O N T E N T S

2
June 13, 2018

3
PROCEEDINGS

4
  Plaintiff's Motion to Limit Dr. McGrail's
  Testimony  123
5
  Scheduling  231

6

7
WITNESSES

8
For Plaintiff:

9
  Norman "Neil" Brown, MD, PhD
    Direct Examination by Mr. Bailey  4
10
    Cross-Examination by Ms. Posteraro  39
    Redirect Examination by Mr. Bailey  56
11
  Sean M. Mahan, MD
    Direct Examination by Mr. Bailey  59
12
    Cross-Examination by Ms. Posteraro  98
    Redirect Examination by Mr. Bailey  119
13

For Defendant:
14

15
  Kevin M. McGrail, MD
    Direct Examination by Ms. Posteraro  126
    Cross-Examination by Mr. Bailey  150
16
    Redirect Examination by Ms. Posteraro  174
17
  Marc Kaye, MD
    Direct Examination by Ms. Posteraro  177
    Cross-Examination by Mr. Bailey  208

18

19
EXHIBITS

20
For Defendant:

21
  Number 16    Admitted  103

22

23
Joint Exhibits:

24
  Number 1    Admitted  188

25

*3*

P R O C E E D I N G S

1

2     (Call to order of the court at 9:03 a.m.)

3          THE COURT:  Welcome to the ceremonial courtroom.

4          Okay.  We're here today, as I understand it, for

5     Dr. Brown's deposition.

6          Before we get started, I wanted to state for the

7     record my -- the rationale for my ruling with respect to his

8     testimony.  It's apparent that Plaintiff's counsel sent

9     Mr. Brisebois to see Dr. Brown for the purpose of eliciting

10    expert testimony with respect to causation and impairment, and

11    although Dr. Brown had been a treating physician previously,

12    he was not a treating position at the time; therefore,

13    Dr. Brown was clearly a Rule 702 witness, and Rule 26(a)(2)(B)

14    required that there be disclosure of Dr. Brown as an expert

15    witness.  There was no such disclosure, and the -- and, in any

16    event, the summary disclosure made by Plaintiff's counsel

17    would -- would not satisfy the Rule 26(a)(2)(B) requirements.

18    So, for those reasons, I will not allow Dr. Brown to give

19    testimony concerning causation or impairment.  Okay?

20         MR. BAILEY:  Causation and impairment too, Judge?

21         THE COURT:  Yes.

22         MR. BAILEY:  Any other restrictions on his

23    testimony --

24         THE COURT:  Not --

25         MR. BAILEY:  -- so that I'll understand?

*Testimony of Norman "Neil" Brown, MD, PhD*                          **4**

1           THE COURT:  Not in limine.

2           MR. BAILEY:  All right.  Fair enough.

3           THE COURT:  All right.  Are we ready to proceed,

4    then?

5           MR. BAILEY:  Yes, Judge.  May it please the Court.

6           THE COURT:  Sure.

7           MR. BAILEY:  We're going to call Dr. Neil Brown, who

8    is available here by video conference.  We checked it out, and

9    I believe we can hear each other; right, Dr. Brown?

10          DR. BROWN:  Yes, I can.

11          MR. BAILEY:  Very good.

12          THE COURTROOM DEPUTY:  Dr. Brown, if you can please

13   stand and raise your right hand, I'll place you under oath.

14                NORMAN "NEIL" BROWN, MD, PhD,

15   was called as a witness on behalf of Plaintiff and, having

16   been duly sworn, testified via videoconference as follows:

17          THE WITNESS:  Yes, I do.

18          THE COURTROOM DEPUTY:  Thank you, sir.  You may be

19   seated.  And if you can please give us your full name.

20          THE WITNESS:  My full name is Norman Neil Brown, but

21   I've went my entire life by going by my middle name, Neil.

22                    DIRECT EXAMINATION

23   BY MR. BAILEY:

24   Q    Thank you, Dr. Brown.

25          Dr. Brown, tell us a little bit about your educational

*Testimony of Norman "Neil" Brown, MD, PhD*                    **5**

1   background and training as a physician.

2   A     My training was in Canada.  I did my undergraduate degree

3   in Canada followed by my master's in physics at McGill

4   University, then did a combined MD/PhD program at the

5   University of Western Ontario in London, Ontario, and then I

6   followed up on that with a neurosurgical residency.  And with

7   that neurosurgerical residency -- as part of the residency,

8   we're actually board eligible in the U.S. by the time we

9   completed our residency.  I was board-certified in Canada,

10  then came down to the U.S. subsequently, and I'm

11  board-certified in both Canada and the U.S. in neurosurgery.

12  Q     Very good.

13        Dr. Brown, when did you receive your MD degree there in

14  Canada?

15  A     My MD was received in 1991.

16  Q     And tell us about your residency training in

17  neurosurgery, please.  Where was that, and what years did it

18  entail?

19  A     Essentially, my residency was from '91 through '96.  I

20  was -- got one year's credit for my residency because I got a

21  PhD which was relevant to neurosurgery.

22  Q     All right.  And then when were you first licensed to

23  practice medicine in Canada, sir?

24  A     I was licensed to practice medicine in Canada as of 1991.

25  Q     Did you enter private practice in Canada before coming to

*Testimony of Norman "Neil" Brown, MD, PhD*                                      **6**

1   the States or not?

2   A    No.  I directly started practicing in the U.S.

3   Q    When were you first licensed to practice medicine here in

4   the United States, sir?

5   A    It was in December, I believe, of '96.

6   Q    After you completed your neurosurgery residency?

7   A    Yes.

8   Q    All right, sir.  And then when did you first enter

9   private practice here in the United States, and where was

10  that?

11  A    It was December of '96 as well.  The licensing probably

12  started somewhat before then.  I started my position December

13  of '96 in Ocala, Florida.

14  Q    And where did you practice there, sir?  With what

15  affiliation?

16  A    It was Ocala Neurosurgical.

17  Q    How long were you with that group, sir?

18  A    I was there approximately six months.

19  Q    And where next?

20  A    After that, I then practiced in Champaign, Illinois, with

21  a multispecialty group.

22  Q    How long there, sir?

23  A    From -- essentially, from '97 through 2001.

24  Q    Okay.  When did you first come to Florida and begin

25  practicing medicine here?

*Testimony of Norman "Neil" Brown, MD, PhD*                    7

1   A    I first came in '96, but I came back again in 2005.

2   Q    Okay.  And when you returned to Florida in 2005, where

3   did you practice, sir?

4   A    I was employed as an independent contractor by another

5   neurosurgeon in South Florida.  I worked with him for about

6   18 months, and then I started a practice on my own.

7   Q    In South Florida?

8   A    Yes.

9   Q    How long down there, sir?

10  A    I continued down in South Florida --

11          MS. POSTERARO:  Objection, Your Honor.  It's -- the

12  witness seems to be referring to documents that I don't know

13  what they are or what he seems to be referring to.  If we

14  could have some idea of what the witness is looking at.

15          THE COURT:  Yeah.  Doctor, what are you -- are you

16  referring to notes or a résumé or what?

17          THE WITNESS:  I'm -- I'm referring to my CV in front

18  of me.  Yes.

19          THE COURT:  Okay.  And do you have a copy of that?

20          MS. POSTERARO:  No.  His CV was not disclosed, as

21  one would have expected pursuant to Rule 26(a)(2)(B).

22          THE COURT:  All right.  Well, I don't think there's

23  any prejudice in him referring to his CV, but beyond that, we

24  may have a problem.  That's why we have 26 reports and

25  compliance with them.  But let's go.

*Testimony of Norman "Neil" Brown, MD, PhD*                          8

1    BY MR. BAILEY:

2    Q    Dr. Brown, let's move forward in time.  Have you

3    practiced in Florida continuously since 2005?

4    A    Yes, I have.

5    Q    All righty.  I want to ask you a few other predicate

6    questions, if I can, sir.  You said you're board-certified in

7    neurosurgery here in the U.S.?

8    A    Yes, I am.

9    Q    When were you first board-certified in neurosurgery?

10   A    I was first board-certified in neurosurgery in Canada.

11   That would have been in '96.  In Canada you can't practice

12   unless you're board-certified.

13        In the U.S. I became board-certified initially in 2002,

14   and then I've been recertified subsequently.

15   Q    All right.  Have you been recertified in neurosurgery

16   every time you've come up for recertification?

17   A    Yes.  I was recertified again -- the next expiration is

18   in 2022.  So I have to recertify a year or two before that

19   again.

20   Q    Right.  All right.  Very good, sir.

21        Dr. Brown, in the course of your neurosurgical practice,

22   have you seen my client, Jeff Brisebois?

23   A    Yes, I have.  I've seen him twice.

24   Q    All right.  What I want to do first is ask you when you

25   first saw him and in what context.

*Testimony of Norman "Neil" Brown, MD, PhD*                                    **9**

1  A    I first saw him as a consultation on January 21, 2014,

2  approximately three months after his accident.

3  Q    And where were you practicing at the time, sir?

4  A    I still had my own practice, but I was working as an

5  independent contractor a couple days a week for a company

6  called Total MD.

7  Q    And your private practice at that point -- was that, I

8  assume, in neurosurgery?

9  A    Yes, it was.

10  Q    And where was that, sir?  What location?

11  A    My primary private practice was in South Florida in

12  Coconut Creek, whereas Total MD -- I went with them a day or

13  two a week and saw patients in Daytona Beach and sometimes in

14  the Orlando area.

15  Q    Jeff Brisebois -- where did you see him on January 21,

16  2014?

17  A    I saw him in Daytona Beach.

18  Q    Okay.  How was Mr. Brisebois referred to you?

19  A    He was referred by Dr. Michael Sandborn, a pain

20  management physician with Advantacare.

21  Q    When you first saw Jeff Brisebois on January 21, 2014,

22  what did you understand about the problems that he was seeing

23  you for?

24  A    I was called to assess him with regard to a complaint of

25  low-back pain related to an accident on October 28, 2013.

*Testimony of Norman "Neil" Brown, MD, PhD*                    **10**

1    Q    And what did you understand about the history of that

2    accident and the problems that he related to it?

3    A    Essentially, he was riding a bicycle across an

4    intersection, and he was struck on his left side by a mail

5    truck, which he had stated went through a stop sign.

6    Q    What problems did he tell you that he related to that

7    incident?

8            THE COURT:  Okay.  We have a problem.

9            MS. POSTERARO:  Well, just a clarification.  Can we

10   clarify what it is that Dr. Brown is referring to?

11           THE COURT:  Okay.  Dr. Brown, what are you referring

12   to now?

13           THE WITNESS:  I'm referring to my initial

14   consultation note.  I have one other note on the second visit

15   as well.

16           THE COURT:  Have those been provided to counsel?

17           MR. BAILEY:  Yes.

18           MS. POSTERARO:  Is that the document that's entitled

19   "Neurosurgery Consultation" dated January 21, 2014, and it is

20   seven pages long, signed by you?

21           THE WITNESS:  Yes.

22           MS. POSTERARO:  Okay.  Thank you.

23           THE COURT:  Okay.  We're on the right page.

24   BY MR. BAILEY:

25   Q    Dr. Brown, let's continue, then.  Let me ask you again:

*Testimony of Norman "Neil" Brown, MD, PhD*                    **11**

1   What complaints did Jeff have -- physical complaints he wanted

2   you to evaluate him for?

3   A    I was seeing him for constant low-back pain, which was

4   moderate to severe, rated at 5 to 7 out of 10 severity.

5   Initially, he has some left leg pain, which had improved with

6   an epidural steroid injection.  Importantly, he described his

7   prior leg pain, which was in the posterior or the back of the

8   leg and the side of the leg involving the thigh and the calf

9   to the ankle.  That particular symptom had resolved, but it

10  helps localize where his pain generator was.

11  Q    Let me stop you there and go back up.  In the history of

12  his complaints to you, he characterized the nature of the back

13  pain, did he not?

14  A    Yes.

15  Q    And how did he characterize it?

16  A    Initially, he characterized it as sharp -- sharp low-back

17  pain.  On my visit he stated it was constant low-back pain.

18  Q    And did you understand that the left leg pain had

19  subsided to some extent as a result of any particular

20  intervention he'd had?

21           MS. POSTERARO:  Objection.  Leading.

22           THE WITNESS:  Yes.

23           THE COURT:  Overruled.

24           THE WITNESS:  It had improved as a result of an

25  epidural steroid injection.

1    BY MR. BAILEY:

2    Q    Do you know when that was?

3    A    It was performed by Dr. Sandborn, but I don't know the

4    exact date that it had been performed.

5    Q    All right.  On the particular date that you saw him,

6    January 21, 2014, was he having any specific left leg pain at

7    that point?

8    A    No.  He no longer had any pain in his leg.  His pain was

9    not confined to his low back.

10   Q    Okay.  Is that consistent with a response to an epidural

11   steroid if it's effective?

12   A    Yes, it is.  Epidural steroid injections generally

13   improve the pain in the leg or the sciatic pain, but it's

14   questionable as to how much benefit it is for back pain, but

15   it's the leg pain that helps us localize what was the source

16   of their pain.

17   Q    Understood.

18        Is an epidural steroid injection always something that's

19   curative, that you can hope will last forever and not allow

20   the leg pain to come back?

21   A    Unlikely curative.  It treat -- it treats localized

22   inflammation, but it's a medication, so it's going to wear

23   off.

24   Q    In your experience as a neurosurgeon, when folks have

25   low-back pain radiating into the leg and it's responsive to

*Testimony of Norman "Neil" Brown, MD, PhD*                    **13**

1  epidural steroid injections, do they always get better and not

2  have any further symptoms?

3  A    That's -- that's unlikely.  It's unlikely to have

4  significant benefit with the low-back pain.  The leg pain is

5  likely to recur.  It's just a question of when.

6  Q    Let's go back to your evaluation of Mr. Brisebois on

7  January 21st, then.  What did you understand about any prior

8  history that might involve his low back or similar complaints?

9  A    He -- he indicated that approximately ten years

10 previously he'd fallen off a truck, and he said he had a

11 slipped L5-S1 disc, which I interpreted that he had a disc

12 herniation at the L5-S1 level.

13 Q    Ultimately, did you have an opportunity to see the

14 July 7, 2006, MRI of his low back to see for yourself what the

15 nature of that prior problem was?

16 A    Yes, I did.  I actually was able to visualize that on my

17 subsequent evaluation.

18 Q    All right.  We'll get to that in time here.

19      Did you agree with the assessment of the radiologist who

20 originally interpreted that July 2006 MRI?  Or perhaps a

21 better way to say it is did you agree he had a herniated disc

22 at L5-S1 as shown on the MRI?

23 A    Yes, I certainly agree with that.  Again, I'm going

24 through my later note when I actually reviewed that study, and

25 it said there was a left-sided disc herniation at the L5-S1

*Testimony of Norman "Neil" Brown, MD, PhD*                    **14**

1    level.

2    Q    Okay.  And, again, we'll come back to that and talk about

3    it in more detail.  Let's stay on your January 21st exam for

4    the time being.

5         And as far as the occupational history, what did you

6    learn about Mr. Brisebois at that point in time?

7    A    He -- he worked as a cook full-time, was currently

8    working during the evaluation.  He'd been off work for

9    approximately one week as a result of the accident, using

10   medications so he could tolerate the pain and be off of work.

11   Q    Was he actively taking any medications at the time you

12   saw him in January 2014?

13   A    Yes.  He was -- he was taking Albuterol for asthma; a

14   pain pill called hydrocodone, 10-milligram tablets up to two

15   tablets four times daily; and also taking ibuprofen.

16   Q    Hydrocodone, 10-milligram, two tablets up to four times

17   daily -- is that a lot of hydrocodone?

18   A    Yes.  It's a high strength.  It's a fairly significant

19   dose, yes.

20   Q    Dr. Brown, in your experience as a neurosurgeon, can a

21   patient's symptoms and clinical exam findings change from

22   visit to visit?

23   A    Yes.  That's really the expectation, that they're going

24   to wax and wane in terms of severity.  There's going to be

25   some variability with regard to their symptoms.

1   Q    And in Jeff Brisebois's particular case, the fact that he

2   had experienced a sharp radiating low-back pain into the left

3   leg prior to the time you saw him on January 21st but was not

4   having that symptom that day, does that rule that out forever?

5   A    No, it -- no, it doesn't.  In fact, he had actually been

6   scheduled for another epidural steroid injection, so he had to

7   stop his ibuprofen because of that.

8   Q    You conducted an exam that day on January 21st, didn't

9   you?

10  A    Yes, I did.

11  Q    Tell us about that.  What positive findings did you make?

12  We don't need to talk about anything that wasn't instructive

13  or helpful to understanding what was going on with him.

14  A    Okay.  People have a normal C-shaped curve to their spine

15  in the neck and low back, C-shape bending backwards.  He had a

16  slight loss of that.  He was tender to touch in the midline

17  really just above the pelvis and over his right sacroiliac

18  joint, and he had some mild spasm in his muscles on both sides

19  in the low back.  He had --

20  Q    I'm sorry.  And there is another feature of that.

21  You're -- you're looking on the bottom of page 3 of your

22  report, aren't you?

23  A    Yes.

24  Q    He had a straight leg raising test, and that was

25  negative.  What does that tell you?

1   A    That -- that's a test that we use to see if there's any

2   tension on the nerve roots.  Essentially, if you straighten

3   out the leg, it will bolster the nerve if there's a disc

4   herniation pressing on the nerve, and if it's too tight, it'll

5   increase pain down the leg.

6   Q    Now, the fact that his straight leg raising test was

7   negative, does that rule out the possibility of nerve root

8   impingement from a herniated disc?

9   A    Not -- not necessarily.  It's not a perfect test, and, to

10  be honest, most pain is actually caused by the inflammation

11  rather than direct pressure.

12  Q    In your experience as a neurosurgeon over the years, have

13  you seen patients with radiating low-back complaints who yet

14  had negative straight leg raising tests like Jeff did?

15  A    Yes.  It's -- it's fairly common.  It's not a perfect

16  test.  You know, it's helpful if it's positive; it doesn't

17  help if it's negative.

18  Q    Have you done surgery on any patients who had the kind of

19  complaints Jeff had and yet had negative straight leg raising

20  tests on one exam or another?

21  A    Yes, I have.

22  Q    Is that uncommon in your practice or any neurosurgeon's

23  practice?

24  A    It's not -- not uncommon.  Again, the most common reason

25  we see patients is because of pain.  We're treating their

*Testimony of Norman "Neil" Brown, MD, PhD*                    **17**

1    pain.

2    Q    All righty.  Let me ask you about some of those things

3    you've told us already, Doctor.  You mentioned the usual

4    curvature of the spine.  Is that called "lordosis"?

5    A    Yes.

6    Q    And when you say he had a slight loss of lumbar lordosis,

7    what does that mean to us in terms of how that might explain

8    what's going on with him?

9    A    Typically, it's due to spasm in the muscles.  Spasm in

10   the muscles straighten out the spine.

11   Q    And did you find spasm as well?

12   A    Yes, there was.

13   Q    And you say bilaterally.  Does that mean what?

14   A    On both sides of his back.

15   Q    All right.  Now, I'm curious, Dr. Brown.  He was tender

16   over the right sacroiliac joint, and yet he told you he'd had

17   this radiating pain into the left leg.  What do you make of

18   that?

19   A    It just means that people can certainly have sacroiliitis

20   or inflammation of their sacroiliac joint, but it was a

21   localized tenderness, so it couldn't account for his prior

22   sciatica because it was on the wrong side.  If it had been on

23   the left side, it can cause sciatica, but it would not go down

24   as far as the ankle, which he had before.  So it's -- even if

25   it had been on the left side, it would not be the explanation

*Testimony of Norman "Neil" Brown, MD, PhD*                    **18**

1    of his prior left-sided leg pain.

2    Q    All right.  Thank you.

3         Continuing with your clinical exam, your physical exam of

4    Mr. Brisebois January 21, did you test his low-back range of

5    motion?

6    A    Yes.  He had some restriction in how far he could bend

7    forward.  Most -- most people can almost get to the floor with

8    their fingertips.  Some people can put their palms on the

9    floor if they're really flexible.  He could get his -- his

10   fingertips to about midway down between the knee and the

11   bottom of the floor.  So we call that "tibia," between the

12   knee and the ankle.

13   Q    How about his left and right rotation?

14   A    His left and right rotation were just -- I would consider

15   very mildly restricted, but that's not a significant amount.

16   It's more his forward flexion that is really the significant

17   feature.

18   Q    Yes, sir.  Did you quantify, though, his ability to

19   rotate left and right versus a normal range?

20   A    Yes.  I -- I had him at 60 degrees versus 80 degrees

21   normal.  But, again, there is a normal range.  Eighty is the

22   absolute amount that it can rotate.  As people get older,

23   they're not going to go a full 80 degrees.

24   Q    Sure.  How about --

25   A    So I didn't --

*Testimony of Norman "Neil" Brown, MD, PhD*                      **19**

1   Q    How about a guy who's 30 years old?  Would you expect him

2   to have the full rotational range of motion on both sides?

3   A    Very, very close, yes.

4   Q    Okay.  The other ranges of lumbar motion, extension, and

5   lateral bending -- were those normal?

6   A    Those were normal, yes.

7   Q    Okay.  When you do these range-of-motion testing, is it

8   done actively or passively?

9   A    It's really -- we just tell the patient to do it and to

10  stop when they start to have discomfort because we --

11  obviously, we don't want to hurt anybody.  So --

12  Q    Sure.

13       Did Jeff appear to be giving his best effort when he

14  displayed what range of motion he could exhibit?

15  A    Yes.

16  Q    Okay.  All right.  There are some findings in your

17  January 21, 2014, report that I'm not going to ask you about

18  related to his neck.  He didn't have any neck problems, did

19  he?

20  A    No, he did not.

21  Q    All right.  How about the motor exam with respect to his

22  lower extremities and the muscles there?  Was that normal?

23  A    That was normal.

24  Q    And same question I asked you earlier with respect to

25  some of his other findings:  Can somebody have pain and the

*Testimony of Norman "Neil" Brown, MD, PhD*                    **20**

1    kind of complaints he did with low-back pain, sharp, radiating

2    into the leg, although not on this date, and yet have, you

3    know, a normal motor exam in the lower extremities?

4    A    Absolutely.  Pain is just one function of a nerve.  And,

5    ideally, if you treat people surgically, you want to get to

6    people before they have a neurosurgical deficit.  You know,

7    if -- their recovery or their outcome is not nearly as good if

8    they already have a deficit in the nerve.

9    Q    Explain the difference between sensory function and motor

10   function of the nerve as it relates to this kind of situation

11   and why motor function is important in evaluating the

12   situation.

13   A    Motor and sensory function -- they're different parts of

14   the nerve.  They're different ways to localize where the

15   symptoms are coming from.  Each nerve supplies certain

16   muscles.  If that muscle is weak, it helps you -- lets you

17   know which nerve is potentially involved.  In terms of the

18   sensory part of the nerve, where people describe their pain

19   outlines the areas in the skin where that nerve can be

20   affected.  It may or may not have numbness in that area.  If

21   they do have numbness, they've already had an injury to that

22   nerve.  So they're just different parts of the localizing

23   process that we use to decide where the primary generator of

24   pain is.

25   Q    Understood.

*Testimony of Norman "Neil" Brown, MD, PhD*                              **21**

1    And in that respect, when we talk about the sensation of

2  pain, does that have anything to do with the motor nerve

3  function in the legs?

4  A    No.  In terms of the motor, the sensation of pain has

5  nothing to do with it.  It's really on the sensory side.

6  Q    Can a patient like Jeff Brisebois have what would be

7  considered to be a normal lower extremity motor exam without

8  any atrophy of the muscles, that kind of thing, and yet still

9  have pain radiating into the legs from a back problem?

10 A    Yes.  It just means that the nerve has not been injured.

11 It's just operating as a conductor of pain.

12 Q    All right.  You tested his deep tendon reflexes.  What is

13 that about?

14 A    Essentially, we have a reflex hammer, and we test certain

15 reflexes in the arms and legs.  Each reflex involves certain

16 nerves as well, and his reflexes were all normal.

17 Q    Same question with respect to the nerve reflexes, deep

18 tendon reflexes in the legs, the knee jerk, ankle jerk.  Those

19 were normal.  Does that mean he doesn't have pain?

20 A    No, it doesn't.  And, in fact, the most relevant -- in

21 terms of his distribution of his pain, the most relevant

22 reflex is the ankle jerk, because what happens, a reflex -- it

23 takes the signal -- when you tap on that reflex or tap on that

24 area, it goes back to the spinal cord via the sensory tracks

25 in the nerve and comes back to the -- to the muscles by the

*Testimony of Norman "Neil" Brown, MD, PhD*                    **22**

1    motor tracks.  So it's a loop.  His were normal.  But you

2    notice it's the S1 nerve root involving the ankle jerk.  None

3    of these reflexes are involving L5.  His distribution of pain

4    is in the L5 distribution.

5    Q    Ah.

6    A    So you wouldn't expect any involvement of the S1 nerve

7    root.

8    Q    Thank you for that explanation.

9         Now, you said he could walk on his heels and toes without

10   any difficulty.  Why do you test that, and what does the fact

11   that he can do that mean?

12   A    It's -- it's yet another test of strength, because some

13   people are just very strong, and you're comparing your own

14   strength against the patient's.  But when you get them to walk

15   on their heels and toes, they're having to bear their whole

16   weight on their toes and their heels.  So it's just -- it can

17   test for subtle problems.  People may have a mild drop foot,

18   which it may not pick up just on clinical exam motor testing

19   otherwise.  So that's why it's valuable.

20   Q    So does the fact that he could do that, walk on his heels

21   and toes as you examined him, relate to the sensory function

22   at all of the nerves?

23   A    No.  He had no instability with that.  It's primarily a

24   motor examination.  So --

25   Q    So consistent with the fact that he didn't have motor --

1    or muscle atrophy, that kind of thing, I guess?

2    A    Correct.

3    Q    Did you review any diagnostic studies at that point when

4    you examined him in January of 20- -- or 21st, 2014?

5    A    Yes.  At the facility where I saw the patient, he had an

6    MRI scan study of his low back on November 18, 2013, and I

7    reviewed that study directly.

8    Q    Let me just stop you there and ask you, Dr. Brown:  When

9    you say you reviewed it directly -- in your report it says the

10   following is your personal review -- does that mean you looked

11   at the images of the November 18, 2013, MRI?

12   A    Yes, I did.

13   Q    Okay.  So not just the radiologist report?

14   A    No.  Correct.

15   Q    And is that something that you do as a routine part of

16   your practice as a neurosurgeon?

17   A    Yes.  It's really the standard of care for -- for a

18   neurosurgeon.  You -- you always have to, you know, look at

19   the studies directly themselves because anybody's fallible.  A

20   radiologist could make a mistake.  He could say something on

21   the left side rather than the right side.  You don't want to

22   operate on the basis of a report.  If it's at the wrong level,

23   you don't want to operate on the basis of that report.  So you

24   have to review it directly.  And you have an added advantage

25   compared to a radiologist.  You see the patient and you know

*Testimony of Norman "Neil" Brown, MD, PhD*                    **24**

1   their symptoms, so you're going to be sensitized to looking

2   more carefully at those areas to see if there's anything

3   subtle that may explain the patient's symptoms.

4   Q    That's why the radiologists always say, "Clinical

5   correlation advised," or something along those lines, isn't

6   it?

7   A    Yes.

8   Q    Let's go back to your personal interpretation of the

9   images of that November 18, 2013, MRI of Jeff's low back.  How

10  did you read that, sir?

11  A    Okay.  I said at that time there was a normal lordosis.

12  Q    Let me stop you there.  We talked about the fact he had a

13  loss of his lumbar lordosis on your clinical exam.  How do we

14  reconcile that?

15  A    Two ways.  One, it could have been positioning.  During

16  MRI scan studies, it's not uncommon to have some cushions

17  placed under the patient.  So it may be positioning.  The

18  other thing is the patient may not have had any spasm while he

19  was having his MRI scan.  So there's two -- you know, a couple

20  different explanations.

21  Q    So nothing inconsistent there?

22  A    No.

23  Q    All right.  I'm sorry.  Continue with your interpretation

24  of the MRI, please.

25  A    And I said that there's desiccation, just another word

1  for dehydration, but retained disc at the L5-S1 level.  I saw

2  a tear in the disc posteriorly.

3  Q    At what level, sir?

4  A    At L5-S1.

5  Q    Again, let me stop you, if I might, so we keep up.  A

6  posterior annular tear -- what is that at L5-S1?

7  A    Essentially, it's -- it's the MRI appearance really of

8  seeing a scar on the back of the disc.  It's an area where

9  there has been some bleeding.  The MRI scan picks up,

10 essentially, the -- a component of blood called

11 "deoxyhemoglobin."  It changes -- on an MRI scan study, the

12 signal of blood changes over time.

13 Q    And let me understand.  When you see a change in the

14 deoxyhemoglobin, how does that appear on the MRI?  Is it a

15 lighter or darker signal than their surrounding tissue?

16 A    Yes.  To put it into context, if -- if you did an MRI

17 scan immediately or within the first week or two after --

18 after an injury to the disc, the blood still has some oxygen

19 in it.  So it would appear exactly the same color as a -- the

20 other tissues, so you wouldn't see it.  But once -- once the

21 blood loses the oxygen content in it, then -- then it develops

22 this brightness on an MRI scan study, and that will persist

23 for a few months afterwards.

24 Q    Okay.  So at three weeks out, which is about when that

25 MRI was done, you would expect to see what?  A brighter signal

*Testimony of Norman "Neil" Brown, MD, PhD*                    **26**

1  at that L5-S1 disc?

2  A    A brighter signal on what we call the T2-weighted

3  sequences.

4  Q    And I'm sorry.  Continue, then, and tell us about your

5  further interpretation of that November 18, 2013, MRI.

6  A    Then I look at the cross-sectional views.  And I say at

7  L4-5 there was a broad-based disc herniation eccentric towards

8  the left side, and it was pushing back or posteriorly

9  displacing the left-sided L5 nerve root.  At L5-S1 there was a

10 broad-based disc herniation eccentric towards the left side

11 but contacting both of the S1 nerve roots with slight

12 displacement of the left S1 nerve roots.

13 Q    And let me ask you what all that means, and talk about

14 L4-5 first, broad-based disc herniation eccentric towards the

15 left side and -- and displacement of the left L5 nerve root.

16 What does all that mean in the layman's terms?

17 A    Essentially, the disc was going back beyond the bony

18 border of the vertebrae.  It was touching the nerve root and

19 pushing it back, pushing back the left-sided L5 nerve root and

20 pushing back the left-sided S1 nerve root.

21 Q    Okay.  Now, again, jump forward a bit just for the sake

22 of comparison.  Your subsequent examination of Jeff -- you

23 also got a chance to look at his July 7, 2006, prior lumbar

24 MRI, didn't you?

25 A    Yes.

1    Q    How about that one?  Did it show any abnormality at all

2    at the L4-5 disc level?

3    A    No, there was not any abnormality.  It was totally normal

4    in the 2006 study.

5    Q    Okay.  I think we already talked about the fact that the

6    L5-S1 did show a herniation at that point back in 2006, huh?

7    A    Yes.

8    Q    Okay.  What did you make of all that, Dr. Brown, in terms

9    of your clinical exam of Jeff Brisebois and your understanding

10   of what the MRI told you in the way of additional objective

11   information?  How did you assess his condition on January 21,

12   2014?

13   A    It was my conclusion that his left-sided leg symptoms,

14   which had resolved, were most consistent with an L5

15   distribution of pain.  So I thought the primary pain generator

16   was most likely related to the disc herniation at the L4-5

17   level, but you -- you still cannot absolutely exclude the

18   other level as well just on an inflammatory basis.  You can

19   affect -- at the L5-S1 level, if there's inflammation there --

20   and we know there's a tear of that disc, and that tear can't

21   be related to the 2006 herniation because they just don't last

22   that long.  So the L5 nerve root can be impinged or is

23   impinged, actually, by the disc herniation at L4-5, but that

24   nerve root also comes down the side or the inner aspect of the

25   spinal canal of the L5 vertebrae, and then it exits through a

1   hole in the side -- in this case the left-side nerve root

2   exits and goes down right at the area where the disc is

3   between L5 and S1.  So inflammation at that level could also

4   affect the L5 nerve root too.  So there's two potential places

5   that the L5 nerve root could be impinged or irritated by.

6   Q    Thank you.

7        As between the contribution to Jeff's pain complaints

8   between the L4-5 level and the L5-S1 level, could you

9   apportion that at all or figure out which of the two was the

10  greatest concern?

11  A    I think most likely the L4-5 level, but it's very

12  difficult to apportion because, again, that L5 nerve root

13  could be affected by either -- either level.  You know,

14  they're sort of tandem -- tandem levels.  So if I had them

15  operated -- you know, I would have probably treated or

16  decompressed that nerve root at both sides to be absolutely

17  certain because you don't want to go back unnecessarily.

18  Q    Sure.

19       Let's go back to your earlier explanation about that

20  L5-S1 disc and that brighter signal there.  Was that chronic

21  or acute, as those terms are used?

22  A    That would be considered an acute -- or consistent with

23  an acute injury.

24  Q    Was that change you saw at L5-S1 in the disc signal there

25  in the posterior aspect of it consistent with trauma three

1   weeks earlier on November -- I'm sorry -- October 28, 2013, in

2   this accident?

3   A    Yes, it would be.

4   Q    How about the L4-5 disc herniation you see now on the

5   November 18, 2013, MRI?  Was that consistent with the history

6   of the accident of October 28, 2013, or not?

7   A    Yes, it would be.

8   Q    Dr. Brown, based on your examination of Jeff Brisebois

9   January 21, 2014, your interpretation of the November 18,

10  2013, MRI images, and all the information you had about his

11  prior history as well and the history of this accident

12  October 28, 2013, did you arrive at any -- any thoughts about

13  what the best course of treatment you might offer him would

14  be?

15  A    During the initial evaluation, I thought I should try

16  the -- an epidural steroid injection, possibly a left-sided

17  sacroiliac joint injection, just to see if that would resolve

18  his pain enough that he wouldn't have to have surgery.  Then

19  it came to different surgical options.  I'm more on the

20  conservative side so -- because he was so young.  I -- at that

21  point in time, I probably would have done a simple

22  decompression of the L5 nerve root, discectomies to be

23  certain.  I had the left L5 nerve root totally decompressed.

24  But another equally valid option at that point in time would

25  have been consideration of a fusion, which, again, I like to

*Testimony of Norman "Neil" Brown, MD, PhD*                    **30**

1    defer in such a young person.

2    Q    Yes, sir.  And I understand that.

3         Let me ask you a little bit more about those thoughts.

4    At that point in time, you knew he was -- well, he had had an

5    epidural injection that seemed to quell the left leg pain.

6    A    Yes.

7    Q    And you knew he was scheduled to have another one, yes?

8              MS. POSTERARO:  Objection.  Leading.

9              THE WITNESS:  Yes.

10   BY MR. BAILEY:

11   Q    Dr. Brown, did you know that Jeff Brisebois was scheduled

12   to have another epidural steroid injection at the point you

13   saw him January 21, 2014?

14             THE COURT:  Mr. Bailey, you're going to have to --

15             THE WITNESS:  Yes.  He said he was.  He had --

16             THE COURT:  Excuse me, Dr. Brown.

17        Leading a witness, giving him the answer, and then

18   simply making up for it time and time again is not going to

19   work with me.

20             MR. BAILEY:  Judge, I'm sorry.

21   BY MR. BAILEY:

22   Q    Dr. Brown, let me ask you this:  Did you have any

23   information about any further interventional procedures that

24   Jeff Brisebois was proposing to have at the point you saw him

25   on January 21, 2014?

*Testimony of Norman "Neil" Brown, MD, PhD*                          **31**

1    A    He told me that he had stopped his ibuprofen in

2    anticipation of another epidural steroid injection.

3    Q    You mentioned the surgical options, one being fusion and

4    the other being, essentially, a decompressive procedure at

5    L4-L5, L5-S1; is that right?

6    A    Yes.

7    Q    Now, at that point in time, given the fact he's 30 years

8    old, were you anxious to do surgery on him or not?

9    A    I was -- a decompressive procedure -- you know, I

10   wouldn't have much concern in doing that because the

11   downside -- you know, there's very little downside other than

12   the risk of recurrent disc herniation, but a fusion, you can't

13   take back.  And if you do a fusion, the level that will

14   compensate for that fusion -- they degenerate quicker, and

15   then you can get what we term to be "fusion disease."  You

16   treat one level, and then you have to treat the level above or

17   below, and so forth.  As a young person, that's not a nice

18   thing to look forward to.  So --

19   Q    Understood.

20        Let me ask you this:  If you had given Jeff your best

21   recommendation at that point, would you have suggested that he

22   immediately have surgery or continue with the conservative

23   care?

24             MS. POSTERARO:  Objection.

25             THE COURT:  Excuse me, but I think the question

*Testimony of Norman "Neil" Brown, MD, PhD*                               **32**

1   should be what recommendations he made, not what he would have

2   made had he been hired as an expert witness.

3   BY MR. BAILEY:

4   Q    What recommendation did you make at that time, Dr. Brown,

5   about how Jeff should manage his problems at that point, from

6   your perspective?

7   A    In my note, I said my primary recommendation for him at

8   this time would be to consider another epidural steroid

9   injection and possibly even a left sacroiliac injection.  If

10  those did not improve his pain satisfactorily, he would then

11  be a surgical candidate.

12  Q    All right.  And what does it mean, in your mind, as you

13  use those terms, to be a surgical candidate?

14  A    Essentially, as a surgeon I want to make certain that

15  people have used all reasonable means, conservative means to

16  avoid surgery.  But, you know, if they've used everything

17  possible, then surgery becomes an option, and that's

18  important.  It's an option for them to relieve their pain.

19  Q    Okay.  Let's move forward in time.  You mentioned that

20  you saw Mr. Brisebois again in October 2017.

21  A    Yes.

22  Q    At that point did you again get a chance to learn more

23  about his history since you'd seen him last in January 2014?

24          MS. POSTERARO:  To what document is Dr. Brown

25  referring to?

1          THE WITNESS:  Yes.

2     BY MR. BAILEY:

3     Q     Looking at what's -- Dr. Brown, are you looking at "Final

4     Narrative Report and Impairment Rating" October 19, 2017?

5     A     My encounter note was October 17, 2017.

6     Q     Do you have with you the October 19, 2017, document that

7     says "Final Narrative Report and Impairment Rating" that

8     consists of six pages -- seven pages?

9     A     I've never -- sorry.  I never had that -- that note in my

10    reports here that were printed out for me.  Sorry.  I

11    apologize.

12    Q     Dr. Brown, do you have a recollection of your encounter

13    with Mr. Brisebois October the 17th, apparently, 2017?

14    A     Yes.

15    Q     What do you recall learning about what had happened to

16    him in the intervening almost four years, three-plus?

17    A     Yes.  And I actually do have that note.  In the interim

18    since -- since my evaluation, he stated he treated with the

19    facility Advantacare for a couple more months and then

20    switched to another facility called Coastal Pain.

21          MS. POSTERARO:  To confirm --

22          THE COURT:  Excuse me.  Excuse me.

23          MR. BAILEY:  Dr. Brown, just a second.

24          THE COURT:  Excuse me, sir, but you need to identify

25    what it is you're reading from there.  What document?

1        THE WITNESS:  This is my evaluation note dated

2   October 17, 2017.

3        THE COURT:  Is that heading under Alexander

4   Orthopaedic Association?

5        THE WITNESS:  Yes, it is.

6        THE COURT:  Okay.

7        MS. POSTERARO:  For the record, we have the

8   document.  It was not produced during discovery.  We only

9   learned about it -- the United States learned about the

10  existence of this document when it was produced with

11  Plaintiff's exhibits.  Discovery was not possible on this

12  particular document and the conclusions or the observations

13  contained therein.

14       THE COURT:  All right.  Well, I'll take your

15  objection under advisement.  Let's go ahead and continue.

16  BY MR. BAILEY:

17  Q    Dr. Brown, by way of predicate, do you have documented

18  the same information in your final narrative report, or is it

19  different in terms of the history you took?

20  A    It would be the same history.  The only thing a narrative

21  report and impairment rating would have would be issues with

22  respect to causation of impairment ratings based upon the AMA

23  Guides, which I gather I'm not allowed to give anyway.  So --

24  Q    You heard the Court's ruling on that, so let's -- let's

25  not get into that.

1    But, otherwise, is all of the other information the same

2  as between your office note and that October 19, 2017, final

3  narrative report?

4  A    Yes.

5  Q    Okay.

6         MS. POSTERARO:  Objection to the characterization of

7  the similarities between the documents.  Dr. Brown doesn't

8  have the final --

9         THE COURT:  Well, I can compare the two documents,

10  and they're not the same.  So let's move on.

11  BY MR. BAILEY:

12  Q    Dr. Brown, in any event, what was your understanding --

13  tell us about what you understood of his intervening history

14  between the two visits.

15  A    Essentially, he treated with the facility Advantacare for

16  a couple more months after I seen him and then switched to

17  another facility called Coastal Pain.  He had more pain

18  injection procedures with epidural steroid injections, some

19  facet joint injections, and facet rhizotomies as well with

20  little or no benefit.

21  Q    Did he tell you whether -- sorry.  Continue.

22  A    He stated that the physicians at that facility had

23  offered him another surgical treatment, which, by his

24  description, sounded like a spinal cord stimulator implant,

25  but I can't be certain of that.

*Testimony of Norman "Neil" Brown, MD, PhD*                    36

1    Q    Did he tell you whether he was still taking any

2    prescription medication at that point in October of 2017?

3    A    Yes.  He was being treated with narcotics and other

4    medications and doing some other therapeutic exercises,

5    chiropractic treatment.

6    Q    At that point in time, what medications -- prescription

7    medications was he taking?

8    A    He was taking gabapentin, 100 milligrams daily.  That can

9    be used for pain management.  Taking a strong medication for

10   pain called Dilaudid.  The date -- he had just started taking

11   the Dilaudid the day before.  Prior to that he had been taking

12   oxycodone, 15-milligram tablets several times daily, and

13   that's a fairly strong medication, and taking hydrocodone when

14   necessary as well.  So his narcotic use went up substantially.

15   Q    And had his problems, the complaints he had, changed

16   since the last time you saw him at all?

17   A    Yes.  He now had radiation into both of his legs,

18   described it as a deep pain, which is more difficult to

19   localize.  So it was in both front and back of the legs to the

20   level of his knees symmetrically, a dull ache, but there could

21   be sharp characteristics as well.  And his pain seemed to be

22   more mechanical in nature.  Prolonged standing, prolonged

23   walking worsened the pain.

24   Q    What was your thought about what was going on with him at

25   that point, after examining him again and considering the

1  intervening history?

2  A    I felt that his pain had significantly worsened.  He had

3  more of a circumferential distribution of his pain rather than

4  any particular terminal involved.  So at this time, you know,

5  I really felt -- his options were both the same, but I did

6  discuss one other option with him besides decompression alone

7  or fusion.  I discussed the other possibility of using lumbar

8  artificial discs, which have been a newer treatment in the

9  lumbar region, and avoid the fusion disease.

10  Q    Dr. Brown, let me ask you this:  At this point in time,

11  October of 2017, you knew something more of his intervening

12  history.  The care that he'd had since you last saw him -- is

13  that -- well, the best way I know to ask it:  Is that

14  conservative care, or is that something else?

15  A    I think it -- it's conservative care, but I think in

16  retrospect, looking back at it -- and his narcotic use has

17  increased, so his pain has continued to worsen over time.  So

18  I would consider the intervening care more palliative in

19  nature.  It's really addressing his immediate concerns of

20  pain, but it's not moving him forward towards relief

21  permanently.

22  Q    Now, back in January, when you first saw him, the last

23  sentence of your office narrative there says:  "At this point

24  in time this gentleman is comfortable to proceed with further

25  injections of his low back."  If these are not successful,

*Testimony of Norman "Neil" Brown, MD, PhD*                        **38**

1    you'd be happy to reevaluate him.  Is that essentially what

2    you did in October 2017?

3    A    In January of 2014 or --

4    Q    No.  When -- I was reading from your last sentence of --

5    your last sentences of your January 21, 2014, report.

6    A    Yes.

7    Q    Now, he'd had additional conservative care ever since you

8    saw him last; right?

9            MS. POSTERARO:  Objection.  Leading.

10           THE COURT:  Sustained.

11   BY MR. BAILEY:

12   Q    Doctor, did he have conservative care ever since you'd

13   seen him last time in January?

14           THE COURT:  I'm not going to consider the answer.

15           THE WITNESS:  Yes, he did.

16           THE COURT:  I'm not going to consider the answer

17   anymore after you give him the answer.

18           MR. BAILEY:  Okay.

19   BY MR. BAILEY:

20   Q    Doctor, other than what you've told us about in the way

21   of options for treatment from a neurosurgical perspective, did

22   you have anything else to offer Mr. Brisebois either in

23   January 2014 or in October 2017?

24   A    No.  The only additional option --

25           MS. POSTERARO:  Objection to the extent that the

*Testimony of Norman "Neil" Brown, MD, PhD*                    **39**

1   answer would be contrary to the Court's order limiting the

2   witness's testimony.

3            THE COURT:  Well, I'll take that into account.

4   Overruled.

5   BY MR. BAILEY:

6   Q    I'm sorry, Dr. Brown.  Your answer?

7   A    The only thing additionally that I offered him was

8   potentially placing artificial discs rather than a fusion.  So

9   that was a third option I had discussed before.

10  Q    Thank you, Dr. Brown.  That's all I have, sir.

11       Let me just ask you:  All of the thoughts you've given

12  us -- have they been within a reasonable degree of medical

13  probability or certainty?

14  A    Yes.

15            MR. BAILEY:  That's all I have, sir.  Thank you.

16            THE COURT:  All right.  Cross.

17                      CROSS-EXAMINATION

18  BY MS. POSTERARO:

19  Q    Good morning, Dr. Brown.  My name is Julie Posteraro.

20  I'm an assistant United States attorney representing the

21  United States in this case.  You did not personally review all

22  of the available imaging of Plaintiff's lumbar spine; is that

23  correct?

24  A    Correct.  At the last visit he -- I had reviewed the

25  July 7, 2006, imaging and again reviewed the November 18,

*Testimony of Norman "Neil" Brown, MD, PhD*                    **40**

1   2013, imaging.  Other than that, there were reports of other

2   studies which had been done subsequently.

3   Q    Right.  To be clear, Dr. Brown, you reviewed the reports

4   only for the imaging done in November 2015, September 2016,

5   and April 2017; is that correct?

6   A    Correct.

7   Q    Okay.  And you reviewed neither reports nor imaging from

8   the CT of Plaintiff's lumbar spine in January 2012; is that

9   correct?

10  A    Correct, although a CT scan isn't nearly as good of

11  detecting disc herniations as an MRI scan study.

12  Q    Right.  Dr. Brown, my question was slightly different,

13  which is you didn't either review either the report or the

14  imaging for the January 2012 CT; is that correct?

15  A    That's correct.

16  Q    So you can't say one way or another what that imaging

17  demonstrates; is that correct?

18  A    I would have to defer to the report since I haven't

19  reviewed it.

20  Q    Okay.  So you can't say one way or another what that

21  imaging demonstrates; is that correct?

22  A    Correct.  All I can say is a CT scan would not show an

23  annular tear.  It's not designed to.

24  Q    But, once more, Dr. Brown, you didn't review the image of

25  the January 2012 CT; is that correct?

*Testimony of Norman "Neil" Brown, MD, PhD*                    **41**

1          MR. BAILEY:  Asked and answered, Judge.

2          THE WITNESS:  Correct.

3   BY MR. BAILEY:

4   Q    Now, you did not review any of Plaintiff's medical

5   records prior to the 2000- -- the October 2013 incident; is

6   that correct?

7   A    There were limited records in the Advantacare chart that

8   I had seen at the time of the assessment.

9   Q    Do you have a recollection of what those documents were?

10  A    There were -- there were just a few evaluations in the

11  emergency department at Bert Fish hospital.

12  Q    So you reviewed --

13  A    I think --

14  Q    You reviewed the Bert Fish medical records that were

15  available through Advantacare; correct?

16  A    Yes, but they were very limited in number.  I could

17  probably list what I can recall.  I think there was something

18  December of 2011 with upper back pain and left arm symptoms,

19  which would probably localize to the neck.  So that would be

20  unrelated.  Some low-back complaints in January of 2012, then

21  I believe in March of 2012.  Then there was an instance at the

22  end of January 2013 for about a week or so into February of

23  low-back complaints, left leg symptoms, and then June some

24  low-back complaints and leg symptoms as well, and then

25  nothing -- nothing further until his accident.  That's what I

*Testimony of Norman "Neil" Brown, MD, PhD*                                    **42**

1    can recall.

2    Q    And when was the last time you reviewed those records,

3    Dr. Brown?

4    A    I had been sent a link -- a link for a Dropbox just to

5    review some of those records.

6    Q    When were you sent that link, Dr. Brown?

7    A    A few days ago.

8    Q    And who sent you that link, Dr. Brown?

9    A    The -- the attorney's office of Mr. Brisebois.  So I had

10   seen them -- I had seen him four years ago, but to refresh my

11   memory, it --

12          MS. POSTERARO:  Your Honor, I would like to move to

13   strike the testimony of Dr. Brown.  He is clearly a 702

14   witness with respect to his findings in January 2014, and

15   subsequently thereafter, he has since been briefed by

16   Plaintiff's counsel, including documents relating to the

17   litigation.  The United States does not -- had not had notice

18   of this preparation of Dr. Brown, did not have opportunity for

19   discovery of Dr. Brown, and his interests are prejudiced by

20   Dr. Brown's hidden retention as an expert in this case.

21          THE COURT:  All right.  Well, let's -- let's deal

22   with the legal arguments later, and let's continue with your

23   cross of Dr. Brown, and I'll deal with the legal issues in due

24   course.

25   BY MS. POSTERARO:

*Testimony of Norman "Neil" Brown, MD, PhD*                              **43**

1   Q    Dr. Brown, in that link that was sent to you by

2   Plaintiff's counsel to the Dropbox, what other documents were

3   included in that link?

4   A    I had only really looked at the Bert Fish -- I think

5   there were about 450 pages or so, but of relevance to me was

6   really prior history of -- of complaints related to the spine,

7   treatment thereof.  That was really what was relevant to me,

8   and I think there were, you know, a few other notes related to

9   the assessments in -- at Advantacare.

10           THE COURT:  Dr. Brown, let me ask you a question.

11   Did your review of those prior records that were sent to you

12   by Plaintiff's counsel affect your -- the testimony you gave

13   today with respect to the plaintiff's medical condition,

14   treatment, and recommendations?

15           THE WITNESS:  No.  Because if you look at my

16   January 21, 2014, note, I -- it indicated I had been provided

17   with medical charts from the office of Advantacare -- or

18   Advantacare at that time.  So I had access to those notes at

19   my initial evaluation.

20           THE COURT:  But you used that link to refresh your

21   recollection for your testimony today?

22           THE WITNESS:  Yes.

23           THE COURT:  Okay.  Thank you, sir.

24   BY MS. POSTERARO:

25   Q    To be clear, Dr. Brown, in your January 24th -- excuse

*Testimony of Norman "Neil" Brown, MD, PhD*                                    **44**

1   me -- January 21, 2014, neurosurgical consultation, you make

2   note that you had been provided with medical charts from the

3   office of Advantacare; is that correct?

4   A    Yes.

5   Q    And you're silent as to the review of any records from

6   Bert Fish Medical Center; is that correct?

7   A    Well, Bert Fish Medical Center -- those records were

8   within the Advantacare chart.  I think I can put things in

9   perspective.  I was actually seeing the patient at the

10  Advantacare facility, so I had access to their patient

11  records.

12  Q    Right.  My question, Dr. Brown, was slightly different.

13  Your January 21, 2014, neurosurgery consultation is silent as

14  to your record review of the Bert Fish Medical Center records;

15  is that correct?

16  A    It doesn't specifically state that.  It just says the

17  Advantacare chart.

18  Q    You did not review any prior low-back examinations of

19  Mr. Brisebois prior to the October 2013 incident; is that

20  correct?

21  A    No.  Only what I would have seen in the -- those

22  emergency records.

23  Q    You don't recall having reviewed the low-back examination

24  in the records you reviewed, similar to the one you conducted

25  on Mr. Brisebois in January 21, 2014, that would have been

*Testimony of Norman "Neil" Brown, MD, PhD*                    **45**

1   dated prior to the 2013 incident; correct?

2   A    Correct.

3   Q    And you reviewed the Advantacare records available

4   through the time of your initial visit with the plaintiff in

5   January 2014; is that correct?

6   A    Yes.  They would have been limited initially because I

7   saw the patient about three months after the accident.

8   Q    Now, Dr. Brown, I'm sorry I got sidetracked for a minute.

9   I asked you what documents were sent to you through the link

10  from Plaintiff's counsel, and you listed the ones that were

11  relevant to you, but my question was sightly different, which

12  is which were the documents that were sent to you through the

13  link to the Dropbox by Plaintiff's counsel just before this

14  trial?

15  A    It -- it just said "Advantacare chart."

16  Q    Any other document --

17  A    That was my recollection.

18  Q    Is it possible that there were additional documents that

19  you're unable to recall today as we sit here?

20  A    I just saw stuff related to the Advantacare chart.  Now,

21  the Advantacare chart -- they had asked for prior records,

22  apparently, from Bert Fish.  So those were within that chart.

23  Q    And the Advantacare chart that was sent to you contained

24  records that were dated after your initial examination of

25  Plaintiff; is that correct?

1  A    I believe there were a few.  The patient stopped treating

2  with Advantacare a short time afterwards.

3  Q    But you're aware that Mr. Brisebois stopped treating with

4  Advantacare in October 2014; is that correct?

5  A    I don't know the exact date.  I just know he said in my

6  subsequent evaluation that he stopped treating with them and

7  switched to Coastal Pain a couple months after I saw him.

8  Q    Is it your understanding that the documents sent to you

9  by Plaintiff's counsel comprised the entirety of the

10  Advantacare documents?

11  A    I'm not -- I can't be absolutely certain of that.  I just

12  know, you know, it was listed as the Advantacare chart.  So I

13  can't say entirety.  I don't know.

14  Q    The updated history of present illness provided to you in

15  October 2017 was provided to you by Plaintiff himself; is that

16  right?

17  A    Yes.  And I also have my prior notes when I'd seen him

18  previously as well, and he gave the interim history.

19  Q    Right.  So everything that you knew prior -- between your

20  initial visit with him on October 21, 2014, through

21  October 2017 was provided to you by Mr. Brisebois?

22  A    Yes.

23  Q    Now, on October 21, 2014, when you first saw

24  Mr. Brisebois, he provided you with a description of the

25  accident in question; is that right?

1    A    You mean January 21, 2014?

2    Q    Yes.

3    A    Or -- yes.

4    Q    So on your initial visit on January 21, 2014,

5    Mr. Brisebois provided you with a description of the accident

6    in question?

7    A    Yes, he did.

8    Q    Okay.  And he told you that he was struck from the left

9    side by a mail truck that went through a stop sign?

10   A    That was the history provided, yes.

11   Q    Did you ask how fast the mail truck was going?

12   A    I don't see it documented here, no.

13   Q    Mr. Brisebois told you that he felt an immediate sharp

14   pain; is that correct?  Excuse me.  An immediate sharp

15   low-back pain; is that correct?

16   A    Correct.

17   Q    Was that a significant -- was that significant to your

18   findings?

19   A    Well, it's really the history provided.  Sharp low-back

20   pain, left-sided leg pain, left-sided wrist pain, which were

21   on the side that he stated he'd been struck on.

22   Q    Right.  My question, Dr. Brown, was slightly different,

23   which is that that was Mr. Brisebois's representation that he

24   experienced immediate sharp low-back pain significant to your

25   findings?

*Testimony of Norman "Neil" Brown, MD, PhD*                    48

1    A    Yes.  It's the history provided by the patient.

2    That's -- that's important.

3    Q    What significance did this finding -- did this

4    representation have to your findings?

5    A    His -- really the history provided by the patient, their

6    recollection of what happened with the accident.  In medicine,

7    you know, what's provided by -- historically by the patient is

8    the most important part of the interaction.  Then you confirm

9    findings on -- based on your physical and other studies.  So

10   this subjective history is very important.

11   Q    Okay.  Mr. Brisebois reported low-back pain to you, which

12   you rated between a 5 and a 7 out of 10 in severity; is that

13   correct?

14   A    Yes.

15   Q    And he was no longer experiencing any left pain; is that

16   correct?

17   A    Yes.  His left leg pain had resolved with the epidural

18   steroid injection.

19   Q    Okay.  And he had no residual ankle pain; is that

20   correct?

21   A    Correct.

22   Q    Now, he told you he had fallen off a truck and injured

23   his back about ten years prior; is that correct?

24   A    Correct.

25   Q    And he informed you that he had slipped the L5-S1 disc;

*Testimony of Norman "Neil" Brown, MD, PhD*                    **49**

1   is that correct?

2   A    Yes.

3   Q    Okay.  And he had reported to you that he had improved

4   from that injury and that it was not bothering him; correct?

5   A    Correct.

6   Q    Did you ask him what sort of treatment he received for

7   this prior injury?

8   A    No.  I didn't since it was ten years previously.  He said

9   that he had improved and went on about his normal life, was

10  able to go to the gym.

11  Q    Now, you determined that Mr. Brisebois, based on the

12  November 18, 2013, MRI, had a posterior annular tear at the

13  L5-S1 level; is that correct?

14  A    Yes.

15  Q    "Annular tear" is a bit of an outdated term, isn't it,

16  Dr. Brown?

17  A    There's some controversy with regard to tears.  Some

18  people don't like the term "tear" because it can imply trauma.

19  Q    Right.  The alternative to the use of "tear" is the word

20  "fissure"; isn't that right, Dr. Brown?

21  A    Yes.  Some people use "fissure," but "tear" is entrenched

22  in the literature as well.  So --

23  Q    Right.  Because "tear" could mean that it is as a result

24  of trauma; correct?

25  A    Correct.

*Testimony of Norman "Neil" Brown, MD, PhD*                    **50**

1   Q    Okay.  And an annular fissure, or known as a "tear,"

2   isn't necessarily the result of trauma; isn't that correct?

3   A    Sorry.  Could you repeat that question.

4   Q    An annular tear or fissure is not necessarily the result

5   of trauma; isn't that correct?

6   A    Correct.  They can occur with degeneration as well.

7   Q    So you can't say that just because a tear or fissure is

8   present that it results from trauma; isn't that correct?

9   A    Correct.  You can only say it's consistent based upon the

10  symptoms.

11  Q    If I understand your testimony previously, Dr. Brown,

12  your opinion is that the bright signal appears on an MRI two

13  to -- at least two weeks after a traumatic injury; is that

14  correct?

15  A    That's what the literature supports.  Just because the

16  break -- the way blood breaks down over time and then studies

17  on the MRI scan and imaging of it.

18  Q    Well, I understand that's what the literature supports,

19  Dr. Brown, but I want to understand your testimony here today.

20  Is that your testimony here today, that the bright signal

21  appears two to three weeks after a traumatic injury as a

22  bright signal on an MRI?

23  A    Yes.  That's what's supported by the medical literature,

24  yes.

25  Q    And your testimony is that this bright signal persists

1   for a few months afterwards; is that correct?

2   A    Yes.  It persists for a few months.  And it depends on

3   the -- on the resolution of the imaging.  You may not see it

4   as well on a low-quality machine.  You may see it better for a

5   longer length of time on a high-quality machine.

6   Q    How many months is a few months, Dr. Brown?

7   A    It can persist, again, going by the medical literature,

8   as long as 18 months, perhaps even up to two years afterwards.

9   Q    So if I understand your testimony correctly, a bright

10  signal that appears on an MRI dated November 18, 2013, could

11  have occurred anywhere between November 18, 2011, or after?

12  A    That's possible.

13  Q    And following your examination of Mr. Brisebois on

14  January 21, 2014, you did not make any surgical

15  recommendations one way or another; is that correct?

16  A    I made -- I gave him surgical options.  I felt he would

17  be better to proceed with more conservative management at that

18  time.

19  Q    Right.  My question, Dr. Brown, is slightly different,

20  which is that you didn't make any recommendations with regard

21  to surgery following your January 21, 2014, visit; is that

22  correct?

23  A    Actually, my opinion was that I did give surgical

24  recommendations if he didn't have a response to more

25  injections.

*Testimony of Norman "Neil" Brown, MD, PhD*                    **52**

1    Q    When you saw Plaintiff, or Mr. Brisebois, again in

2    October 2017, Plaintiff told you his condition had worsened;

3    is that correct?

4    A    Yes.

5    Q    And you did not review any additional documentation prior

6    to -- or in support of that October 2017 examination; is that

7    correct?

8    A    No.  The only records I had additionally available at

9    that time were his prior MRI scan study and the study that I

10   had reviewed before as well an analysis by another radiologist

11   in the Orlando area that I had reviewed, all involving the

12   studies.

13   Q    Are you referring to a radiological record by Sean Mahan,

14   Dr. Brown?

15   A    Yes.  Yes.

16   Q    When did you receive Dr. Mahan's report?

17   A    I had received that at that time of the MRI scan studies

18   as well.  The patient -- in my memory, I believe that the

19   patient just brought everything with him for that evaluation.

20   Q    To your recollection it's that Mr. Brisebois brought with

21   him Sean Mahan's radiological report; is that correct?

22   A    That's my recollection.

23   Q    And he brought with you -- brought with him additional

24   scans; is that correct? -- or additional reports; is that

25   correct?

*Testimony of Norman "Neil" Brown, MD, PhD*                    **53**

1    A    Reports as well as two CDs.

2    Q    What CDs --

3    A    I think that's all I have documented in terms of

4    diagnostic test findings.  So --

5    Q    What CDs did Mr. Brisebois bring with him the day of his

6    examination, Dr. Brown?

7    A    I've reviewed one from July 7, 2006, at Johnson's Surgery

8    Center, and then I've reviewed another one that had been done

9    at Advantacare, which I've previously reviewed, dated

10   November 18, 2013.

11   Q    Doctor -- excuse me, Dr. Brown.  Did Mr. Brisebois bring

12   anything else with him to his examination on October 17, 2017?

13   A    Well, I have reports -- reports of other studies, and I

14   have an analysis by Dr. Sean Mahan.

15   Q    And did you rely on the analysis by Dr. Sean Mahan in

16   reaching -- excuse me.  I'll rephrase it.  Did Sean Mahan's

17   study inform your examination of Mr. Brisebois on October 17,

18   2017?

19   A    I think -- well, I can only comment upon the two studies

20   that I had actually reviewed, and my opinions coincided with

21   his opinions on those studies.  I can't say about the other

22   studies; I can only respect his opinions from the prior

23   studies that I had also reviewed as well.

24   Q    Do you know why Mr. Brisebois brought with him those

25   studies on those days?

*Testimony of Norman "Neil" Brown, MD, PhD*                    **54**

1  A    I can only assume that he wanted me to get an idea of

2  what had gone on after I had last seen him, the updates --

3  really update my opinions and recommendations.

4  Q    Did he bring with him an October 17, 2017, letter from

5  Mr. Bailey?

6  A    If there was, I don't have it in my chart here.  So I --

7  I don't know.

8  Q    Do you have Mr. Brisebois's --

9  A    I just have my clinic notes --

10  Q    Do you have Mr. Brisebois's complete chart in front of

11  you, Dr. Brown?

12  A    All I have -- I'm an employee at Alexander Orthopaedic

13  Associates, so I just have my clinic note from October 17,

14  2017.

15  Q    Following your examination of Mr. Brisebois on

16  October 17, 2017, you recommended a stretching and strength

17  regimen to him; is that correct?

18  A    Yes.  That's -- that's really consistent with what I

19  recommend to all patients with spinal problems, you know, core

20  strengthening, stretching.

21  Q    And you offer in your examination note that any

22  definitive surgical recommendations would have to wait for

23  your direct review of the MRI scan that was performed

24  recently, in April of that year; is that correct?

25  A    Yes.

1   Q    What time was your appointment with Mr. Brisebois on

2   October 17, 2017, Dr. Brown?

3   A    I think it was the afternoon, but I have no idea.  I'm

4   pretty certain it was the afternoon.

5   Q    I have a letter from Mr. Bailey to you dated October 17,

6   2017, indicating that the appointment time was 3:00 p.m.   You

7   wouldn't have any reason to dispute that, would you?

8   A    No, I wouldn't.  No.

9   Q    Your notes -- your examination notes from October 17,

10  2017, on the last page, 3 of 3, the time is noted at

11  3:16 p.m.; is that correct?

12  A    Yes.

13  Q    Did you spend 16 minutes evaluating Mr. Brisebois,

14  Dr. Brown?

15  A    No.  The appointments are set for half -- half an hour

16  long.  So he may have arrived early.  I -- I can't tell

17  because I --

18  Q    But you --

19  A    -- I always bring back other patients after I see the

20  patient.

21  Q    You don't dispute the accuracy of your record from

22  October 17, 2017; is that right?

23  A    No, I do not.  No.

24         MS. POSTERARO:  I have no further questions.  Thank

25  you.

*Testimony of Norman "Neil" Brown, MD, PhD*                    **56**

1       THE WITNESS:  Thank you.

2       THE COURT:  Any redirect?

3       MR. BAILEY:  Brief, Your Honor.

4                    REDIRECT EXAMINATION

5   BY MR. BAILEY:

6   Q    Dr. Brown, briefly Ms. Posteraro asked you about the

7   appointment on October 17, 2017.  How long do you recall

8   spending with Mr. Brisebois when you saw him that day?

9   A    I can't recall exactly, but typical appointments are --

10  are scheduled for half an hour.  So it would be my impression

11  it would be around that time, plus or minus.  It's variable.

12  Q    Any reason to think it was as short as 16 minutes?

13  A    It would be unlikely because I was -- I would have had to

14  review the MRI scan studies, and that takes some time as well.

15  Q    All right.  Different -- different topic.  I just want to

16  confirm:  The report from Dr. Mahan -- did that at all factor

17  in to your personal interpretation of the MRIs of July 7,

18  2006, or November 18, 2013?

19  A    No.  I think it's -- if you have a radiology report,

20  you'd like to review it.  And, you know, from a practical

21  viewpoint, I like to know whether my opinions are consistent

22  or not.  Have I missed something?  Have they seen something I

23  haven't seen?  You know, it's just a check, but it's -- you

24  know, it's reassuring that they were fairly consistent.  So --

25  Q    And particularly, Dr. Brown, with respect to the

*Testimony of Norman "Neil" Brown, MD, PhD*                    **57**

1   November 18, 2013, postaccident MRI, did your impressions

2   about that change at all from your interpretation in January

3   of 2012 -- or '14?

4   A    No.

5   Q    Did you document your impressions about the

6   interpretation of the November 18, 2013, MRI in your

7   January 21, 2014, report?

8   A    Yes, I did.

9   Q    Did they change when you documented it again in the

10  October 19, 2017, report?

11  A    No, they did not.

12  Q    There was some discussion about the Advantacare chart,

13  and I think you told us that at the time you saw Mr. Brisebois

14  back on January 21, 2014, you saw him at the Advantacare

15  facility.

16  A    Yes, I did.

17  Q    And do you recall back at that time in January 20- --

18  2014 that the Bert Fish records that you refer to were a part

19  of that chart?

20  A    Yes.

21  Q    And your review of them, when I sent you the link, was

22  just to refresh your recollection; is that right?

23  A    Essentially, yes.

24  Q    Did any of that change any of your opinions as documented

25  on January 21, 2014?

*Testimony of Norman "Neil" Brown, MD, PhD*                    **58**

1    A    No, it has not.

2    Q    Or as you've expressed them here today?

3    A    No.  My opinions have not changed.

4              MR. BAILEY:  Thank you, sir.  That's all I have.

5              THE COURT:  All right.  Thank you, Dr. Brown.  We

6    appreciate your participation by video here to accommodate

7    your schedule.  So have a good rest of your day.

8              THE WITNESS:  Thank you very much.

9              THE COURT:  All right.  We'll be in recess for

10   15 minutes and back down to Courtroom 5 -- whatever my

11   courtroom is.  I don't know where it is.  Fifth floor.

12       (Recess at 10:36 a.m. until 10:57 a.m.)

13             THE COURT:  We have Dr. Mahan; is that correct?

14             MR. BAILEY:  We do, Your Honor.

15             THE COURT:  All right.

16             THE COURTROOM DEPUTY:  Please come forward, sir, to

17   be sworn.  Come all the way up front here, please.  Yes.

18                       SEAN M. MAHAN, MD,

19   was called as a witness on behalf of Plaintiff and, having

20   been duly sworn, testified as follows:

21             THE WITNESS:  I do.

22             THE COURTROOM DEPUTY:  Thank you, sir.  You may be

23   seated in our witness box.  Watch your step.

24             THE WITNESS:  I went the wrong way.

25             THE COURT:  Yeah, you're going the wrong way but --

1          THE COURTROOM DEPUTY:  The long way.

2          THE COURT:  Just don't go through that door.  It's

3    where the lockup is.

4          THE WITNESS:  Uh-oh.  Got it.  Thank you.

5          THE COURTROOM DEPUTY:  If you could please speak

6    your name into the microphone for the record and spell your

7    last name.

8          THE WITNESS:  My name is Dr. Sean, S-e-a-n, Mahan,

9    M-a-h-a-n, MD.

10          THE COURT:  Thank you.

11                    DIRECT EXAMINATION

12   BY MR. BAILEY:

13   Q    Good morning, Dr. Mahan.

14   A    Good morning.

15   Q    Dr. Mahan, first introduce yourself, if you would.  Tell

16   us what you do for a living and then your educational

17   background and training to do that, please.

18   A    Certainly.  My name is Dr. Sean Mahan.  I'm a medical

19   doctor.  The type of doctor that I am -- I'm a specialist in

20   diagnostic radiology, and they call the type of doctor that I

21   am a radiologist.

22       I began my training with a bachelor's degree at the

23   University of Virginia in Charlottesville, Virginia, in 1984.

24   My degree was in English and in art.  I had not decided to

25   become a physician, and I went out to work.  My first job was

1    working for the federal government.  I worked at the -- for

2    the Department of Defense in the Pentagon.  My home is in

3    Washington -- my home area is in Washington, D.C.

4         I then -- I did volunteer work at Arlington hospital, and

5    I decided to become a physician.  So I went to the medical

6    college of Virginia in 1987, three years later.

7              THE COURT:  Is that in Richmond?

8              THE WITNESS:  In Richmond, Virginia.  And I

9    graduated in 1991.  I was at the top of my class, and I was

10   inducted into the Honors Society for physicians that graduated

11   at the top of their class, which is called Alpha Omega Alpha.

12             After that I decided to become a radiologist, and

13   I -- I enjoyed diagnosing people and finding out what was

14   wrong with them.  So I did my internship and fellowship, and I

15   continued to stay in Richmond because it was convenient.

16             After I had done that, I was offered a fellowship

17   position at Georgetown University Medical Center, which is

18   where my home is, in Washington.  So I went back to

19   Washington, and I finished my training at Georgetown

20   University Medical Center, where I specialized in MRI, and I

21   specifically specialized in musculoskeletal imaging, which has

22   to do with bones and joints.

23             After that I was given appointment to be a professor

24   at Brown University, which I accepted, but I later also got a

25   job offer to work as a staff doctor treating patients in -- at

1   Orlando Regional Medical Center here in Orlando, Florida.  And

2   I made the decision I would rather be a treating doctor in

3   Florida than a -- an academic physician in Rhode Island and

4   definitely --

5                THE COURT:  You don't regret that?

6                THE WITNESS:  What's that?

7                THE COURT:  You don't regret that?

8                THE WITNESS:  Well, there's some regrets that I -- I

9   wish I had stayed in academics a little bit, but I -- I love

10  Florida, and I've been living in Florida since 1996, and I'm

11  proud to be a Floridian now.

12               THE COURT:  Okay.  We'll make you an honorary native

13  Floridian.

14               THE WITNESS:  I root for Florida football teams.

15               THE COURT:  Wait a minute.  You're treading on --

16               MR. BAILEY:  I was going to say.

17               THE COURT:  You need to be really careful here.

18               MR. BAILEY:  Are we going to talk about religion and

19  politics too?

20               THE WITNESS:  Excuse me?

21               THE COURT:  Because, I mean, if you're a Seminole

22  fan, then all bets are off.

23               THE WITNESS:  Well, I went to the University of

24  Virginia, so I do not root for Florida State.

25               THE COURT:  There you go.  All right.

1    BY MR. BAILEY:

2    Q    So to proceed, Dr. Mahan, what did you do there?

3    A    While I was there, I was a staff radiologist, and I

4    became the department head of radiology for several of the

5    smaller hospitals in their chain, which includes South

6    Seminole Hospital in Seminole County and St. Cloud Hospital in

7    Osceola County.

8         I also took an interest in outpatient radiology, people

9    who are being treated on a nonemergent basis, because I was

10   dealing with an emergency room at the hospital, but I also

11   enjoyed taking care of patients that were less emergent, and

12   that became the focus of my interest.  And so I later became

13   the chairman -- I left ORMC and became a chairman of radiology

14   for the largest chain of outpatient radiology centers in

15   Central Florida, which was called Drew Medical, and the

16   practice was called Central Florida Radiologists.  So I became

17   the chairman of a ten-man group at that time.  At about

18   2000- -- this was between 2002 and 2004.

19        And in 2004 I realized that this Internet thing was going

20   to become a big thing and that radiology studies could all be

21   transmitted over the Internet.  So I started a practice that

22   would be able to practice nationally over the Internet, and

23   that is the -- what I do today.  I am the chairman and medical

24   director of a national teleradiology group called EliteRAD

25   Radiology Services, and we practice not in every state in the

*Testimony of Sean M. Mahan, MD*                                    **63**

1  United States, but we do practice from coast to coast, in

2  California to Florida and -- and many states in between, and

3  when other people have a need, we get our -- we get doctors

4  who have licenses in those states, and we spread in those

5  areas.  We now run -- we now read for over 200 radiology

6  centers in the United States.

7  Q    Dr. Mahan, obviously, as a medical doctor doing radiology

8  practice, you're licensed to practice medicine here in

9  Florida, yes?

10  A   I am.  My primary focus is in Florida, so I have a

11  license to practice in Florida.  I do also practice in

12  Georgia, Virginia, and the District of Columbia.  So I have

13  licenses to practice in those areas as well.

14  Q    Okay.  Are you board-certified in radiology?

15  A   I am.  I am board-certified by the American Board of

16  Radiology.  I received that certification in 1995.

17  Q    Have you had to re-up at all since then?

18  A   The certification that I have does not require

19  recertification.  It is their highest certification that

20  includes all areas of radiology.  So I'm also certified to

21  read in the other areas of radiology, which include

22  mammography and nuclear medicine.

23  Q    Currently, as part of your role there at Elite Radiology,

24  do you actively interpret radiology studies on a regular

25  basis?

*Testimony of Sean M. Mahan, MD*                                    **64**

1    A    I do.  I usually read about 50 to 100 studies a day.  I

2    read two studies this morning that needed to be done on an

3    emergent basis.  We had patients who had appointments today.

4    They weren't true emergencies, but I need -- they needed to be

5    done before the patients saw their physicians.  So I did that

6    this morning before coming today.

7    Q    Of the various radiology studies that you review on a

8    regular basis now, what percentage of that involves spinal or

9    skeletal MRI images?

10   A    I would say the majority.  I mean, the majority of work

11   that I do requires -- is MRI work.  I would say 70 to

12   80 percent.  And most of those studies are spine and joint

13   studies, the large majority of those.  I also read brain MRIs.

14   I read one breast MRI earlier this week.  That's very unusual.

15   I don't read most of those because we have dedicated breast

16   people to read those, but I do read in all areas of the body.

17   Q    Now, obviously, as in this case, you also served as a

18   consultant; is that right?

19   A    I do.  I mostly am a treating physician in cases, and,

20   usually, when I'm asked to testify, they're in cases in which

21   I am a treating physician.  However, because I meet a lot of

22   attorneys, people have asked me to consult on these cases, and

23   I do it.  And so I do offer that as a service that I will

24   consult on cases.  I try to keep it down to a minimum number

25   because I don't want it to interfere with my regular work,

*Testimony of Sean M. Mahan, MD*                                    **65**

1   although it has been interfering recently.

2   Q    Dr. Mahan, have you worked with me or the folks in my

3   office before?

4   A    I have.  I testified in one case in which -- for you in

5   Seminole County, to my memory.  I may have consulted on

6   another case, but I just don't have it in my memory.

7   Q    When was the one you testified up in Seminole County?

8   A    I don't remember the date.  I think it was two years ago.

9   It was a while ago, but I do remember very distinctly seeing

10  Ms. Pappas's computer with a picture of Greece on her laptop.

11  That's why -- in fact, that's the memory that I have of that

12  event.

13  Q    Fair enough.

14       All right.  Let's talk about your involvement in this

15  particular case involving Mr. Brisebois.

16            THE COURT:  Can I ask something?  Did you testify in

17  another case before me about --

18            THE WITNESS:  I did, yes, sir.

19            THE COURT:  Mr. Dyer?

20            THE WITNESS:  That's correct.

21            THE COURT:  Okay.  I remember that.

22  BY MR. BAILEY:

23  Q    Dr. Mahan --

24            THE COURT:  You specialize in bicycle car accidents.

25            MR. BAILEY:  Seems that way, doesn't it?

*Testimony of Sean M. Mahan, MD*                                    **66**

1    THE WITNESS:  I didn't do it intentionally, but it

2    seems to be that way.  In federal court, in fact.

3    THE COURT:  Yes.

4    BY MR. BAILEY:

5    Q    All right.  Turning your attention to what you did in

6    this case, Dr. Mahan.  At my request did you, in fact, review

7    some imaging studies for Mr. Brisebois?

8    A    Yes.  I was given many studies to review, and I created a

9    report in which I listed the seven studies that I reviewed on

10   Mr. Jeffrey Brisebois.

11   Q    Please tell us what those were.

12   A    The list is -- there are seven studies on the list, and

13   I'll number them one through seven:  One, 6/15/2006, X-ray

14   lumbar spine; two, 7/7/2006, MRI lumbar spine; three,

15   1/26/2012, CT lumbar spine; four, 11/18/2013, MRI lumbar

16   spine; five, 11/3/2015, MRI lumbar spine; six, 9/7/2016, MRI

17   lumbar spine; and, seven, 4/14/2017, MRI lumbar spine.

18   Q    And to refresh our recollection, which of those were done

19   before this accident of October 28, 2013, that we're concerned

20   with and which were after?

21   A    The first three studies were done prior to the accident,

22   and the last four studies were done after the accident.

23   Q    Okay.  And were they all of sufficient quality to

24   evaluate the -- the issues that they depicted?

25   A    Yes.  I didn't think any of these studies were

*Testimony of Sean M. Mahan, MD*                                    **67**

1   suboptimal.  They were all of satisfactory quality.

2   Q    Dr. Mahan, after reviewing those various imaging studies,

3   both before and after this accident, did you come to some

4   interpretative conclusions about what they tell you as a sort

5   of big picture, overall situation with Mr. Brisebois?

6   A    Yes.

7   Q    If you will, let's talk about that as -- as you evaluated

8   it based on those collective interpretations, and then we'll

9   come back and talk about some of them individually.  Okay?

10  A    Yes, sir.

11  Q    All right.  What ultimate thoughts, conclusions, opinions

12  did you have after reviewing those various imaging studies?

13  A    I believe that Mr. Brisebois had a preexisting problem in

14  his lumbar spine.  He did have a herniated disc at L5-S1 that

15  you can see in a preaccident MRI on 7/7/2006.  After --

16  however, I believe that the -- I believe that he didn't have a

17  lot of significant degenerative change for a person of his

18  age.  He's a relatively young man.  He was 30 years old at the

19  time of the accident, so he was less than 30 prior to the

20  accident.  And the -- I don't believe that the herniated disc

21  at L5-S1 is a part of a degenerative process.  I believe that

22  he had some type of injury, but I don't know when that injury

23  is or what it was.

24       I also know that Mr. Brisebois had an accident on

25  10/28/2013, and subsequent to that accident, he had multiple

1   MRI studies.  The first MRI study was done about a month

2   later, and that MRI study identified a herniated disc at L4-5,

3   which had not been identified prior to that date on any of the

4   other studies.  So that is a new finding.

5        And he also had at L5-S1 a herniated disc which

6   preexisted the accident, but that -- now there's a new signal

7   change within that herniated disc.  There's this bright signal

8   that is very intensely bright in the herniated disc that

9   didn't exist on the 2006 MRI, and this indicates that there

10  has been an acute injury at this herniated disc.  This is

11  either an acute aggravation of the preexisting herniation of

12  the disc, or it can be characterized as a new herniated disc

13  that superimposed on the old herniated disc.  I prefer to

14  characterize it as an acute aggravation because there was a

15  herniated disc prior to that.

16       This bright signal then goes away on a follow-up MRI that

17  was done in 2015.  It's completely gone.  And then it comes

18  back on follow-up MRIs that I see in 2016, and I believe that

19  this indicates the fluctuations that we see in a herniated

20  disc.  In other words, they can get worse and better depending

21  on what type of day this person had.

22       So I believe that the initial injury occurred around the

23  time of the MRI of 11/18/2013 because that's when we first see

24  this bright signal, and that's why I believe that this patient

25  had two herniated discs at L4-5 and L5-S1, and I believe these

*Testimony of Sean M. Mahan, MD*                                      **69**

1  were both most likely related to this patient's accident of

2  10/28/2013 based on that conclusion of those findings.

3  Q    All right.  Thank you.

4       Let's talk about these various imaging studies

5  individually, and I know we have your computer hooked up, at

6  least I believe we do, to the monitors where we can bring them

7  up and look at them together.

8  A    Yes, sir.

9  Q    Let's do this.  Let's go --

10       MR. BAILEY:  If we can, Judge -- and I'll ask

11  whether the Court feels it's necessary or not.  We have the

12  July 7, 2006, lumbar MRI only on film available.  We have a

13  view box.  If you think it would be helpful to the Court, I'm

14  happy to have Dr. Mahan review what's on there.  It would

15  involve him stepping down from the witness stand and firing up

16  the view box.

17       THE COURT:  Well, let's go and see.

18       MR. BAILEY:  All right.  I think that's a good idea

19  too.

20  BY MR. BAILEY:

21  Q    Dr. Mahan, if you will come on down.  I'm going to turn

22  this thing on.  We've got the --

23       MS. POSTERARO:  The United States has produced a CD

24  with -- well, I think Plaintiff has produced to us initially,

25  and we marked it as an exhibit, the 2006 MRI.  If Dr. Mahan

*Testimony of Sean M. Mahan, MD*                                              **70**

1   would like to open it up.

2          MR. BAILEY:  And I'm fine with that too, Judge.

3   Either way.  It might --

4          THE COURT:  Well, I'd rather have him testify from

5   over there so -- so his back's not to us, if that's a better

6   procedure.

7   BY MR. BAILEY:

8   Q    Do you have a disc drive on your --

9   A    I don't have a disc drive, but if you have -- either an

10  accessory disc drive --

11         MS. POSTERARO:  Ms. Medina could probably pull it

12  up.

13         MR. BAILEY:  Whatever you want to do.  I will say

14  that I did show Ms. Posteraro the films here in their original

15  form before we got to this point.

16         THE COURT:  All right.  Well, we just -- I just had

17  a film come up on my screen.

18         So, Doctor, why don't you look at your monitor there

19  and see if this is adequate for you to testify from.

20         MR. BAILEY:  Well, there you go.  Thank you.

21         THE WITNESS:  It is.

22         MR. BAILEY:  All right.  Good.

23         THE COURT:  If you think you need to use the view

24  box, let me know.  Okay?

25         THE WITNESS:  Yes, sir.

1          MS. PAPPAS:  Let me stop blinding you-all.  I'm

2    sorry.

3          THE COURT:  Thank you.

4          MS. POSTERARO:  You're welcome.

5    BY MR. BAILEY:

6    Q    And if you don't mind, I'm going to just move close

7    enough so my old eyes can see this thing while we talk about

8    it, Dr. Mahan.  This is the July 7, 2006, MRI of the low back?

9    A    Yes, sir.

10   Q    And tell us what we're looking at.  What image is that --

11   or images?

12   A    These actually have a name -- a number on these images,

13   and if you look on them very carefully, you will be able to

14   find the image.  You can look on the upper left corner.

15   You'll see three -- the first three lines -- the first one

16   says "EX."  That's usually the number of the examination.  So

17   that's just -- 4750 would be the entire study that it is.  The

18   next one is "SE."  That stands for sequence.  This is

19   Sequence 102.  That's just a random number they assign to the

20   sequence.  And then the third image is the image number, IM.

21        And you can see that we're looking at Images 5 and 6 of

22   Series 102.  These are sagittal T2 images.  And what you'll

23   notice on here -- what's interesting on this lumbar spine

24   study is that you'll see -- at the very top of the image, you

25   can actually see that the T11 vertebra -- it has words over

*Testimony of Sean M. Mahan, MD*                                          **72**

1   it, but the T11 vertebra does not look like a perfect block.

2   It's actually collapsed a little bit, and that suggests that

3   this patient may have had an old trauma, perhaps sometime in

4   childhood even.  This is old.  This is not new.  This is from

5   some previous event.  So this patient has had a previous

6   injury of the back.  They may not even remember it.

7        This is a very minor type of compression fracture.  They

8   usually heal on their own, and they usually are of no clinical

9   consequence.

10  Q    If I might, let me just stop you there and ask you does

11  that T11 compression fracture have any factor in your opinions

12  here today?

13  A    Well, it only has a factor in that it really proves that

14  this patient has had a prior back problem, which this patient

15  has had prior back problems.

16       Then, when we go down, if we call that T11, the next bone

17  is T12, and then L1, L2, L3, L4, and L5.

18       Excuse me.  I didn't mean to do that.  Can we remove

19  those arrows?  But now that I know I can do that, I will put

20  an arrow --

21            THE COURT:  It's helpful to me to see what you're

22  looking at.

23            THE WITNESS:  Yes.  I'm going to use it in a better

24  way now that I know I can do it.

25            THE COURT:  Okay.

1        THE WITNESS:  I'm going to put an arrow here.  This

2   is the L4-5 disc.  The flat structure that's in between the

3   two square bones is the disc, and you can see that the back of

4   the disc -- the back of the disc is over on this side.

5   That's -- the second arrow is on the back; the first arrow is

6   on the front.  And you can see that the back of the disc

7   roughly lines up with the bone at that level.

8        Now, if you look at the next level -- the next level

9   is the L5-S1 level, and I'm going to point to it better on

10  this image over here because I can see it better over there.

11  BY MR. BAILEY:

12  Q   Dr. Mahan, let me stop you.  I apologize, but on that

13  left image where you're talking about the back of the L4-5

14  vertebra, do you have the arrow at the back of the vertebra or

15  somewhere else?

16  A   Well, the arrow's actually not on the back of the

17  vertebra.  The arrow is pointing to the soft tissues, but I

18  just put it towards the back.  I don't know how to

19  manipulate --

20  Q   Well, that's what I was concerned about.  I don't want to

21  mislead anybody in thinking we're trying to identify something

22  specific if that's not the case.

23  A   Can I draw a line on here? draw a circle?

24        THE COURT:  Yeah.  But I understand what he's

25  pointing to.

1          MR. BAILEY:  Okay.

2          THE WITNESS:  All right.  This is the area I'm

3     pointing to right there.  I'm sorry that I'm messing that up.

4     But that area there -- particularly, you can see it on the

5     other image over here.  The back of the -- the back of that

6     disc lines up with the bones.

7          The lower arrow on that second image is pointing to

8     the L5-S1 disc, and you can see that the disc is going beyond

9     the bone.  That's a herniated disc.  So this patient did have

10    a herniated disc prior to this accident at L5-S1 back in 2006.

11    You can see it very easily there.

12          What's important to note on that herniated disc --

13    the two things that are important to notice, and you can see

14    them on this image, is that the L4-5 disc is normal.  It's

15    relatively normal.  And the L5-S1 herniated disc does not have

16    intense bright signal inside of that herniated disc.  If

17    anything, the signal inside the herniated portion of the disc

18    is darker than the rest of the disc, and you can even see that

19    better on the first image.  The signal inside that disc is

20    darker.  This is what we would -- I would say is consistent --

21    this does not have the bright signal change.  That's all it

22    means.  I can't age this herniated disc.  It's possible this

23    herniated disc could be a day old or ten years old.  I can't

24    tell the difference.  But I don't see bright signal.  That's

25    very important.

1    BY MR. BAILEY:

2    Q    And this is a 2006 study.  How does it compare with the

3    resolution of some of the later ones that we're going to look

4    at?

5    A    I actually think the resolution of this image is

6    excellent.

7    Q    Good.

8    A    This is a very good, quality study.

9    Q    All right.  And with respect to the weighting of this,

10   what kind of MRI study is this of the sagittal view?

11   A    This is called a T2-weighted sequence.

12   Q    Tell us about T2 and T1 and that sort of thing so we'll

13   understand what the difference is, please.

14   A    Well, generally, T2 is better for looking at the disc.

15   The way you can tell the difference between T1 and T2 is that

16   water is bright on T2.

17        And over here -- I'm going to point -- put an arrow on

18   the spinal cord.  The spinal cord is this gray, striped

19   structure here that's coming down.  That's the spinal cord.

20        There's fluid around the spinal cord, and the fluid,

21   you'll notice, is bright.  So there's this bright stuff around

22   the spinal cord.  That fluid is called the cerebrospinal

23   fluid, and that's the fluid that doctors get a sample of when

24   they're doing a spinal tap.  So when they do a spinal tap,

25   they take a needle and put it into the spine right about here

1   and get a sample of that fluid.  That's what a spinal tap is.

2       Also, when we do an epidural, we -- for example, on a

3   pregnant woman who's getting an epidural anesthesia for

4   delivering a baby, they put the needle about the same place so

5   they can get into the space around the sac.  They don't want

6   to actually put it in the sac.  They try to get it around the

7   sac.  But the way they do that is they put the needle in too

8   far, they get the fluid out, and then they pull back the

9   needle until you stop getting fluid.  That's how you know

10  you're in the right space.

11      And that's the -- so this is -- that fluid there is very

12  important for multiple reasons, but you can see that the fluid

13  is bright.  That means this is a T2-weighted image.

14      On the signal -- the other type of sequence that we get

15  an MRI is called a T1-weighted image.  That's where the fluid

16  is dark.  And on that particular image, you really don't see

17  the discs quite as well.  That image is better for looking at

18  the bone marrow.  We use it for looking for cancer in the bone

19  marrow.  That's the best reason for T1-weighted imaging.

20  Q   Thank you, Dr. Mahan.

21      I want to finish with this couple of images, but one last

22  thing I want to ask you about it is, when you look at the

23  lumbar disc from L4 up, L, you know, 2, 3, and on up, are

24  they, in your view, different than L4-5, or are they pretty

25  similar?

1  A    You'll notice that they're all about the same -- they

2  have this bright -- the discs have this bright material inside

3  of them.  All of the discs do.  And that bright signal is the

4  water content, and you'll notice that they're all about the

5  same.  So I would say all the discs are the same except the

6  L5-S1 disc, which has that dark area towards the back of the

7  disc.

8  Q    Where we see that dark area and it looks like it's got

9  lighter -- that sort of curves around the back of it --

10 what -- what's going on there?

11 A    Well, where the disc is curved out and pointing outwards

12 beyond the bone, that's the herniated disc.

13 Q    What is --

14 A    And it's darker inside that herniated disc because it's

15 becoming dehydrated where the disc is herniated.

16     Now, I can tell you that on later studies this disc is

17 completely black, which tells me that it's most likely that

18 this herniated disc at L5-S1 occurred around the time of this

19 study in 2006.

20 Q    At the time you looked at these, did you have any

21 information about the fact that Mr. Brisebois had sustained a

22 low-back injury working at FedEx in 2006 where he slipped off

23 the back of a truck?

24 A    I don't remember if I had seen that history or not, but

25 this would go along with it.  It's likely that that L5-S1

1   herniating disc occurred at about that time.  And you can see

2   the findings of aging to that herniated disc because it's

3   starting to become black.

4   Q    Okay.  And that structure, if you will, that abuts or

5   appears adjacent to the herniated part of the L5-S1 disc, the

6   lighter colored area -- what is that that is next to it?

7   A    I'm not sure what you're talking about.

8            THE COURT:  I'm not either.

9            MR. BAILEY:  All right.  Obviously a bad question.

10  BY MR. BAILEY:

11  Q    That herniated part of the disc in the back --

12  A    Yes.

13  Q    -- where is it if it's not where it's supposed to be?

14  A    Well, it's herniated outwards into the thecal sac, and

15  it's pressing on the thecal sac, which is the sac that

16  contains that fluid around the brain and the spinal cord.  At

17  this level there's no brain or spinal cord; there's only

18  nerves.  The spinal cord ends at about the level of the belly

19  button, which is right here.  You can see that it tapers down

20  to a cone.  And, actually, the name of that is the conus

21  medullaris.  It looks like a cone.

22  Q    Okay.  Anything else about that July 7, 2006, MRI that's

23  of interest to us?

24  A    No.

25  Q    All right.  Let's move on.  You did also look at a

1   June 15, 2006, X-ray-ray of the lumbar spine.  Is there

2   anything about that that's significant?

3   A    No.  I can't see the discs on that spine.  The only thing

4   I would say is significant is I really don't see a lot of

5   extensive degenerative change --

6           THE COURT:  Wait a minute.  Are we looking at a new

7   image now?  I'm lost.

8           MR. BAILEY:  I don't think he's put it up yet,

9   Judge.

10  BY MR. BAILEY:

11  Q    Let's just pull that June 15, 2006, X-ray of the lumbar

12  spine up for a quick review and talk about anything that is or

13  isn't significant in it.

14  A    I have it up right now.  I've oriented this in the same

15  orientation as the lumbar images that we saw so you can see

16  these blocks of the bone.  These are the -- this is L5.  This

17  is L5 because this is the lowest disc.  So this is L5-S1.

18  This is the L5-S1 disc.  This is L5, L4, L3, L2, and L1.  And

19  you can see that the back of the bones look relatively flesh

20  with one another.  There isn't a lot of degenerative change.

21  There is some mild whiteness around the L5-S1 disc.  The bones

22  look a little bit whiter than the other bones.  This is

23  probably early degeneration related to the fact that we know

24  that this disc was injured in 2000- -- at least in 2006.

25  Q    And you had that same indication on the plain X-ray at

*Testimony of Sean M. Mahan, MD*                                    **80**

1    L4-5?

2    A    No.  The L4-5 disc looks very similar to the rest of the

3    bones of the spine.

4    Q    Okay.  Well, let's move on and pull up the next one,

5    which is a January 26, 2012, CT of the lumbar spine.

6    A    This is the CT image that I have up now.

7    Q    Okay.  And before we start talking about it, let me ask

8    you some things.  Other than to know the date of it, did you

9    know what was going on in Mr. Brisebois's life at the point

10   that lumbar CT was done on January 26, 2012?

11   A    I don't recall -- I don't recall.  I did have a copy of

12   the report, but I don't recall why this study was performed.

13   Q    No worries.  But, obviously, somebody had a concern about

14   his low back; true?

15   A    That is correct.

16   Q    Now, what do we see on this CT in January of 2012 that

17   tells us anything about the condition of his lumbar spine?

18   A    Well, the only thing that I see on here -- if you notice,

19   this is the -- I tried to bring up about the same view that we

20   had before, and I'm going to put an arrow on the L5-S1 disc.

21   You can clearly see in this area -- and I'll put a circle

22   around the actual bad portion of the disc.  Excuse me.  I

23   covered it up with a bunch of words.  I'm going to put it back

24   to the default state so I can start all over.

25        I'm going to widen this up so we can see the discs a

1    little bit better.  Now we can start seeing the discs.  It

2    does look like this disc perhaps is bulging at L4-5.  It

3    doesn't look as big as what I'm seeing down there at L5-S1.

4    At L5-S1 I can see that the disc is extending outside of the

5    bone, which is what I expect because we know this patient has

6    a herniated disc at L5-S1.  There may be a bulging of that

7    disc at L4-5 but --

8            MS. POSTERARO:  I'd like to object to the extent

9    that these are new demonstratives that were not disclosed to

10   the extent they now have arrows and Dr. Mahan's manipulating

11   them.  I would just ask the Court the same latitude with

12   respect to our radiologist when he later presents his

13   testimony and explains his findings and conclusions.

14           THE COURT:  Sure.

15           MS. POSTERARO:  Thank you.

16           THE WITNESS:  The only thing I'm seeing here is that

17   there's whiteness of the bone right here.  You'll notice the

18   bone right in this back part of the L5-S1 level is whiter than

19   the rest of the bones.  This is probably an early degenerative

20   process related to the fact that this patient has this

21   preexisting herniated disc at L5-S1.  But I don't see a

22   herniated disc at L4-5, and, more importantly, I don't see any

23   degenerative changes throughout the rest of the spine.  And

24   these degenerative changes are mild.

25           What is a more significant degenerative change would

1    be a bone spur, which the medical word for bone spurs are

2    "osteophytes."  So it would be improper to call this a disc

3    osteophyte complex.  First of all, that phrase is not supposed

4    to be used in the lumbar spine, but, secondly, I don't see any

5    osteophytes here.  So this is actually a herniated disc with

6    some early degenerative change of the bone.

7             THE COURT:  What's the difference between a

8    herniated disc and a bulging disc?  How do you -- how do you

9    quantify that difference in terminology?

10            THE WITNESS:  Well, the way we --

11            THE COURT:  You see -- you see some bulging in 4-5;

12   right?

13            THE WITNESS:  I believe that it may be bulging.  It

14   looks like it's perhaps sticking out a little bit.

15            THE COURT:  So how far does it have to stick out to

16   be herniated?

17            THE WITNESS:  The way that we typically diagnose a

18   bulge versus a herniation is not by how far it sticks out, but

19   by how much around the disc it involves.  So if it involves

20   more -- the current literature says that, if it's more than

21   90 degrees or 25 percent of the circumference, we call that a

22   bulge.  In this case I don't really know how far that sticks

23   out.  I don't know if it's involving 25 percent or 50 percent,

24   but it doesn't look particularly worse towards the back of the

25   disc than it does in the front of the disc.  So I think there

1    may be some bulging of the disc at L4-5.

2         THE COURT:  And the CT scan is not going to show the

3    image as well as an MRI?

4         THE WITNESS:  That's correct.  In fact, based on

5    this CT scan, I would not call this a bulge or a herniation --

6         THE COURT:  Okay.

7         THE WITNESS:  -- on the CT.  I would just say it

8    looks like it may be.  But if I were to be the interpreting

9    physician to this, I would call it normal because I can't see

10   it well enough.  At L5-S1 I can clearly see disc material

11   sticking out, and I would call that a herniation, but I

12   wouldn't say it at L4-5.

13        THE COURT:  All right.

14   BY MR. BAILEY:

15   Q    And, Dr. Mahan, we're going to move on, and we're going

16   to talk about the immediate postaccident MRI done November 18,

17   2013.  Can we put a corresponding image up from that MRI and

18   leave that CT up to show the difference that you see between

19   the two types of studies?

20   A    I would have to make a -- I would have to make an image

21   of it.  So, in other words, this is from the study that was

22   done on 11/18/2013.  You can see the date right here.

23   11/18/2013.  And I would have to make a "print screen" of

24   this, which I can do.

25   Q    Okay.  Sorry.  I didn't mean to quite get as involved as

*Testimony of Sean M. Mahan, MD*                                    **84**

1  I'm asking, but I think it's helpful.

2  A    I want you to know I've never played any of these games.

3  Q    This is not your computer, or is it?  Yes, it is.

4  A    I'm not sure how I can --

5  Q    No.  Let's -- let's not --

6  A    I'm just not prepared to do that.

7  Q    And I apologize.  I didn't mean to get into all that if

8  it was going to be complicated.

9      But let's look now -- we just did look at the CT.  I

10 think we can remember the appearance there.  This is a

11 November 18, 2013, MRI?

12 A    Yes.

13 Q    All right.  Are we looking at, basically, the same depth

14 of the sagittal cut that we saw on the previous CT in 2012?

15 A    Yes.  You can see the spinal cord right here, and you can

16 see the conus medullaris, so you know we're at the same -- on

17 the same slice as the 2006 MRI that we saw earlier.

18 Q    Okay.  And how about that CT?  Can we pretty well be

19 certain we're at about the same depth or slice?

20 A    We are.  We can't see the spinal cord as well on the CT

21 scan, so I can't use that as the marker, but this is

22 approximately a midline cut.  And what I'm seeing here now --

23 I'm putting the arrows on L4-5 and L5-S1.  I'm going to do the

24 same thing on this side.  And the only reason I put it on this

25 side is to show you what's on the right side of the screen

*Testimony of Sean M. Mahan, MD*                                    **85**

1    over here -- that's the T1-weighted image, and this -- what's

2    on the left side of the screen is a T2-weighted image.  You

3    can see very easily how you can see the discs much better on

4    the T2-weighted images than you can on the T1-weighted images.

5    I mean, you can see them on both; you just see them better

6    on -- on the T2-weighted images.

7    Q    Okay.

8    A    And I'm going to just move this.  And I just magnified it

9    to make it easier to see.

10             THE COURT:  The resolution's not as good.

11             THE WITNESS:  Yes.  The larger I make it, the more

12    the resolution deteriorates.  I had to go down in resolution

13    to adapt to the monitor a little bit.  We do have them in

14    higher resolution.

15             But you can see that the disc over here at L4-5 now

16    looks like what the L5-S1 disc looked like back in 2006.  And

17    now you can see that the L5-S1 disc has this intense bright

18    signal inside of the herniated disc, which wasn't present back

19    in 2006.  This bright signal on T2-weighted imaging is one of

20    the findings that suggests that a disc has been recently

21    injured.

22    BY MR. BAILEY:

23    Q    And earlier you told us that that was going to be

24    something that we would get to look at.  What does that bright

25    signal there at that herniated disc in the back indicate?

1  A    Well, in my opinion, that indicates the presence of

2  swelling or edema, that there is some edema inside the

3  herniated disc.  And the reason I say that is because they did

4  a special sequence on this particular patient, which is called

5  a "STIR sequence," and on the STIR sequence, water is

6  intensely bright, and it blackens out almost everything else.

7  And they did that, and that's what this is.  This is a STIR

8  sequence.  You'll notice everything is a little bit blacker on

9  this sequence, but you'll notice that bright signal in the

10 back of the herniated disc is intensely bright.

11      And I'll magnify that as well so that we can see that a

12 little bit better, and I'll put an arrow on the herniated

13 disc.  I'm also going to put an arrow on something else.

14 You'll see that there's this intense bright signal right next

15 to it.  That's actually in a ligament.  There's a ligament

16 that's right there.  It's called the interspinous ligament.

17      And I see this bright signal, which means there's extra

18 water in the interspinous ligament at the exact same level.  I

19 don't see it here, and I don't see it here.  I don't see it

20 anywhere else in the interspinous ligament, just at this

21 level.

22           THE COURT:  So that would be soft tissue?

23           THE WITNESS:  It is.  That's a soft tissue finding,

24 and it shows that there's swelling at the soft tissue at the

25 same level.  So these findings are all consistent with an

*Testimony of Sean M. Mahan, MD*                                87

1    acute injury at that level.

2    BY MR. BAILEY:

3    Q    All right.  And how about that L4-5 disc?  Obviously, you

4    say it's got a different appearance than it did earlier.  How

5    would you characterize that one?

6    A    Well, I don't see the bright signal in the L4-5 disc, but

7    I clearly can see that this disc is sticking out more -- I

8    mean, particularly seen better on the T2 image, which is the

9    best image to look at it.  And I would say that that is a new

10   herniated disc.  We haven't seen that before on previous

11   studies.

12   Q    Now, how do we know when that L4-5 herniated disc

13   occurred, Dr. Mahan?

14   A    Well, what I can tell you with certainty is I did not see

15   evidence of it on the -- on the 2006 MRI, it was normal.  And

16   on the 2012 CT, I didn't see it for certain.  So, in my

17   opinion, this occurred sometime between 1/26/2012 and

18   11/18/2013 just based on the times of these studies, and that

19   is one of the reasons why I believe this is most likely due to

20   the patient's accident.

21   Q    Can we be any more precise than that about aging it,

22   though?

23   A    No.  I can tell you there's no degenerative change.  You

24   can see that the L5-S1 disc is now completely black.  Remember

25   that it was starting to turn black back in 2006.  It's now

*Testimony of Sean M. Mahan, MD*                                    88

1   completely black.  So what that -- that's normally what I

2   expect when a disc has been injured.  It becomes completely

3   black with time.  It's completely black except for where the

4   herniated disc is, and if you remember on the previous study,

5   it was black where a herniated disc was.  It was blacker where

6   the herniated disc is.  This indicates to me that this has

7   been acutely aggravated.  It's been recently aggravated by

8   something.

9   Q    Okay.  Well, let's stay on that L5-S1 disc, then.  And

10  both of -- the acutely aggravated part of the disc material

11  there in the back as well as that interspinous ligament that

12  you identified for us -- do those correlate at all?  The

13  ligament enhancement and the bright signal in the posterior

14  aspect of the herniated disc at L5-S1?

15  A    Yes.  I believe that this patient had an acute injury

16  that affected both of these levels here.  It seems to me that

17  this area withstood the brunt of that injury because I can see

18  that bright signal within the herniated disc.  Also, I can see

19  the bright signal within the ligament at that same level.  So

20  this is likely where the greatest forces were, and then

21  probably the forces were enough to cause this disc to also

22  herniate.

23  Q    And going back to that L4-5 disc and the notion of its

24  appearance with regard to it being bright, light, or darker,

25  does L4-5 look any different to you as a trained radiologist

1  than L3-4?

2  A    I think it's relatively unchanged.  There's clearly this

3  little black dot that I can see here within the disc on this

4  one image.  When I go through the rest of the disc, it's

5  roughly the same.  It may be a little bit darker.  It's also

6  possible that this could be the first area of dehydration

7  that's occurring in this disc from this recent accident.  As

8  you can see, the discs do become darker once they've been

9  injured.

10      Now, the L5-S1 disc we know was previously injured, and

11  now you can see it's completely black.  So we're seeing a nice

12  illustration of this on --

13            THE COURT:  Why do they get darker?

14            THE WITNESS:  Well, what the darkness is dehydration

15  of the disc.

16            THE COURT:  Right.

17            THE WITNESS:  We call it "desiccation."  Beef jerky

18  is extreme desiccation of a piece of steak.  That's what

19  happens.  Now, these are not, obviously, like beef jerky.

20  They're just mild desiccation.

21            There are two reasons for it in my experience that

22  I've seen.  One is it's a normal part of aging.  As we get

23  older, our discs become drier.  The second thing that happens,

24  if you injure a disc, it'll become drier faster because it was

25  injured.  In my opinion, that disc was injured in the past.

*Testimony of Sean M. Mahan, MD*                                    **90**

1   We can see it in 2006.  And that's why it became darker faster

2   than the other discs.

3           THE COURT:  So what is the effect of the dehydration

4   on the spine and related pain?

5           THE WITNESS:  Generally, they don't cause pain at

6   all.  When it does cause pain, we call that "arthritis."  In

7   other words, arthritis is the symptoms of pain related to

8   these -- these findings, which we call "degenerative in

9   nature," although in this case this is an accelerated

10  degenerative due to a past trauma.

11          THE COURT:  Okay.

12  BY MR. BAILEY:

13  Q    A couple last questions about the L4-5 disc on the

14  11/18/13 MRI.  Do we have some axial cuts at that L4-5 level

15  that tell us anything about whether that L4-5 disc is having

16  any affect on the nerve roots?

17  A    Well, I don't know that -- if it's causing effects on the

18  nerve roots because I don't know if the patient is truly

19  symptomatic, but what I can tell you is, when I look at the

20  axial pictures -- and this is what I'm looking at right here.

21  I've -- let me magnify this.  You'll see this yellow line on

22  this screen.  That yellow line is the cut that I'm looking at.

23  So this is the L3-4 disc, which is normal.  And you'll notice

24  the back of the disc at this level -- it's -- this is the

25  disc.  It's not truly oval-shaped.  It's got a dent in the

*Testimony of Sean M. Mahan, MD*                                        **91**

1   back.  So it's shaped like a kidney bean or kidney.  You know,

2   doctors use the word "kidney," of course.  It's shaped with a

3   dent.  That's the normal appearance of a disc at this level in

4   the lumbar spine.

5        At L4-5 we don't have that dent, and, in fact, you can

6   see that the disc is sticking out right there where I put the

7   tip of the arrow.  Not only did we lose the dent, but it's

8   sticking out, and it's worse towards this side.  It's worse

9   towards this side rather than this side, which is the

10  patient's left side.  And you can see the letter L right

11  there.  That letter L stands for left.  That's the patient's

12  left side.

13       When radiologists look at a study, we look at it as if

14  we're looking at a person.  So the left side is on the right

15  side of the screen.

16  Q    Okay.

17  A    So this herniated disc is worse towards the left side.

18  So this may be causing symptoms -- it could be causing

19  symptoms on both sides, the right and left side, but I would

20  expect the symptoms most likely to be worst towards the

21  patient's left side.

22  Q    Okay.  Can we do the same thing at the L5-S1 level and

23  see what it looks like on an axial slice that corresponds?

24  A    Yes.  I'm sliding it down.  You can see the yellow line

25  sliding down towards L5-S1, and when I get to the disc, you

1    can also see that the back of the disc is worse towards this

2    side.

3         And, actually, I'm going to put an arrow on these little

4    black dots.  These black dots are the nerves.  Those black

5    dots -- the nerves are lines of -- they look like spaghetti,

6    and if you cut them in an axial view, they look like a little

7    black dot.  So these black dots are the nerves.  I can tell

8    you the names of these nerves.  This is the right S1 nerve,

9    and this is the left S1 nerve, and you can see that this

10   herniated disc is pressing on that left S1 nerve.

11        Also, you can see the bright signal inside of the disc

12   very nicely on this image -- on this axial view.  That's the

13   bright signal that we see on this T2-weighted image.

14   Q    So that bright signal there towards what I'd call the

15   bottom of the image of the disc on the right side -- is that

16   the same thing we're seeing where the line goes through that

17   bright signal in the protruded part of the L5 disc on the

18   left?

19   A    Yes.  It's exactly the same.

20        Just to be clear, that yellow line is not exact because

21   patients do move sometimes in between these exams.  So it's

22   not an exact positioning.  It's to give you a rough idea of

23   where the patient is.  So it does help us out.  But in this

24   case I believe that that's probably exactly the right level.

25   Q    Okay.  So we're seeing the same thing on two different

1    planes, if you will?

2    A    That's correct.

3    Q    Okay.  All right.  Well, let's move on.  Do any of the

4    subs- -- or later studies of the MRIs of the low back give us

5    any understanding of what happens with either of those two

6    discs, L4-5 or L5-S1?

7    A    Yes.

8    Q    Okay.  Let's talk about that, then.  And just pull up the

9    ones you think tell a story.

10   A    Well, I think what's important to understand is that that

11   bright signal on there reflects inflammation or what we call

12   swelling or edema.  You can have inflammation without trauma.

13   You can have inflammation just from overuse.  So it is

14   possible -- usually what we see after a traumatic event is

15   that swelling goes down and it disappears after a period of

16   time, but it can recur if the patient is having acute

17   exacerbations of their symptoms, possibly from overuse, or it

18   could be from another accident.  They could have another

19   accident, and that is possible.  So we always have to consider

20   that possibility.

21        When I look at these images in 2015, I can see that the

22   discs -- and this is the image from 2015.  Let me open this up

23   a little bit.  You can see these discs are sticking out.  They

24   may have actually improved a little bit, but at L5-S1 I don't

25   see any bright signal anymore.  It's completely gone on the

1    2015 study.  There may be a small amount of bright signal now

2    in the L4-5 disc.  So that suggests that the disc may be

3    getting -- may have been acutely aggravated at the time this

4    MRI was performed.

5         Also note the desiccation that's present.  L5-S1 is still

6    almost completely black, and L4-5 is now becoming darker than

7    the other disc levels.  You can now start to visibly see that.

8    So that is what we expect to see with time from injured discs.

9         Then, when I go to the 2016 study, I can see the

10   herniated discs at L4-5 and L5-S1, and the bright signal has

11   come back in the L5-S1 disc.  So that suggests to me that this

12   is now either acutely reaggravated or this patient has had a

13   new trauma.  It's one of the two.  So either the person has an

14   overuse now process or the patient has a new injury.  However,

15   this bright signal in L5-S1 is not as bright as it was in

16   2013.

17   Q    What does that tell you?

18   A    Well, it's not a definitive finding, but it suggests that

19   the herniated disc was more likely to have been acutely

20   injured back in 2013 and that this is an acute aggravation

21   that's been caused possibly by overuse or a new injury.

22   Q    I want to put up that last MRI image and then go back and

23   kind of talk about them collectively.  I think it's April of

24   '17.

25   A    April 2017.  This is April 2017, and now we again see

1    these herniated discs.  Here's the one at L4-5, and now you

2    can see that the disc is continuing to become blacker.  It's

3    becoming more dehydrated.  That's at L4-5.  Clearly it's now

4    darker than the other levels, which is what we expect in an

5    injured disc with time.  We've seen it at L5-S1; now we're

6    seeing it at L4-5.  So, in other words, if L4-5 was injured in

7    2006, I would expect it to be as black as L5-S1 is in 2013.

8        I think that the L4-5 disc was most likely injured in

9    2013 based on this one finding alone, the fact that I can

10   follow this desiccation.  Actually, there are two findings:

11   One is that the herniated disc was new, and the second one is

12   I can see this rapid development of the desiccation at that

13   level.

14   Q    Well, let me understand that, Dr. Mahan.  Would you

15   expect without any trauma or injury to the disc that you'd see

16   the degree of progression or degeneration that we see between

17   November 18, 2013, and April of 2017 at L4-5?

18   A    Well, I would say it's not unusual for a person in their

19   60s, but for a person in their 30s, this is -- this is

20   unusual.

21            THE COURT:  So it's not related to normal aging?

22            THE WITNESS:  That is correct.  Similar to the way

23   it's not unusual for a person in their 60s and 70s to have

24   heart problems, but for a person in their 30s, it's unusual.

25   BY MR. BAILEY:

*Testimony of Sean M. Mahan, MD*                                    **96**

1   Q    Okay.  And how about -- how about the condition of the

2   discs there at L5-S1 on that last study, the April of 2017?

3   Is it changing significantly from the earlier studies?

4   A    Well, you can see that the herniated disc doesn't look as

5   prominent.  So it may have improved a little bit in size

6   but -- and I do see that there may be some bright signal right

7   in here.  It looks like there's some bright signal inside that

8   herniated disc, but clearly it's less.

9        So this patient is getting these follow-up MRIs.  They're

10  likely getting these follow-up MRIs because their back pain is

11  probably fluctuating and coming and going, and they're

12  rescanning them when it comes back, which is why we're seeing

13  this bright signal there.  This is a pattern that I typically

14  see in patients that are trying to not have surgery.  They're

15  trying to treat it medically, and then they have these acute

16  aggravations, and the doctors want to make sure that the

17  patient has not developed a significant worsening, which is

18  why they get the follow-up MRIs.

19  Q    Overall -- taking all of that into consideration,

20  Dr. Mahan, tell us what your opinion is about the L4-5 disc as

21  it relates to this accident of October 28, 2013.

22  A    Well, I believe that this patient has a new herniated

23  disc that I see on November 2013, and I believe that after

24  that date we see a rapid development of degeneration there, as

25  evidenced by this desiccation, and I believe that it's most

*Testimony of Sean M. Mahan, MD*                                    **97**

1   likely that that herniated disc occurred around the time of

2   the MRI of November 2013.  So I believe that it was most

3   likely related to the patient's accident of 10/28/13.

4       And I believe that the L5-S1 disc preexisted this

5   patient's accident, but I believe that it was acutely

6   aggravated because we start seeing this bright signal, and we

7   see the bright signal come and go after that date.  So we know

8   that this patient probably has better days and worse days.

9   Q    But does the bright signal at L5-S1 ever get as bright

10  after November 18, 2013, as it was on that day?

11  A    No.  That's the day that it's clearly the brightest.

12  Q    The opinions you have, Dr. Mahan, particularly with

13  respect to the condition of these L4-5 and L5-S1 discs and

14  their relationship to this auto accident of October 28, 2013,

15  do you hold those within a reasonable degree of medical

16  probability or certainty?

17  A    Yes.  I -- I've taken the data that I see, I've tried to

18  process the data, and I've made these conclusions, I believe,

19  within a reasonable degree of medical probability.

20  Q    Dr. Mahan, I just want to make sure that there's nothing

21  about your evaluation of these various imaging studies that

22  I've neglected to ask you that you think is significant to our

23  understanding of Jeffrey Brisebois's condition.  Is there

24  anything that I've missed?

25  A    No.  That's it.

*Testimony of Sean M. Mahan, MD*                                    **98**

1      MR. BAILEY:  All right.  In that case, I'll leave

2   you be.  Ms. Posteraro will have some questions.

3      THE COURT:  Okay.  How long do you anticipate your

4   cross?

5      MS. POSTERARO:  In all candor, I'm not sure,

6   Your Honor.

7      THE COURT:  Well, in that case, in all candor, let's

8   go ahead.  I was going to see if we want to take a lunch break

9   but --

10      MS. POSTERARO:  I would very much like to take a

11   lunch break.

12      THE COURT:  Well, I know you'd like to, but, of

13   course, it's whether we need to.

14      MS. POSTERARO:  Just ignore the rumblings.

15      THE COURT:  I mean, I assume Dr. Mahan is charging

16   by the hour or by the appearance?

17      THE WITNESS:  Well, I charge for the half day, but

18   if we go into the afternoon, we'll charge for the full day

19   because I'll have to make phone calls and let people know that

20   I won't be back.

21      THE COURT:  Well, we better keep going.

22      MR. BAILEY:  I'd like to avoid that.

23                    CROSS-EXAMINATION

24   BY MS. POSTERARO:

25   Q    If I understand your testimony correct -- Dr. Mahan?

*Testimony of Sean M. Mahan, MD*                                    **99**

1    Mahan?

2    A    Either way is okay with me.  Those both sound good.

3    Q    You're not a clinician; is that correct?

4    A    I don't practice clinical medicine.  That's correct.

5    Q    So in your role as a radiologist, you primarily review

6    films?

7    A    Yes, ma'am.

8    Q    You don't engage with the patients; is that correct?

9    A    Very unusually.  I would say three or four times a year

10   at the most.

11   Q    It's not common in your practice to review other medical

12   records for a patient whose studies you are reviewing; is that

13   correct?

14   A    That is correct.

15   Q    And in this case -- at the time you rendered your

16   opinions in this case, you hadn't, in fact, reviewed other

17   records; is that correct?

18   A    That is correct.

19   Q    You looked at the images and described what you saw in

20   those images; is that correct?

21   A    Yes, ma'am.

22            THE COURT:  Is it -- is my recollection correct that

23   you really don't want to be biased when you look at the film?

24   You don't want to know what the complaints are?

25            THE WITNESS:  Well, it's good to know some basic

1    history to know why I'm -- the examination was performed, but

2    I would prefer not to know anything else.  In fact, the less I

3    know, I think, the better.

4         THE COURT:  Because it creates bias ahead of your

5    review.

6         THE WITNESS:  Yes.

7         THE COURT:  In other words, it caused you to look

8    for something before you look at it.

9         THE WITNESS:  Well, it can be helpful, for example,

10   if I know a patient has right lower quadrant pain, I will

11   focus and find the appendix and make sure I see either a

12   normal or abnormal appendix or I don't see the appendix at

13   all.  So, you know, it is helpful to know some basic history

14   to come up with a good diagnosis, but it's always -- in my

15   opinion, the less you know about things, such as a medicolegal

16   issue, the better.  Unfortunately, in this case I did know

17   about the medicolegal issue when I was starting my involvement

18   in the case.

19        THE COURT:  Okay.  And I guess she's going to get to

20   that.

21   BY MS. POSTERARO:

22   Q    All right.  The images you were looking at are pictures

23   taken at a time certain; is that correct?

24   A    Yes.  That is correct.

25   Q    So what you're seeing in that image is a scene of what's

1   representative of what's going on in that image on that

2   particular date; is that correct?

3   A    That is correct.  It's like a snapshot in time.

4   Q    The images themselves do not inform you on causation; is

5   that correct?

6   A    I believe that they are helpful in forming causation, but

7   you need to have the clinical information to create an opinion

8   on causation.

9   Q    And in this case you didn't have a clinical -- any

10  clinical records when you reviewed the images; is that

11  correct?

12  A    It was very basic clinical information.  It was clinical

13  information that I could obtain from the reports of the

14  radiology studies, which do include some basic clinical

15  information, but it's very basic.

16  Q    And information provided to you by Plaintiff's counsel;

17  is that correct?

18  A    That's correct, although I don't regard that information,

19  although I do -- I try not to.  Let me just say that.  But I

20  will say that the conclusions that I make -- I always try to

21  put the caveat that the clinical doctors need to make the

22  final confirmation because they know far more clinical

23  information than I do.

24  Q    So, for instance, when looking at an image, you could

25  tell me that someone's leg is broken; right?  But you couldn't

1    tell me whether they broke their leg jumping out of a tree or

2    jumping off a roof; is that right?

3    A    Well, if somebody told me that the person fell out of a

4    tree, then I could tell you that it's most likely that this

5    broken leg occurred from falling out of a tree.  But if a

6    person told me that a person fell out of a tree and they

7    didn't hurt their leg and the EMTs got there and they got into

8    a fight and then the guy couldn't walk afterwards, I would say

9    that it's likely the patient broke their leg from the fight.

10   So certainly additional information is helpful.

11   Q    So your reading of images is helpful in corroborating a

12   clinician's determinations; is that correct?

13   A    I would agree with that.

14   Q    Now, you did not talk to Mr. Brisebois; is that correct?

15   A    That's correct.  I've never met him and never spoke with

16   him.

17   Q    But you received a letter from Mr. Bailey, Plaintiff's

18   counsel; is that correct?

19   A    That is correct.  I did see that letter this morning.

20   Q    Well, you received it when you -- well, you saw it when

21   you received it; right?

22   A    Oh, I did, but I meant that I saw it again.  So I do

23   remember seeing the letter.

24   Q    You reviewed it this morning?

25   A    I just looked at it.  I didn't review the letter itself.

1    Q    How do you distinguish between the understandings of

2    "looked at" and "reviewed"?

3    A    Well, I only looked at the top that said Bailey Fisher.

4    So I remember I got the letter from them.  That's all I'm

5    saying.  I didn't actually read the letter again this morning.

6    Q    Okay.  And what's the date of that letter?

7    A    October 2, 2017.

8    Q    When you got that letter, did you review it?

9    A    Of course I did.

10        MS. POSTERARO:  Your Honor, the United States has

11   marked the letter from Mr. Bailey to Dr. Mahan as Defense

12   Exhibit 16.  There's been some objections to that exhibit, but

13   we would like to admit that exhibit into evidence.

14        MR. BAILEY:  I'll withdraw the objection, Judge.

15        THE COURT:  All right.  I'll admit out of order

16   Defendant's Exhibit 16.

17        MS. POSTERARO:  Thank you, Your Honor.

18        (Defendant's Exhibit No. 16 was admitted into evidence.)

19        MS. POSTERARO:  Ms. Medina, can you please display

20   Exhibit 16, Bates 02948 to 02949.

21   BY MS. POSTERARO:

22   Q    Now, in this letter that you received from Mr. Bailey

23   dated October 2, 2017, he forwards to you the images he wants

24   you to review; correct?

25   A    That is correct.

1   Q    And he later sent you some additional medical records; is

2   that right?

3   A    That's correct.  As you can see on the letter, there are

4   only five things listed.  In my report I had seven items on

5   it.

6   Q    Right.  And then he sent you some additional medical

7   records -- is that correct? -- in addition to the images.

8   A    He did, yes.

9   Q    At the time that you reached your conclusions in this

10  case, you had not yet reviewed those documents; is that

11  correct?

12  A    That is correct.

13  Q    So at the time you wrote your opinions, you knew what

14  Mr. Bailey had told you as background for this case; is that

15  correct?

16  A    That wasn't the only thing I had.  I did have the reports

17  as well, but I did have that -- that is where I got -- I

18  certainly received information from this letter.

19  Q    And Mr. Bailey tells you that Mr. Brisebois was riding

20  his bike in Edgewater, Florida, on October 28, 2013, and was

21  hit by a mail truck; is that right?

22  A    That's what it says on here, yes.

23  Q    He describes the impact as modest; is that correct?

24  A    That is correct.

25  Q    And then Mr. Bailey tells you that Mr. Brisebois had

*Testimony of Sean M. Mahan, MD*                                    **105**

1  significant low-back pain since the accident happened; is that

2  correct?

3  A    That's correct.

4  Q    Mr. Bailey does not provide you any of the particulars of

5  the accident; is that correct?

6  A    That's correct.

7  Q    And there's no estimates of speed provided; is that

8  correct?

9  A    That's correct.

10  Q    No description of the impact besides the word "modest"?

11  A    That's correct.

12  Q    There's no information included as to where Mr. Brisebois

13  was impacted --

14  A    That is correct.

15  Q    -- or whether he impacted the ground; is that right?

16  A    That is correct.

17  Q    Mr. Bailey acknowledges Mr. Brisebois's preexisting

18  injury to his low back in 2006; correct?

19  A    He does mention an injury in Connecticut in 2006.

20  Q    Well, he says an injury to his low back; right?

21  A    Yes.

22  Q    Mr. Bailey also tells you in this letter that "However,

23  the accident of October 28, 2013, significantly aggravated his

24  preexisting condition to the point that Mr. Brisebois has

25  constant pain"; is that correct?

1   A    Yes.

2   Q    In your report from October 10, 2017, you make a note

3   that Mr. Brisebois was -- had experienced new symptoms of

4   worsening pain; is that correct?

5   A    That is correct.

6   Q    Okay.  But you're unable to describe that worsening pain;

7   is that right?

8   A    That is correct.

9   Q    And you produced not one but two reports -- is that

10  right? -- in this case.

11  A    I do remember that, yes, because I had additional

12  information provided.

13  Q    So you produced one report with Plaintiff's expert

14  disclosure on April 20, 2017; is that correct?

15  A    I believe that's correct.

16  Q    And then you produced a later report in January 2018; is

17  that correct?

18  A    Yes.

19  Q    And the difference between these two reports is that your

20  first report was not written with the inclusion of

21  Mr. Brisebois's January 2012 CT scan; correct?

22  A    That is correct.

23  Q    And then, after you were provided with the

24  January 12th -- excuse me -- January 2012 CT, you produced a

25  second report; is that right?

1    A    Yes.  I made changes to show that I reviewed that.

2    Q    Your conclusion, however, didn't change; is that right?

3    A    That's correct.  I didn't see anything on that CAT scan

4    to change my opinion.  It just further confirmed my opinion.

5    Q    And your opinion is that at the -- with respect to the

6    L5-S1 disc space, that there existed a herniation of the disc,

7    a condition that was evident from the -- as early as the

8    July 2006 MRI?

9    A    Yes.

10   Q    And it's possible that there was a herniation at the

11   L4-L5 disc level in the January 2012 CT but that you just

12   didn't see it; is that correct?

13   A    I would have to say that that is correct.  We don't see

14   herniated discs as well.  I don't see a herniated disc.  The

15   disc does look a little different, so there may be a process

16   going on there, but I can't conclusively say that there's a

17   herniated disc.  But it's possible it -- there could be

18   something going on there.  Had he -- this patient gotten an

19   MRI at that time, it might have provided additional

20   information.

21   Q    In your expert opinion, it looks like there could be

22   something going on there?

23   A    Yes, there could be.

24   Q    Now, you spoke about a bright signal on the November 18,

25   2013, image; correct?

1    A    Yes.

2    Q    And it's your testimony that this bright signal was not

3    visible on any imaging prior to 2013; is that correct?

4    A    Yes.  But in all fairness, we really would have only seen

5    it on one study, and that's the 2006 MRI, which it isn't

6    there.

7    Q    Okay.  Your testimony is that you don't see the bright

8    signal on the 2006 MRI?

9    A    Correct.

10   Q    Now, the bright signal is a sign of edema, you testified;

11   is that correct?

12   A    I believe in this case it's edema.  In accordance with

13   the medical literature, we don't know for sure, but in this

14   case they did a special sequence for edema, and we see the

15   bright signal at the exact same place.  So I believe that it

16   is edema in this -- in this case.

17   Q    Can you describe what you mean by "edema."

18   A    Well, "edema" is the same word as "swelling."  So

19   swelling -- the swelling that you get when you sprain your

20   wrist or sprain your ankle and it gets puffy -- that's edema.

21   So in this case we see a focal area of edema right where the

22   herniated disc is, and we also see edema in the soft tissues

23   in the back of the spine at that same level.

24   Q    So the same way -- if I banged my elbow, I might see some

25   swelling in the area where I banged it; correct?

1   A    That's correct.  And you could say that that's edema.

2   Q    But eventually that swelling usually goes down; is that

3   right?

4   A    Absolutely.

5   Q    Is the edema you see the result of an annular fissure?

6   A    Whenever you have a herniated disc, there's always an

7   annular fissure.  So this patient had an annular fissure back

8   in 2006 at L5-S1 because he has a herniated disc.  Now, I

9   don't believe that -- I don't know if the bright signal in

10  this case is due to an annular fissure or not, but I believe

11  that it probably is due to new tearing of the annulus or new

12  fissuring of the annulus that has been caused.  That is my

13  belief.  That's not from the medical literature.

14  Q    I'm sorry.  I want to make sure I got that.  So your

15  belief is that the swelling is from a new annular fissure?

16  A    Yes.  I believe that this patient has new injuries, which

17  is causing this swelling.

18  Q    And an annular fissure on top of an annular fissure; is

19  that right?

20  A    Basically, there's more fibers of the annulus that have

21  been torn.  In other words, there are hundreds of fibers of

22  the annulus.  We know that this patient had it there before

23  because we had a herniated disc before, but you can't see the

24  annular fissures at that time.  At this time we can see the

25  swelling around the annular fissure.  In other words, you

1    don't actually see the annular fissure; you really see the

2    swelling associated with the annular fissure.  That's what I

3    believe this is.

4    Q    And how is that swelling formed?

5    A    Well, swelling occurs due to an immune process in the

6    human body where white blood cells come to an area of injury,

7    and they actually explode and release these things called

8    "histamines," which is what causes swelling, and it's why we

9    take a drug called an "antihistamine" when you have allergic

10   reactions to decrease swelling.

11   Q    So the histamines caused the swelling?

12   A    The histamines are the body's response to try to fix a

13   problem.  So these things occur whenever you have any kind of

14   problem.  So if you have a cancer, your body will try to fight

15   it and release these histamines.  If your body has an

16   infection, it -- it does the same thing.  If your body has an

17   allergic reaction, it does it, and if your body has a

18   traumatic injury, it also does this.

19   Q    So edema is not only the result of an acute injury; is

20   that right?

21   A    That is correct.

22   Q    Now, you didn't investigate other causes between

23   Mr. Brisebois's 2006 MRI and his 2013 MRI for other possible

24   causes; is that correct?

25   A    Well, I wouldn't say that I didn't investigate it.  I

1   certainly took into consideration the other possible things

2   that could be causing these findings, which I always have a

3   differential diagnosis that includes things like cancer and

4   infection in normal variance.  So I certainly considered those

5   things.  But what I didn't investigate -- I don't know that

6   this patient didn't have other traumatic injuries and things,

7   which always can exist.  And similar to the analogy I gave

8   earlier about the person who fell out of a tree, I don't know

9   about other things that could have happened, like the patient

10  got into a fight with the EMTs.  I don't know those things.

11  And if that information was given to me, of course I will

12  change my opinion.

13  Q    And are you looking for things that are necessarily

14  violent, traumatic events, or can it be something that can be

15  more subtle?

16  A    Well, I don't know what you mean by that exactly.  I

17  mean, a -- I just look for -- to see if there's changes in the

18  anatomy, really.

19  Q    Right.  So my question is maybe an aggressive golf

20  swing -- could that cause the sorts of conditions we see?

21  A    Oh, absolutely, particularly if the disc is already

22  desiccated and degenerated as this disc is.  The patient could

23  have an aggressive golf swing that could pop the disc and

24  cause a herniated disc.  That is of course possible.

25  Q    What about someone who is actively involved in sports?

1    Basketball, football, those sorts of things -- could that

2    result in this sort of injury?

3    A    Of course.  You can have a sports injury very easily.

4    Q    What about running?  Could that cause this sort of

5    injury?

6    A    Yes.  I have seen people who run and had injuries,

7    particularly if they have degeneration.

8    Q    What about sit-ups?  Could that cause this sort of

9    injury?

10   A    Of course.  Any kind of exercise can do it.  We normally

11   don't consider exercise to be bad, but anyone who has -- who

12   exercises on a regular basis knows that it's not unusual to

13   get an injury.

14   Q    Now, most causes of disc herniation is normal

15   degenerative aging; is that correct?

16   A    Yes.

17   Q    Okay.  The second most common form is a traumatic event;

18   correct?

19   A    That is my -- that is what I know from the medical

20   literature.  Of course.

21   Q    Okay.  And -- and any traumatic event, which would

22   include a nontraumatic event that would normally not herniate

23   a disc, may cause a disc herniation that's already weakened by

24   degeneration.  Is that fair to say?

25   A    Yes.  Once a disc has been degenerated, it's more

1    susceptible to getting a herniated disc.

2    Q    And to be clear, your position is that a desiccated disc

3    is more likely to herniate than a nondesiccated disc?

4    A    Yes.  If you have five discs and four of them are

5    healthy -- that's, like -- they're closer to, like, an

6    18-year-old -- those are probably going to withstand an injury

7    better than the disc that's already desiccated.  So a lesser

8    injury will -- can injure that disc.  It's why we try to

9    encourage football players to retire as they get older,

10   because they're more prone to getting an injury.  It's why we

11   don't like it if elderly people take up playing tackle

12   football, because they're more prone to injury.

13   Q    Now, you acknowledged today on the January 2012 CT that

14   there may be something going on with Mr. Brisebois's L4-L5

15   disc; is that correct?

16   A    Yes.

17   Q    Okay.  And your report from both October 10, 2017, and

18   January 2018 you noted that a specific -- excuse me -- a

19   specific evaluation of the discs demonstrate that the L4-L5

20   disc is normal.

21   A    Yes.  I had to make a conclusion, and my conclusion is

22   that it's probably normal.

23   Q    It's probably normal?

24   A    Yes.

25   Q    Did you reach that conclusion with -- to a medical degree

*Testimony of Sean M. Mahan, MD*                                    **114**

1  of certainty?

2  A    Yes.  I would say that it's more likely to be normal, but

3  I did point it out that it's possible there could be some

4  bulging that is developing at L4-5.  It's difficult to tell on

5  the CT scan to be with a definite degree of certainty, but I

6  would say that, if I have to choose between the two, I would

7  say it's likely normal.  I certainly do not see a herniated

8  disc there for certain.

9  Q    Okay.  And you can't determine at this point a cause of,

10 you know, something going on as a result of -- excuse me.  At

11 the L4-L5, which is something -- the something that's going on

12 in the January 12th -- 2012 CT; is that correct?

13 A    That's correct.  It would have been better had they

14 done -- in other words, it's not really the best test for

15 evaluating the disc.  So had they done an MRI, I certainly

16 could have made a better conclusion.

17 Q    Were you aware that CT was done by an emergency

18 department order?

19 A    I do remember seeing the report, yes.

20 Q    Okay.  And as a typical course for something like this,

21 that if someone comes to an emergency department voicing back

22 pain -- severe back pain, that you order a CT in the first

23 instance to get a quick evaluation of what's going on in the

24 patient's spine; is that correct?

25 A    Well, I don't really want to comment on what happens in

1   the emergency room because it's really out of my specialty

2   area, but based on what I -- you know, you have to take into

3   consideration what's going on.  The main reason to get a

4   CAT scan is usually if you're looking for a broken bone.  And

5   if the patient doesn't have a history of trauma, it's unusual

6   that they would just get a CAT scan.  It is also possible they

7   may have done the CAT scan because it was the only test they

8   had available in the emergency room, which is also quite

9   common.  So I don't really want to try to think about what was

10  going on in the ER doctor's head at the time.

11  Q    It would not be, you know, unusual or it wouldn't

12  surprise you if, following a CT scan, a patient would be

13  referred to a specialist for follow-up for an MRI; is that

14  correct?

15  A    I would think that that's typical, in fact.

16  Q    Are annular fissures permanent?

17  A    Generally, we think of them as being permanent injuries

18  to the spine, but they typically are associated with herniated

19  discs, and we know that only through autopsy studies.  In

20  other words, we only know that by doing autopsies on people

21  with herniated discs.  They always have annular fissures.  But

22  we do also know that herniated discs can go away, but,

23  generally, the tear of the annulus is a permanent injury.

24  Q    When one sees a bright signal in the MRI, such as the one

25  you say you saw on the November 2013 image, how long does that

1   typically last?

2   A    Well, I will tell you that it's variable.  In the medical

3   literature, they report that this can persist for four months.

4   I also have seen it -- the medical literature say that edema

5   can dissipate within 72 hours.  So we have -- we have the

6   medical literature saying anywhere from three days to four

7   months.

8         I will tell you that in my history I have seen people --

9   because they have to use their back on a daily basis, I've

10  seen this bright signal persist for years in my history.  I do

11  know in this case in 2015 we do have a scan in which the

12  bright signal is completely gone by 2015.

13  Q    So we know sometime between 2013 and -- November 2013 and

14  the MRI done in 2015 it -- the bright signal went away?

15  A    That's correct.

16  Q    But we can't say when within that time period it went

17  away; is that correct?

18  A    Yes, that is absolutely correct.

19  Q    Did I hear your testimony correct, Dr. Mahan, that

20  herniations can get worse depending on the day the person is

21  having?

22  A    Well, what I meant by that is that, if a person is

23  overusing their back, it can get worse, and that can happen on

24  a day-to-day basis, certainly.

25  Q    And that would be reflected in the imaging?

1  A    It may be, and I believe in this case that's what we're

2  seeing.  In other words, the patient may have done, as you

3  said, you know, overexercised or something, and now all of a

4  sudden they're having back pain.  They go to the doctor; they

5  get a follow-up MRI to make sure things are stable or they

6  haven't blown out.  Maybe the patient has a massive herniated

7  disc that now requires surgery, which we see that sometimes.

8  And that's usually why they get that scan, just to make sure

9  that isn't happening.  And what we will sometimes see is we'll

10  see this new inflammation there because -- and that's what

11  we're seeing, I believe, in this scan.  We see that this

12  bright signal comes and goes in this patient, and I believe

13  that they're acutely aggravating that back.

14  Q    How, in your opinion, Dr. Mahan, does one acutely

15  overaggravate their back?

16  A    Well, I believe it's -- you know, typically, I think of

17  an aggravation as being -- as doing too much, in other words,

18  overexercise.  All of a sudden a patient decides to take up

19  running, and they -- they're running ten miles when they've

20  never done that before in their life.  Usually these kind of

21  findings are associated with what we call "overuse injuries."

22  The most common overuse injury is something called a "stress

23  fracture," where you actually are breaking the bone, but you

24  can't even see it on the X-ray.  You need an MRI to see that.

25  But, also, you can do a similar thing with the discs of the

*Testimony of Sean M. Mahan, MD*                                      **118**

1    back.

2    Q    How are you certain that the bright signal that appears

3    in 2013 is not the result of overuse?

4    A    I'm not certain.  I'm basing it based on a -- on what I

5    believe is most likely based on a conglomeration of the

6    evidence.  I see a clear new herniated disc at L4-5.  It's

7    clear in 2013.  I see that that herniated disc at L5-S1 has

8    bright signal on it, which wasn't present in 2006, and now

9    that disc is completely black.  I see the swelling in the soft

10   tissues adjacent to the L5-S1 disc, that that swelling --

11   that's there.  And then on the follow-up studies, I see that

12   these discs become more black with time.  And it -- all these

13   findings in a person of this age -- the age is important on

14   this patient, which suggests to me that these discs were

15   injured around the time of that November 2013 MRI.

16   Q    But if I understand your testimony correctly, we don't

17   know how that injury happened; correct?

18   A    That's correct.  And I'm saying this within medical

19   probability, not with -- in other words, I'm not saying that

20   I'm definitely sure of this.  I'm saying that that's the most

21   likely conclusion.

22   Q    It could also have been caused by running in or about

23   that time frame; correct?

24   A    Absolutely.

25   Q    Or, as we mentioned, sports, basketball, football, that

1   sort of thing?

2   A    That's correct.

3   Q    Boxing?

4   A    That's correct.

5   Q    And in approximately 200 times you've testified,

6   Dr. Mahan, either by deposition or trial, you've testified for

7   the defense one time; is that correct?

8   A    That is correct.

9   Q    And you have one publication from the '90s when you were

10  doing your residency in diagnostic radiology; is that correct?

11  A    Yes.

12  Q    Any other publications?

13  A    No.  I actually try to not do publications only because

14  of the time requirement.  I have dreams of doing it.

15        MS. POSTERARO:  Thank you.  I have no further

16  questions.

17        THE COURT:  Redirect.

18        MR. BAILEY:  Very briefly, Judge.

19        THE COURT:  Brief would be good.

20                  REDIRECT EXAMINATION

21  BY MR. BAILEY:

22  Q    The findings at the L4-5 and L5-S1 discs -- am I

23  remembering correctly they were both predominantly left-sided?

24  A    Yes.  We can see that on the axial views.  You can see

25  that they're predominantly on the left side.

1  Q    Would the findings in both discs be consistent with

2  Mr. Brisebois's complaints that his radiating pain has

3  primarily been left-sided?

4  A    That is consistent.  I'm not saying that that's the

5  situation; I'm saying, if that were the case, it would be

6  consistent.

7  Q    Can you also have bilateral radiating pain with discs of

8  this condition and configuration?

9  A    Yes.  Because we can see that it's actually affecting

10  both the right and left sides.  It's just worse on the left.

11  Q    Ms. Posteraro asked you about whether this bright signal

12  we see at L5-S1 that is, you know, brighter on the

13  November 18, 2013, study than it is later on could be related

14  to different kinds of activities.  Is it consistent with the

15  facts of this accident where Mr. Brisebois is hit from the

16  front by a mail truck and then breaks off a mounted pot mirror

17  on the left side of the vehicle with the upper part of his

18  body?

19  A    Well, it does make sense to me.  I mean, that's a -- a

20  typical type of injury in which a person gets this.  I'm not a

21  biomechanics expert; so I don't know that this is consistent

22  with that injury or not.  But based on what I'm hearing and

23  based on what I'm seeing, it seems like that type of accident

24  could result in this.

25  Q    Do you have any knowledge that Mr. Brisebois had any

1   other trauma or overuse or aggravation that would have caused

2   that bright signal to appear at L5-S1 --

3           THE COURT:  Yeah.  I can't hear a thing you're

4   saying if you're sitting down.

5   BY MR. BAILEY:

6   Q    Do you have any information, Dr. Mahan, that

7   Mr. Brisebois had any trauma, overuse, unusual event, anything

8   at all that happened in his life around the time of this

9   accident of October 28, 2013, that would otherwise explain the

10  presence of that bright signal at L5-S1?

11  A    No.  And if I was given that information, I might change

12  my opinion.  My opinion is based on the information that I

13  have.

14  Q    We know that it existed on November 18, 2013.

15  A    That's correct.

16  Q    Okay.  The accident we're concerned with happened, I

17  think, almost exactly three weeks earlier, October 28, 2013.

18  Is the nature of the bright signal you see at L5-S1 consistent

19  with that time frame?

20  A    I would say it's consistent, yes.

21  Q    How about the bright signal in that interspinous ligament

22  that you referred to that -- at the same level, L5-S1?

23  A    Yes.

24  Q    Is it consistent with that timing?

25  A    Yes, sir.

1          MR. BAILEY:  That's all I have.

2          THE COURT:  All right, Doctor.  Thank you for

3    coming.  I appreciate your time.

4          THE WITNESS:  Thank you for keeping me over lunch.

5          THE COURT:  By the way, we have some things in

6    common.  I went to William & Mary and was admitted to UVA law

7    school but decided I couldn't stand Virginia winters anymore,

8    so I came back to Florida.

9          THE WITNESS:  Yeah.  I'm with you, by the way.  I'm

10   not going back to Virginia.

11         THE COURT:  Okay.  Well, thank you, sir, for being

12   here.

13         THE WITNESS:  Thank you very much.

14         THE COURT:  All right.  We're going to take a lunch

15   break.

16         Do we have another witness at 1:00, or can we take a

17   little bit longer?

18         MS. POSTERARO:  We do have another witness at 1:00,

19   Your Honor.  I would be more than happy to talk to Dr. McGrail

20   and see if maybe we can start a little bit later.  I don't

21   anticipate that he's going to be on the stand maybe as long as

22   some of our other witnesses this morning.

23         THE COURT:  Well, I'm going to try to give the staff

24   a little bit of a lunch break.  Can we maybe start at 1:15?

25         MS. POSTERARO:  That would be ideal.  Thank you,

1   Your Honor.

2           MR. BAILEY:  Judge, I do want to take up some issues

3   with the Court about Dr. McGrail's testimony before he goes

4   on.

5           THE COURT:  All right.

6           MR. BAILEY:  I mentioned those in passing yesterday.

7           THE COURT:  All right.  Well, we'll let Dr. Mahan

8   go, and then tell me what your concerns are.

9           MR. BAILEY:  Yes, sir.  The Court has limited

10  Dr. Brown's testimony for reasons that relate to disclosure

11  issues under Rule 26.  I would ask the same consideration with

12  respect to Dr. McGrail and that he be limited to the four

13  corners of his report.

14          The Court has it on file.  He's basically rendered

15  three opinions on the last page of his report, the first being

16  that --

17          THE COURT:  I need to resee it.

18          MR. BAILEY:  Yes, sir.

19          THE COURT:  I don't process things well without

20  looking at it.

21          MR. BAILEY:  I have my copy here.  I highlighted the

22  opinions that -- I read them --

23          THE COURT:  Well, I tell you what.  It's 12:30.

24  Let's take a lunch break.

25          MR. BAILEY:  All right, sir.

*124*

1          THE COURT:  I work during lunch.  So I'm going to go

2     back and work.  You-all can have lunch.  I'll see you at 1:15.

3          MR. BAILEY:  Very good.

4          MS. POSTERARO:  Thank you, Your Honor.

5          MR. BAILEY:  Thank you, Judge.

6        (Recess at 12:28 p.m. until 1:18 p.m.)

7          THE COURT:  Okay.  I've reviewed the McGrail report.

8     I made my own copy of it.  And the report's dated

9     November 13th of 2017, and I assume Dr. McGrail was disclosed

10    as an expert witness?

11         MS. POSTERARO:  Yes, Your Honor.

12         THE COURT:  And that report, in my opinion, complies

13    with Rule 26(2)(B) in that it sets forth Dr. McGrail's

14    opinions, the facts and data -- or the facts and -- the basis

15    for his opinions, the facts and data that he reviewed and

16    relied upon, his qualifications and publications and prior

17    testimony, all of which is required by Rule 26, and none of

18    which was supplied by Dr. Brown.  So I find no problem with

19    respect to Dr. McGrail.  So let's proceed with the testimony.

20         MR. BAILEY:  Your Honor, if I might.  Just a point

21    of clarification and for the record, the three paragraphs

22    under the opinion heading on the last page of Dr. McGrail's

23    report are the ones that I see opinions generated or rendered

24    in, and the opinions that I see there are that "The disc

25    degeneration seen on MRI scan of lumbar spine performed

1  November 18, 2013, approximately three weeks following the

2  collision with a U.S. postal truck, was not new and" --

3          THE COURT:  Yeah.  I've read it.  Don't read to me.

4  What's your point?

5          MR. BAILEY:  Well, my point is, Judge, is he going

6  to be limited to those three opinions in those three

7  paragraphs?

8          THE COURT:  Yes.  He's basically limited to the

9  opinions disclosed, and if he goes beyonds that, you're free

10 to object.

11         MR. BAILEY:  All right, sir.  Thank you.

12         THE COURT:  All right.

13         MS. POSTERARO:  The United States calls

14 Dr. Kevin McGrail.

15         THE COURT:  All right.  Let's proceed.

16         THE COURTROOM DEPUTY:  Sir, if you could please

17 stand and raise your right hand, I will place you under oath.

18                  KEVIN M. McGRAIL, MD,

19 was called as a witness on behalf of Defendant and, having

20 been duly sworn, testified via videoconference as follows:

21         THE WITNESS:  I do.

22         THE COURTROOM DEPUTY:  Thank you, sir.  You may be

23 seated.  And please speak your name for the record and spell

24 your last name.

25         THE WITNESS:  My name is Kevin McGrail.  Last name

1    is spelled M-c-G-r-a-i-l.

2                        DIRECT EXAMINATION

3    BY MS. POSTERARO:

4    Q    Good afternoon, Dr. McGrail.  We've not yet met

5    face-to-face.  I'm Julie Posteraro.  I'm an assistant

6    United States attorney representing the United States in this

7    case.

8         Are you a medical physician, Dr. McGrail?

9    A    Yes, ma'am.

10   Q    And what type of physician are you?

11   A    I am a neurosurgeon.

12   Q    Can you please summarize your education beginning with

13   your college, please.

14   A    Yes.  I went to college and medical school at Tufts

15   University in Massachusetts.  Following graduation from

16   medical school, I did a one-year internship in general surgery

17   at the University of Maryland in Baltimore.  Following that, I

18   spent the next six years in residency training in neurosurgery

19   at Massachusetts General Hospital in Boston, which was

20   followed by a one-year fellowship at the Mayo Clinic in

21   Rochester, Minnesota.  After I completed that fellowship at

22   the Mayo, I came to Georgetown University Hospital, where I

23   have been my entire professional career.  Now for over

24   26 years, I've been at Georgetown, starting out as assistant

25   professor and then gradually rising through the academic ranks

*Testimony of Kevin M. McGrail, MD*                              **127**

1    to full -- to full professor and chairman of the Department of

2    Neurosurgery.

3    Q    Are you board-certified, Dr. McGrail?

4    A    Yes, ma'am.

5    Q    Okay.  And in what are you board-certified?

6    A    Neurosurgery.

7    Q    Are you licensed to practice medicine?

8    A    Yes.

9    Q    Can you please briefly outline your relevant

10   publications.

11   A    Sure.  I've -- I've -- they're disclosed in my curriculum

12   vitae.  I have published numerous articles over many years.

13   My -- my main interest academically has been in

14   cerebrovascular disease, particularly brain aneurysms and

15   stroke, but my clinical practice is basically about -- roughly

16   about half spine surgery and half brain surgery.

17   Q    And could you please describe your involvement with the

18   residency program at Georgetown University center.

19   A    Sure.  Well, I'm the chairman of a teaching program,

20   which we have 12 -- actually, 14 resident physicians.  So

21   we're training -- we train 14 residents.  We graduate two

22   residents a year.  I'm the chairman of the department, so I

23   have a significant responsibility.  I do have one of my

24   faculty who is the program director who oversees the training

25   program, and I also serve as an academic advisor to all of the

1   Georgetown medical students who are pursuing -- are interested

2   in pursuing careers in neurosurgery.

3   Q    And you practice as a neurosurgeon.  How long have you

4   practiced as a neurosurgeon, Dr. McGrail?

5   A    I finished my training in 1992, so I've been in practice

6   as a neurosurgeon for 26 years.

7            MS. POSTERARO:  Your Honor, I would like to proffer

8   Dr. McGrail as a medical expert in the field of neurosurgery.

9            THE COURT:  Any objection or voir dire?

10            MR. BAILEY:  No, Your Honor.  I'll defer to my

11   cross.

12            THE COURT:  Okay.  He's -- Dr. McGrail is recognized

13   as an expert in neurosurgery.

14   BY MS. POSTERARO:

15   Q    Have you testified as an expert witness in trial before,

16   Dr. McGrail?

17   A    Yes, I have.

18   Q    And how much do you charge for reviewing medical cases?

19   A    It generally -- for this case, for the U.S. Attorney's

20   Office, I think my charge was $500 an hour for record review

21   and conference calls.

22   Q    And about how many hours have you billed in this case?

23   A    Oh, boy.  I'm not exactly sure.  I -- obviously,

24   rendering a report, reviewing the records, which have been

25   somewhat voluminous, I would say it's certainly way over an

1    excess of ten hours at this point.

2    Q    In the course of your work on this case, did you review a

3    number of medical records, Dr. McGrail?

4    A    I did.

5    Q    Okay.  Did you review medical records from Bert Fish

6    Medical Center?

7    A    Yes, I did.

8    Q    A practice called Advantacare?

9    A    Yes.

10   Q    Records from Coastal Pain & Neurology?

11   A    Yes.

12   Q    The records from Dr. Neil Brown?

13   A    I have.

14   Q    And you've reviewed imaging from both before and after

15   the accident in October 2013; is that correct?

16   A    Yes, I have.

17   Q    Have you also reviewed the deposition testimony that was

18   provided by the plaintiff, Mr. Brisebois, in this case?

19   A    I have.

20   Q    Okay.  From all the information you've reviewed and

21   considered, have you arrived at opinions in this case

22   regarding whether or not Mr. Brisebois sustained permanent

23   injuries as a result of this incident?

24   A    I have.

25   Q    It might be helpful, Dr. McGrail, if you could please

1   briefly explain the structure of the lumbar spine, including

2   its subparts.

3   A    Sure.  The -- well, the lumbar spine is a -- is an

4   extremely elegant anatomical structure in the human body.

5   It's particularly important because we are -- we are primates

6   that ambulate on two extremities, different from most other

7   mammals; and, therefore, the lumbar spine has evolved over

8   time to accommodate the posture of a -- of a human.  And in

9   doing that, there's a lot of compromises that have been made

10  in the spine.  It's a very strong structure, but it is unlike

11  other quadruped animals.

12       Bipeds, which are mammals that ambulate on two

13  extremities, are prone, because of the stress that's put on

14  the lumbar spine -- we're particularly prone to degeneration

15  of the spine, and that is most problematic for the discs in

16  that the lumbar discs are basically the shock absorbers --

17  nature's shock absorbers for the lumbar spine.  The bones are

18  sort of the chassis, if you will, of a car.

19       But the shock absorbers are those lumbar discs, and they

20  are -- they are prone over time to degenerate and to become

21  damaged, and as that -- as that occurs, it can result in

22  disorders of the lumbar spine, particularly degenerative disc

23  disease, disc herniations, and there can be other injuries to

24  the bones.  As the discs degenerate, the bones can begin to

25  try to compensate for that in ways that cause problems, and

1    that's when the bones develop "osteophytes," is the medical

2    term.  The -- the lay term for those would be "bone spurs."

3    And that can result in pinching of the nerves and chronic pain

4    syndromes.

5    Q    Could you please briefly explain the difference between a

6    normal spine disc and a diseased or desiccated spine disc.

7    A    Yes.  The most important difference is the water content

8    in the -- in the normal disc versus the diseased disc.  That's

9    very obvious on an MRI scan.  But what happens with time is

10   that the -- the -- the nutritional supply through the blood to

11   the disc is -- is a very, very tenuous structure, and that can

12   degenerate over time, and the disc can lose its water content.

13   As it loses its water content, it starts to shrink, and

14   that -- that is -- causes narrowing of the disc space, which

15   can decrease the openings for the nerves of the neuroforamen.

16   So the degenerative disc process is the disc shrinks in size.

17   It can -- it can also bulge into the canal and push on the

18   nerve, and that results in the disc itself pushing on the

19   nerves.  But, also, as the disc becomes smaller, the bones are

20   closer together, so there's less room for the nerves to exit

21   the spinal canal.  This is all part of a degenerative disc.

22        A nice, normal disc should be nice and plump.  It should

23   have brighter signal on the MRI scan versus a degenerative

24   disc.

25   Q    Could you explain the difference between a herniation, a

*Testimony of Kevin M. McGrail, MD*                                    **132**

1   bulge, and a protrusion.

2   A    Sure.  Well, "herniation" and "protrusion" are oftentimes

3   used almost interchangeably.  A bulging disc is generally a

4   disc that is degenerated and abnormal, but the outer structure

5   or the annulus, which is -- is basically the fibrous outside

6   coat of the disc, is intact.  Generally, in a disc herniation,

7   there's a rupture of that annulus, and that sometimes -- not

8   always, but in clinical use, that is oftentimes what defines

9   the difference between a bulging disc and a herniated or

10  protruded disc.

11  Q    Do herniation, bulges, and protrusions only occur as a

12  result of trauma?

13  A    No.  They're -- they're frequently -- most often they

14  occur in the absence of any clear trauma.  They can occur in

15  trauma, but they usually occur in the absence of trauma.  Most

16  typically, not always.

17  Q    And what are other instances in which a herniation, a

18  bulge, or a protrusion might occur?

19  A    Well, there is no doubt that there's a certain genetic

20  predisposition.  Certain people are, unfortunately for them,

21  just more prone to this process, and what exactly those

22  predisposing genetic factors are in individuals are not

23  clearly defined, but we know that these things can run in

24  families and that people that have degeneration of one disc in

25  the lower back are also prone to develop degeneration at other

1    levels in their spine.  Even more interesting, it's very

2    common for people who have degenerative disc disease in their

3    lumbar spine to have similar processes in their cervical spine

4    or in their neck region.

5    Q    Finally, Dr. McGrail, could you explain what annular

6    fissures are.

7    A    Well, annular fissures, as -- as would be used for the

8    spine -- in the spine, would be an opening that is not normal

9    of the surrounding structure of a disc, the opening being the

10   fissure.

11   Q    And do annular fissures occur only as a result of trauma?

12   A    No.  Most -- they can occur as a result of trauma, but

13   the vast majority occur in the absence of any obvious trauma

14   to the spine.

15   Q    Turning our attention more directly to this case, did you

16   perform a record review of Plaintiff's medical and employment

17   history, Dr. McGrail?

18   A    I did.

19   Q    Did you perform a physical examination of Plaintiff --

20   Mr. Brisebois?

21   A    I did not -- yeah, I did not personally examine

22   Mr. Brisebois.

23   Q    Even though you have not personally examined

24   Mr. Brisebois, do you feel like you have a sufficient detailed

25   understanding of his medical history based on the records you

*Testimony of Kevin M. McGrail, MD*                                    **134**

1    have reviewed?

2    A    The records and the images and his deposition testimony,

3    yes.

4    Q    Did you form any opinion of Plaintiff's health history

5    based on your review?

6    A    I did.

7    Q    Based on your review, did you determine that

8    Mr. Brisebois had a documented history of back pain?

9    A    He did.  Yes, ma'am.  And degenerative disc disease.

10   Q    Can you please explain what you know or what is relevant

11   about Mr. Brisebois's health history to understanding the

12   facts in this case.

13   A    Sure.  Well, he clearly is an individual who had problems

14   with his lumbar spine going back many years.  I think that the

15   first time I noted difficulty -- and I'm referring back to my

16   report, if I may -- he fell from a truck in 2006, and that was

17   the first incident where there were -- that I saw in the

18   medical record where there was a documented problem with his

19   lumbar spine, that -- you know, at that time he had -- he had

20   imaging performed.  I think it was an MRI done in -- July 7,

21   2006, where degenerative disease at the L5-S1 level was first

22   seen.  Obviously, through the records there's a pretty

23   significant history of problems with the lower back that

24   preceded his October 28, 2013, incident involving the postal

25   truck.

*Testimony of Kevin M. McGrail, MD*                                135

1   Q    Are you aware that Plaintiff first went to the emergency

2   department at Bert Fish in January 2012?

3   A    Yes, I am aware of that.

4   Q    And what do you know or what is significant about that --

5   those segments of visits of Plaintiff, or Mr. Brisebois, to

6   the emergency department during that time period?

7   A    Well, I mean, I think in a simple sense it indicates that

8   there -- you know, that he clearly was having problems with

9   his lumbar spine that were bothersome enough to him that he --

10  he sought medical attention.  So, generally, when patients do

11  that, they're in a fair amount of discomfort.

12       You know, most people strain their back, have problems.

13  You know, we all do that at times.  That's part of the human

14  condition.  And we might just limit our activity a bit for a

15  few days and take some anti-inflammatories.  But, generally,

16  when people start -- have a bad enough experience that they're

17  going to see physicians, they're getting imaging studies,

18  they're going to emergency rooms, generally, that's a pretty

19  significant pain problem for the patient.

20  Q    Are you aware that January 23, 2012, Mr. Brisebois

21  reported to the emergency department with pain after doing

22  sit-ups?

23  A    Yes, I am aware of that.

24  Q    Can sit-ups cause pain in the lumbar spine?

25  A    Absolutely.  And I -- you know, I frequently tell my

1   patients that have problems with their spine that that -- that

2   is probably not the best exercise for them to be doing.

3   Sit-ups can actually -- can, on occasion, even cause a disc

4   herniation.  That has been described in the literature.  Most

5   times it won't do that, but it can -- it can -- it's probably

6   not the best exercise for somebody that has problems in the

7   lumbar spine.

8   Q    And are you aware that Plaintiff -- Mr. Brisebois

9   reported back to the emergency department two more times on

10   January 24th and January 26th?

11   A    Yes, I am aware of that.

12   Q    What does this immediate recurrence of these trips to the

13   emergency department tell you as a neurosurgeon?

14   A    It tells me as a patient, you know, unfortunately,

15   who's -- who's got pretty significant symptomatic -- we know

16   he has -- you know, we've had imaging, so now he's had two

17   images.  He had the MRI in 2007.  It demonstrated degenerative

18   disc disease at the L5-S1 level.  Degenerative disc disease

19   does not go away.  The symptoms from it can wax and wane over

20   time, but it does not get better on its own time, and contrary

21   to that, it tends to get worse over time.  So we know back as

22   early as July of 2007 that he's having problems with the lower

23   back.

24        And fast-forward to -- to other complaints in January of

25   2012, ultimately resulting in a new imaging study, which was a

1  CT scan of the lumbar spine that I have carefully reviewed,

2  which demonstrates now not only the presence of a degenerative

3  disc at the 5-1 level, but he's also got changes consistent

4  with degeneration at the level above, at L4-5.

5  Q    Now, Mr. Brisebois does not go back to the emergency

6  department until approximately two months later, in

7  March 2012.  Does that suggest to you that he is better or

8  healed in those intervening months?

9  A    Probably.  I mean, well, first of all, the degenerative

10 disc is not going to get better, but patients' symptoms can

11 wax and wane -- we see that all the time -- so that the

12 patients can become more tolerant of it.  They may change

13 their activity pattern in a way that -- that seems to

14 aggravate the condition less.  So that -- that situation is

15 not in and of itself unusual.  I've seen it many times before.

16 Q    And is the same true of Mr. Brisebois's subsequent trips

17 to the emergency department?  I won't take you through all of

18 them, but is your analysis still the same?

19 A    I think it would be largely the same.  It's a -- I -- you

20 know, it's so typical of so many of the patients that I see in

21 my office on a daily basis and treat and advise regarding

22 their situation with degenerative disc disease of the lumbar

23 spine.

24 Q    How so?  How is it similar to the patients that you see?

25 A    Well, it's a very common condition.  It is -- you know, I

*Testimony of Kevin M. McGrail, MD*                                    **138**

1  am a neurosurgeon.  I -- I -- you know, I deal with all kinds

2  of things, you know, with the central nervous system: brain

3  tumors, brain aneurysms, hydrocephalous, arteriovenous

4  malformations.  But the single most common problem that I see

5  coming into my office on a daily basis is low-back pain,

6  secondary to degenerative disc disease of the lumbar spine.

7  Q    In light of Plaintiff's complaints of back pain through

8  June 2013, what is your opinion regarding Plaintiff's back

9  health through that point?

10  A    You know, I think he's so typical.  I think he's got

11  significant problems with his lumbar spine.  He's very, very

12  typical.  And we see this all the time, a patient that really

13  genuinely has problems and genuinely has discomfort in his

14  lower back, occasionally has some -- I think if you tease

15  through these records carefully, there are some radicular

16  signs of nerve root irritation that you will see.  And this is

17  just a very, very typical story of a patient with low-back

18  pain, secondary to degenerative disc disease, who -- you know,

19  most of these folks don't need surgery and probably shouldn't

20  have surgery.

21      There's just a lot -- I know that in the public, in the

22  domain, there's a lot of talk about lumbar spine surgery and

23  that it's done too often, and I couldn't agree with that more.

24  Most people can get along with this and can be functional, and

25  I think, you know, to the -- to this gentleman's credit, he

*Testimony of Kevin M. McGrail, MD*                                    **139**

1  was functional and he was maintaining his work.  He went --

2  you know, went to work.  I think he was a cook.  And people go

3  on with their lives.  So this is a typical -- very typical

4  situation medically.

5  Q    Do you have an understanding of the circumstances of the

6  October 28, 2013, accident in this case?

7  A    I do.

8  Q    Okay.  What is your understanding?

9  A    My understanding of the accident is that it was -- that

10 Mr. Brisebois was on a bicycle that -- that basically impacted

11 a mail truck and that at that time he was -- I do not believe

12 he was knocked to the ground, but I think the -- my

13 understanding, he was pinned between the bicycle and the --

14 and the mail truck when that occurred.

15 Q    Now, do you have an understanding based on the medical

16 records that you've reviewed whether Mr. Brisebois experienced

17 immediate or voiced immediate experience of back pain?

18 A    No.  I didn't see any evidence of that.  He was -- he did

19 not -- at the time of the impact and afterwards, there was no

20 loss of consciousness.  He did not fall to the ground.  He did

21 complain immediately following the accident of pain in his

22 left wrist, chest, and left leg.  He also complained of

23 dizziness.

24 Q    Is it significant to you that Plaintiff, or

25 Mr. Brisebois, did not express immediate or -- back pain

1    immediately following the accident?

2    A    I -- I think there is significance to that, yes, I mean,

3    especially given the fact that that was such a common

4    complaint for him as a patient.  That was -- you know, if you

5    look through the medical records, that's what he was -- that

6    was his most common interaction with health care providers

7    that I could see, at least in the records provided to me,

8    related to his lumbar spine.  Interestingly, after this, that

9    was the -- the complaints regarded other parts of his body:

10   left wrist, chest, left leg.

11   Q    Did you review Plaintiff's medical records, or

12   Mr. Brisebois's medical records, from Bert Fish Medical Center

13   following the October 2013 accident?

14   A    I did.

15   Q    Can you please describe for the Court what significance

16   you found initially in the October 28, 2013, record from

17   Plaintiff's, or Mr. Brisebois's, presentation at the emergency

18   department.

19   A    I'd be happy to.  So he was -- at the time of the

20   accident, he was transported by an ambulance to the Bert Fish

21   Medical Center.  His -- he was examined by the emergency room

22   providers, and he got X-ray studies.  The examination

23   demonstrated that he had no serious traumatic injuries.  He

24   had X-rays -- he had an X-ray of his chest, which was within

25   normal limits, an X-ray of the left ankle that showed no

*Testimony of Kevin M. McGrail, MD*                                    **141**

1  evidence of fracture or dislocation, but did show some soft

2  tissue -- some swelling in the soft tissues in the left lower

3  extremity.  He was prescribed ibuprofen and Percocet, and he

4  was sent home from the emergency room that day.

5  Q    Did you notice in those medical records whether

6  Mr. Brisebois was offered X-rays of his back at the time?

7  A    I think that -- I'd have to go back and look at the -- I

8  think he -- there was no X-ray of the lumbar spine done

9  immediately at that visit.  I think it might have been offered

10 and declined.  I'm not 100 percent certain, but that's my

11 recollection.

12 Q    Now, are you aware that two days later Mr. Brisebois went

13 back to the Bert Fish emergency department?

14 A    I am.

15 Q    Okay.  And you reviewed that record?

16 A    I did.  Yes, ma'am.

17 Q    What -- of what significance did you find that record, if

18 any?

19 A    Well, I think everything's significant.  Obviously, he --

20 this was two days later.  This was October 30th.  He was

21 complaining of pain in his lower back at that time, and they

22 did again a -- I looked, and they're a pretty good neurologic

23 exam.  They didn't see -- he had a normal neurologic exam,

24 nothing abnormal on his physical examination.  An X-ray of the

25 lumbar spine was done at that point in time, but it showed no

*Testimony of Kevin M. McGrail, MD*                                    **142**

1   evidence of any fracture, dislocation, or other trauma.

2       He was able to return to his work as a cook about a

3   week -- I think a week after the accident, which would have

4   been -- about five days after this visit, he went back to

5   work.

6   Q    Is it significant to you that Mr. Brisebois was able to

7   return to work after a week -- a week after the accident?

8   A    Yes, it is significant.

9   Q    And how so?

10  A    Well, it would be unusual.  I mean, obviously, the major

11  bad, bad things are ruled out by plain X-ray, but a plain

12  X-ray doesn't rule out everything with the lumbar spine, and

13  he subsequently -- I'm sure we'll get to that -- had an MRI

14  performed.  But the fact that he was able to return to work --

15  we know he didn't have any fracture, dislocation, or major,

16  traumatic injury of the spine, and the fact that he was --

17  returned to work is -- is really not typical of somebody who's

18  had a serious injury to their spine.  That would be unusual,

19  especially -- especially somebody who works as a cook, who

20  really -- you know, that's a job that's hard.  I mean, you're

21  on your feet a good part of the day.  So it's unlike, you

22  know, a businessperson who really is able to sit in a chair or

23  even -- you know, this is a person who has to be on his feet.

24  So that would not be typical for a major back injury.

25  Q    Did you review Mr. Brisebois's records from Advantacare

*Testimony of Kevin M. McGrail, MD*                                    **143**

1    following the accident?

2    A    I did.

3    Q    Did you learn anything that informed your opinion of

4    Mr. Brisebois's condition in the records from Advantacare?

5    A    Well, I mean, he -- you know, he was having continued

6    problems with his lower back.  We know that.  He was -- he did

7    receive treatment for his lower back.  This included analgesic

8    medication, anti-inflammatory medication.  He also did

9    chiropractic treatment and -- as well as steroid injections of

10   the spine.  I think two of them were in the facets, and then

11   one is in an epidural.  So we do know he was continuing to

12   have problems, but we also know he was having problems with

13   the lumbar spine prior to the accident as well.

14   Q    Is the treatment that Mr. Brisebois received at

15   Advantacare consistent with the care and treatment one might

16   expect of someone with chronic disc degeneration?

17   A    It would be quite typical, yes.

18   Q    Did you also review a January 2014 record from

19   Dr. Neil Brown?

20   A    I did.

21   Q    Okay.  And what -- what did you learn from your review of

22   that record?

23   A    Well, I -- I think that the thing that -- so this was on

24   January 21, 2014.  Mr. Brisebois goes to see Dr. Brown.  He

25   says at that time the main complaint is low-back pain.  He

1  reports to Dr. Brown that he's no longer experiencing any

2  radiating pain into his lower extremities.  He does say that

3  the back pain's worsened by flexing his back, kneeling, and

4  prolonged standing or sitting, which is entirely consistent

5  with degenerative disc disease, and his pain was improved by

6  movement.

7      The examination is really quite, overall, a pretty benign

8  exam.  He has some tenderness in the midline at the

9  lumbosacral region and the right sacroiliac joint and some

10 minor tenderness over the lumbar spine muscles.  His straight

11 leg raising test was negative.  He did have a little bit of

12 diminished ability to flex his lumbar spine, but his

13 neurologic evaluation was entirely normal throughout.

14     Motor sensory and reflexes were also normal.  He was able

15 to walk without any difficulty on his heels and toes.  So

16 that's a pretty -- and that, of course, is an exam by a

17 neurosurgeon, not just an emergency room physician.  So this

18 is a pretty detailed examination that is objectively within

19 normal limits, with the -- with the exception of the palpable

20 tenderness and some limitation of his ability to flex his

21 spine.

22 Q   Can you please explain the import of the finding that the

23 straight leg raising test was negative.

24 A   Well, that's a very common test that's done to assess for

25 irritation of a nerve root, especially a nerve that's

*Testimony of Kevin M. McGrail, MD*                                    **145**

1   irritated by a lumbar disc herniation.  And, basically, what

2   you're doing when you -- is you have the patient lie down on

3   the table, and then you keep the knees straight and you raise

4   the leg off the table.  You're basically stretching the

5   patient's sciatic nerve, and that sciatic nerve will in turn

6   pull on the nerve that's coming out of the base of the spine.

7        And if it's being pinched by a disc, the disc is going to

8   catch it at that point in time, and the patient is going to

9   complain of pretty significant pain shooting down their leg.

10  So the absence -- so not only is he not complaining of

11  radicular pain at the time of the visit, but on a -- on a

12  provocative test, where the doctor is really trying to really

13  push the limits and see if there is even a hint of pinching of

14  that nerve -- that test by Dr. Brown was negative, indicating

15  no clinical -- clinical indication of a pinched nerve.

16  Q    What is the significance of the neurological evaluation

17  which showed normal motor function?

18  A    Well, it indicates that there's no evidence that any

19  nerve compression is causing weakness in either of the lower

20  extremities in any of the muscle groups.

21  Q    What does Dr. Brown's January 21, 2014, examination of

22  Mr. Brisebois say about the condition of his back at this

23  point?

24  A    Well, I think what it says to me about the condition of

25  his back -- I don't think we can -- we certainly can't say his

1   back is perfect, or he wouldn't be in a neurosurgeon's office

2   with a complaint of back pain.  So this is typical.  And he's

3   sought -- you know, over a significant period of time, he's

4   sought opinions from multiple providers.

5        So what I think it says to me is that this is an

6   individual who's continuing to have some chronic pain in the

7   lower back, almost -- we know it's from degenerative disc

8   disease.  He's already had a repeat MRI exam that demonstrates

9   that.  And, most importantly, though, there's an entirely

10   normal neurological picture in a patient who is able to move

11   about pretty well.  So this is the type of patient with a

12   normal neurologic exam, negative straight leg raising test,

13   that I think is a good candidate for what he's been getting,

14   which is continued conservative, nonoperative treatment of his

15   lumbar spine.

16   Q    Do you have an understanding of Mr. Brisebois's physical

17   health or conditions following his examination in January 2014

18   by Dr. Brown?

19   A    Yes.  I mean, I followed the -- I continued to follow the

20   medical records after that.

21   Q    Okay.  And did you develop an opinion regarding

22   Mr. Brisebois's continued complaints of back pain?

23   A    I did.

24        MR. BAILEY:  Judge, respectfully, I think we're

25   wandering far afield from the three opinions I see set forth

*Testimony of Kevin M. McGrail, MD*                                   **147**

1    in Dr. McGrail's report.  I'd raise the same objection.

2              THE COURT:  Overruled.

3    BY MS. POSTERARO:

4    Q    And what was your opinion?

5    A    Well, my opinion is that, you know -- you know, is that

6    he -- he continues to have problems with his lumbar spine, as

7    I would expect based on -- based on his long-standing history

8    of degenerative disc disease in the lumbar spine.  He has

9    continued -- you know, he has additional imaging studies.

10   But, you know, fortunately for him, he's never required

11   surgery on his lumbar spine, and he seems to be manageable

12   with continued nonoperative, conservative treatment.

13   Q    You reviewed the April -- or did you review the

14   April 2017 MRI image of Mr. Brisebois's lumbar spine?

15   A    I did, yes.

16   Q    What did you note in that study?

17   A    Well, I noted in the study that he's got persistent

18   degenerative disc disease at both the L5-S1 and L4-5 level.

19   Q    Was there further degeneration of Mr. Brisebois's spine

20   in this April 2017 image?

21   A    I thought there might have been some progression, yes, of

22   the degenerative disc disease, as is characteristic of this

23   process.

24   Q    If Mr. Brisebois had demonstrated further degeneration at

25   the L3-L4 level, what would this signify to you?

*Testimony of Kevin M. McGrail, MD*                                    **148**

1    A    Oh, I think it would signify what -- what -- that the

2    diagnosis of a patient with -- that probably has some

3    predisposition to degenerative disc disease in the lumbar

4    spine -- is -- is -- is entirely consistent with that

5    diagnosis.  Patients who get it at one disc level are very

6    prone to develop it at adjacent disc levels.

7    Q    In total, taking into consideration Mr. Brisebois's back

8    condition prior to October 2013 and the MRI imaging and his

9    further complaints of back pain that have come subsequent to

10   the October 2013, what conclusions were you able to draw based

11   on the totality of Mr. Brisebois's health condition with

12   respect to his lumbar back?

13            MR. BAILEY:  Objection.

14            THE WITNESS:  Sure.  I think that --

15            THE COURT:  Wait a second, Doctor.  Hold on.

16            MR. BAILEY:  The question is so open-ended.  I'm not

17   sure where it's going.  I want to make sure it's restricted to

18   opinions he's rendered in his report, if we can get some

19   focused questions.

20            THE COURT:  Well, overruled.  If it's not within

21   that, I won't consider it.

22            You can answer the question, Doctor.

23            THE WITNESS:  Thank you, Your Honor.

24            Well, I think he's clearly got a long-standing

25   history of degenerative disc disease.  It goes back many, many

1    years prior to the -- the accident that occurred on October --

2    in October of -- October 28, 2013.  It's very long-standing.

3    I think he's reasonably well compensated for it.

4              I think that there might -- you know, he -- he does

5    go to the -- you know, he is involved in the accident.

6    There's no immediate complaints of problems with his lumbar

7    spine at the time when he's first evaluated on the 28th, but

8    he does go back two days later, and at that time the lower

9    back is -- is bothering him.  I -- I don't find that -- you

10   know, that would not be unusual for somebody where that's been

11   a complaint for so long, that he was involved in this accident

12   and there might have been, you know, some muscular ligamentous

13   strain or something else.  But I don't think the -- and then

14   the -- you know, this whole process continues of difficulties

15   with the lower back right up into 2017.  There's additional

16   imaging done.

17             So I think this is entirely consistent with a

18   patient who has a very long-standing, chronic degenerative

19   disease of the lumbar spine, and I think there's really no

20   clear evidence that I can see that the October 28, 2013,

21   accident caused any permanent additional harm to his lumbar

22   spine beyond what one would expect from the natural history of

23   his degenerative disc disease.

24             THE COURT:  Can I ask you a question here?  Is it

25   unusual for someone at Mr. Brisebois's age -- that is,

*Testimony of Kevin M. McGrail, MD*                              **150**

1   30 years old -- to have chronic disc disease to this extent?

2          THE WITNESS:  It's far more common, Your Honor, in

3   patients as they get older; however, I just -- you know, I

4   saw -- I see pediatric patients in my practice that have this

5   disease.  So just yesterday I saw a patient in my office who's

6   16 years old with degenerative disc disease at the L4-5 level,

7   no clear history of traumatic cause of this, but he's had this

8   now -- I've been following him I think now since he was 14.

9   So it is -- it is not the norm for somebody who's 30, but yet

10  it's not unusual either.  We do -- we do see this all the

11  time, and I've operated on many patients in their early 20s

12  with degenerative disc disease.

13          THE COURT:  Thank you, sir.

14          THE WITNESS:  You're welcome.

15  BY MS. POSTERARO:

16  Q    Thank you, Dr. McGrail.

17       One last question:  Do you hold the opinions expressed

18  here today in your testimony to a reasonable degree of medical

19  probability?

20  A    I do.

21          MS. POSTERARO:  Thank you.

22          THE COURT:  Okay.  Cross.

23          MR. BAILEY:  May it please the Court.

24                       CROSS-EXAMINATION

25  BY MR. BAILEY:

*Testimony of Kevin M. McGrail, MD*                                    **151**

1   Q    Good afternoon, Dr. McGrail.  Mike Bailey here.

2   A    Good afternoon.

3   Q    Dr. McGrail, in -- well, let me back up here.  You're

4   there at Georgetown.  I couldn't help but notice Ms. Posteraro

5   has her U.S. Attorney's badge on a Georgetown lanyard around

6   her neck every time I see her.  Do you-all know each other?

7   A    Never met her before in my life until I was involved in

8   this matter.

9   Q    Do you know how she came to contact you?

10  A    No.

11  Q    You mentioned in response to Ms. Posteraro's questions

12  that one of the things that was significant to you was the

13  fact that Mr. Brisebois didn't complain of low-back pain when

14  he went to the emergency room the day of the accident.  Did I

15  understand that correctly?

16  A    Yes.  I think there was some significance to that, yes.

17  Q    If he had complained about it, would it have been

18  significant to you in that respect?

19  A    I -- I think there would have been some significance to

20  that, yes.

21  Q    If it had been his primary complaint as documented in the

22  emergency room record that day, would you put more weight on

23  that?

24  A    I -- I think everything is important, in response to your

25  question.

**Testimony of Kevin M. McGrail, MD**                              **152**

1   Q    Find that emergency room record for October 28, 2013,

2   please.  Bert Fish.

3   A    I've got a lot of pages in front of me.  If you could

4   produce the document.

5   Q    Yes, sir.  Let's do this.

6   A    Or if you've got the page number.

7   Q    Well, see, I don't have the same set that you've got.

8   What may be easier to find off the bat -- do you have the

9   ambulance run report?  Because I think you said that it was

10  also significant that he didn't complain of low-back pain to

11  the ambulance attendants.

12  A    I don't think I said that.  Maybe I did.

13  Q    Okay.  Well, let's find it and see what he did say.

14  A    I'm sorry?

15  Q    The EVAC ambulance report -- do you have that, sir?

16  A    I'd have to look through the -- you know, it's not a

17  discovery deposition.  I'm here to -- so I'd be happy to look

18  at any document you want to look, but I would request, just as

19  is typical at trial, that you produce it.  Maybe we can show

20  it on the screen.

21  Q    Let's do this, Dr. McGrail.  Let me just ask you:  If the

22  EVAC ambulance report says at the bottom of the first page

23  "Chief complaint:  Pain, back, paren, primary," would that be

24  significant to you?

25  A    I -- well, I think there's some significance.  I don't

*Testimony of Kevin M. McGrail, MD*                                         **153**

1   think it would -- that complaint in and of itself would change

2   my fundamental opinions in the case, but I would -- I wouldn't

3   discount it.

4   Q    The emergency room records that you have from

5   Bert Fish -- are they Bates-stamped with numbers down at the

6   bottom of them on the right corner?

7   A    Yes -- yes, sir.

8   Q    Maybe that's an easier reference point to find that

9   October 28, 2013, ER record from Bert Fish.  The one that I

10  have has Bates numbers on it, 144 through -- let me see

11  here -- 153.  See if you can find that one without --

12  A    Yeah.  Hang on one second.  I'll do my best.  I don't

13  want to get these out of order.  Okay.  Yep.  I think we're

14  looking at it.

15  Q    Okay.  Find page 152 there, if you would, the triage by

16  the nurse when he goes into the emergency room that day right

17  after the accident.  1:00 in the afternoon after this thing

18  happened about 12:30.  A nurse by the name of

19  Patricia Koerner.  Do you find the triage there under

20  musculoskeletal problems?

21  A    Yes.

22  Q    And what did the nurse document there?

23  A    She says "musculoskeletal symptoms, back pain, other."

24  Q    What else underneath that?

25  A    It says "left lower leg pain."

*Testimony of Kevin M. McGrail, MD*                                    **154**

1    Q    Okay.  Did you see that when you looked through it the

2    first time?

3    A    Which I did -- I did -- yeah, I documented that in my

4    report, if I can go back to it.  Yeah.  I said he did -- I did

5    note in the report:  "Immediately following the accident,

6    complained of pain, left wrist, chest, and left leg."  So that

7    is in my report.

8    Q    Okay.  But now he complained of primary left leg pain,

9    didn't he, where his foot got trapped between the vehicle and

10   his bike?

11   A    He did complain of that, yes.

12   Q    Okay.  But the report of pain there on page 152, what he

13   told the triage nurse -- do you know whether that related to

14   leg pain related to the back or the leg pain that he had from

15   being trapped between the vehicle and his bike?

16   A    I don't think there's any way to be certain.

17   Q    Okay.

18   A    It just says "left lower leg pain."  So, I mean, patients

19   would complain of pain and could complain of pain in either

20   scenario.

21   Q    But to the extent that there was any misunderstanding

22   about whether Mr. Brisebois complained of back pain to the

23   EMTs, the ambulance folks at EVAC, or to the emergency room

24   personnel at Bert Fish on the day of the accident, would you

25   agree that it appears that he did?

1   A    I see it -- you are correct.  I see it in one -- I

2   didn't -- I see it in that nursing assessment.  I don't recall

3   seeing it in the physician's.  I'd have to look again.

4   Q    I understand.

5        Dr. McGrail, as a neurosurgeon, I wonder if you've heard

6   an old saw that I've heard a lot in medical malpractice cases

7   that doctors are fond of saying it, and that is you treat the

8   patient; you don't treat the X-ray.  Have you ever heard that?

9   A    Well, you -- there's certain cases you better treat the

10  X-ray too.  So, I mean, these are all -- the imaging studies

11  are very important.

12  Q    Sure.

13  A    I think it's a combination.  I would not ascribe to that,

14  and I wouldn't teach that to my residents.

15  Q    Okay.  You'd agree, though, helpful to have personal

16  contact/interaction with a patient where you can do clinical

17  exams, follow them over the course of time, all those things,

18  and that you don't get the full sense of things from reviewing

19  imaging studies or records?

20  A    I think that is true to some extent.  It's certainly true

21  with rendering treatment, that prior to -- certainly in an

22  elective situation I would really want to get -- examine the

23  patient before I would recommend the treatment I was going to

24  give as a practicing neurosurgeon.

25  Q    Sure.  It would be malpractice otherwise, wouldn't it, to

1  treat a patient without being able to examine them yourself

2  and decide on a --

3  A    Not necessarily.  I can tell you many times as a

4  neurosurgeon where I've operated on patients that I've never

5  had a chance to examine because the situation was so urgent --

6  Q    I understand.

7  A    -- that the first time I met them was in the operating

8  room.  So that certainly wouldn't rise to the level of

9  malpractice.  However, I think if you're doing an elective

10  surgery and you've never seen the patient or examined the

11  patient, that would not be typical of the standard of care, in

12  fairness to your question.

13  Q    Well, yes, and that was the context in which I posed it.

14  I'm sorry if it wasn't clear.

15  A    Yes.

16  Q    And in Mr. Brisebois's case, to the extent you're

17  weighing in on his medical condition, you're doing that in a

18  context where it would be an elective-type encounter.  It's

19  not an emergency; right?

20  A    Yes.  You mean in determining if Mr. Brisebois needed

21  surgery or what should be done?  Yes, this would be entirely

22  elective.  That's correct.

23  Q    And if he were to come to you as a patient and say, "Doc,

24  look, I've had all this problem with my back.  I'm trying to

25  figure out what to do.  Is surgery an option?" would you make

*Testimony of Kevin M. McGrail, MD*                              157

1   sure to examine him before you rendered an opinion about

2   whether that would be a good idea or not?

3   A    Yes.

4   Q    Okay.  And by the same token, wouldn't you examine a

5   patient with those same problems to determine whether it was

6   not appropriate or not advisable to do surgery to solve the

7   problem?

8   A    That would be part of my assessment.  Yes, sir.

9   Q    And here in this case, though, I hear you saying, unless

10  I'm mistaken, that just based on a review of records and

11  imaging studies and some other bits of information without

12  examining the patient, that you feel like he wouldn't benefit

13  from surgery.  Did I misunderstand?

14  A    Oh, he's much better off if he doesn't get surgery.  And

15  let me just -- I mean, that's the -- you know, I think it's

16  obvious he -- he did see Dr. Brown.  Surgery was discussed.  I

17  think this is a patient who has -- has not wanted to have

18  surgery on his back, and -- and I think for a lot of reasons

19  that's a pretty good idea.  There's -- you know, surgery in

20  the lumbar spine is a last resort effort for people that

21  are -- are really absolutely nonfunctional or they're

22  developing severe neurological problems that may be

23  irreversible if they don't have treatment.

24       But patients -- patients with this type of problem in

25  general are a whole lot better off doing what he has done and

1  avoiding surgery if it's not -- if it's not absolutely

2  necessary.  So I -- you know, I -- I can pretty much -- you

3  know, assuming that -- I mean, I'm going by the reports --

4  that his neurology situation is a pretty normal one, I think

5  he's doing exactly the right thing.  And -- and I would -- I

6  would not want to have surgery in his situation unless --

7  unless it was just an unmanageable situation otherwise.

8  Q    And I think that makes common sense.

9  A    And then he may require it.

10 Q    Sure.

11      And, you know, that's perfectly understandable,

12 particularly from the surgeon's perspective.  Understandable

13 from the patient's perspective too, isn't it, that you'd try

14 to avoid it if you can?

15 A    Absolutely.

16 Q    Particularly at a young age.

17 A    Even more so.  I couldn't agree with you more.

18 Q    But, now, isn't one of the typical things that brings

19 patients to surgery the fact that they can no longer manage

20 the pain through conservative means?

21 A    Yes.  That can be one of the things that brings a patient

22 to surgery.  That's right.

23 Q    Isn't that the most common thing?

24 A    I think that would certainly be one of the most common

25 things, yes.  It would be a patient who is in reasonably good

*Testimony of Kevin M. McGrail, MD*                                    **159**

1  neurologic condition, but they're just -- they just can't deal

2  with the pain anymore.  It cannot be managed by conservative

3  measures.

4  Q    Now, I -- I thought I heard you say -- and correct me if

5  I'm wrong -- that you, in reviewing Mr. Brisebois's medical

6  records up to this point, felt like he'd been following an

7  appropriate conservative course of care.  Did I hear right?

8  A    I do, yes.  Yeah.

9  Q    So you think everything he's done to try to get better

10  and avoid pain is reasonable on his part?

11  A    Yes.

12  Q    Okay.  And that the expenses he's incurred associated

13  with that necessarily go along with it and they're reasonable

14  too?

15  A    Yes.  I think that the -- the conservative measures that

16  he's done to deal with his degenerative disease of the lumbar

17  spine, perfectly reasonable treatments and very common ones.

18  Q    Now --

19  A    Just to outline, he's had physical therapy, he's had

20  chiropractic treatment, he's had steroid injections, and I

21  think he's even had a facet -- I'd have to look back -- a

22  rhizotomy of the facet or some other treatment.  I think these

23  are all perfectly reasonable things to do.

24  Q    Three rhizotomies, in fact.  Attempts at it.

25  A    Yeah.

*Testimony of Kevin M. McGrail, MD*                                160

1    Q    Did you see anything that you know of that he has not

2    tried in the nature of conservative care short of surgery in

3    those medical records you looked at?

4    A    No.  I think he's had a pretty extensive trial of -- a

5    pretty extensive use of conservative therapy, but that can go

6    on indefinitely.

7    Q    Well, understandably, and, of course, that's one of

8    Jeff's concerns.  Do you have any thought about whether he's

9    going to have pain indefinitely in his low back?

10   A    I think the answer to that question is -- is,

11   unfortunately, yes.  However, along -- you know, it's not a

12   completely discouraging situation.  Low-back pain is one of

13   the most common parts of the human condition.  Very, very

14   common complaint.  So I think that the key thing for him as he

15   goes forward is not whether he's going to have low-back

16   pain -- I think he is going to have that; it will persist --

17   is whether it can be managed and whether he can be functional

18   with that, whether he can be employable, if he can enjoy

19   family activities, and so forth and so on.  That really -- it

20   really becomes a quality of life issue.

21   Q    Agreed.

22        But to the extent that he's had continuing symptoms now

23   for what?  Four and a half years?  Would you expect he's going

24   to have any spontaneous resolution with continued conservative

25   care?

*Testimony of Kevin M. McGrail, MD*                                161

1   A    I don't think it's ever going to completely resolve, nor

2   do I think that a surgery is going to be the final cure of

3   this problem.  You know, surgery -- I always tell my patients

4   surgery can fix one problem and can create two new problems

5   you don't have.

6        So I think that -- what does happen with these folks over

7   time -- and we see this more in the older population -- is the

8   spine stiffens and the movement -- that they actually can have

9   some decrease in pain over time because the spine becomes less

10  mobile, and it's -- it's -- it almost fuses on its own.

11  Q    Sure.

12  A    So there is -- there is hope in that -- in that extent,

13  but he's still a relatively young patient.  So -- but the more

14  typical clinical situation with this is -- is pain -- is

15  remissions and exacerbations over many months and many years

16  with this condition.

17  Q    More typical of his history prior to this accident in

18  October of '13, occasional visits to the emergency room.

19  A    Yeah.  Yes.

20  Q    And now you'd agree, wouldn't you, that it's been

21  different?  His life is not the same as it was before this

22  accident in the sense he's had much more extensive and much

23  more continuous medical care than he ever had before.

24  A    Well, he -- he certainly -- there were times when he

25  was -- you know, in 2012 before the accident, I think there

1    were a series of visits.  So it was -- it was somewhat

2    problematic for him back then.  It certainly seems to be

3    problematic for him now, though.  I would agree with that.

4    Q    Well, in what you saw, would you agree that he's needed

5    conservative medical care for his low back and leg pain more

6    frequently than he did before the accident?

7    A    I think if you -- you know, it depends on what time

8    period you pick out, but I -- I think there's -- I can't

9    dispute the fact that he's required continued treatment for

10   his lower back of late, and he's -- you know, it's bad enough

11   for him that he's gotten imaging studies.  He's gotten, I

12   think -- I counted them up.  I think he's had three follow-up

13   MRI scans of the lumbar spine.

14   Q    Right.

15        Dr. McGrail, I want to digress here and go back to the

16   accident itself and your understanding of what occurred as it

17   relates to your thoughts about Mr. Brisebois.  Did you

18   understand that, when the mail truck hit him, the driver's

19   first recognition that he was there was when he was on the

20   hood of the truck in front of his windshield?

21   A    I believe -- yes, I believe that that was my

22   recollection.

23   Q    From Mr. Brisebois 's deposition?

24   A    Yes.

25   Q    Were you aware that for whatever distance the mail truck

*Testimony of Kevin M. McGrail, MD*                                    **163**

1  traveled after it came into contact with him, that

2  Mr. Brisebois tried to remain upright on his bike to keep from

3  getting run over?

4  A    I think that's what he said in his deposition, yes.

5  Q    Were you aware that the force of the collision between

6  Mr. Brisebois's body and a pot mirror mounted on the left side

7  of the truck caused the pot mirror to get broken off?

8         MS. POSTERARO:  Objection.  Misstates the testimony

9  and evidence.

10         THE COURT:  Overruled.

11         THE WITNESS:  I think that -- I think that's what he

12  testified to.

13  BY MR. BAILEY:

14  Q    Did you see any photographs of the mail truck or the

15  bicycle or Mr. Brisebois after the accident occurred?

16  A    Yes.

17  Q    Is that part of what you had?

18  A    Yeah.

19  Q    Okay.  Do you remember seeing the --

20  A    I think those were -- I think those were entered into

21  evidence in the case, and I think they were shared with me.  I

22  didn't review them just prior to my testimony, but I have seen

23  them.

24  Q    Okay.  You saw where the left-sided pot mirror on the

25  truck got broken off, though, didn't you?

1   A    I believe that was one of the photographs.

2   Q    And you understood that it was because Mr. Brisebois's

3   body, the upper torso, came into contact with it to the point

4   that it ripped it off the truck, didn't you?

5   A    I can't remember that.  It may have been in his -- in his

6   testimony.  I -- as I sit here today, I just can't remember

7   that specifically.

8   Q    Hypothetically, I want you to assume that that's what

9   happened as a result of this collision.  Mr. Brisebois is

10  trying to maintain an upright position on his bike.  All the

11  while the truck is pushing against him from his left side, and

12  he runs into the left pot mirror with enough force to tear it

13  off the truck.  Wouldn't you agree that that's going to cause

14  a sufficient impact to his upper torso to put a lot of strain

15  on his low back?

16  A    You know, it's always difficult to say in any trauma,

17  which happens so quickly, what its -- what its impact is or is

18  not on any part of the -- of the body.  So, you know, exactly

19  what that accident would do is -- is purely speculative one

20  way or the other.  I can't say it wouldn't have caused any

21  problem.  Of course I can't say that.  Nor can I say it would

22  have obviously caused this problem.

23  Q    I understand.

24  A    That -- that is hard -- hard to say.  It just --

25  because -- and something like that would happen so rapidly

1   that it would be just pure speculation on my part.  I -- I

2   just can't speculate one way or the other.

3   Q    I appreciate that, sir.

4        Let me just ask you, though.  Where a guy's trying to

5   maintain a fixed position on his bike with his legs astride it

6   and his upper torso then comes to a sudden halt, doesn't that

7   cause extension of the low back just by the physics of things?

8   A    I mean, it just depends.  I mean, it depends on exactly

9   what position you're oriented in.  It may not cause the back

10  to move at all, and, you know, the impact may just be in the

11  upper body.  So, I mean, it's -- it's just -- it would be so

12  speculative to me to render any opinion one way or another on

13  that.  I just don't think I can do that.

14  Q    Fair.  I'll leave you be on that.

15       Let me just ask you, though:  Is that scenario I'm

16  describing at all inconsistent with an injury to

17  Mr. Brisebois's low back?  Anything about it that says, "Nah,

18  that couldn't have happened"?

19  A    Anything can happen in a trauma.  So I can't say.  It

20  certainly is possible that it -- that something like that

21  could happen.  The more -- the more common thing for the lower

22  back is actually an axial load injury, and that we see a lot

23  of, where somebody ends up on their buttocks.  That would be

24  the more common situation.

25  Q    Sure.

1    A    However, any -- you know, I can't sit here today under

2    oath and say that that -- there's no way that something like

3    that could -- of course I can't say that.  That would be way

4    too speculative and -- and too much of a stretch.

5    Q    Sure.  No.  And I appreciate that.  That's all I'm trying

6    to understand, is where the lines get drawn in terms of your

7    thoughts about this whole thing.

8         Do you know of anything that happened in Mr. Brisebois's

9    life around the time of this accident in October of 2013 that

10   would otherwise account for the onset of low-back pain on

11   October the 28th and continuing to trouble him for lo these

12   many years after?  Anything else other than it just

13   spontaneously happening?

14   A    Well, it certainly wouldn't have been a new problem for

15   him.  I mean, we -- we have this long, long-standing history

16   of problems with the lower back that go back not months but

17   years in Mr. Brisebois.  So reason that this has been a very

18   long-standing problem for which he has sought medical

19   attention, imaging studies.  So it wouldn't -- I mean,

20   certainly -- you know, my personal opinion is I don't think

21   that this trauma changed the picture for him, but, you know,

22   this -- this was certainly anything but a new finding or a new

23   complaint.

24   Q    You run into that every time you have a patient that has

25   any preexisting history of similar problems; true?  You have

*Testimony of Kevin M. McGrail, MD*                                         **167**

1    to kind of sort out --

2    A    You can, yes.  It can make that difficult to sort out.

3    That is true.

4    Q    And do we hear you saying in this case that the trauma

5    Mr. Brisebois sustained in the accident of October 28, 2013,

6    couldn't have caused him to need all this medical care he's

7    had since that time?

8             MS. POSTERARO:  Objection.  Misstates testimony.

9             THE COURT:  Overruled.  Cross-examination of an

10   expert.

11            THE WITNESS:  I think the weight of the evidence --

12   I -- there's no way I can say something to 100 percent

13   certainty because there's just too many unknowns, but I think

14   that the -- to a reasonable degree of medical certainty, his

15   course is much more consistent with just natural progression

16   of long-standing degenerative disc disease of the lumbar

17   spine.  I mean, that's just my humble opinion, having reviewed

18   these -- these records.  I mean, certainly, if we -- if we saw

19   that he -- you know, he went in and we saw a fracture or

20   dislocation, junk facet joint or -- that would have been a

21   no-brainer.  There's no question.  You know, here, we're in a

22   much more nebulous situation.  I would, you know -- but I

23   think that the weight of evidence is more consistent with

24   somebody who has long-standing degenerative disc disease.

25            And I would point out the fact that clinically, yes,

*Testimony of Kevin M. McGrail, MD*                                    **168**

1   he was -- and I did see that nurse's note.  You are correct.

2   I didn't -- I didn't put that in my report.  You pointed it

3   out.  But it didn't seem -- in the physician's note didn't

4   seem to be the main issue.  It was the main -- it was an issue

5   when he went back on the 30th, but yet five days later he was

6   able to return to work as a cook, which is a pretty hard job.

7   So, I mean, I'm putting all of these -- you know, this is the

8   best I can do with what I've been given, and that's what my

9   opinion is based on.

10  BY MR. BAILEY:

11  Q    Yes, sir.  I know.  I understand that.

12      Let me pose it to you this way:  Do you think it's more

13  likely that this accident precipitated the problems that have

14  resulted in these four and a half years of ongoing problems

15  and medical care or more likely that all those problems just

16  spontaneously begin again after being acquiescent on that

17  date?

18  A    I think it's -- I think it's more likely it's the same

19  process that's been long-standing, and -- and -- and it's

20  typical.  And I think, to his credit, it's still manageable

21  conservatively.  To my knowledge, he still hasn't had surgery

22  on his lumbar spine.  I hope for his sake that he doesn't

23  require that.  I can't say he never ever will.  But that's my

24  opinion.

25  Q    No.  I understand.

*Testimony of Kevin M. McGrail, MD*                                169

1    And, again, I hate to be so persistent, but I've got to

2    understand here.  Do you think it's more likely that this

3    accident had absolutely nothing to do with the medical care

4    he's needed for the last four and a half years or that it was

5    at least the straw that broke the camel's back that

6    precipitated this ongoing need compared to the prior history

7    that he had?

8              THE COURT:  I'm going to let him answer that

9    question one more time --

10             MS. POSTERARO:  Objection.

11             THE COURT:  -- but not --

12             THE WITNESS:  Well, he certainly didn't break the

13   back because we would have seen that on the X-ray.

14   BY MR. BAILEY:

15   Q    Touché.

16   A    But -- but -- but not to be too -- I think your question

17   is an extremely fair one and one that I expected.  And I --

18   and my personal opinion is that, while anything is possible, I

19   think it's more likely that this was not the -- that this was

20   more consistent with progression -- disease progression.

21   Q    If he hadn't been in this accident on October 28, 2013,

22   when's the next time he would have had any low-back problems

23   that would have required medical care after June of -- June

24   the 10th of 2013?

25             MS. POSTERARO:  Objection.  That calls for

*Testimony of Kevin M. McGrail, MD*                                    **170**

1    speculation.

2              THE WITNESS:  Oh, I think he was -- I think he would

3    have --

4              THE COURT:  The objection is overruled.

5              THE WITNESS:  -- more likely than not required

6    continued care for problems with his lower back absent the

7    accident.  I mean, I -- I think it -- it's entirely plausible

8    it could have been a very similar scenario.  The -- and it

9    wouldn't have been different that, you know -- I don't think

10   there's any clear evidence to me that there -- there was

11   anything about that accident and the time frame that was --

12   that it was -- that would indicate that this still wasn't

13   entirely consistent with the natural history of degenerative

14   disc disease in the lumbar spine.

15   BY MR. BAILEY:

16   Q    Is it inconsistent with the natural history of the

17   problems he had with degenerative disc disease with trauma

18   superimposed that triggered where he is now?

19   A    I -- I don't think that on my review that's -- and,

20   again, I -- again, this is -- my opinion is based on a

21   reasonable degree of medical certainty.  It is not an

22   absolute, and I'm not here to say that to you or to any way

23   give misleading testimony in that regard.

24   Q    Truth is we just don't know what his history would have

25   been had he not been involved in this accident, do we, with

1   any degree of medical certainty?

2   A    Well, I -- well, I'm saying -- I'm saying something

3   that's a little bit different.  So I think that's --

4   Q    (Simultaneous speaking.)

5           THE COURT:  Wait a minute.  Wait a minute.  Wait a

6   minute.

7           Do not interrupt the witness, Mr. Bailey, please.

8           MR. BAILEY:  Yes, Your Honor.

9   BY MR. BAILEY:

10  Q    I'm sorry.  Go ahead, Dr. McGrail.

11  A    Yeah.  I mean, I think my testimony is that I think that

12  the course actually would have been quite similar.

13  Q    We do know for certain, though --

14  A    I mean, the only thing -- I'm sorry.  I -- the only thing

15  I might add to that is he was in the -- you know, two days

16  later he was -- he did have some complaints of back pain.  It

17  was two days after the accident.  It is quite possible that

18  there was some -- you know, there was some soft tissue, some

19  ligamentous issues because that was -- you know, that was a

20  short time from the accident.

21      So I don't want -- but I think on the way of things, the

22  way this is -- the way this has played out over -- and we have

23  the opportunity to follow this out now many, many years now

24  since the accident and a patient still is requiring surgery,

25  and I think that overall is more consistent -- that length of

*Testimony of Kevin M. McGrail, MD*                                    172

1   time is -- is helpful in me having formulated that opinion

2   that this is more consistent with chronic degenerative disc

3   disease rather than a traumatic injury.

4   Q    Have any thought about when, if ever, Jeff Brisebois is

5   going to get better and not have the back problems he's got

6   now?

7   A    Oh, I -- I think he's going to -- I think there's --

8   first of all, I will tell him right now I don't think the

9   future is that gloomy.  I think that he's got -- you know,

10  he's got degenerative disc disease in the lumbar spine.

11  There's a lot worse medical problems you can have than that at

12  a young age, and I think the treatments now are very, very

13  good.  I think you can continue to manage without surgery.

14  That certainly is in his best interest to do so.  But if there

15  comes a point where there's just -- there's just severe

16  compression and -- and radicular symptoms and he really -- I

17  think he would do very well and would be an excellent

18  candidate for surgery if it comes to that, and I think he

19  will -- would -- I don't think this is a dark future for him.

20  I think there's -- we deal with this all the time in patients

21  in his age group, and most of them do pretty well.

22  Q    Short of that happening, though, if he comes to the point

23  where it's so intolerable that he opts to have surgery, is his

24  only option to continue to have conservative care as he has or

25  just put up with it?

*Testimony of Kevin M. McGrail, MD*                            173

1   A    What I would say -- what I would advise him to do if he

2   was my patient is to -- is to try not to have surgery if he

3   can avoid it.  I think that's a really good thing to try to

4   do.  I would encourage him to stay in good physical condition.

5   Do not put on excess weight.  I would advise him to be careful

6   with his back.  Don't do sit-ups.  You know, get physical

7   therapy.  Stay in good shape.

8         And if those things are not working, if he is

9   nonfunctional, has trouble just getting to work, life is just

10  one day of dreary drudgery after another, at that point it is

11  worth taking the risks, and there are risks that would be

12  involved in a spine operation of that type.

13  Q    What are -- what are some of the risks?

14  A    Well, it depends on what surgery you're going to perform,

15  and that really gets into -- into very much specifics, but

16  there's always a risk.  In any spinal surgery, there's a risk

17  of mortality in a young patient like him that would be very,

18  very low without major comorbidities.  There is a risk of

19  paralysis.  There's a risk of spinal fluid leak.  If he has a

20  fusion, there's a risk of failure of the fusion or

21  instrumentation.  And then then there's the other risk that

22  the pain just doesn't go away.  Or when you fuse the spine,

23  you can cause adjacent segment disease at other levels.  So

24  lots of reasons, good reasons, to try to avoid surgery if

25  possible.

*Testimony of Kevin M. McGrail, MD*                              174

1   Q    And getting back to the future for Jeff Brisebois,

2   assuming that he never gets to the point that he decides he's

3   going to take that risk and have -- have some kind of surgery,

4   is it reasonable that he continue to get conservative care at

5   whatever that's going to cost?

6   A    It's entirely reasonable, in my opinion.

7            MR. BAILEY:  Thank you, sir.  That's all I have.

8            THE WITNESS:  Thank you.

9            THE COURT:  Redirect.

10            MS. POSTERARO:  Briefly, Your Honor.

11                     REDIRECT EXAMINATION

12   BY MS. POSTERARO:

13   Q    Dr. McGrail, if you could please turn to Defendant's

14   Exhibit 4.  I believe it is the Bates No. 144.  It's a

15   document that Mr. Bailey referred you to, the emergency

16   department notes from October 28 --

17   A    Yeah.  Hold on.  Somehow I got -- oh, boy.  Yeah, I got

18   it.  Oh, yep.  Right here.  Sorry about that.  I forgot they

19   were double-sided.  Yes.  I've got that right here in front of

20   me.

21   Q    Dr. McGrail, I'll direct your attention to Bates No. 144,

22   history of present illness, initial comments, where it states:

23   "Comes to ER.  Was riding his bike and noted a mail truck

24   coming his way.  Was going to go around it and was expecting

25   it to stop; however, it kept going."  And then it describes

*Testimony of Kevin M. McGrail, MD*                                    **175**

1  the accident.  But later in the paragraph, it says "Did not

2  hit his head or neck or back, though he claims to have back

3  problems for which he takes ibuprofen."  Do you see that?

4  A    I do, yes.

5  Q    Does that indicate to you that potentially the back

6  problems described in this document predated the accident at

7  issue in this case?

8           MR. BAILEY:  Objection.  Calls for speculation.

9           THE WITNESS:  Well, in this paragraph it looks like

10 it did in the history -- in the initial comments.

11 BY MS. POSTERARO:

12 Q    Mr. Bailey asked you about the reasonableness of

13 Mr. Brisebois's medical expenses.  Do you recall that?

14 A    Yes.

15 Q    Have you seen Mr. Brisebois's medical expenses in this

16 case?

17 A    I have not.  I've seen the treatments.  I don't think

18 I've seen the itemized bills.

19 Q    All right.  So is your opinion with respect to the

20 reasonableness of the treatments?  Is that right?

21 A    Yes.  Thank you for clarifying that.  I think the

22 treatments that he's received are entirely reasonable.  I

23 haven't seen what he's been billed for them.

24 Q    Are you able to offer an opinion on the reasonableness of

25 Mr. Brisebois's bills in this case?

1   A    No.

2   Q    To be clear, when we were talking about the risks of

3   surgery, do you -- is it your opinion that Mr. Brisebois is a

4   surgical candidate as a result of the October 28, 2013,

5   accident?

6   A    No.  I think if he requires surgery it wouldn't be

7   secondary to any alleged injuries to his spine that occurred

8   in that accident.

9            MS. POSTERARO:  Thank you, Dr. McGrail.  I have no

10  further questions.

11           THE WITNESS:  Thank you.

12           MR. BAILEY:  Nothing further, Dr. McGrail.  Thank

13  you, sir.

14           THE COURT:  All right.  Thank you, Dr. McGrail.

15  Thank you for appearing this way, and I appreciate your

16  helping this case, and I hope you have a good afternoon.

17           THE WITNESS:  And, Your Honor, thank you very much

18  for allowing me to appear via video.  I very much appreciate

19  that.

20           THE COURT:  No problem.  Thank you, sir.

21           All right.  We'll reconvene in 5A in 15 minutes.

22       (Recess at 2:46 p.m. until 3:03 p.m.)

23           THE COURT:  All right.  So what do we have next?

24           MS. POSTERARO:  Your Honor, may it please the Court.

25  The United States next calls Dr. Marc Kaye.

*Testimony of Marc Kaye, MD*                                              177

1           THE COURT:  Okay.

2           THE COURTROOM DEPUTY:  Please come forward, sir, to

3    be sworn.  Please raise your right hand.

4                          MARC KAYE, MD,

5    was called as a witness on behalf of Defendant and, having

6    been duly sworn, testified as follows:

7           THE WITNESS:  I do.

8           THE COURTROOM DEPUTY:  Thank you, sir.  You may be

9    seated.  Once seated, please speak your name into the

10   microphone for the record and spell your last name.

11          THE WITNESS:  Marc Kaye, K-a-y-e.

12                     DIRECT EXAMINATION

13   BY MS. POSTERARO:

14   Q    Dr. Kaye, were you asked to review medical records and

15   imaging and give opinions in this case?

16   A    Yes.

17   Q    And did you complete this review of medical records and

18   imaging?

19   A    Yes.

20   Q    Based on this review, is there sufficient evidence to

21   form to a reasonable degree of medical certainty an opinion as

22   to whether the accident on October 28, 2013, caused any injury

23   to or exacerbated any of Mr. Brisebois's existing injuries?

24   A    Yes.

25   Q    And did you form opinions based on this review?

*Testimony of Marc Kaye, MD*                                      178

1   A    Yes, I did.

2   Q    Generally speaking -- and we'll discuss your opinions

3   more in detail in just a bit -- can you tell the Court the

4   opinions that you reached based on your review of

5   Mr. Brisebois's medical records and images.

6   A    Yes.   Concerning the lumbar spine, he had preexisting --

7   there was evidence -- radiographic evidence, MRI scans, and

8   CT scan scans that he had preexisting disc disease in the

9   lumbar spine that was present prior to the accident and was

10  present after the accident, and with a reasonable medical

11  certainty, those -- there was no significant change or

12  evidence of any acute injury from the accident to his lumbar

13  spine.

14  Q    Were you compensated for your time, for the work you did

15  on this case?

16  A    Yes, I was.

17  Q    And how much have you been paid for your time to date?

18  A    I think for -- to date, just under $6,000.

19  Q    And does your fee depend on the outcome of this case?

20  A    No.

21  Q    Are you prepared today to testify and offer opinions

22  based on your review and evaluations of Mr. Brisebois's

23  medical records and imaging in this case?

24  A    Yes.

25  Q    Before we get to your opinions, can you please inform the

*Testimony of Marc Kaye, MD*                                          *179*

1    Court of your current occupation or profession.

2    A    I'm a radiologist.  I practice diagnostic radiology in

3    vascular and interventional radiology primarily in

4    South Florida but also in Central Florida.

5    Q    Can you describe your educational background, please.

6    A    Yes.  I attended the University of Florida and then

7    undergraduate, and went to medical school at the University of

8    Miami.  I graduated in 1976, and then after graduation, I did

9    my postgraduate training in radiology at Stanford University

10   in California.

11   Q    What did you do after Stanford?

12   A    I was in the Navy.  I had to go on active duty in the

13   Navy.  I was in the reserves during medical school, and after

14   medical school, I went on active duty in Jacksonville,

15   Florida, and then went into private practice in Jacksonville,

16   Florida.

17   Q    Do you hold any certificates or licenses?

18   A    Yeah.  I'm licensed to practice medicine in Florida and

19   Virginia.  Currently those are the only two states I'm

20   licensed to practice in.

21   Q    Can you summarize your medical training, please.

22   A    Basically, undergraduate medical school at the University

23   of Miami and then four years of radiology training at Stanford

24   University.

25   Q    Do you continue to practice radiology in a clinical

1    setting?

2    A    Yes.

3    Q    Okay.  Can you describe your current practice.

4    A    Well, about half of my practice is diagnostic radiology.

5    That's reading CT scans, X-rays, MRI studies, mammograms,

6    nuclear medicine studies, ultrasound, and half of it is

7    interventional, which is using image guidance to perform

8    minimally invasive procedures, like biopsies, angioplasties,

9    embolizations.  I'm on staff at three Level 2 trauma centers

10   and perform interventional radiology, diagnostic radiology

11   there.  And I recently have actually also been practicing

12   outside of D.C. and Virginia.

13   Q    Are you board-certified in radiology?

14   A    I'm board-certified in diagnostic radiology and

15   board-certified in vascular and interventional radiology.

16   Q    Do you sit on any boards?

17   A    I sit on the admissions committee for the University of

18   Miami Medical School Admissions Committee, and I've been a

19   board examiner for the American Board of Radiology.

20   Q    Can you describe your teaching career, academic career.

21   A    Well, presently, I'm on the faculty at Florida

22   International University in Dade County, Florida.  I teach

23   medical students also at the hospitals.  We have medical

24   students, residents, nursing students, PA, physician

25   assistant, students who rotate through.  I spend clinical time

1   with them.  I also give didactical lectures to the students.

2   Q    Are you a member of any professional organizations or

3   societies that we haven't talked about yet?

4   A    Yeah.  I've been a member of the American Medical

5   Association, the American College of Radiology, Society of

6   Interventional Radiology, Florida Radiological Society.

7   Q    Have you published articles in your field?

8   A    Yes.

9   Q    Okay.  Can you give a brief description of relevant

10  articles or subject matters.

11  A    Well, I don't have a copy of my CV.  I published articles

12  on breast biopsies, on kyphoplasty, trauma, treatment of

13  trauma, and so on.

14        MS. POSTERARO:  Your Honor, I'd tender Dr. Kaye as

15  an expert in the field of radiology.

16        THE COURT:  Any objection?

17        MR. BAILEY:  No voir dire, Judge.

18        THE COURT:  Okay.  He's recognized by the Court as

19  an expert in that field.

20  BY MS. POSTERARO:

21  Q    Did you write a report in this case, Dr. Kaye?

22  A    Yes, I did.

23  Q    Did that report set forth your conclusions and opinions?

24  A    Yes.

25  Q    Did you review the X-ray of Mr. Brisebois's lumbar spine

1    from Johnson's Surgery Center on June 15, 2006?

2    A    Yes.

3    Q    Did you review the MRI of Mr. Brisebois's lumbar spine

4    dated July 7, 2006?

5    A    Yes, I did.

6    Q    And did you review the X-ray of Mr. Brisebois's lumbar

7    spine dated January 24, 2012?

8    A    Yes.

9    Q    And did you review Mr. Brisebois -- the CT of

10   Mr. Brisebois's lumbar spine dated January 30, 2012?

11   A    I thought it was January 26th, but it may be

12   January 30th.  I'm not certain.

13   Q    No.  I stand corrected.  Thank you.

14   A    Okay.  Yeah, I reviewed it.  Yes.

15   Q    Thank you.

16        And did you review the MRI of Mr. Brisebois's lumbar

17   spine from Advantacare on November 18, 2013?

18   A    Yes.

19   Q    All right.  Did you review the MRI of Mr. Brisebois's

20   lumbar spine dated November 3, 2015?

21   A    Yes.

22   Q    Did you review the MRI of Mr. Brisebois's lumbar spine

23   dated September 7, 2016?

24   A    Yes.

25   Q    And did you review the MRI of Mr. Brisebois's lumbar

1    spine dated April 14, 2017?

2    A    Yes.

3    Q    Are these the types of documents or images an expert of

4    your field would typically rely on for the analysis you were

5    asked to do in this case?

6    A    Yes.

7    Q    Before we get into your opinions, Dr. Kaye, could you

8    briefly explain what an X-ray is, when you would order an

9    X-ray versus another type of imaging.

10   A    Well, an X-ray is basically the most simple imaging

11   technique.  It uses an X-ray tube, which produces ionizing

12   radiation that passes through the body and then strikes the

13   film and, depending upon the density of the tissue, creates an

14   image based upon differences in density.

15        A CT scan is a type of X-ray.  Basically, it has an X-ray

16   tube and there's image detectors, and it rotates around the

17   patient, creating -- and a computer does a reconstruction of

18   cross-sectional imaging of the body, again, based upon the

19   density of tissue.  In other words, dense tissue like bone or

20   metal or blood's going to stop the X-ray beam.  Less dense

21   tissue, like air in the lungs, is not going to stop the X-ray

22   beam as much, and so that's what creates the image or

23   contrast.

24   Q    How does this compare to a CT scan?

25   A    That is a -- a CT scan is an X-ray, but, basically, I was

1   trying to explain the CT scan.  The CT scan is an X-ray that

2   rotates around the patient, and as it rotates around, it

3   continually emits radiation, and there's detectors on the

4   other side.  And it creates a three-dimensional image of the

5   inside of the body, again, based upon tissue density.

6   Q     How does this compare to an MRI?

7   A     An MRI is different.  An MRI is basically -- the signal

8   from an MRI is based upon the magnetic properties of the

9   tissue and primarily the water -- the amount of water and the

10  environment that the water is in.  And, basically, a patient's

11  placed in a very strong magnetic field that's about 10- to

12  15,000 times the earth's magnetic field, and radio signals are

13  pulsed in to disalign the protons in the water molecules.  And

14  they emit a signal, which depends upon the tissue

15  characteristics.  So it's different than an X-ray, which is

16  solely reliant upon the density of tissue.

17  Q     When would you order one type of imaging over another?

18  A     Well, it -- it's -- that's very complicated, and there's

19  no quick or simple answer.  I would say generally in emergency

20  rooms acutely -- I work in trauma centers.  We usually get

21  X-rays and CT scans.  If it's significant trauma, we scan a

22  patient from -- almost from head to toe.  We get a head CT,

23  cervical spine, chest, thoracic spine, lumbar spine, abdomen,

24  pelvis, and so on, acutely, because that's very quick.  You

25  can do a CT like that with new CT scanners within -- you can

1    actually scan from the head to the bottom of the pelvis in

2    45 seconds.

3        If there's an issue, like if there's concern in the

4    emergency room about spinal cord compression or a spinal cord

5    injury, then you may get an MRI, but initially -- the initial

6    evaluation, I would say, in trauma centers is to get a

7    CT scan.  Now, if somebody is having back problems, disc

8    problems, then an MRI is -- is -- you know, once they're

9    stable or on an elective basis, that's the technique of choice

10   or the modality of choice.

11   Q    Would it be standard practice to order an initial CT in

12   an emergency department and then have the patient follow up

13   with a primary care provider or other referred physician for

14   an MRI?

15   A    That's correct.

16   Q    As a radiologist, can you compare one type of imaging to

17   another?  For instance, can you compare a CT scan to an MRI?

18   A    Well, you -- certainly.  That's what we do, at least I do

19   and I think most radiologists do all day long, is we might

20   look at a CT of the brain and then an MRI of the brain or a CT

21   of the spine.  Different modalities depict different things,

22   and oftentimes we'll get multiple different types of studies.

23   But, yes, you can compare them.

24   Q    Before we get into the images and look at them, briefly

25   could you explain disc desiccation.

1   A    Okay.  Disc desiccation -- desiccation, basically, is a

2   fancy way of saying dehydration, loss of water content.

3   That's part of the degenerative process.  As the disc

4   degenerates, the water content within the disc is decreased

5   and the disc loses its resiliency and cushion effect.

6   Q    And could you please briefly explain degeneration -- disc

7   degeneration.

8   A    Right.  Well, the disc -- first of all, the disc is

9   composed of two different substances.  There's an inner

10  substance, which is the nucleus, which is the jelly and sort

11  of the -- that gives you the resilience and the shock

12  absorption of the spine.  And then surrounding that is the

13  annulus, which are dense fibers, which hold it in.

14      With degeneration, the first thing that you see is that

15  the jelly starts to dry up or the nucleus starts to dry up,

16  and it loses water content, and so the disc becomes less

17  resilient, starts to flatten out, and often bulges, moves out.

18  It's like you take a hamburger patty and squeeze on it, and it

19  moves out in all directions.  That's typically a bulge, and

20  that's part of the degenerative process.

21  Q    Briefly, can you compare how a herniation differs from a

22  bulge.

23  A    Yeah.  The -- the definition of a bulge is when the disc

24  is diffusely extending beyond the margins of the posterior or

25  anterior margins of the vertebral bodies.  If it's -- the

*Testimony of Marc Kaye, MD*                                                187

1   definition that's uniformly used:  If it's more than

2   50 percent of the diameter of the disc, they call it a bulge.

3   If it's less than 50 percent, if it's more focal or confined,

4   it's a herniation or protrusion.

5   Q    And, briefly, can you explain what an annular fissure is.

6   A    An annular fissure is a degeneration of the annulus --

7   the fibers in the annulus that you see with degeneration.  For

8   the most part, it's not due to acute trauma or a traumatic

9   event; it's due to degeneration.

10        It used to be referred to as an "annular tear," but they

11   deliberately removed the term "tear" and replaced it with

12   fissure because tear refers to a traumatic etiology, when most

13   of the time it's just due to degeneration.

14   Q    Before we begin to look at the images that you've already

15   seen, are there any other terms that you believe would be

16   helpful for the Court to understand before we delve into these

17   images?

18   A    I think that's an overview, hopefully.  If so, I'll try

19   to explain on the fly.

20   Q    Fair enough.

21        MS. POSTERARO:  Can we turn on the monitor, please.

22        Your Honor, for ease of presentation and for

23   efficiency for the Court, I've put together some images on

24   this PowerPoint, and I've shown it to Mr. Bailey.  We're going

25   to use these to show you, the Court, the images that

*Testimony of Marc Kaye, MD*                                          **188**

1   Mr. Kaye -- Dr. Kaye has reviewed.  We've marked the

2   exhibit numbers on the documents so you have -- you know which

3   exhibit we're referring to.  I have extra copies if you would

4   like a copy of the PowerPoint or would like to mark it as a

5   demonstrative.

6              THE COURT:  Well, I think it would be helpful to

7   mark it as a court exhibit so later on we know what we're

8   looking at if we need to talk about it.

9              MS. POSTERARO:  Okay.  That sounds fine.  Would you

10  prefer to do that now or later?

11             THE COURT:  Well, let's go ahead and do it.

12             MS. POSTERARO:  May I approach?

13             THE COURT:  Sure.  So we'll mark this as Court

14  Exhibit No. 1.

15       (Court Exhibit No. 1 was admitted into evidence.)

16  BY MS. POSTERARO:

17  Q    Dr. Kaye, this is Defendant's Exhibit 12, which is a

18  lumbar spine X-ray from the Johnson surgery center dated

19  June 15, 2006.  Can you explain what we're looking at here,

20  please.

21  A    These are just -- it's called an AP, a frontal view and a

22  side view.  The image on the left is a side view or sagittal

23  view or lateral view of the lumbar spine, just plain X-rays of

24  the lumbar spine.

25  Q    Do you see any sorts of degeneration on this?  I'm

*Testimony of Marc Kaye, MD*                                    **189**

1    guessing no.

2    A    Not really.  You can't actually see the disc.  If -- if

3    there's advanced degeneration, the disc space would be

4    narrowed and you may see some other bony changes, but,

5    basically, no.

6    Q    Typically, you wouldn't see stuff -- something -- those

7    findings on an X-ray.

8    A    That's correct.

9    Q    The next image is Defendant's Exhibit 12, which is an MRI

10   from Mr. Brisebois's lumbar spine dated July 7, 2016.  Can you

11   please explain what we're looking at here.

12   A    Well, this is part of the MRI.  This is, again, what's

13   called a sagittal view, or a side view, if you're looking at

14   me from the side.  The patient's front or the belly button or

15   umbilicus is toward our left, and the back toward the spinous

16   process is towards the right, and the head is up here, and the

17   bottom is down here.  I think, if we go to the next image,

18   it's a little bit better.

19   Q    Can you please plain to the Court why we're looking at a

20   windowpane arrangement of the images.

21   A    Because what they did was -- this was done, I think, in

22   2006, and they just had the printed films on just regular

23   X-ray film that you put up on a view box.  Now we read

24   everything off computers.  So they took that film or those

25   seven sheets of film, and they scanned it and put it on a CD.

*Testimony of Marc Kaye, MD*                                      **190**

1    So that's why you're seeing it like it is.

2    Q    And the images are of sufficient quality to read?

3    A    Yes.

4         Okay.

5    Q    This is another image of Mr. Brisebois's lumbar spine

6    dated July 7, 2006, Defendant's Exhibit 12.  What are we

7    looking at here?

8    A    Right.  Is there a way for me to point -- oh, I guess it

9    is on the screen.  I just made a mark.  I don't know if

10   everybody can see that or not.

11             THE COURT:  Yes.  You can play with it.

12             THE WITNESS:  Oh, okay.

13   BY MS. POSTERARO:

14   Q    You can write on it, but you can't make it bigger or

15   smaller.

16   A    Okay.  Well, I'm just trying to point.  Okay.

17   Basically -- let's see.  I guess I'm trying to draw an arrow,

18   and I'm not a very good artist.  But, anyway, that's the L5-S1

19   disc, and there's a disc bulge there.  You can see it's

20   projecting beyond the back borders of the vertebral body.  So

21   that -- and by looking at all of the images in sequence from

22   front to back, it's diffuse.  So I can say it's a bulge.

23        And if you look at this disc here, it's a little bit

24   darker than the other ones.  So that's -- and it becomes more

25   apparent later on.  That's early disc desiccation.

*Testimony of Marc Kaye, MD*                                        *191*

1      And the one above it, which I'll try to mark "4" there,

2  but I'm not doing a very good job.  Yeah, that's good.  That's

3  L4, and below this is L5.  So that's the L4-L5 disc.  Those

4  have a slight bulge and slight desiccation.

5      So there's a pretty good size bulge with early

6  degeneration or desiccation at L5-S1 and some mild disc

7  bulging at L4-L5, and that's in 2006.

8  Q    The next image is Defendant's Exhibit 8, which is a

9  Bert Fish Medical Center X-ray from January 24, 2012.  If you

10  could please explain what we're looking at here.

11  A    Right.  These are just explain X-rays of the lumbar

12  spine.  There's no fracture.  There's no slippage of the

13  spine.  But you really can't get any detail or any significant

14  information about the disc itself on the X-rays.  Same thing

15  here.  Okay.

16  Q    The next image is Defense Exhibit 8, which is the

17  January 26, 2012, CT of Mr. Brisebois's lumbar spine taken

18  at -- or done at Bert Fish Medical Center.  Can you please

19  explain what we're looking at here, Dr. Kaye.

20  A    Right.  I put the marks and the arrows on this.  This is

21  a CT scan.  Again, it's a fancy type of X-ray, and this is

22  what's called the "sagittal reconstruction."  It's like you're

23  looking at me from the side, a slice sort of down the middle

24  toward the side.  And I've labeled -- that's the L4-L3-L5

25  vertebral bodies.  So the disc between the L3 and L4 vertebral

*Testimony of Marc Kaye, MD*                                          **192**

1   body is the L3-L4 disc.  That's the nomenclature.  And if you

2   look at the screen on the right side -- it's a blowup -- you

3   can see that the L4 -- the arrow showing the L4-L5 disc that's

4   bulging -- moderate bulge there -- and the larger bulge at

5   L5-S1.

6        So there's no evidence of fracture or bone injury, but

7   there's disc bulging certainly at L4-L5 and L5-S1.  L5-S1

8   doesn't look a lot different than it did in 2006 on the MRI.

9   The L4-L5 bulge is more prominent -- significantly more

10  prominent than in 2006.

11  Q    Why do you refer to the bulges at L4-L5 and L5-S1 as

12  bulges rather than herniations?

13  A    Well, because -- again, because if you go through them,

14  they're -- it's diffuse.  It's not just in one -- if it was in

15  one area, it would be a herniation, but it's diffuse.  It's

16  greater than 50 percent of the diameter of the disc, so you

17  call it a bulge.  That's the definition.

18  Q    Do you see on this image any signs of desiccation or

19  degeneration?

20  A    Well, you can't see desiccation very well on a CT scan.

21  You can see that on an MRI because you really -- it's not

22  sensitive enough to tell it.  But the fact that the disc is

23  bulging is evidence of degeneration.  It's not a normal disc.

24  Q    The next is Exhibit 8, which is the -- an X-ray of

25  Mr. Brisebois's lumbar spine dated October 30, 2013.  Can you

*Testimony of Marc Kaye, MD*                                         **193**

1   please explain what we're looking at here, Dr. Kaye.

2   A    Again, you're looking at -- the image on our far left

3   is -- that has an R on it -- that's an AP or frontal view of

4   the lumbar spine, and the other two images are lateral or

5   sagittal views of the lumbar spine.  They're just plain

6   X-rays.  There's no fracture.  The alignment of the spine is

7   normal.  There's no slippage or spondylolisthesis.  You really

8   can't tell much on the X-ray if there's -- you know, if

9   there's any living pathology, at least on these X-rays.

10  Q    And this is the same image -- Defendant's Exhibit 8,

11  additional X-rays from October 30, 2013, of the lumbar spine?

12  A    Yes.

13  Q    Do these tell you anything additional?

14  A    No.

15  Q    The next image we have from Mr. Brisebois is Defendant's

16  Exhibit 11, which is an MRI of his lumbar spine dated

17  November 18, 2013.  Can you please explain to the Court what

18  we're looking at on this particular image.

19  A    Right.  I put up three -- three images of the lumbar

20  spine.  Again, these are what we call "T2-weighted images."

21  Starting -- the image on our far left is over to the

22  patient's -- a slice through the right side.  The one in the

23  middle is sort of a midline slice, and the one on the left is

24  off to the left side.

25       And a couple of things.  If you look at the middle image,

1    this -- I don't have the arrow, but this white stuff over here

2    is cerebral spinal fluid.  That's fluid surrounding the lower

3    spinal cord, which is up here in the nerve roots.  When you do

4    a lumbar puncture, you put a needle in and you drain that

5    fluid.  That's cerebral spinal fluid.  The point being is that

6    on these sequences, anything that has water is going to look

7    whiter as opposed to something that has less water is going to

8    look darker.

9         And you can see that the -- first of all, the L5-S1 disc,

10   the lowest disc down here -- it looks blacker than these other

11   discs.  That's disc desiccation.  It's dried up.  And we know

12   that disc, at least going back seven years, was diseased, and

13   it's still got a bulge in it.  And, again, I say it's a bulge

14   because it's diffuse.  You can see it all the way to the

15   right, and you can see it all the way to the left.

16        And there's actually a little annular fissure here.  I

17   think there's a blowup of that later.  That little white dot

18   there.  And then, again, you have this bulging of the L4-L5

19   disc, which is slightly desiccated and slightly bulging, and

20   that looked similar to the degree of bulging as what we saw on

21   the CT scan of January 2012, which was, like, 18 months

22   before.  So, basically, these look similar to what was present

23   in terms of the degree of disc bulging in January of 2012,

24   18 months earlier.

25   Q    Now, you've talked about a bright signal at L5-S1.

*Testimony of Marc Kaye, MD*                                    **195**

1    A    Yes.

2    Q    Can you please describe what that bright signal is.

3    A    That's -- I'm going to try to circle it the best I can,

4    but anyway.  And I'm not doing a very good job.  That's the

5    typical appearance of an annular fissure.

6    Q    This is Mr. Brisebois's first image post-October 28,

7    2013.  Why is this significant?

8    A    Well, it just shows this is -- well, it shows this is a

9    chronic process.  It's a chronic degenerative process.  And

10   that bright signal -- the annular fissure is not evidence of

11   any acute injury.  That's evidence of disc degeneration.  It's

12   not edema; it's an annular fissure, which is fluid and

13   granulation tissue within a degenerative annulus, the outside

14   portion of the disc.

15   Q    Now, the degeneration or desiccation that you talked

16   about -- how long after an acute injury would one normally see

17   desiccation of this type?

18   A    Well, at the L5-S1 level, I mean, that degree of

19   desiccation would take at least a year if not considerably

20   longer.  It's nothing that -- it doesn't happen immediately.

21   Q    And what about the L4-L5 level?

22   A    Same.  Same.

23   Q    Would such desiccation typically take more than a month?

24   A    Oh, yes.

25   Q    The next image is a comparison between the MRI of

*Testimony of Marc Kaye, MD*                                    *196*

1   November 18, 2013, and the CT scan of January 26, 2012.  The

2   MRI is Defendant's Exhibit -- MRI of November 18, 2013, is

3   Defendant's Exhibit 11.  The CT scan is Defendant's Exhibit 8.

4   Can you please explain what we're looking at here, please.

5   A    Right.  Well, the CT scan, again, is about 18 months

6   before this incident in 2013.  And, again, just comparing, you

7   know -- it is a little bit of apples to oranges, but clearly

8   you can see there was a bulging disc at L4-L5 on the CT scan

9   in January of 2012, and it's still there, and it's about the

10  same degree of bulging.  And the same with L5-S1.  So both of

11  these are preexisting conditions that certainly predated the

12  accident by over a year.

13  Q    Are the changes that you see consistent with chronic

14  degeneration?

15  A    Yes.

16  Q    This is Defendant's Exhibit 9, the MRI -- Mr. Brisebois's

17  lumbar spine taken at New Smyrna hospital November 3, 2015.

18  Can you explain what we're looking at here, Dr. Kaye.

19  A    Yeah.  It's basically -- again, these are what we call

20  "T2-weighted images," and when you do an MRI, you get T1, T2.

21  You may get another series called "STIR images" or something,

22  and you may get axial images, different images.  So this is --

23  this is three images from a study that probably has 40 images

24  total, four different series with ten images in each series,

25  roughly.

1    But, again, it doesn't show a lot of change.  This is

2    about two years -- I guess this is about two years since the

3    prior study.  There may be slightly more desiccation at L4-L5.

4    There's still a slight bulging and -- at L5-S1.  So, again,

5    these changes are -- are very slow and developing over many

6    years, but there's not a lot of change between this study and

7    the study that was done, I guess, almost two years earlier.

8            THE COURT:  Is there more desiccation in L4-5 than

9    this one?

10           THE WITNESS:  Yes.  There is slightly more.  Yes,

11   sir.

12   BY MS. POSTERARO:

13   Q    Is that desiccation consistent with chronic degeneration?

14   A    Yes.  It's been two years.  I mean, it's not striking,

15   but there's more desiccation, yes.

16   Q    Do you see the annular fissure that you saw on the

17   November 2013 image?

18   A    I think you could see it -- if we blow it up, I think you

19   could see it.  I had one that I blew it up on.  You can

20   certainly see it in the middle at L4-L5.  You can see a small

21   annular fissure.  And I think you can see it in the central

22   one on -- on the L5-S1.

23           Okay.  This shows --

24   Q    This is Defendant's Exhibit 9, an MRI of Mr. Brisebois's

25   lumbar spine dated September 7, 2016.  What are we looking at

*Testimony of Marc Kaye, MD*                                    **198**

1   here?

2   A    Basically, again, they're T2-weighted images, and you can

3   certainly see the annular fissure.  I'm trying to put an -- a

4   mark on it, but I'm not doing a very good job.  Let's see.

5   I'll just circle it right about there.  That little bright dot

6   there -- that's the annular fissure.  And you can actually see

7   it over here too.  Circle's in the center circle.  That's the

8   annular fissure.  And I think I can see -- it's a little hard

9   on this image -- at L -- L4-L5 -- I thought I might be able to

10  see it.  It might be on another series.  But that's the

11  annular fissure.  It's still there.

12  Q    As you progress from left to right --

13  A    Yes.

14  Q    -- does your ability to see the annular fissure change?

15  A    Well, you're getting -- they're different areas of the

16  disc.  You're starting when you go from the one -- what's on

17  our left, this side of the screen -- that's the right side of

18  the patient.  So your cutting through that annular fissure's

19  pretty small.  So you got to hit it just right to see it.  So

20  if it -- if the -- if the slice is where the fissure is, you

21  should see it.

22  Q    So is your ability to see the annular fissure conditioned

23  on the cut of the -- of the slide that you're looking at?

24  A    Yeah.  If it's small, you could miss it on it.  You're

25  not going to see it on every slice.  Yes.

*Testimony of Marc Kaye, MD*                                      **199**

1    Q    I'm just going to clear your writings here.

2    A    Thank you.

3    Q    We're looking at Defendant's Exhibit 13, which is the MRI

4    of Mr. Brisebois's lumbar spine dated April 14, 2017.  What do

5    we see on this image, Dr. Kaye?

6    A    Basically, I think you see more disc desiccation compared

7    to the earlier studies.  Those discs are starting to look

8    blacker.  You know, again, it's been compared to the study --

9    you know, the earlier study.  It's been several years.  I

10   think on the far right image you can see -- I think you can

11   see part of that annular fissure there.  And it's a little

12   hard for me to see it, but I can see it on this series at

13   L4-L5.  But, basically, you see further disc desiccation and

14   degeneration.

15   Q    Is this consistent with the chronic degeneration we've

16   seen to date on Mr. Brisebois's images?

17   A    Yes.

18   Q    The next image is a side-by-side shot of Defendant's

19   Exhibit 11, an MRI dated November 18, 2013, and Defendant's

20   Exhibit 8, the CT scan of January 26.

21   A    Yeah.  I think we actually showed this before.  It's the

22   same thing, yeah.

23   Q    I'll move quickly, then.

24   A    Okay.

25   Q    Let's see.  The next slide is a comparison between the

*Testimony of Marc Kaye, MD*                                        **200**

1    MRI done on July 7, 2006, Defendant's Exhibit 12, and the MRI

2    done November 18, 2013, Defendant's Exhibit 11.

3    A    Right.

4    Q    Can you explain the comparison between the two, please.

5    A    Right.  Well, at L5-S1 you can see the annular fissure.

6    I'm going to try to -- I'm not being very successful at

7    circling this.  Nope.

8    Q    I can get rid of it.

9    A    Thank you.  Get rid of all my -- just above -- just going

10   up above the -- if I make -- that wasn't very good.  Let me

11   see if I can be a little more precise here.

12        But, anyway, you can see the annular fissure there at

13   L5-S1, and you can see it in 2013.  I think you can see a tiny

14   bit of the annular fissure at 4-5, and you can see it in 2013.

15   There is certainly -- there's more of a disc bulge -- slightly

16   more of a disc bulge in 2013 than there was in 2006, but it

17   certainly looks the same as it did on the CT scan of 2012.

18   Q    Do you -- do you see the annular fissure at L5-S1 on

19   July 7, 2006?

20   A    Yes, you can see it.  If I could be a little more

21   precise, I'll try to circle it there, but you can see it.

22   That white there.

23   Q    And is -- is that what is referred to as a bright signal?

24   A    Well, it's a brighter signal, yeah.  I mean, it's a

25   brighter signal.  That's correct.

*Testimony of Marc Kaye, MD*                                                    *201*

1      All right.  Here we go.

2    Q    So the next image is a comparison of the November 18,

3    2013, image, Defendant's Exhibit 11, against Defendant's

4    Exhibit 9, September 7, 2016.  Why is this noted, or can you

5    explain to the Court why we have Mahan Figure 7 on there?

6    A    Well, from what I saw of Dr. Mahan's report and his

7    images, he was saying that on the November 13th -- excuse me.

8    November 18, 2013, study that there was a bright signal at the

9    L5-S1 level, which indicated edema from an acute process, and

10   that's not an acute process.  That's the annular fissure that

11   you can see, and you can see it in 2016, almost three years

12   later.  That's probably always -- that's not an acute finding.

13   It's not acute swelling.  It's an annular fissure.

14   Q    So the bright --

15   A    This bright signal, that bright dot -- I'll try to circle

16   it there -- is the same as this bright dot that you see in

17   2016.

18   Q    Is that the same bright dot that we saw from the MRI from

19   2006?

20   A    Yes.

21   Q    The next slide is an MRI comparison of Mr. Brisebois's

22   lumbar spine at the L5-S1, and we're looking at images from

23   November 13th, Defendant's Exhibit 11; September 7, 2016,

24   Defendant's Exhibit 9; and April 14, 2017, Defendant's

25   Exhibit 13.  Can you please explain this comparison.

1   A    Right.  Again, you have -- the arrows are pointing to the

2   annular fissure that's present in 2013 and 2016, and you could

3   also see it in 2017.  I mean, again, this is a chronic

4   finding.  It's not acute swelling or injury to the disc.  This

5   is a chronic fissure within the annulus, which is

6   degenerative.

7           THE COURT:  Does the fissure cause the desiccation

8   or water loss?

9           THE WITNESS:  I'm sorry, Your Honor?

10          THE COURT:  Does it cause the water loss?

11          THE WITNESS:  Well, it's part of that process.  It's

12  drying up, and it's cracking.  The disc is basically kind of

13  cracking, and so that's -- it's part of the process.  It's

14  more of a result than a cause, sir.

15          THE COURT:  Okay.

16  BY MS. POSTERARO:

17  Q    Do annular fissures heal?

18  A    No.

19  Q    Once you have an annular fissure, is a -- I'm trying not

20  to lead you, but are annular fissures permanent?

21  A    Yes, they are.  Basically, again, an annular fissure

22  means that those fibers in the annulus and the disc have

23  degenerated, basically died or torn or frayed, and you get

24  fluid in granulation tissue there that gives you that bright

25  signal.  It doesn't go on and heal.

1    Q    Can you explain why you might see the bright fissures --

2    excuse me -- the bright signals in some images but not in

3    others, for instance, the MRI from 2015?

4    A    Right.  Well, you have to kind of hit it right.  Okay?

5    You have to -- it's a very small thing, and if the slice isn't

6    through it completely -- like if you look at 2017, the image

7    on the far -- you only get a portion of it.  Okay?  Because

8    you're probably just off to the side of that fissure.  It's

9    very small.  You're talking about something that's on the

10   order of 2 millimeters or so in this case.

11   Q    Does the presence of a -- does the continued presence of

12   an annular fissure visible in imaging in several progressive

13   years indicate any sort of reinjury of that --

14   A    No.  No.  No.  Again, that's -- they use the term

15   fissure, not tear, because it's degeneration.  It's not due to

16   an acute -- generally due to an acute injury; it's due to wear

17   and tear and degeneration of the disc.  If we all live long

18   enough, we're going to have degenerative disc disease.  Okay?

19   There's no question about it.  They're going to wear out.

20   Some people, depending upon their body habitus, their

21   genetics, their lifestyle, whether they played aggressive

22   sports, and so on, are going to have more advanced disease at

23   different ages than other people, but if we all live long

24   enough, our discs are going to wear out.

25   Q    In your clinical experience, is it unusual to see someone

*Testimony of Marc Kaye, MD*                                    **204**

1   of Mr. Brisebois's age, body habitus, with chronic

2   degenerative disc disease like we've seen here?

3   A    No, no.  It's not uncommon.  As you get older -- it

4   becomes more common in older people and people with different

5   types of body habitus, but it's not unusual to see it in

6   people in their 30s.

7   Q    The CT scan that we looked at in January 2012 -- could a

8   disc bulging like that that we looked at be caused by

9   aggressive sports or, you know, exercise or sit-ups?

10  A    Yes.

11  Q    We're looking at now a comparison between the MRIs of

12  July 7, 2016, Defendant's Exhibit 12, and November 18, 2013,

13  Defendant's Exhibit 11.  Can you please explain what we're

14  looking at here.

15  A    Yes.  I think, according to the diagrams, the figures

16  that Dr. Mahan had in his report -- in his report, he had the

17  image on the -- which was his Figure 4, where the arrow is.

18  He was saying there was edema within the interspinous ligament

19  and that that was what that white area was when, in fact,

20  that's not edema.  That's fat within the ligament, and you can

21  see it, and you're catching it there.  And you can see the

22  same area in 2006 that's bright, and you can actually -- if

23  you scroll through the other images, you can see the same

24  thing if you catch it.  That's not edema; that's fat within

25  the ligaments.

*Testimony of Marc Kaye, MD*                                    **205**

1  Q    Not to put too fine a point on it, Dr. Kaye, but when you

2  see the annular fissure, the bright signal --

3  A    Yes.

4  Q    -- is that edema?

5  A    No, that's not edema.  That's not acute edema.  It's

6  actually granulation tissue, cells that are called

7  "granulation tissue" within the disc.  That's what the

8  pathologist tells when they look under the microscope at it.

9  Q    Did your review in total of these images allow you to

10 make any conclusions regarding Mr. Brisebois's lumbar spine?

11 A    Yes.

12 Q    And what conclusions did you reach?

13 A    Well, first of all, the disc bulging and degenerative

14 changes at L4-L5 and L5-S1 were present prior to the accident

15 in October of 2013.  I mean, we have a CT scan that shows

16 bulging at L4-L5 and L5-S1, similar to what we see on the MRI

17 following the incident.  And we know that he had disc disease

18 dating back to at least 2006.  So there was no evidence that

19 there was any acute injury or exacerbation or worsening of his

20 condition after the incident.

21 Q    Is your review of the images of Mr. Brisebois's lumbar

22 spine from 2006 to April 2017 in total consistent with what

23 you might see from someone with chronic and consistent

24 degeneration?

25 A    Yes.

*Testimony of Marc Kaye, MD*                                        **206**

1   Q     Did you reach an opinion with respect to whether

2   Mr. Brisebois suffered an acute injury as a result of the

3   October 28, 2013, incident?

4   A     Well, outside of his ankle, but if we're talking about

5   the lumbar spine, there's no evidence -- there's no objective

6   evidence or radiographic evidence of any acute injury or

7   trauma.

8   Q     Can you state to a reasonable degree of medical

9   probability whether Mr. Brisebois's herniation at L5-S1 was

10  caused by the accident?

11  A     I can state that it was not caused by the accident with

12  reasonable medical certainty.

13  Q     Can you state with reasonable medical certainty whether

14  the accident exacerbated any preexisting degeneration of

15  Mr. Brisebois's L5-S1 level?

16  A     I can state with certainty there's no radiographic

17  evidence either on the CT scans or MRI studies that there was

18  any exacerbation or worsening.

19  Q     Okay.  Can you state to a reasonable degree of medical

20  probability whether Mr. Brisebois's herniation at L4-L5 was

21  caused by the accident?

22  A     I would call it a bulge.  In my opinion, it's a bulge.

23  It's diffused.  But, no, it was not -- it predated the

24  accident.  There's radiographic evidence that it was present

25  18 months -- at least 18 months prior to the accident.

*Testimony of Marc Kaye, MD*                                          *207*

1    Q    Okay.  Can you state to a reasonable degree of medical

2    certainty whether the accident on October 28, 2013,

3    exacerbated any preexisting degeneration at -- or bulging at

4    the L4-L5 level?

5    A    There's no evidence that it worsened or exacerbated.

6    Q    What might you have expected to see on the November 18,

7    2013, image -- MRI of Mr. Lumbar -- Mr. Brisebois's lumbar

8    spine had there been any signs of objective trauma?

9    A    Well, we're fortunate we have a study from 2006 to

10   compare it with and 2012.  I would have expected to see a

11   change in the morphology and extent of disc protrusion if it

12   was acute.  There may be acute bony changes or soft tissue

13   changes or swelling or ligament disruption if it was an acute

14   disc herniation or acute injury.

15   Q    And did you see any of those signs --

16   A    No.

17   Q    -- on the November 18, 2013, image?

18   A    No.

19        MS. POSTERARO:  I have no further questions -- oh,

20   one more.

21   BY MS. POSTERARO:

22   Q    Did you reach all of your opinions to which you testified

23   today to a reasonable degree of medical certainty?

24   A    Yes, I did.

25   Q    Thank you.

*Testimony of Marc Kaye, MD*                                      **208**

1    A     Thank you.

2          THE COURT:  All right.  Cross.

3          MR. BAILEY:  Thank you.  May it please the Court.

4          What I'd ask is that whoever's running the

5    PowerPoint find some of these things for me to look at

6    previously so we can look at them again.  I obviously don't

7    have that capability on my own.

8          MS. POSTERARO:  What we have, Mike, is a paper copy

9    that might be helpful.

10         MR. BAILEY:  Yeah.  That might.  And then I can call

11   out what --

12         MS. POSTERARO:  That might be more efficient.

13         MR. BAILEY:  Thank you.

14         MS. POSTERARO:  If you keep them in order, it will

15   be helpful for finding them.

16         MR. BAILEY:  Yeah.  I won't try to rearrange them.

17                      CROSS-EXAMINATION

18   BY MR. BAILEY:

19   Q    Dr. Kaye, I'm assuming that you helped Ms. Posteraro --

20         MR. BAILEY:  I'm sorry?

21         MS. POSTERARO:  I'm sorry to interrupt, Your Honor.

22   If I may approach Mr. Bailey.  He can have the control for the

23   clicker, and he can find it himself, which might be more

24   efficient.

25         MR. BAILEY:  We'll see how good I am at that.

1          UNIDENTIFIED SPEAKER:  When you click, you have to

2    face this way.

3          MR. BAILEY:  Oh, I see.

4    BY MR. BAILEY:

5    Q    Dr. Kaye, I'm assuming that you helped Ms. Posteraro to

6    put these images together and get them printed out in paper

7    form so we can look at them?

8    A    I created the PowerPoint, and she printed them out in

9    paper form.

10   Q    Sure, sure.

11         But in terms of selecting the images, you did that?

12   A    For the most part, yes.

13   Q    Okay.  Ms. Posteraro didn't do it, did she?

14   A    Select the images?

15   Q    Yeah.

16         MS. POSTERARO:  Objection to the extent that this is

17   a privileged communication between my retained expert and

18   myself and to the --

19         THE COURT:  Those communications are not privileged.

20   Sorry.  You lose that one.

21         THE WITNESS:  Okay.  I picked out the images that I

22   thought were most pertinent.  There were some images she

23   didn't want to show.  Okay?  I mean, they were just redundant,

24   I guess, but, basically, I picked out the images I thought

25   were most appropriate to show.

1    BY MR. BAILEY:

2    Q    Okay.  But you say there were some that got nixed in the

3    process?

4    A    Well, yeah.  They were duplicitous, and there were too

5    many images.  Again, each of these MRIs has about 40 images.

6    There's probably at least four sequences with ten images on

7    it.  I always have too many individuals, and then we pick the

8    best ones.

9    Q    I'm assuming that's what you tried to do here is pick the

10   best ones so you'd have something that would be easy to look

11   at; right?

12   A    Rather than going through -- I don't think the Court

13   would want to go through each and every image of every study.

14   Yes.

15   Q    Let me find -- the one thing I noticed:  There weren't

16   any axial images that you put together here, were there?

17   A    I don't think so, no.

18   Q    Why not?

19   A    I think the sagittal images show the pathology the best.

20   Q    Well, now, as far as talking about where the disc is --

21   is misconfigured, if you will, whether you want to call it a

22   bulge or a herniation, doesn't an axial image help you

23   understand that better?

24   A    I think -- when I'm reviewing them in clinical practice,

25   I look at axial images, but I think, if you have multiple

**Testimony of Marc Kaye, MD**                                      **211**

1   sagittal images, that displays the same information.

2   Q    Sure.  It's just a different plain.

3   A    It's a different view.

4   Q    But, I mean, if you want to learn whether you've got true

5   circumferential bulging or whether it's lateralized or in a

6   focal area, don't you have to look at the axial images?

7   A    Well, to answer your question, you don't have to look at

8   them as long as you look at all the sagittal images, because

9   the sagittal images cover the same area.  In practice I would

10  certainly look at the axial images.  If I'm reading -- when

11  I'm reading studies for patients, I certainly look at the

12  axial images.

13  Q    Yeah, well -- and where I'm going with this, Dr. Kaye,

14  when you looked at the axial images of the November 18, 2013,

15  MRI of Mr. Brisebois's low back, didn't you see that the L5-S1

16  disc was more left-sided?

17  A    It's diffuse.  It's more -- there's more of a bulge to

18  the left side than to the right side, but it's diffuse.

19  That's correct.  And you can tell that when you go through the

20  sequences on the sagittal images.

21  Q    Okay.  But if you had the axial cuts at the most

22  pertinent level, you could really see the lateralization of it

23  to the left side, couldn't you?

24  A    You could see that on both the sagittal and the axials.

25  It doesn't matter.

*Testimony of Marc Kaye, MD*                                           **212**

1   Q     Yeah.  And in practice, when you're trying to figure out

2   lateralization of a disc bulge or disc herniation, however you

3   might call it, you're going to look at the axials first,

4   aren't you?

5   A     That's what I've testified.  When I'm looking at a study,

6   I look at every single image, everything that's included

7   within the four corners of the image.

8   Q     But staying on that same topic, as far as the L4-5 disc

9   is concerned, that misconfiguration, bulge, herniation,

10  whatever we might call it, that's also predominately

11  left-sided, isn't it?

12  A     I believe it is.  It's more -- it's more eccentric to the

13  left than it is to the right.  That's correct.

14  Q     Is that L4-5 more eccentric to the left even than the

15  L5-S1 is currently?

16  A     I'd have to go through the studies before I make -- I

17  don't recall offhand.  I have all the studies here on CD.  We

18  can put them up, and I can look at them.

19  Q     Okay.  We may want to do that here in a bit.

20  A     Okay.

21  Q     One thing that I just want to make sure I understand:

22  These paper images, the ones that are up on the PowerPoint

23  here -- the resolution of those isn't as good as you get on a

24  computer screen with the digitals, is it?

25  A     Well, these are digital images.  Okay?  Let me finish.

1    These are digital images.  They were just copied as JPEGs and

2    put on here.

3    Q    I understand.

4    A    Okay?  Depending upon the computer screen and what you're

5    looking at it, you know, it -- it could be better; it could be

6    worse.

7    Q    Okay.

8         THE COURT:  And we have really good screens here.

9    BY MR. BAILEY:

10   Q    Once you print them out on paper and you're showing them,

11   you have at least a different image than you do when you look

12   at it on the computer screen from the original digital image,

13   don't you?

14   A    Well, we're looking at this on a computer screen.  We

15   didn't --

16   Q    (Simultaneous speaking.)

17   A    Let me -- let me -- I just have to finish my answer, sir.

18   I'm sorry.

19        We didn't take the images and print them out on paper and

20   then scan them and put them on this computer screen.  What's

21   on the computer screen -- the computer images were printed

22   out.  Okay?  And I'm not even looking -- I'm looking at the

23   computer screen.  I'm not looking at the paper images.

24   Q    Understood.  I'm looking at paper images, and that's why

25   I'm struggling as much as I am.

*Testimony of Marc Kaye, MD*                                    **214**

1        Look for me, if you will, at Exhibit 8.  It's the

2   Bert Fish CT lumbar spine, January 26, 2012, where we've got

3   the vertebral bodies labeled with some arrows.

4   A    I'm sorry, sir.  I have no ability to manipulate the

5   screen.

6   Q    Oh, sorry.  I got to do it.  Yeah.  Forgive me.

7            MR. BAILEY:  Why don't you do that for me.  It will

8   be Exhibit 8.

9            Well, that's not what I've got that says Exhibit 8

10  here.

11           MS. PAPPAS:  Exhibit 8 here?

12           MR. BAILEY:  Looking for the CT scan.

13           THE COURT:  Defendant's Exhibit 8 was the

14  October 30, '13, X-rays.

15           MR. BAILEY:  Judge, I've got one in my hand here

16  that says Exhibit 8.  In fact, I've got a whole bunch of them

17  that say Exhibit 8 for some reason.

18           There we go.  I think that's it.  That's the one I'm

19  looking for.

20  BY MR. BAILEY:

21  Q    All right.  This one that I've got printed out says

22  Exhibit 8.  We see some arrows there.  I want to make sure I

23  understand what we're looking at.  Is the left image you

24  just -- an unenlarged one, and the right image a blowup of the

25  same thing?

*Testimony of Marc Kaye, MD*                                    **215**

1  A    That's correct.

2  Q    Okay.  And the arrows -- to my eye, Dr. Kaye, I tell you,

3  they don't look like they're actually at the edge of the disc.

4  Am I missing that, or are they --

5  A    I would say that they're less than a fraction of a

6  millimeter from the edge of the disc.

7  Q    Okay.  And I'm looking particularly at that L4-5 disc.

8  I'm seeing that arrow looking like it's out in the middle of

9  space and the tip of the arrow.  Am I just not seeing well?

10  A    Well --

11        THE COURT:  We can measure it, but it's a pretty

12  small space.

13        THE WITNESS:  Yeah.  I mean, I think that disc --

14  the arrow's just -- certainly a fraction of a millimeter away

15  from the back of the disc.

16  BY MR. BAILEY:

17  Q    That was the intention, though, is to put it right at the

18  margin of the disc on the backside?

19  A    I think my intention was to put it as close to the back

20  of the disc without actually touching the disc.  I think

21  that's what my intention was.

22        MR. BAILEY:  If you will find what I've got as

23  Exhibit 13.  It's the MRI of April 14, 2017.

24  BY MR. BAILEY:

25  Q    Okay.  Dr. Kaye, look with me at this one.  I want to

1   understand again what we're looking at.  Are these all

2   different sagittal images from that MRI?

3   A    Yes.

4   Q    Different cuts?

5   A    Yes.

6   Q    Okay.  Same way we talked about them earlier, the -- what

7   is it?  The far left one is what?

8   A    The far left one -- I'll have to look at the original.

9   The far left one, I think, is off to the right and the -- to

10  the right side.  The one in the middle is close to midline,

11  and the one on our right side is toward the left side of the

12  page toward the left of the midline.

13  Q    Okay.  What I want to ask you about there is, to start

14  off, the middle image there.  Why is that one so much darker

15  than the other two?

16  A    I think that's just the technique that it was done with.

17  I'd have to look at the original image.  I can't --

18  Q    Okay.

19  A    Okay.  It does -- I admit it does look darker, yeah.  I

20  don't know if it particularly transferred and it -- we'd have

21  to look at the original.  I have the CDs here.  We can look at

22  them.

23  Q    Yeah.  Let's do that in a minute.

24       The other thing that caught my eye was that L4-5 disc

25  there, particularly on that far left image -- it's as dark and

1   desiccated as the L5-S1, isn't it?

2   A    On that image it does look that way.  That's correct.

3   Q    And so we're seeing now a comparison of two discs, one of

4   which we know has been injured since at least 2006 at L5-S1.

5   A    Well, we know it's been degenerative.  It's degenerative.

6   Okay?

7   Q    It's -- it's in a condition where it starts to desiccate.

8   A    It already has started to desiccate in 2006.  That's

9   correct.

10  Q    Yeah.  And yet if we look back -- and we're going to do

11  that -- at that L4-5, we see that now -- while it looks just

12  as dark and desiccated as the L5-S1 in April of 2017, if you

13  go back to November 18, 2013, it doesn't look nearly that

14  desiccated, does it?

15  A    No.  It -- it doesn't, but let me -- let me just caution

16  you because you're looking toward the periphery of the disc.

17  Okay?  And that part of the disc does look more desiccated on

18  that image than the central portion of the disc and toward the

19  left side.

20  Q    I understand.

21  A    But I think I've already testified that there is

22  progressive desiccation of L4-L5.  I think the Court asked me

23  that specifically --

24  Q    Yes.

25  A    -- that there was progressive desiccation of L4-L5 over

**Testimony of Marc Kaye, MD**                                    **218**

1   time, and that's what you'd see.

2   Q    I understand that, but my point is -- and maybe I'm not

3   understanding.  But, clearly, that L4-5 disc has gotten more

4   dried out, more desiccated, more darker-looking in the span of

5   what?  Two and a half years? -- than that L5-S1 disc did or at

6   least as much in 11 years.

7   A    Well, I don't know.  My math is -- I think between 2013

8   and 2017, that's four years, isn't it?

9   Q    Well, I've got --

10  A    Maybe three and a half years.  From October -- let me --

11  let me --

12  Q    November of '13 to April of '14 -- I guess that's three

13  and a half years.

14  A    Okay.  So that's three and a half years.  Okay?  But,

15  again, that's -- you're looking at one image on the side

16  there.  If you look at the central image, you know, it looks

17  like -- if you look at the image to the far right, clearly the

18  L4-L5 disc looks brighter, is less desiccated than L5-S1.

19  Q    True.  True.

20  A    But, you know, typically -- and I'm sure, if you take

21  another image five years from now, it's going to be even more

22  desiccated, and you'd probably see desiccation in the other

23  discs.

24  Q    I'm sure it is.

25       But the point being here, that L4-5 disc has really

*Testimony of Marc Kaye, MD*                                      **219**

1   gotten more degenerative and more desiccated in a shorter span

2   of time than you would expect to see with natural progression,

3   hadn't it?

4   A    No.  I don't agree with that, sir, no.

5   Q    So you'd expect a naturally occurring degenerative

6   process to cause the degree of desiccation change we see in

7   L4-5 over the span of whatever that is, November of 2013 to

8   April of 2017?

9   A    Well, if you're -- if you're comparing it to November of

10  2013 to April of 2017, you're talking about three and a half

11  years.

12  Q    Yes, sir.

13  A    Secondly, I wouldn't base -- base it upon one image on

14  one series.  Again, as you look at that, that's not as

15  apparent on the other slices.  I agree that it's -- there's

16  progressive desiccation.  It's not profound.  It's not

17  unexpected.

18  Q    It is what it is.

19  A    It is what it is, and that's -- there's -- you know, it's

20  not rapidly progressing.

21       MR. BAILEY:  Okay.  Fay, if you'll find the

22  November 3, 2015, Exhibit 9.

23  BY MR. BAILEY:

24  Q    Okay.  This is the MRI done not quite two years after

25  that first postaccident November 18, 2013.  Now, here again we

*Testimony of Marc Kaye, MD*                                                   **220**

1    do see the extent to which both the L4-5 and L5-S1 discs have

2    gotten darker to the extent that's existed; true?

3    A    Yes.

4    Q    Okay.  And, again, in less than two years' time, does

5    that not look like an accelerated degree of deterioration of

6    the L4-5 disc in that span of time --

7    A    No.

8    Q    -- with naturally occurring process?

9    A    No, no, no.  That's not -- in fact, I think we have a

10   slide that shows, I think, 2013, 2015 or '16, 2017 comparison.

11   No.  That's not -- certainly the change at L4-5 is rather

12   subtle, in my opinion, and the same at L5-S1.  I mean, no,

13   that's not rapid.  That's over two years.  That's not rapid.

14   The change is rather subtle.

15   Q    Okay.

16   A    But if you want -- if you really want to assess it, I'd

17   put them up side by side, the different years.

18   Q    Well, can we do that and pull them up on the computer?

19   A    I think I have a slide that shows it.  I think I did a

20   slide that shows the different years.

21   Q    Yeah.  Let's see if we can find that, and at least I'll

22   understand what we're dealing with.

23   A    I think it's toward the end.

24   Q    I've got one that says Exhibit 11, 9, and 13.  It's got

25   the November 18, 2013, September 7, '16, and April 14, '17,

1    images, presumably the same kind of views.  Is that the one

2    you're thinking of?

3    A    That's one of them, yeah.  Absolutely.

4    Q    Well, and there again I'm looking at the L4-5 disc in

5    November of '13 compared to the later years, and it just, to

6    my eye, looks like it's getting progressively darker.  And,

7    again, I'll ask:  Is that just my old eyes?

8    A    No.  I don't think that's -- I don't think there's

9    anything wrong with your vision, but I think you have to be

10   cautious.  If you look at the 2016 study compared to 2013, it

11   looks like that L4-L5 disc is certainly darker, but if you

12   look -- if you compare '17 to -- 2017 to the one in the

13   center, 2016, the '17 study, the disc looks brighter.  Okay?

14   It almost looks like it's reversed at L4-5.  Some of that's

15   technique.  Okay?

16        Again, I don't think there's any question there's

17   progressive desiccation, there's progressive darkening of the

18   disc over time, and that's what you see with degeneration.

19   There's nothing startling or anything surprising about it.

20   And, again, on those slides you can see the annular fissure is

21   there in 2013.  It's there in 2016.  It's there in 2017.

22   That's not an acute edema in the disc.  That's an annular

23   fissure.

24   Q    Yeah.  We're going to talk some more about that.

25   A    Okay.

*Testimony of Marc Kaye, MD*                                          **222**

1   Q    Staying on the disc now, that L5-S1 disc, though, over

2   time appears to look about the same color, if you will, the

3   same degree of darkness.  Is it just a more stable,

4   longer-standing thing that doesn't change as much?

5   A    No.  I disagree with you.  I think there's desiccation of

6   the L5-S1 disc also.

7   Q    Okay.  Is it desiccating or getting darker over the same

8   period of time at the same rate or as progressively, as

9   quickly as L4-5 is?

10  A    I -- I don't know how to measure the rate, but I would

11  say -- it's been my testimony it's continued to desiccate.

12  Q    No.  I understand.

13       And, again, I'm looking now at these three -- Exhibit 11,

14  Exhibit 9, Exhibit 13.  We've got the --

15  A    Okay.

16  Q    -- November '13, September '16, and April '14 -- or

17  April '17 views, and that L4-5 disc looks pretty well hydrated

18  or pretty bright there in November of '13, but by the time we

19  get to April of '17, it's pretty dark, yeah?  Is that some

20  different technique or a true deterioration that we can see by

21  the difference in the shades over that time?

22  A    Well, again, if you look at those studies, it continues

23  to desiccate with time.  And, again, there's no question

24  there's more desiccation in 2017 compared to 2013.  But,

25  again, I caution you because there can be subtle differences.

**Testimony of Marc Kaye, MD**                                              **223**

1  Again, as I look at the 2017 study, the disc looks brighter

2  than it does in 2016, but I think that's a difference in the

3  contrast in the technique of the 2017 study.

4  Q    Well, and -- and as far as that goes, you can vary the

5  contrast on these images when you've got them on the computer

6  display, can't you, by rolling the --

7  A    You can change the window and the level of the contrast

8  on the screen.  That's correct.

9  Q    Was that done on any of these?

10 A    Was that done on any of these?  There are -- I mean, were

11 the settings different?

12 Q    Yes, sir.

13 A    I'd have to go and look at the settings.  You know, I

14 can't tell you.  But if it's a different -- a different

15 institution -- it looks like it's on a different magnet -- the

16 settings are probably going to be different.

17 Q    But as far as the way these images were generated, did

18 you manipulate them at all to enhance the contrast on any of

19 them for these displays that are done here?

20 A    No.

21 Q    Okay.  They were just the native image without any window

22 enhancement?

23 A    All the images are the -- they're the -- they're computer

24 images.  They come up when you -- when you put the disc in

25 your computer and you bring it up, it comes up with a standard

*Testimony of Marc Kaye, MD*                                          *224*

1  display setting, which you can vary, but I don't think I

2  varied the display setting.

3  Q    Well, that was my question.

4  A    Okay.

5  Q    These are the ones that just come up automatically, all

6  of them?

7  A    It's the preset -- it's the default setting, if you will.

8  Q    Okay.

9  A    But I think the easiest think to do is put the disc in

10  and let's look at the entire study.

11  Q    Let's do that.

12  A    Okay.

13  Q    Do we have the capability of comparing different studies

14  side by side, or do we have to look at them individually?

15  A    I think if you have -- are you saying if you put the disc

16  in in the courtroom?

17  Q    Yes, sir.

18  A    I think you'd have to have two computers to do it

19  simultaneously.

20  Q    Let's not bother with that.  We've spent enough time with

21  it.

22  A    Okay.

23  Q    Dr. Kaye, I do want to talk a bit about that annular

24  fissure.  The bright signal is something that has more water

25  content; is that right?

1  A    It -- in the case of annular fissures, it's water and

2  granulation tissue.  That's what the pathologist tells.  It's

3  granulation tissue that creates it.

4  Q    What is granulation tissue?  What does that consist of?

5  What's the substance of it?

6  A    There's certain type of cells that compose granulation

7  tissue, and that's, admittedly, beyond my area of expertise to

8  go into detail about what it is, but pathologically it's

9  composed primarily of granulation tissue, inflammatory tissue.

10  Q    Okay.  But it's stuff that shows up brighter because it's

11  got more water content than the surrounding disc material?

12  A    It's got -- well, it's also the -- it's not just the

13  water content.  It's the environment of the water content.

14  Q    Different than the surrounding disc material that it's

15  shown in, though.

16  A    Different than the -- than the annular tissue.  That's

17  correct.

18  Q    And this is in the annulus part of the disc, in the

19  posterior annulus?

20  A    That's correct.

21  Q    Okay.  And looking at that November 18, 2013, MRI there

22  where Dr. Mahan described what he thought was edema in the

23  interspinous ligament in L5-S1 --

24  A    Yes.

25  Q    -- that's fat?

1   A    That's fat within the ligament.  That's correct.

2   Q    Why is the fat not enhancing to that degree at other

3   interspinous ligament levels?

4   A    Because it -- well, first of all, it's not a matter of

5   enhancement; it's a matter of signal.  And if you cut through

6   it and you look at different areas, it'll show up at different

7   areas being brighter.  Okay?

8        But -- I'm trying to find it.  You can see -- if you look

9   above there -- and I can't -- I don't know if I can mark it up

10  there.  I didn't do a very good job.  You can see that bright

11  area there.  That's fat within the interspinous ligament.

12  That's not edema.  And as you get -- as you go through the

13  original series and you go through, you can see it.

14  Q    If we were to put that November 18, 2013, sagittal series

15  up, whatever that one came from, and scroll through them,

16  would we see the same degree of brightness of signal in the

17  interspinous ligaments at other levels that we see at L5-S1?

18  A    I don't know.  I'd have to look at it.  But that's not

19  edema.  That's fat within the interspinous ligament.

20  Q    Why would fat light up like that differentially if, in

21  fact, we don't see it at other levels?

22  A    Well, I'm not saying we don't see it at other levels, but

23  that's just -- that's what you see.  There's normally fat.

24  Fat has a brighter signal than disc or bone does, for example.

25  So it's not unusual to see it, but that's what it represents.

*Testimony of Marc Kaye, MD*                                          **227**

1   Q    Yes, sir.  I understand.

2   A    And that's why you're catching it like that.

3        I have not seen edema within the interspinous ligament, I

4   think, in my 38-year career.  Okay?

5   Q    Well, indulge me.  And, again, for the sake of my

6   understanding, let's find that November 18, 2013, MRI, put the

7   disc in the machine, and let's scroll through the sagittal

8   cuts and see if we see the degree of enhancement in that same

9   general area --

10  A    Okay.

11  Q    -- at any other level.

12  A    Right.  But, again, it's not enhancement; it's signal.

13  Q    What's causing the signal to look different?

14  A    Well, it's -- the signal is from the fat.  Okay?  But

15  enhancement implies -- when you talk about enhancement, it --

16  maybe I'm being a little too picky here.  Enhancement implies

17  if you give somebody contrast.  Like gadolinium or X-ray

18  contrast and it lights up -- that's what we call enhancement.

19  Q    I apologize.

20  A    That's okay.

21  Q    That is the correct terminology to use.

22       But I'm talking about it just shows up as a brighter

23  signal on the --

24  A    It -- it shows up as a brighter signal, but on various

25  studies -- if you look at the image on the far right from

*Testimony of Marc Kaye, MD*                                                    **228**

1    2017, you see here?  Okay?  That looks pretty bright too.  Is

2    that edema?  No, that's not edema.

3    Q    Right.  But I --

4    A    Okay?  That's fat within the inter- -- you know, adjacent

5    to the interspinous ligament.  Okay?  It's not edema.

6    Q    Don't disagree that it looks brighter on that particular

7    study, but it does consistently at all levels; right?

8    A    I'm sorry?

9    Q    Doesn't it look brighter in that area at all of the

10   vertebral levels, all of the --

11   A    It looks -- it looks bright there.  You can see it.

12   That -- on that one little image, you can see it's bright, but

13   what I'm telling you is that's fat, and you can see it at the

14   other levels.

15   Q    I'll tell you what.  Regardless of what we want to call

16   it, indulge me.  Let's put in the November 18, 2013.  Let's

17   look at the different cuts and see if we see that degree of

18   bright signal in the same area where the fat would be at any

19   other level.

20   A    Fine.

21             THE COURT:  Wait a minute.  You don't wander around

22   up here.  You're not in state court.

23             MR. BAILEY:  Sorry, Judge.

24             THE COURT:  Go ahead, sir.

25             THE WITNESS:  I don't think there's a question

1    pending, Your Honor.

2              THE COURT:  He wants you to put something -- put

3    a -- your -- a disc in your computer and do something.

4              THE WITNESS:  Well, sir, I was prohibited from

5    bringing my computer into the courtroom by the marshals.  So

6    if you have a computer and if you have the disc, I'd be glad

7    to go through it with you.

8    BY MR. BAILEY:

9    Q    All right.  We'll leave it be because I thought that's

10   what we were trying to do.

11   A    But I do -- I'm sorry, sir, if I interrupted you.  I do

12   have the disc with the study on it, but I just don't have a

13   computer.

14             MR. BAILEY:  I understand that.

15             THE COURT:  Well, we can go get the computer, if you

16   want.

17             THE WITNESS:  It's over in the -- I left it in the

18   U.S. Attorney's Office.

19             MR. BAILEY:  Yeah.  Never mind.

20             THE COURT:  We've got two more days if --

21             MR. BAILEY:  He can bring it back.  It's close.

22             THE COURT:  I'm sorry.  What?

23             MS. POSTERARO:  The U.S. Attorney's Office is close,

24   and he can bring it in if --

25             MR. BAILEY:  Never mind.

*Testimony of Marc Kaye, MD*                                              **230**

1          THE WITNESS:  If we can hook it up.  Okay.

2          THE COURT:  We can get access to your office.

3    BY MR. BAILEY:

4    Q    Dr. Kaye, let me ask you --

5    A    Okay.

6    Q    -- a few questions.  We'll let you be then.

7         Do any of these MRI findings or lack of them, whatever

8    the case may be, necessarily correlate with whether a patient

9    has pain at any lumbar level?

10   A    Well, let me -- let me say that -- let me say this:

11   There's no tests -- radiological tests -- X-ray, CT scan, MRI,

12   PET scan, what have you -- that shows pain.  There's no blood

13   test that shows pain.  That's a subjective finding.  There's

14   certainly reason -- I don't doubt that Mr. Brisebois has pain.

15   You know, he's got degenerative disc disease.  He's got

16   abnormalities of the spine that produce pain.  But you can't

17   tell looking at these studies whether or not he's having pain

18   at the time of the study or not or where the pain is.  You

19   can't tell that.

20   Q    Okay.  And by the same token, we can't necessarily look

21   at these images and tell anything about exactly when that L4-5

22   disc began to deteriorate to the extent it is, can we?

23   A    Well, I can't -- I can't testify that it happened on such

24   a date at such a time, but we know that it was present and it

25   was deteriorated to about the same degree in January of 2012

1  over 18 months prior to this incident from the CT scan.  We

2  have evidence.  We know that back in 2006, seven years prior

3  to this incident, he had degenerative disc disease, moderate

4  degenerative disc disease with disc bulging at L5-S1, and mild

5  disease at L4-L5.

6  Q    Did the original interpreting radiologist interpret there

7  to be any degenerative disc disease at L4-L5 in the July 2006

8  MRI?

9  A    I don't recall.  I'd have to look at the report.

10           MR. BAILEY:  Dr. Kaye, that's all I have.  Thank

11  you, sir.

12           THE WITNESS:  Thank you, sir.

13           THE COURT:  Redirect.

14           MR. BAILEY:  No, Your Honor.

15           THE COURT:  All right.  Thank you, Dr. Kaye.

16           THE WITNESS:  Thank you, sir.

17           THE COURT:  I think you're done.

18           THE WITNESS:  Thank you, sir.

19           THE COURT:  Hope we weren't too difficult on you.

20           THE WITNESS:  No, sir.  Thank you very much.

21           THE COURT:  Okay.  All right.  It's 4:30.  What is

22  your game plan here?  We have to finish tomorrow because my

23  race car team is racing in Bowling Green, Kentucky, on Friday,

24  and I'm going to be there.

25           MS. POSTERARO:  The United States has one additional

1  witness, our accident reconstructionist, Dr. Morgan, as well

2  the remaining outstanding item of the cross-examination of

3  Mr. Brisebois.  I would like to conclude the cross-examination

4  of Mr. Brisebois before conducting the examination -- the

5  direct examination of the accident reconstructionist.  I

6  anticipate we can finish both of those items tomorrow morning.

7          THE COURT:  Okay.  Mr. Bailey, do you agree?

8          MR. BAILEY:  It makes sense to me.

9          THE COURT:  Okay.  Let's go ahead and talk about how

10  we wrap this up.  When I do a bench trial, I -- if you want to

11  argue closings, you can.  If you want to submit written papers

12  after we get a transcript, I'd prefer that.  It helps me in

13  terms of writing an opinion.  You can do either or both.  Most

14  of the time you don't really want to argue; you'd rather do it

15  just the briefs.  So that's fine with me.

16          MS. POSTERARO:  I'd prefer the briefs, Judge.

17          MR. BAILEY:  Suits me, Judge.  I think it takes less

18  time for the Court.  The only thing I'd ask in that respect

19  is -- my schedule is just nuts -- how much time would the

20  Court allow us to get all that done?

21          THE COURT:  Well, you know, it's been what?  Five

22  years since this --

23          MR. BAILEY:  Sooner rather than later.

24          THE COURT:  Another five weeks probably won't make a

25  difference; five months would.  So you-all get together and

1   agree on that.  I'm agreeable.  I don't care.  I've got plenty

2   of other stuff to do.

3          MR. BAILEY:  I'm just trying to get an understanding

4   so I can juggle my workload.

5          THE COURT:  Usually we time it from the receipt of

6   the transcript.  Three or four weeks after that.

7          MR. BAILEY:  Yeah, I think that's fine.  Four weeks

8   might be best just to put a round number on it.

9          MS. POSTERARO:  Thirty days from the receipt of the

10  transcript?

11         THE COURT:  Yeah.

12         MR. BAILEY:  All right.

13         THE COURT:  Okay.  So no closings.  Briefs -- and

14  you can do whatever format you think is most helpful to your

15  position or to me, and probably should set a page limit.  I

16  usually -- anything over 30, I usually won't read it.  So does

17  30 give you enough pages?

18         MR. BAILEY:  I think so, Judge.  You'd like a --

19  sort of a bullet point format or doesn't matter?

20         THE COURT:  I don't have a preference.  Whatever you

21  think is most helpful to me.

22         MR. BAILEY:  Okay.

23         MS. POSTERARO:  Thirty should be more than

24  sufficient.

25         THE COURT:  And just -- you know, do pinpoint cites

*234*

1    to exhibits so, when I read your briefs, I can look at

2    exhibits and see exactly what we're talking about.

3           All right.  In the morning start again at 9:00.  Is

4    that all right?

5           MR. BAILEY:  Yes, Your Honor.

6           THE COURT:  Okay.  See you at 9:00 tomorrow.

7      (Proceedings concluded at 4:29 p.m.)

8

9                        -    -    -

10

11              CERTIFICATE OF REPORTER

12

13   I certify that the foregoing is a correct transcript of the
     record of proceedings in the above-entitled matter.

14

15

16    /s/ Heather Jewett_____          07/09/2018
     Heather Jewett, RPR, FCRR               Date

17   Federal Official Court Reporter

18

19

20

21

22

23

24

25