1                UNITED STATES DISTRICT COURT
                 MIDDLE DISTRICT OF FLORIDA
2                    ORLANDO DIVISION

3

   - - - - - - - - - - - - - - - - X
4   JEFFREY BRISEBOIS,           :
                            :
5        Plaintiff,      :  Case No.:
                            :  6:16-cv-01589-GAP-GJK
6                            :
   vs.                   :
7                          :  Orlando, Florida
                          :  June 14, 2018
8   UNITED STATES OF AMERICA,   :  9:01 a.m.
                            :
9        Defendant.      :
                            :
10                            :
                            :
11                            :
   - - - - - - - - - - - - - - - - X
12                             

13           TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
         BEFORE THE HONORABLE GREGORY A. PRESNELL
             UNITED STATES DISTRICT JUDGE
14

15   APPEARANCES:

16

    Counsel for Plaintiff:     Michael Keith Bailey
17                               Fay O. Pappas

18    Counsel for Defendant:     Julie Posteraro

19

20

21   Proceedings recorded by mechanical stenography.
   Transcript produced by computer-aided transcription.
22

23   Court Reporter:  Heather Jewett, RPR, FCRR
                 Federal Official Court Reporter
24                401 West Central Boulevard, Suite 4600
                 Orlando, Florida 32801
25                e-mail: heatherjewett.focr@gmail.com

# T A B L E   O F   C O N T E N T S

### June 14, 2018

<u>WITNESSES</u>

For Plaintiff:

  Jeffrey Brisebois
     Cross-Examination by Ms. Posteraro    4
     Redirect Examination by Mr. Bailey    48

For Defendant:

  Justin Morgan, PhD
     Direct Examination  by Ms. Posteraro    55
     Cross-Examination by Mr. Bailey    85
     Redirect Examination by Ms. Posteraro    143


<u>EXHIBITS</u>

For Plaintiff:

| Number 5 | Admitted under Seal | 148 |
| Number 7 | Admitted | 148 |
| Number 17 | Admitted as Amended | 152 |
| Number 21 | Admitted | 152 |
| Number 24 | Admitted | 153 |
| Number 28 | Admitted | 154 |
| Number 29 | Admitted | 154 |

For Defendant:

| Number 1 | Admitted | 145 |
| Number 2 | Admitted | 145 |
| Number 3 | Admitted | 145 |
| Number 4 | Admitted | 42 |
| Number 5 | Admitted | 145 |
| Number 6 | Admitted | 145 |
| Number 7 | Admitted | 145 |
| Number 8 | Admitted | 145 |
| Number 9 | Admitted | 145 |
| Number 10 | Admitted | 145 |
| Number 11 | Admitted | 145 |
| Number 12 | Admitted | 145 |
| Number 13 | Admitted | 145 |
| Number 14 | Admitted | 145 |
| Number 15 | Admitted | 145 |
| Number 17 | Admitted | 145 |

## Table of Contents

1

  Number 18      Admitted                          146

2

3 Court Exhibits:

4

  Number 2       Admitted                           60

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PROCEEDINGS

(Call to order of the court at 9:01 a.m.)

THE COURT:  Yesterday I had kind of lost a day when I was talking about my schedule.  I actually only have this morning.  I've got a pretrial this afternoon, and I'm leaving town tomorrow morning.  So we need to get this done.

So, anyway, you were going to cross-examine Mr. Brisebois?

MS. POSTERARO:  Yes, Your Honor.

THE COURT:  All right.  Mr. Brisebois, come on back up, please, sir.  You're still under oath.  Okay?

THE COURTROOM DEPUTY:  You can be seated.

THE WITNESS:  Oh, okay.  Thank you.

THE COURT:  Once is enough.

JEFFREY BRISEBOIS

was called as a witness on behalf of Plaintiff and, having previously been duly sworn, testified as follows:

CROSS-EXAMINATION

BY MS. POSTERARO:

Q    Good morning, Mr. Brisebois.

A    Good morning.

Q    Prior to my cross-examination today but subsequent to the direct examination by Plaintiff's counsel -- by your counsel on Tuesday, did you do anything additional to prepare for your testimony before the Court?

1  A    I just looked over my deposition.

2  Q    How long did you spend going over your deposition?

3  A    Not long.

4  Q    Okay.  Can you approximate the amount of time that you

5  spent reviewing your deposition?

6  A    A couple minutes the other day, a couple minutes

7  yesterday, a couple minutes early this morning.

8  Q    Were there specific sections of your deposition

9  transcript that you reviewed?

10  A    No.  I was just looking over it on some of the stuff that

11  I didn't remember the last time we had a deposition.

12  Q    Could you be more specific?

13  A    It was, like, certain pages.  I can't remember the

14  sentences.

15  Q    Certain topic areas that you reviewed to assist in your

16  recollection?

17  A    They were just quick glances of the accident.

18  Q    Okay.  But what are some of the things you felt you

19  couldn't remember during your deposition?

20  A    I'm not quite sure.

21  Q    Well, you testified that you reviewed your deposition

22  transcript for -- to help you remember things that you

23  couldn't remember at the deposition; is that right?

24  A    Yes.

25  Q    Okay.

1  A    It was just a quick glance.

2  Q    Okay. But you're unable to tell me precisely how long

3 you spent going over your deposition transcript prior to your

4 testimony here today; is that right?

5  A    Yes. Just a couple minutes.

6  Q    Specifically, did you look at the sections of your

7 deposition transcript involving activities that you -- that

8 you were able to do before --

9  A    No.

10  Q    -- the accident versus after?

11  A    No, ma'am.

12  Q    Did you review the sections of your deposition transcript

13 regarding the specifics of how the accident happened?

14  A    Just when it happened. Correct.

15  Q    And what did you feel that you could not remember during

16 your deposition that you are now able to recall?

17  A    It's exactly the same, that I did not remember.

18  Q    Did you do anything else to prepare for your

19 cross-examination here this morning?

20  A    No.

21  Q    Did you talk to anybody?

22  A    No.

23  Q    So is it your testimony that the same things you could

24 not recall during your deposition you are unable to recall

25 today?

1  A    Yes, ma'am.

2  Q    Can you tell me specifically what that is?

3  A    No, I cannot.

4  Q    Well, you looked at your deposition transcript this

5  morning; right?

6  A    Yes.

7  Q    Okay.  Well, what in that review did you confirm that you

8  were unable to recall during your deposition that you are also

9  unable to recall today?

10  A    I'm -- I really don't remember.  I'm very forgetful in

11  short time.

12  Q    Well, it's only 9:05 this morning, Mr. Brisebois.

13  A    Yes.

14  Q    What time did you review your deposition transcript?

15  A    Like, an hour or two ago.

16  Q    Okay.  But you're unable to recall today what specific

17  portions of the transcript that you reviewed?

18  A    Yes.

19  Q    Did you review anything else in preparation for your

20  cross-examination this morning?

21  A    No.

22  Q    Is my understanding correct, Mr. Brisebois, that you did

23  not graduate high school?

24  A    Correct.

25  Q    And you do not have a GED; is that correct?

1  A   Correct.

2  Q   And you've failed a grade; is that correct?

3  A   Yes.

4  Q   Did you fail more than one grade?

5  A   I know I failed first grade.  I might have stayed back in

6  high school.

7  Q   You're unable to recall whether you stayed back in high

8  school?

9  A   Yes.  I think I had to repeat a class -- a year.

10 Q   But you don't recall which year in high school that you

11 had to repeat?

12 A   No.

13 Q   In October 2013 you were not licensed to drive a car; is

14 that correct?

15 A   Correct.

16 Q   And you had taken the exam to become a licensed driver;

17 is that correct?

18 A   Yes.

19 Q   You had taken the exam four times; is that correct?

20 A   Yes.

21 Q   The fourth time you took the exam, you took the exam in

22 the state of Florida; is that correct?

23 A   Correct.

24 Q   The three previous times were in Connecticut?

25 A   Correct.

1  Q    You moved to Florida in 2009; correct?

2  A    Yes.

3  Q    So you took the exam sometime prior to 2013; is that

4  correct?

5  A    I don't know the exact year, but I know I took it when we

6  moved here.

7  Q    So you took it prior to the October 2013 accident; is

8  that correct?

9  A    I think so.

10  Q    And you recall giving a deposition in this case; is that

11  correct?

12  A    Correct.

13  Q    On May 15, 2017; correct?

14  A    I think that was the date.

15  Q    And at the start of that deposition, you swore an oath to

16  tell the truth.  Do you remember that?

17  A    Yes.

18  Q    Were you asked this question, and did you give this

19  answer?  Page 45.

20      "QUESTION:  So sometime before October 2013 is when you

21  took the driver's license exam?

22      "ANSWER:  Yes."

23      Were you asked that question, and did you give that

24  answer?

25  A    Yes.

1  Q    Is that deposition testimony still accurate?

2  A    Yes.

3  Q    You failed the written portion of each exam each time you

4  took it; is that correct?

5  A    Correct.

6  Q    So you were never able to take the driving portion of

7  those four exams; is that correct?

8  A    Correct.

9  Q    Since your deposition testimony in May 2017, have you

10 taken another driver's license exam?

11 A    No.

12 Q    In October 2013 you worked at a restaurant called

13 McKenna's; is that correct?

14 A    Correct.

15 Q    And you worked there from May 12th -- excuse me --

16 May 2012 to May 2014?

17 A    I think -- I think I did, or October to May.  I know it

18 was, like, one or two years or somewhere around there.  I

19 don't remember the exact time I started and it ended.

20 Q    I'll refer -- I'll refer you, Mr. Brisebois, to

21 Defendant's Exhibit 18 in your notebooks.  It's the white

22 notebooks.

23 A    Up here?

24 Q    Yes.

25        MS. POSTERARO:  May I approach, Your Honor?

1      THE COURT:  Yes.

2      THE WITNESS:  What would you like me to do with

3 these?  Just leave them?

4      Thanks.

5 BY MS. POSTERARO:

6 Q    In Defendant's Exhibit 18 -- I'll refer you to -- the

7 Bates number will be --

8 A    What exhibit?

9 Q    Excuse me.  You know what?  You were -- I had my notes

10 wrong.  You were correct.  I'll -- it was Defendant's

11 Exhibit 18, which is Plaintiff's interrogatory responses where

12 he lists the dates of his employment.  But the testimony was

13 correct; you worked from October 2012 to May 2014 at

14 McKenna's.

15      At any rate, you worked at McKenna's for almost eight

16 months following the October 2013 accident; is that correct?

17 A    Correct.

18 Q    And you worked in the kitchen that entire time?

19 A    Correct.

20 Q    And you made approximately 9 or $10 an hour; is that

21 correct?

22 A    Around there.

23 Q    And you left McKenna's because your brother worked at a

24 different restaurant, Barracuda's, and he said it was a better

25 restaurant; is that correct?

1    A    Correct.

2    Q    So after you left McKenna's, you went to the restaurant

3    of Barracuda's; correct?

4    A    Correct.

5    Q    And there you worked as a prep cook; is that right?

6    A    Correct.

7    Q    You worked at Barracuda's for approximately seven months;

8    is that correct?

9    A    Correct.

10   Q    And you left Barracuda's in November 2014; is that right?

11   A    Yes.

12   Q    Okay.  And you left Barracuda's to start your work at

13   SoNapa Grille, which is where you currently work; is that

14   right?

15   A    Correct.

16   Q    And you left Barracuda's because they weren't giving you

17   enough hours; is that right?

18   A    Yes.

19   Q    You needed to make more money; is that right?

20   A    Correct.

21   Q    And, in fact, until you got your job at SoNapa Grille,

22   you were going to leave Barracuda's and move back north; is

23   that correct?

24   A    We thought about it.  So correct, yes.

25   Q    To Connecticut?

1  A    Connecticut or Mass.

2  Q    And you left Barracuda's in November 2014.  You had an

3  exit interview.  Do you recall that?

4  A    What?  Sorry?

5  Q    When you left Barracuda's in November 2014, you had an

6  exit interview.  Do you recall that?

7  A    What is that?

8  Q    A meeting with your -- did you meet with your managers

9  prior to leaving Barracuda's --

10  A    Oh, yes.  Sorry.

11  Q    And they wanted you to keep working there; is that right?

12  A    Yes.

13  Q    They even offered you a raise; is that right?

14  A    Yes.

15  Q    They were willing to match what you were being offered at

16  SoNapa Grille.  Do you recall that?

17  A    Yes.

18  Q    But you left because you wanted to work at SoNapa Grille?

19  A    Correct.

20  Q    And you've been working at SoNapa Grille since

21  November 2014; correct?

22  A    Correct.

23  Q    You work in food prep at SoNapa Grille?

24  A    Correct.

25  Q    That's the same type of work that you were doing at

1  Barracuda's; is that right?

2  A    Correct.

3  Q    About a year and a half after you started at SoNapa

4  Grille, they gave you a raise; is that right?

5  A    Yes.

6  Q    And they gave you a raise to $12 an hour; is that right?

7  A    Yes.

8  Q    Do you still make $12 an hour?

9  A    No.

10  Q    Did they give you another raise?

11  A    Yes.

12  Q    How much do you make now?

13  A    Thirteen.

14  Q    And when did they give you that raise?

15  A    I think it was a year after I got that other raise.

16  Q    SoNapa Grille has a formal review process; is that right?

17  A    Yes.

18  Q    In your first review after you started there, you got a

19  raise; is that right?

20  A    Yes.

21  Q    And you were told to keep up the good work; is that

22  right?

23  A    Yes.

24  Q    You testified about the availability of an assistant

25  manager position at SoNapa Grille.  Do you recall that?

1   A    Yes.

2   Q    Okay.  But you did not apply for the position of

3   assistant manager; is that right?

4   A    Yes.

5   Q    And you don't know how much the position of assistant

6   manager would pay; is that right?

7   A    Yes.  I know it's more than -- I'm sorry.  Can I say

8   something?

9   Q    No.  There's no question pending.

10  A    Okay.

11  Q    Now, you injured your back in a work-related accident in

12  2006; is that right?

13  A    Yes.

14  Q    Okay.  You testified that you fell off the back of a

15  FedEx truck; is that right?

16  A    Yes.

17  Q    And you injured your disc at L5-S1; is that correct?

18  A    Yes.

19  Q    And you did file a workmen's compensation application; is

20  that correct?

21  A    Yes.

22  Q    At the time of your deposition, you testified that you

23  did not recall how long you received the workers' compensation

24  benefits.  Is that still accurate?

25  A    Yes.

1  Q    You also do not recall the amount of the benefits you

2  received?

3  A    Correct.

4  Q    And you don't recall what treatment you received for this

5  injury?

6  A    Correct.

7  Q    And you don't recall how long you treated after this 2006

8  accident?

9  A    No.

10  Q    And you don't recall who you treated with?

11  A    No.

12  Q    At the time of our deposition, you testified that you

13  didn't recall seeking treatment at any emergency departments

14  for pain related to your back prior to 2013.  Is that still

15  accurate?

16  A    Can you repeat the question?

17  Q    Sure.  At the time of our deposition, you testified that

18  you did not recall going to the emergency department to treat

19  back pain prior to the accident in 2013.  Is that still

20  accurate?

21  A    Yes, I didn't remember.

22  Q    Do you now recall that you went to the emergency

23  department to treat back pain prior to October 2013?

24  A    If it's in the report, I guess, yeah.  I didn't -- I

25  didn't remember until hearing it.

1  Q    In May 2017, at the time of your deposition, you did not

2  recall that you had gone to the emergency department to treat

3  back pain prior to 2013?

4  A    Yes.

5  Q    But now you recall; is that right?

6  A    When I was listening to the doctors.  At the time I did

7  not remember.

8           MS. POSTERARO:  Ms. Medina, could you pull up

9  Defendant's Exhibit 6, Bates No. 2563.

10          Your Honor, in order to see the exhibit on the

11  screen, would you mind if I moved back to the rear podium?

12          THE COURT:  No.  That's fine.

13          MS. POSTERARO:  Ms. Medina, could you zoom in on the

14  paragraphs entitled "History of Present Illness" and

15  "History" -- both those paragraphs, please -- oh, no.  The two

16  top ones.

17          Thank you.

18 BY MS. POSTERARO:

19  Q    Mr. Brisebois, in December 2011, December 2nd precisely,

20  you presented to Bert Fish Medical Center for a complaint of a

21  pinched nerve in your back, and it was getting worse.  Do you

22  now recall that you went to the emergency department on that

23  date?

24  A    Yes.

25  Q    You complained of pain in your upper back for a few days,

1  relieved with massage, hot packs, cold packs, acetaminophen,

2  ibuprofen.

3  A    Correct.

4  Q    I'm sorry.  I'm waiting for the exhibit to stop moving.

5       It's -- your symptoms seemed to have started after

6  jogging; is that correct?

7  A    Correct.

8  Q    And you told the emergency department that there was no

9  direct trauma, that you were feeling intermittent weakness or

10  numbness in your upper left extremity; is that correct?

11  A    Correct.

12       MS. POSTERARO:  Could you please go to

13  Bates No. 2568 of Defendant's Exhibit 6.

14       THE COURT:  You said 2568; right?

15       MS. POSTERARO:  I did, but now I'm questioning --

16       THE COURT:  Because what's up there is 2658.

17       MS. POSTERARO:  Ah.  I need you to go to 2568.

18       Thank you, Your Honor.

19       MR. BAILEY:  Judge, respectfully, these are all in

20  evidence.  I put them in evidence.  If the Court wants to walk

21  through them, we certainly can, but in deference to time, I'm

22  concerned that, if the Court needs to finish today at noon,

23  we've got a long way to go with other witnesses.

24       THE COURT:  I understand, but there's no basis for

25  an objection.

1    MS. POSTERARO:  Ms. Medina, could you zoom in on the

2  lower assessments, please.

3  BY MS. POSTERARO:

4  Q    In December of 2011, you complained of back pain with an

5  intensity of 7 on a scale of 0 to 10; is that right,

6  Mr. Brisebois?

7  A    Yes.

8    MS. POSTERARO:  Could you please go to

9  Bates No. 2576 of Defendant's Exhibit 6.

10  BY MS. POSTERARO:

11  Q    You recall that during your visit to the Bert Fish

12  Medical Center emergency department on December 2, 2011, that

13  you were referred to Dr. Charles Kollmer.

14    MR. BAILEY:  We'd just object.  He's already said

15  that he didn't remember.  All we're doing here is going

16  through things that are in evidence, Judge.

17    THE COURT:  Well, the document may refresh his

18  recollection.  I don't know.  But that's not the question.

19  So --

20    THE WITNESS:  It's on there, yes.  At the time I did

21  not remember.

22    THE COURT:  So this document refreshes your

23  recollection as to that question?

24    THE WITNESS:  A little bit but -- if it's on there,

25  I guess so.

1    THE COURT:  Well, the fact that it's on the paper

2  doesn't mean that you remember it.

3    THE WITNESS:  Yeah.  I don't remember the doctor's

4  name.

5    THE COURT:  Okay.

6  BY MS. POSTERARO:

7  Q    Do you recall that you were referred in December 2011 to

8  another doctor following your trip to the emergency

9  department?

10  A    I know I was referred to a doctor.  I don't know the

11  doctor's name.

12  Q    Okay.  Well, my question was do you recall that you were

13  referred to a doctor following your visit to the emergency

14  department in December 2011?

15  A    Yeah.

16  Q    And that's your signature on the bottom of the document?

17  A    Correct.

18  Q    Did you follow up with Dr. Kollmer as prescribed?

19  A    No.

20    MS. POSTERARO:  Can you please turn to Defendant's

21  Exhibit 6, Bates No. 2533.

22  BY MS. POSTERARO:

23  Q    Do you recall now, Mr. Brisebois, that you presented to

24  the Bert Fish Medical Center on December 23, 2012?

25  A    Correct.

1  Q    And this would be approximately 18 months prior to the

2  accident at issue in this case?

3          THE COURT:  Well -- I mean, it is what it is.  I

4  don't think we need to count months.  We are going to be here

5  all day at this rate.

6          MS. POSTERARO:  I appreciate that, Your Honor.  I

7  will speed it along.

8  BY MS. POSTERARO:

9  Q    Do you recall that you -- now that you did go to the

10 emergency department in January -- on January 23, 2012?

11 A    Yes.

12         MS. POSTERARO:  Ms. Medina, could you please expand

13 the history of present illness.

14 BY MS. POSTERARO:

15 Q    And do you recall that during that visit you complained

16 of lower back pain, possible pinched nerve in back?  Do you

17 now recall that?

18 A    Correct.

19 Q    Do you also recall that you had pain in your low back

20 since doing sit-ups a few days before that and that you did

21 not have pain into your legs with movement and sitting?

22 A    Correct.

23         MS. POSTERARO:  Could you please turn to

24 Bates No. 2546 of Defendant's Exhibit 6.

25 BY MS. POSTERARO:

1  Q    Do you recall that following the visit in -- on

2  January 23, 2012, that you were referred to another doctor?

3  A    Correct.

4  Q    Did you follow up --

5  A    No.

6  Q    -- with that doctor?

7  A    Sorry.  No.

8  Q    Do you recall that you presented back to the Bert Fish

9  Medical Center on January 24, 2012?

10       MS. POSTERARO:  Bates No. 2518 of Defendant's

11  Exhibit 6.

12       THE WITNESS:  Yes.

13       MS. POSTERARO:  Could you go to the whole page,

14  please, and could you expand the history of present illness.

15  BY MS. POSTERARO:

16  Q    And when you appeared at the emergency department on

17  January 24, 2012, you complained of, again, a pinched nerve in

18  your lower back down the left leg; is that correct?

19  A    Correct.

20  Q    And you again told the emergency department physicians

21  that you had pain in your low back after doing sit-ups.  You

22  reported yesterday, had no new injury, but it hurts to walk

23  and to get up and that you had some tingling in your legs?

24  A    Yes.

25       MS. POSTERARO:  Could you please go to

1  Bates No. 2530.

2  BY MS. POSTERARO:

3  Q    And do you recall after this visit to the emergency

4  department that you were again referred to a -- for follow-up

5  for a physician?

6  A    Yes.

7  Q    And you were told to follow up within two days; is that

8  correct?

9  A    I don't know how many days, but if it's on there, yes.

10  Q    Well, that's your signature on the bottom of

11  Bates No. 2530; is that correct?

12  A    Correct.

13  Q    And the document instructs you to follow up with the

14  following physician in two days; is that correct?

15  A    Yes.  Yes.

16  Q    Did you follow up with the physician in two days?

17  A    No.

18  Q    You went back to the emergency department at Bert Fish

19  Medical Center on January 26, 2012; is that right?

20        MS. POSTERARO:  Bates No. 2754 of Defendant's

21  Exhibit 6.

22        THE WITNESS:  Yes.

23        MS. POSTERARO:  Could you please expand the history

24  of present illness.

25  BY MS. POSTERARO:

1  Q    And you complained on that date of lower back pain; is

2  that correct?

3  A    Correct.

4  Q    Okay.  And you complained to the emergency department

5  physicians of a twisting-motion injury to the lower -- to the

6  left lower back last week with pain and tingling to your left

7  glute; is that correct?

8  A    Correct.

9         MS. POSTERARO:  Could you please go to

10  Bates No. 2755.  Can you blow up the order on the bottom,

11  please.

12  BY MS. POSTERARO:

13  Q    And during this visit to the Bert Fish Medical Center, a

14  CT scan was ordered; is that correct?

15  A    If it's on there, yes.

16  Q    Do you recall --

17  A    I don't remember.  Sorry for interrupting.

18  Q    Do you recall in January 2012 getting a CT scan?

19  A    Right now I don't.

20         MS. POSTERARO:  Can you please go to Bates No. 2767.

21  Bates No. 2767, please, of Defendant's Exhibit 6.  Could you

22  please enlarge the middle section of the referral:  "You

23  should follow up with."

24  BY MS. POSTERARO:

25  Q    At your January 26, 2012, presentation to the Bert Fish

1  Medical Center, do you recall that you were again referred for

2  follow-up to a physician?

3  A    Yes.

4  Q    Okay.  And you were instructed to follow up with a

5  physician at the first available appointment?

6  A    Yes.

7  Q    And did you follow up with Dr. Kollmer as prescribed?

8  A    No.

9  Q    Do you recall going back to Bert Fish Medical Center on

10  March 9, 2012 -- excuse me -- March 29, 2012?

11        MS. POSTERARO:  Bates No. 2738, please.

12        THE WITNESS:  Correct.

13        MS. POSTERARO:  Okay.  Can you enlarge the history

14  of present illness, please.

15  BY MS. POSTERARO:

16  Q    And on your March 29, 2012, visit to the emergency

17  department, you complained of lower back.  "Reactivated my

18  herniated disc"; is that correct?

19  A    I know I hurt my back.  That's all -- I had pain in my

20  back.

21  Q    But when you -- when you presented to the emergency

22  department, did you tell the providers the truth?

23  A    I don't remember if I told them about a herniation.

24  Q    Okay.  Well, my question was slightly different.  When

25  you present to the emergency department seeking emergent care,

1  do you tell the providers the truth?

2  A    I had bad lower back pain.

3  Q    Right.  My question, again, Mr. Brisebois was slightly

4  different.  When you present to the emergency department for

5  the provision of emergent care, do you tell the providers the

6  truth?

7  A    Truth of?  I don't understand.

8  Q    Sure.  When you go to seek medical care at the emergency

9  department because you require immediate medical assistance,

10  do you tell the providers of that care the truth about your

11  condition?

12  A    About my pain, yes.

13  Q    Well, in general you tell them the truth about your

14  condition; right?

15  A    Correct.

16  Q    Because they're providing you medical care; is that

17  right?

18  A    Yes.

19  Q    And you want them to provide the right medical care; is

20  that right?

21  A    Correct.

22  Q    Okay.  So you tell them the truth?

23  A    Correct.

24  Q    Is there any reason to think you didn't tell them the

25  truth on this particular occasion?

1  A    I don't remember.  I don't see why I wouldn't.

2  Q    Okay.  That's fine.

3       The records reflect that on your visit on March 29, 2012,

4  that you conveyed a lower back pain caused by a reactivation

5  of your herniated disc; is that correct?

6  A    I don't know if I told them about reherniating it.

7  Q    The record reflects --

8  A    Okay.

9  Q    -- that you had reactivated your herniated disc; is that

10 correct?

11 A    If it says so.  I just don't remember on that day.

12 Q    On this day the record also reflects you presented with

13 lower back pain radiating into your left lower extremity.  It

14 got worse when you were moving furniture yesterday at work; is

15 that correct?

16 A    Yes.

17 Q    Is that part of the record accurate?

18 A    If it's on there, yes.

19 Q    So if it's on the record, it's accurate?

20 A    Yes.  I just don't remember everything I said on that

21 day.

22       MS. POSTERARO:  Could you please turn to

23 Bates No. 2751.

24 BY MS. POSTERARO:

25 Q    At the conclusion of your visit to the Bert Fish

1  emergency medical center on March 29, 2012, were you referred

2  again for follow-up to a physician?

3  A   Yes.

4  Q   Were you told to follow up with the physician in two

5  days?

6  A   Yes.

7  Q   Did you do that?

8  A   No.

9       MS. POSTERARO:  Bates No. 2722, please.

10 BY MS. POSTERARO:

11 Q   On January 30, 2013, do you recall again presenting to

12 the Bert Fish Medical Center complaining -- do you recall

13 going again to the Bert Fish Medical Center on January 30,

14 2013?

15 A   Yes.

16       MS. POSTERARO:  Could you please enlarge the history

17 of present illness.

18 BY MS. POSTERARO:

19 Q   And on that date your stated complaint was sharp pain,

20 left lower back, pain down nerve of left leg; is that correct?

21 A   Correct.

22 Q   And the initial comments reflect that you had low-back

23 pain with radiation down leg.  Got worse while riding your

24 bicycle today.  Is that correct?

25 A   Yes.

1      MS. POSTERARO:  Could you please go to

2  Bates No. 2724.  Could you please enlarge the written portion

3  of -- thank you.

4  BY MS. POSTERARO:

5  Q    And at this visit you were counseled to do back

6  exercises; is that correct?

7  A    I'm not sure what they told me on that day.

8  Q    You don't recall what they told you?

9  A    Correct.

10  Q    Do you recall that you were -- the primary impression of

11  the physicians was exacerbation of chronic lumbar

12  radiculopathy?

13  A    I have no idea what that means, the last word you said.

14  Q    Okay.  Fair enough.

15      Were you aware at this visit that you were diagnosed with

16  a chronic -- exacerbation of a chronic lumbar condition?

17  A    I don't remember.

18  Q    Now, on this visit in January 30, 2013, you were also

19  referred for follow-up to another physician; is that correct?

20  A    I think so.  I'm not sure.

21  Q    Did you --

22  A    I'm sure -- I'm sure they would.

23  Q    Did you follow up with that referred physician?

24  A    No.

25  Q    Now, you went --

1    MS. POSTERARO:  Bates No. 2705, please.  2705.

2  BY MS. POSTERARO:

3  Q    You went back to the Bert Fish Medical Center on

4  February 8, 2013.  Do you recall that?

5  A    I guess.  I don't remember the date.

6    MS. POSTERARO:  Could you enlarge the history of

7  present illness.

8  BY MS. POSTERARO:

9  Q    Do you recall in February 2013 visiting the emergency

10  department and complaining of a pinched nerve running down the

11  left leg, of the lower back?

12  A    Repeat the question, please.

13  Q    Do you recall going to the emergency department in

14  February of 2013 complaining of a pinched nerve running down

15  the left leg, lower back?

16  A    I might have -- I'm not 100 percent sure.  If it's on

17  there, I guess I did.

18  Q    Okay.  Well, do you recall that in February of 2008 you

19  had pain in your lower back lasting over a week?

20  A    I might have.  I just don't remember.

21  Q    Okay.  And do you recall pain that was left-sided

22  sometimes radiating down the left lateral hip area?

23  A    I don't remember.

24    THE COURT:  You know, at some point I think

25  Mr. Bailey has a point here.  These are all in evidence.  I

1   can read them.  He doesn't dispute them.  We've just used

2   45 minutes and have accomplished very little.

3          MS. POSTERARO:  Fair enough, Your Honor.  I'm moving

4   on.

5   BY MS. POSTERARO:

6   Q    Following this February 8, 2013, visit to the emergency

7   department, did you follow up with a referred physician?

8   A    No.

9   Q    Do you recall reporting back to the Bert Fish Medical

10  Center on June 10, 2013?

11         MS. POSTERARO:  That's Bates No. 2655.

12         THE WITNESS:  I don't remember the dates.  If it's

13  on there, I guess I did.

14  BY MS. POSTERARO:

15  Q    Okay.  Do you have a recollection of following up with a

16  referred physician following your June 10, 2013, visit to the

17  emergency department?

18  A    No.

19  Q    On the day of the accident, October 28, 2013, you were on

20  your way to meet an insurance agent; is that correct?

21  A    Yes.

22  Q    And you don't recall what time that meeting was, do you?

23  A    Sometime in the afternoon.  I just don't remember the

24  exact time.

25  Q    And you were riding your bike south on U.S. Highway 1; is

1    that correct?

2    A    Correct.

3    Q    You were riding your bike on the sidewalk; is that right?

4    A    Correct.

5    Q    Are you confident that you were riding your bike on the

6    sidewalk?

7    A    Yes.

8    Q    Is it possible you were riding your bike on the road

9    surface?

10   A    I was on the sidewalk.

11   Q    And you were riding towards traffic; is that right?

12   A    Correct.

13   Q    Now, before you got to the intersection at New Hampshire

14   Avenue, you saw the postal truck driven by Mr. Turner; is that

15   right?

16   A    Yes.

17   Q    Now, do you recall at your deposition that you testified

18   that you first noticed the mail truck when you were a little

19   before the tree?  Is that right?

20   A    Around that area, yes.

21   Q    Would reviewing the photo you marked at your deposition

22   indicating where you saw the tree be helpful in refreshing

23   your recollection?

24   A    I think so, yes.

25              MS. POSTERARO:  May I approach the witness,

1  Your Honor?

2          THE COURT:  Yes.

3  BY MS. POSTERARO:

4  Q    Did reviewing the photograph that you marked at your

5  deposition refresh your recollection of where you were when

6  you first saw the mail truck on New Hampshire Street?

7  A    Yes.

8  Q    Is it still accurate that you saw the mail truck a little

9  bit before that tree?

10 A    It was in that area.

11 Q    At your deposition you testified that you saw the mail

12 truck when you were a little bit before that tree; is that

13 correct?

14 A    Yes.  Around there -- around the tree, the beginning of

15 the --

16 Q    And you marked a spot on the photograph --

17 A    Correct.

18 Q    -- where you were when you saw the --

19 A    Sorry.  Yes.  Correct.

20 Q    Is it still your testimony that that is where you were

21 when you saw the mail truck?

22 A    Yes.

23          THE COURT:  Do you need the ELMO?

24          MS. POSTERARO:  Yeah.  Can you flip it on?  Sorry.

25          We tested it earlier, and I didn't realize it would

1  reset.

2  BY MS. POSTERARO:

3  Q    In the photograph that you reviewed -- that you marked

4  that refreshed your recollection of where you were when you

5  first saw the mail truck, is that the tree to which you were

6  referring?

7         THE COURT:  Well, the tree you're pointing to is --

8  I mean, there are several trees.

9         MS. POSTERARO:  Right.

10        THE WITNESS:  I don't know if that was there.  It

11  doesn't look familiar with the crosswalk because the crosswalk

12  wasn't there.

13  BY MS. POSTERARO:

14  Q    Right.  Fair enough.

15        MS. POSTERARO:  Your Honor, may I publish the

16  photograph that Mr. Brisebois marked during his deposition?

17        THE COURT:  Sure.

18  BY MS. POSTERARO:

19  Q    Is this the mark that you made during your deposition

20  identifying where you were when you first saw the mail truck,

21  Mr. Brisebois?

22  A    Correct.

23  Q    Now, you testified at your -- well, when you saw the mail

24  truck, it was moving forward; is that correct?

25  A    Correct.

1  Q    And is it your testimony that you swerved to avoid the

2  LLV?  Is that correct?

3  A    What's the LLV?

4  Q    Sorry.  Excuse me.  Is it your testimony that you swerved

5  to avoid the mail truck?

6  A    Correct.

7  Q    And you swerved to your right?

8  A    Yes.

9  Q    And where was your bicycle when you swerved to avoid the

10  mail truck?

11  A    At the end of the sidewalk.

12  Q    So right where the sidewalk met the street?

13  A    Yeah.  If you -- if you point your pen a little further

14  up.

15  Q    Is that correct?  Right where the sidewalk meets the

16  street?

17  A    Yeah.  Yes.

18           THE COURT:  For my information, is there a

19  measurement between that tree and the end of the sidewalk?

20  How far is that?

21           MS. POSTERARO:  I do have an estimate, and

22  Dr. Morgan will be prepared to offer a better estimate than I

23  will right now --

24           THE COURT:  Okay.

25           MS. POSTERARO:  -- if that's okay.

1  BY MS. POSTERARO:

2  Q    So is it your testimony, Mr. Brisebois, if I understand

3  you correctly, that you saw the mail truck before the tree,

4  you traveled the length of the sidewalk to the street, and

5  then you swerved into the travel lanes of U.S. Highway 1 to

6  avoid the impact with the mail truck?

7  A    Can you repeat the question, please.  Sorry.

8  Q    Sure.  I just want to make sure that I understand your

9  testimony.  You saw the mail truck as indicated right before

10 that tree, and then you traveled the length of the sidewalk to

11 New Hampshire Street?

12 A    It was a quick glance when I seen the mail truck, and I

13 didn't travel -- I kept going.  So I thought the mail truck

14 was going to stop.

15 Q    Right.  So I can rephrase my question so that we both get

16 it.  But you didn't try to avoid the mail truck until you got

17 to the street; is that correct?  You just kept going straight?

18 A    On the sidewalk?

19 Q    Yes.

20 A    Yes.

21 Q    And at that point is when you diverted out to the travel

22 lanes of U.S. Highway 1?

23 A    When I seen the mail truck, yes.

24 Q    Well, when you saw the mail truck, you were before the

25 tree; right?

1   A    Yeah.  I was going past the tree.

2   Q    Okay.  And you didn't swerve then; correct?

3   A    Not by the tree, no.

4   Q    If you had not swerved to avoid the mail truck, you would

5   have hit the side of the mail truck; is that right?

6   A    Correct.

7   Q    After impact with the mail truck, you traveled

8   approximately an inch or two; is that correct?

9   A    Around there.  I'm not 100 percent sure.  I might have.

10         THE COURT:  As I understand it, then, you never

11   applied your brakes on the bike?

12         THE WITNESS:  No.  No, Your Honor.

13         THE COURT:  Okay.

14   BY MS. POSTERARO:

15   Q    At your deposition were you asked this question and gave

16   this answer?  Page 64.

17        "QUESTION:  After he noticed you, how far did you -- did

18   he travel after your bike and the USPS vehicle collided?

19        "ANSWER:  Like, an inch maybe.  I don't know the estimate

20   amount -- the right exact amount.

21        "QUESTION:  But not far.  Is that fair to say?

22        "ANSWER:  No.  Because he would have ran my foot over --

23        "QUESTION:  So it wasn't far.

24        "ANSWER:  -- when we impacted.

25        "QUESTION:  Okay.

1  "ANSWER:  Like, an inch or so, two."

2  Do you recall being asked those questions and giving that

3  answer?

4  A  Yes.

5  THE COURT:  That's not really impeaching him.

6  That's just what he said.

7  MS. POSTERARO:  To the extent that he was unable to

8  recall specifically, I just wanted to make it clear, but I'm

9  moving on.

10  BY MS. POSTERARO:

11  Q  Now, you were transported to the emergency department

12  following the October 28, 2013, accident; is that correct?

13  A  Correct.

14  Q  Okay.  And they x-rayed your chest and your leg; is that

15  correct?

16  A  I think so.

17  Q  Okay.  Do you recall that you were diagnosed with a leg

18  sprain?

19  A  I don't remember what I was diagnosed with.

20  Q  Okay.  Do you recall telling the physicians at the

21  emergency department that you had a history of back problems?

22  A  I'm not sure.  I don't remember what I told them.

23  Q  Okay.  Do you recall declining the X-rays of your back on

24  that date?

25  A  No.

1  Q    And you were discharged that same day from the medical

2  center; is that correct?

3  A    Correct.

4  Q    And you went home and took photos of your injuries?

5  A    I did not.

6  Q    Your wife took photos of those injuries; is that correct?

7  A    She did or someone did.

8  Q    You don't recall who took the photos?

9  A    Exactly.  Yes.  Sorry.

10  Q    Now, the day after the accident or two days later you

11  went to the police department to get the incident report; is

12  that correct?

13  A    Yes.

14  Q    And you went to the hospital to get documentation of your

15  October 28, 2013, visit; is that right?

16  A    Correct.

17  Q    That was just a day or two after the accident; correct?

18  A    I think so.

19  Q    And you returned to work a week following -- a week

20  later; is that correct?

21  A    Correct.

22  Q    Now, in October 2013 you did not have health insurance;

23  is that right?

24  A    Correct.

25  Q    In fact, you hadn't had health insurance for quite some

1  time.  Is that fair?

2  A    That's fair.

3  Q    And you also did not have a primary care physician; is

4  that correct?

5  A    How long?

6  Q    As in October 2013 you did not have a primary care

7  physician; is that correct?

8  A    Correct.

9  Q    Okay.  In -- since January 2012 through October 2013, you

10 did not have a primary care physician; correct?

11 A    Yes.

12 Q    Do you recall when you retained an attorney in this case?

13 A    Either a day or two after the accident.

14 Q    Now, following your treatment at Bert Fish Medical Center

15 subsequent to the accident, you were instructed to follow up

16 with a physician; is that correct?

17 A    Correct.

18 Q    You found Advantacare by calling around; is that correct?

19 A    Yes.

20 Q    You were calling around to find a practice that would

21 treat you under a letter of protection; is that right?

22 A    Yes.

23 Q    And what do you understand a letter of protection to

24 mean?

25 A    Pay later, I think.  I was instructed to.

1  Q    You were instructed by whom?

2         MR. BAILEY:  Object.  Loss of communications from

3  prior counsel, Judge.

4         THE COURT:  I can't hear an objection while he's

5  seated.  So go ahead and answer the question.

6         THE WITNESS:  My other attorney.

7  BY MS. POSTERARO:

8  Q    In December 2015 -- excuse me.  In December of 2013, do

9  you recall that you had a fall at work?

10 A    Yes.

11 Q    And it was serious enough to warrant an incident report;

12 is that right?

13 A    What do you mean "an incident report"?

14 Q    They drafted up a report at your work documenting the

15 fall.

16 A    I did?  Sorry.  I just don't understand.

17 Q    In 2013 in December, you were still working at McKenna's;

18 correct?

19 A    Correct.

20 Q    And you had a fall at work in December 2013.

21 A    Yes.

22 Q    Do you recall that?

23 A    Yes.

24 Q    Okay.  And as a result of that fall, you and your manager

25 filled out a form documenting the fall.  Do you recall that?

1   A    I think I did.  I don't remember.

2   Q    Do you recall the circumstances of that fall?

3   A    I know my leg -- I sprained my leg, my foot.

4       MS. POSTERARO:  Your Honor, the incident report is

5   part of Defendant's Exhibit 4, which has not yet been admitted

6   into evidence.  It is part of a -- an employment record from

7   McKenna's restaurant, where Plaintiff worked.  At the time we

8   submitted our joint pretrial statement, Plaintiff did not have

9   any objection to the admittance of this exhibit.

10      THE COURT:  That's correct.  So you're offering --

11  you want to offer it out of order?

12      MS. POSTERARO:  Please, Your Honor.  Or we can offer

13  it in order, I suppose, but I would ask permission to publish

14  a portion of this exhibit to the witness.

15      THE COURT:  Any objection?  There's no objection to

16  the exhibit itself.  So --

17      MR. BAILEY:  That's right, Judge.

18      THE COURT:  All right.  I'll admit 4 out of order.

19    (Defendant's Exhibit No. 4 was admitted into evidence.)

20      MS. POSTERARO:  Thank you, Your Honor.

21      Ms. Medina, can you please pull up from the B list

22  Defendant's Exhibit 4, Bates No. 829.

23  BY MS. POSTERARO:

24   Q    Do you recognize this as the incident report that was

25  filled out in December of 2013 following your fall at work?

1  A    Yes.  Yes.

2        MS. POSTERARO:  Could you please enlarge

3  "description of what happened," please.

4  BY MS. POSTERARO:

5  Q    Now, in December of 2013, you report that your right foot

6  tripped over a bus tub in a walkway, and you fell on your left

7  side to your left wrist on the ground.  Do you recall that?

8  A    Yes.

9  Q    You didn't have any complaints about your back pain

10 during this incident report; is that correct?

11 A    Yes.

12 Q    And you declined medical attention; is that correct?

13 A    Correct.

14 Q    Okay.  And you didn't tell your doctors about this fall,

15 did you?

16 A    I'm not sure if I did or not.  I don't remember.  I might

17 have.  I'm not 100 percent sure.

18 Q    Why did you stop treating with Advantacare in 2014?

19 A    I wanted to get a second opinion.  I didn't really like

20 the doctors there.

21       MS. POSTERARO:  Could you please pull up Defendant's

22 Exhibit 19, Bates 1945 -- oh, excuse me.  That's the wrong

23 one.

24 BY MS. POSTERARO:

25 Q    At the conclusion of your treatment with Advantacare, you

1  told the physicians that -- or the nursing staff that you

2  weren't going to take a drug screen; is that correct?

3  A    I think I did.  I'm not -- I think so.

4  Q    And you told them that you smoked marijuana and then

5  left; is that right?

6  A    Yes.

7  Q    Okay.  And after that incident is when you found a new

8  treating physician; is that correct?

9  A    Correct.

10 Q    And that's when you started treating at Coastal Pain &

11 Neurology; is that correct?

12 A    Correct.

13 Q    And Coastal Pain & Neurology is also treating you under a

14 letter of protection; is that correct?

15 A    Correct.

16 Q    In your direct testimony, you spoke about some activities

17 that you're no longer able to do that you were able to do

18 before the October 2013 accident.  One of those activities is

19 going to the gym; is that correct?

20 A    Correct.

21 Q    And prior to October 28, 2013, you went to the gym a

22 couple days a week?

23 A    Correct.

24 Q    And is it your testimony that you stopped going to the

25 gym because of the accident?  Is that correct?

1  A    Correct.

2  Q    Okay.  And you were going to the gym at Planet Fitness;

3  is that correct?

4  A    Yes.

5  Q    And you don't still have that membership to

6  Planet Fitness; is that correct?

7  A    Correct.

8  Q    You canceled that membership?

9  A    Correct.

10  Q    Okay.  But you canceled that membership before the

11  accident; isn't that right?

12  A    I don't remember.

13  Q    At your deposition do you recall being asked this

14  question and giving this answer?

15      "QUESTION:  When did you cancel your membership?

16      "ANSWER:  Like, two months -- oh, I'm sorry.  I don't --

17  a couple years ago.  I don't remember.

18      "QUESTION:  Was it before the accident or after the

19  accident?

20      "ANSWER:  Before the accident."

21      Do you recall being asked that question and giving that

22  answer?

23  A    I know I was asked it; I just don't remember.  If I did,

24  I guess I did.

25  Q    Now, you also testified that you boxed before the

1  accident; is that correct?

2  A    Correct.

3  Q    Okay.  But you stopped the day of the accident; is that

4  correct?

5  A    Correct.

6  Q    Okay.  And you also testified that you have not boxed

7  since; is that correct?

8  A    Correct.

9  Q    Do you recall going to the Bert Fish Medical Center in

10 January of 2015?

11 A    Yes.

12 Q    Do you recall complaining at that --

13          MS. POSTERARO:  Can you please pull up Defendant's

14 Exhibit 6, Bates No. 83.

15 BY MS. POSTERARO:

16 Q    And you presented at that appointment with a right hand

17 possibly sprained or broken; correct?

18 A    Correct.

19          MS. POSTERARO:  If you can enlarge the history of

20 present illness, please.

21 BY MS. POSTERARO:

22 Q    And you reported that you had been punching a bag that

23 missed one of your landings, and you injured your knuckles; is

24 that correct?

25 A    Yes.

1  Q    You told them that your hand was somewhat painful and

2  swollen; is that correct?

3  A    Correct.

4  Q    But you had no reports of any other additional injuries;

5  is that correct?

6  A    Correct.

7  Q    Now, you also testified that you used to run; is that

8  fair?

9  A    Yes.

10 Q    Okay.  And you would run a couple miles every other day;

11 is that correct?

12 A    Correct.

13 Q    Now, you also testified -- well, at the -- your

14 deposition that you testified that you were no longer able to

15 travel.  Is that still accurate?

16 A    Can you repeat it?  Sorry.

17 Q    At your deposition you testified one of the things you're

18 no longer able to do is travel.  Is that still correct?

19 A    I don't remember.

20        THE COURT:  Well, she's asking you if you're still

21 unable to travel.  That's the question.

22        THE WITNESS:  I do travel.  It just takes longer --

23 a lot longer time.

24 BY MS. POSTERARO:

25 Q    Now, you testified at your deposition that one of the

1  activities that you can no longer do as a result of the

2  accident is parachuting; is that correct?

3  A    I think so.

4  Q    All right.  But prior to October 2013, you had not been

5  parachuting at all; is that correct?

6  A    We were planning on doing it.

7  Q    But prior to the accident --

8  A    No.

9  Q    -- you hadn't done it; is that correct?

10 A    Correct.

11 Q    You also complained -- testified during your deposition

12 that you can no longer go to concerts; is that correct?

13 A    Correct.

14 Q    Okay.  Is it still accurate that you had not been to any

15 concerts since you moved down to Florida in 2009?

16 A    Correct.

17           MS. POSTERARO:  I have no further questions.

18           THE COURT:  Okay.  Any redirect?

19           MR. BAILEY:  Yes, Your Honor.  Thank you.

20                    REDIRECT EXAMINATION

21 BY MR. BAILEY:

22 Q    Jeff, I want to go back to the accident itself.

23 A    Okay.

24 Q    Why didn't you swerve the bicycle until you did?

25 A    Because I thought the mail truck was going to stop at the

1   stop sign.

2   Q    What did you see it doing that gave you that impression?

3   A    It looked like it was slowing down.

4   Q    After it looked like it was going to slow down, did it

5   change at all before the accident happened?  Did the speed

6   seem to change, or did it stay the same?

7   A    It just kept going.

8   Q    When you saw it and it looked like it was going to slow

9   down, had it gotten to the stop sign yet?

10   A    Can you repeat that?  Sorry.

11   Q    When you saw the mail truck for the first time and it

12   looked like it was slowing down, had it reached the stop sign

13   yet?

14   A    No.

15   Q    Did it ever come to a complete stop at the stop sign?

16   A    No.

17   Q    Did you think he was going to?

18   A    Yes.

19   Q    Is that why you did what you did?

20   A    Yes.

21   Q    Did you ever see the eyes of the driver, Mr. Turner, to

22   see where he was looking at any time?

23   A    No.

24   Q    What happened after the mail truck hit you but before you

25   were able to get off your bike, Jeff?

1  A    Banging on the top of the hood to get his attention.

2  Q    And was the mail truck moving that entire time you were

3  banging on the hood?

4  A    A tiny bit.

5  Q    When you banged on the hood, did it get his attention

6  immediately?

7  A    A couple seconds after.

8  Q    Was it still moving when you finally got his attention?

9  A    He stopped.

10  Q    After you got his attention?

11  A    Correct.

12  Q    A couple of seconds?

13  A    Yes.

14  Q    Jeff, how did that mirror on the post office truck get

15  broken off, the one on the left side?

16  A    My chest.

17  Q    How did your chest break it off?

18  A    It hit my chest.  I don't remember exactly how it broke

19  off.

20  Q    But you hit it with your upper part of your body?

21  A    Correct.

22  Q    Were you still on the bike at that point?

23  A    I was in between the bike and the mail truck.

24  Q    Why did you try to stay on the bike, or did you have any

25  choice?

1   A    Can you repeat it?  Sorry.

2   Q    Yeah.  It wasn't a good question.

3        Did you try intentionally to stay on your bike?

4   A    Yes.

5   Q    Why?

6   A    Because I didn't want to fall down to the ground and get

7   hit by oncoming traffic.

8   Q    Were you concerned about getting run over by the mail

9   truck at all?

10   A    Yes.

11   Q    Jeff, there's been a lot of talk about your medical

12   records, particularly your history going to the emergency room

13   there at Bert Fish prior to this accident.  When Ms. Posteraro

14   was showing you all those records on the computer screen here,

15   even seeing them, did you remember truly what you had told

16   anybody or when you'd been there?

17   A    Not exactly.  Certain things.

18   Q    When you gave a deposition, did you remember that?

19   A    No.  Not everything.

20   Q    When you answered interrogatories, though, did you tell

21   the folks that you'd been to the emergency room at Bert Fish

22   for prior back problems?

23   A    I don't think I did.  I know I told them I had been there

24   off and on.

25   Q    Yeah.  You did.

1      MS. POSTERARO:  Objection.  Counsel is testifying.

2      MR. BAILEY:  They're in evidence.

3      THE COURT:  He did.  He's right.  Let's move on.

4  BY MR. BAILEY:

5  Q    Jeff, Ms. Posteraro asked you about the fact that you

6  didn't have a primary care doctor back at any time prior to

7  this accident in October of 2013; right?

8  A    Correct.

9  Q    Why did you go to the emergency room when you had a

10  problem, whether it was asthma, your back, or whatever it may

11  have been?

12  A    Couldn't afford -- didn't have health insurance.

13  Couldn't afford a doctor.

14  Q    And why didn't you follow up with doctors when they tell

15  you to do that?

16  A    Because after a couple days, I got better and went back

17  to my normal life.

18  Q    Anytime you had a back problem prior to this accident in

19  October of 2013, where did you go to get help?

20  A    ER.

21  Q    Anyplace else?

22  A    No.

23  Q    Ever?

24  A    Only to that doctor when I fell off the truck.

25  Q    Back in Connecticut?

1  A    Correct.

2  Q    There was a discussion about an incident at work at

3  McKenna's December 27, 2013, where you apparently caught your

4  foot on something in a cooler.

5  A    Yes.

6  Q    Did you hurt your back at all in that fall?

7  A    Just my ankle.

8  Q    Did you fall on your wrist?

9  A    Yes.

10 Q    Okay.  Did you hurt your wrist?

11 A    A little bit.  Nothing to complain about.

12 Q    Did that fall aggravate your back problems at all?

13 A    No.

14 Q    Did you ever seek any medical attention for that incident

15 at all?

16 A    No.

17 Q    Jeff, things like this are a concern to courts and juries

18 that decide these issues.  I want you to tell the judge

19 whether that fall had any impact whatsoever on your back.

20       THE WITNESS:  No, Your Honor.

21 BY MR. BAILEY:

22 Q    Ms. Posteraro also asked you about the fact you didn't

23 have health insurance.  Do you have health insurance now?

24 A    No.

25 Q    Have you ever had health insurance to pay any of your

1  medical expenses that you've incurred as a result of this

2  accident?

3  A    Just Geico.

4  Q    Your PIP coverage?

5  A    Yes.  And CareCredit.

6  Q    We talked about that.

7       I'm just looking through my notes here.  That's all I

8  have, Jeff.  Thank you.

9            THE COURT:  Thank you, sir.  You can step down now.

10           THE WITNESS:  Thank you, Your Honor.

11           THE COURT:  All right.  We'll take our morning

12 recess.  Fifteen minutes, and then you're going to call who?

13           MS. POSTERARO:  Dr. Justin Morgan.  He's the

14 accident reconstructionist.

15           THE COURT:  And that's your last witness; right?

16           MS. POSTERARO:  Yes, Your Honor.

17           THE COURT:  All right.  We'll be in recess for 15.

18      (Recess at 10:18 a.m. until 10:34 a.m.)

19           THE COURT:  Call your next witness.

20           MS. POSTERARO:  The United States calls

21 Dr. Justin Morgan.

22           THE COURTROOM DEPUTY:  Please come forward, sir, to

23 be sworn.

24           THE COURT:  So, technically, the plaintiff has

25 rested; correct, Mr. Bailey?

1    MR. BAILEY:  Judge, before I formally rest, I want

2  to check the exhibits in evidence to make sure the

3  housekeeping's done, but, otherwise, yes.

4    THE COURT:  Okay.  Well, we'll deal with that after

5  the witness.

6    THE COURTROOM DEPUTY:  Come forward, sir.

7                JUSTIN MORGAN, PhD,

8  was called as a witness on behalf of Defendant and, having

9  been duly sworn, testified as follows:

10    THE WITNESS:  I do.

11    THE COURTROOM DEPUTY:  Thank you.  You may be seated

12  in our witness box.  Once seated, if you could please state

13  your name into the microphone for the record and spell your

14  last name.

15    THE WITNESS:  My name is Justin Fox Morgan,

16  M-o-r-g-a-n.

17                DIRECT EXAMINATION

18  BY MS. POSTERARO:

19  Q    What is your occupation?

20  A    I am a human factors scientist with Forensic Engineering

21  Technologies in Lake Mary, Florida.

22  Q    Were you retained by my office as an expert in accident

23  reconstruction and human factors and traffic safety to provide

24  your opinions in this case?

25  A    Yes, ma'am, I was.

1  Q    Okay.  Did you complete an accident reconstruction and

2  human factors analysis in this case?

3  A    Yes, ma'am, I did.

4  Q    What is accident reconstruction?

5  A    Accident reconstruction is a process of applying science,

6  physics, and mathematics to understand the physical evidence

7  and reconstruct the movement of vehicles and objects in an

8  environment to understand how those come together, both in the

9  collision phase as well as the postcollision phase and in the

10  moments leading up to the collision sometimes.

11  Q    And could you please explain what human factors is.

12  A    Human factors is a branch of science that seeks to

13  understand how humans or individuals interact with their

14  environment.  In the field of driving and specifically the

15  driving domain studied within the field of human factors, that

16  involves understanding the relationship between a driver, a

17  vehicle, and the environment in which they're operating.

18  Q    What is your educational background, Dr. Morgan?

19  A    I hold a bachelor's degree in psychology from the

20  University of North Carolina at Ashville, a master's degree in

21  modeling and simulation from the University of Central

22  Florida, and a doctoral degree in applied experimental and

23  human factors psychology, also from the University of Central

24  Florida.

25  Q    Can you please describe your work experience.

1  A     Yes, ma'am.  After earning my doctoral degree, I joined

2  the research faculty of Virginia Tech.  There, I was with the

3  Virginia Tech Transportation Institute performing applied

4  research and testing for groups such as departments of the

5  United States Department of Transportation, the National

6  Highway Traffic Safety Administration, Federal Motor Carrier

7  Safety Administration, along with automakers and tier-one

8  suppliers.

9       Following my time with Virginia Tech, I joined the

10 Battelle Memorial Institute in Seattle, Washington.  That's

11 B-a-t-t-e-l-l-e.  And there I performed similar research and

12 development work for the United States Department of

13 Transportation, also starting to do work for the Federal

14 Highway Administration in pedestrian safety, as well as also

15 research and development work for the National Highway Traffic

16 Safety Administration.

17      After my time with Battelle, I then joined Forensic

18 Engineering Technologies, and that's where I currently work.

19 Q     Do you have any teaching experience?

20 A     Yes, ma'am.  While at University of Central Florida, I

21 taught as instructor of record courses, including cognitive

22 psychology, physiological psychology, and principals of human

23 factors.  Cognitive psychology is a course that covers how

24 individuals take in and process information as well as act or

25 make decisions upon information.  Physiological psychology

covers the anatomy and physiology that underlies psychological

processes.  And human factors or principals of human factors

is a course that surveys the tools and techniques and methods

used by human factors professionals and introduces students to

those concepts.  And driving provides wonderful examples in

all three of those courses.

Q     Are you a member of any professional societies related to

human factors or transportation?

A     Yes, ma'am.  I'm a full member of the Human Factors in

Ergonomics Society within that organization, which is often

called HFES.  I'm also a member of the Safety Technical Group.

I'm a former chairperson of that group.  I'm also a member of

the Surface Transportation and Cognitive Engineering and

Decision-Making Technical Groups.  Also, I'm a member of SAE

International, which was formerly known as the Society of

Automotive Engineers, and I'm also a friend of multiple

committees of the Transportation Research Board at the

National Academies of Sciences, specifically those involving

driver performance and pedestrian safety.

Q     Have you published any papers or articles in the field of

human factors?

A     Yes, ma'am.  I've published work in peer-reviewed

journals as well as in book chapters.  My work's also been

published as technical reports by agencies of the

United States Department of Transportation, such as the

1  National Highway Traffic Safety Administration and Federal

2  Motor Carriers Safety Administration.

3  Q    What discipline within the field of human factors have

4  these papers and articles covered?

5  A    With very few exceptions, the majority of my work has

6  been in the domain of transportation safety.

7  Q    Do you hold any certification in the field of accident

8  reconstruction?

9  A    Yes, ma'am.  I am an ACTAR-accredited accident

10 reconstructionist.  ACTAR, or the Accreditation Commission for

11 Traffic Accident Reconstruction, is a national-level

12 organization that's formed to ensure a minimum level of

13 competence in performance amongst accident reconstructionists.

14 Q    And what is required for this certification?

15 A    To obtain ACTAR accreditation, one must submit proof of

16 experience as well as education in the field of traffic

17 accident reconstruction as well as pass two four-hour exams,

18 one covering practical and theoretical issues in accident

19 reconstruction and a second exam covering reconstruction of an

20 actual crash.  And then, following that, assuming one passes

21 both of those, then there's a process of continuing education

22 where one must maintain a certain amount of continuing

23 education on a five-year basis.

24         MS. POSTERARO:  The United States tenders Dr. Morgan

25 as an expert in the fields of human factors and accident

1  reconstruction.

2         THE COURT:  Any voir dire?  Objection?

3         MR. BAILEY:  No objection, Your Honor.  I'll defer

4  my cross.

5         THE COURT:  All right.  The Court recognizes

6  Dr. Morgan as an expert in human factors and accident

7  reconstruction.

8         MS. POSTERARO:  Thank you, Your Honor.

9         Can you activate our system?

10         Your Honor, to assist with Dr. Morgan's direct

11  examination, we have put our exhibits on a PowerPoint that we

12  can flip through.  I have provided Plaintiff's counsel with a

13  copy.  He's reviewed it and did not voice any objections.

14         THE COURT:  Okay.  Do you have a copy for me?

15         MS. POSTERARO:  I do.

16         THE COURT:  Let's mark it as Court Exhibit 2.

17     (Court's Exhibit No. 2 was admitted into evidence.)

18         MR. BAILEY:  If I could have a copy to look on.  I

19  did see it, but I don't have one to follow along with.  Thank

20  you.

21         MS. POSTERARO:  May I approach?

22         THE COURT:  Sure.

23         MR. BAILEY:  And, Your Honor, if I might, I did have

24  one caveat that I spoke with Ms. Posteraro about, and I think

25  this will come out in Mr. Morgan's testimony, but some of the

1   diagrams included here, we understand from prior deposition

2   testimony, as a scale is not quite precise because of the

3   software that's used.

4           Is that right, Mr. Morgan?

5           THE WITNESS:  Well, that would be on one particular

6   diagram, sir, as we discussed.

7           THE COURT:  All right.  Well, you can deal with that

8   on cross.

9   BY MS. POSTERARO:

10  Q    I guess I'm jumping ahead of myself a little bit.  As

11  part of your investigation, Dr. Morgan, did you review any

12  documents?

13  A    Yes, ma'am, I did.

14  Q    Okay.  And what documents did you review?

15  A    I've reviewed the reports produced by Benezette, Brown,

16  Mahan, and Stephens; photographs taken at the accident scene,

17  including those from the United States Postal Service; the

18  complaint and answer to the complaint; repair data for the

19  subject Grumman LLV; accident report; as well as the

20  depositions of Mr. Brisebois and Mr. Turner.

21  Q    Did you review any other evidence as part of your

22  investigation?

23  A    Yes.  I also reviewed astronomical data from the

24  United States Naval Observatory, weather data from Weather

25  Underground, as well as Florida Statute 316.0745, design

1   standards from FDOT, the Florida Green Book, and the Florida

2   Highway Administration's Manual on Uniform Traffic Control

3   Devices.

4   Q    Did you inspect the vehicles involved in the accident?

5   A    Partially, ma'am.  I was able to complete an inspection

6   of the subject Grumman LLV on November 8, 2017.  At that time

7   I inspected, measured, photographed, and 3-D laser scanned

8   that vehicle.  I was not, however, able to complete an

9   inspection of the subject bicycle involved in this collision.

10  Q    And what did you do during your inspection of the mail

11  truck?

12  A    Well, in addition to measuring and photographing the

13  vehicle, I conducted a 3-D laser scan that uses a device that

14  takes a highly accurate 3-D photo realistic measurement of an

15  object that we can then use to place inside a digital

16  environment.  I also, at the time of my inspection, measured

17  where the driver's eyepoint would be in the vehicle, so how

18  far back from the front bumper the driver's eyepoint would be

19  or where a driver's eye would be as they were looking out of

20  the vehicle.  And I also assessed the vehicle to determine if

21  there were any visibility obstructions from the standpoint of

22  a driver within that vehicle looking to the right.

23  Q    And did you inspect the accident site?

24  A    Yes, ma'am, I did.  Two members of my team, Bob Fiorenze

25  and Jaime Aviles, went to the accident site on October 27,

1  2017.  There, they at my direction performed a 3-D laser scan

2  of the accident site.  They also took drone aerial photographs

3  and video as well as took drone photographs in order to create

4  diagrams from the accident site.

5      I visited the accident site and performed an inspection

6  on November 8, 2017, and at that time I photographed and took

7  measurements at that accident site.

8  Q   Can you explain what you know about the basic facts of

9  this accident.

10 A   Yes, ma'am.  As we can see, this photograph that's

11 currently shown on screen is a drone aerial photograph taken

12 in a generally northbound direction.  We see the intersection

13 between New Hampshire Street and U.S. Highway 1.  This is -- I

14 have some photographs to demonstrate.  The intersection has

15 been revised in between the time of the accident and today;

16 however, the overall geometry is roughly similar, especially

17 with regards to the intersection between the two roads.

18     Mr. Turner was approaching on New Hampshire Street and

19 preparing to make a right turn onto U.S. Highway 1.

20 Q   Can you please describe how the accident site has changed

21 since October 2013.

22 A   Yes, ma'am.  And, actually, stepping back even further,

23 as shown in this aerial photograph, we can see -- in between

24 the earlier aerial photograph and one that was taken after the

25 date of the collision, you can see that there were some

1  changes made to this intersection.  So in this aerial, which

2  is reported as being from January of 2012, we see that there

3  is no marked crosswalk and that there is a single center lane

4  projection that leads up to the crosswalk.  We also see that

5  there is a wide median opening on the -- at the center of

6  U.S. Highway 1 across from the intersection of New Hampshire

7  Street.

8  Q    Okay.  And what does this photo show you?

9  A    This is an aerial photograph taken on January 15th of

10  2014, and being after the date of loss, but we can see in

11  comparison to photographs we have from the date of loss that

12  the intersection is now configured in a similar manner.  So

13  the median opening has been reconfigured to only allow for a

14  right turn out of New Hampshire Street.  We see that there are

15  projections of that center lane marking that go from the stop

16  bar onto the projection of the road edge.  However, we can see

17  that there's no marked crosswalk.  That doesn't mean that one

18  can't use that as a crosswalk.  It just simply means there's

19  no crosswalk markings.  And other elements are roughly the

20  same.  So the stop bar is in the same location.  The sidewalk

21  and the shoulder and the road are all in the same location.

22  Q    Does Exhibit 17(L), Bates 2925, represent the accident

23  intersection as it would have been on October 28, 2013?

24  A    Yes, ma'am.  That is a -- that is a fair and accurate

25  depiction of the accident site.

1  Q    Were you able to create a scaled drawing of the accident

2  site?

3  A    Yes, ma'am.

4  Q    And is this scaled drawing shown on Exhibit 17(N),

5  Bates 2927?

6  A    Yes, ma'am.  This is a series of diagrams that are

7  produced to walk through the process of generating a scaled

8  drawing.  So this takes into account both the aerial

9  photograph that we obtained from commercially available

10 services, in this case Google Earth, that includes

11 diagrammatic overlay and data from our drone, and all of this

12 is combined together.  And then, as we remove elements, such

13 as you see here, we're left with a location diagram.

14 Q    And this location diagram is represented by

15 Exhibit 17(O), Bates 2928?

16 A    Yes, ma'am.

17 Q    And how is this scaled drawing that we're looking at now,

18 Exhibit 17(O), helpful in your reconstruction?

19 A    This can serve as a basis for us to understand the

20 movements of the vehicles.  So based on our mathematical

21 reconstruction, we can then place vehicles on this diagram and

22 depict their positions in time and space.

23 Q    Is it your understanding that on October 28, 2013, just

24 prior to the accident at issue in this case, that Mr. Turner

25 intended to make a right-hand turn onto U.S. Highway 1?

1  A     Yes, ma'am.

2  Q     Can you describe the visibility to approaching traffic

3  for a motorist like Mr. Turner attempting to make a right-hand

4  turn onto U.S. Highway 1?

5  A     Yes, ma'am.  I have a photograph that demonstrates the

6  visibility from a point of 7 feet back from the stop bar

7  location on New Hampshire Street.  Now, with this photograph,

8  we need to keep in mind that there is a "for sale" sign

9  located in front of this building; however, my analysis has

10 not included that.  So I've not included the visual

11 obstruction posed by this sign in assessing visibility to

12 approaching traffic.

13       So just looking at the obstruction that's posed by the

14 building edge and its location close to the shoulder of

15 U.S. Highway 1, we understand that from a driver's stopping

16 position 7 feet back from the stop bar, there is approximately

17 119 feet of visible space available to approaching traffic,

18 and if traffic is moving at the posted speed limit of 45 miles

19 per hour, that leaves only 1.8 seconds for a driver to see an

20 approaching vehicle, and that's simply not sufficient time for

21 a driver to be able to make a safe gap acceptance choice.

22       THE COURT:  That -- that photo is taken as if the

23 front of the truck is at the stop bar and the driver's 7 feet

24 behind that?

25       THE WITNESS:  Yes, sir.  That is the driver's eye

1  being positioned back in the position where we would expect it

2  to be in the driver's seat of the vehicle if the front of the

3  vehicle is at the stop bar.

4          THE COURT:  Okay.

5  BY MS. POSTERARO:

6  Q    In other words, Exhibit 17(H) represents Mr. Turner's

7  view looking to his left if he stopped at the stop bar in his

8  mail truck; is that correct?

9  A    Yes, sir -- yes, ma'am.  Sorry.

10 Q    Can you describe the visibility to the sidewalk on the

11 east side of U.S. Highway 1.

12 A    Yes, ma'am.  This photograph is taken from, actually, a

13 position slightly back and offset from where a driver's eye

14 would actually be; however, the cone is marking the location

15 7 feet back from the stop bar, and what this helps us

16 understand is that, with the permanent elements in the

17 environment, so trees primarily, that there is a total of

18 74.6 feet of sidewalk that's visible.  So for a driver

19 positioned 7 feet back from the stop bar, they would be able

20 to see 74.6 feet of distance down that sidewalk from the

21 intersection.

22 Q    Were there any obstructions that would prevent an

23 individual walking on the sidewalk -- or on the sidewalk from

24 viewing the intersection of New Hampshire Street and

25 U.S. Highway 1?

1  A    No, ma'am.  This photograph was taken about 195 feet back

2  from the intersection, and as we can see, there's a clear

3  sight picture forward from this position on the sidewalk.  So

4  any vehicle that was already in the intersection would be

5  visible.  And, of course, visibility is bidirectional.  So for

6  a person stationed at a position about 7 feet back from the

7  stop sign, there would be 74.6 feet of visibility down the

8  sidewalk; likewise, from someone on the sidewalk, they, once

9  they reached a point of 74.6 feet, would be able to see the

10  driver of the vehicle waiting to make a turn.

11  Q    And, for the record, does Exhibit 17(F), Bates 2863, show

12  what a pedestrian on the sidewalk would see looking towards

13  the intersection of New Hampshire Avenue and U.S. Highway 1?

14  A    Yes, ma'am, it does.

15  Q    Exhibit 17(I) is our next document.  Were there any

16  aspects of the mail truck that would affect the visibility out

17  of the vehicle?

18  A    No, ma'am.  From my inspection of the subject Grumman

19  LLV -- and this is a photograph that was taken at my

20  inspection -- we can see that there is no elements of the

21  vehicle that would pose any kind of difficulty or visual

22  obstruction to a driver who is attempting to survey traffic to

23  the right.

24  Q    Were you able to reconstruct this accident?

25  A    Yes, ma'am.

1  Q    We're looking at Exhibit 2, Bates 4.  Was there

2  photographic evidence of the final rest locations of the mail

3  truck and the bicycle?

4  A    Yes, ma'am.  We have photographs that were taken at the

5  scene of the accident that both Mr. Turner and Mr. Brisebois

6  testified as to representing the accident scene and final rest

7  locations of the vehicles.

8  Q    Specifically looking at Exhibit 2 -- Defendant's

9  Exhibit 2, Bates 3, was there photographic evidence of the

10  final rest location of the vehicles -- was in the travel lane

11  of U.S. Highway 1?

12  A    Yes, ma'am.  From the photograph that's currently shown,

13  we can see that the final rest location of both vehicles was

14  in the northbound travel lanes of U.S. Highway 1, and

15  specifically that of the Grumman LLV and the bicycle.

16  Q    Was there any evidence that the mail truck overrode the

17  bicycle?

18  A    No, ma'am.  As -- I do have a photograph to illustrate

19  that.  And what we can see is that the location of the hub of

20  the rear tire of the bicycle is actually located in line or

21  perhaps even a little bit forward of the bumper edge of the

22  Grumman LLV.  And so that is one way that we can understand

23  that the -- that the bicycle was not overridden by the

24  Grumman.  Also, Mr. Brisebois testified in his deposition that

25  the bike remained upright to final rest and that the total

1  travel distance was rather short.

2      THE COURT:  That's Bates 3 you're looking at?

3      MS. POSTERARO:  Yes.

4      THE COURT:  But you don't have 3 up on the screen

5  yet, so that's why I asked.

6      MS. POSTERARO:  I'm sorry.  I guess I'm not

7  understanding.  We're looking at Exhibit 2, Bates 3.

8      THE COURT:  Well, my Exhibit 2, Bates 3, is a

9  different photograph than what's appearing on the screen.

10     MS. POSTERARO:  Apologies, Your Honor.  I will

11 review your slide deck.

12     THE COURT:  Well, this is showing a frontal view of

13 it, not -- it's a different view.

14     MS. POSTERARO:  I apologize, Your Honor.  I may have

15 in my haste given you an old copy.  I thought that I had

16 printed out sufficient copies.  We can --

17     THE COURT:  Okay.  Well, I have two Exhibit 2, Bates

18 3s, is the problem.

19     MS. POSTERARO:  Right, Your Honor.  I apologize.

20     THE COURT:  Which one do you want me to have?  If

21 you want me to have the one on the screen, I'll discard this

22 other one.

23     MS. POSTERARO:  Yes, Your Honor.  I wish that you

24 would disregard the other one.

25     MR. BAILEY:  I think it's your next slide.

1          MS. POSTERARO:  Oh, it is?

2          MR. BAILEY:  I think it is, looking at what I have.

3     I'm sorry to interject, but I believe that's true.

4          MS. POSTERARO:  I gave away all my hard copies.

5     So --

6          MR. BAILEY:  Here you go.

7          THE COURT:  We see it has the same -- oh, I see up

8     on the top there's a difference between 12 and 13.

9          MS. POSTERARO:  Right.  Those are the page numbers

10    of the slide deck.

11         THE COURT:  Oh, okay.  So that's the explanation.

12    Then we're looking at page 13 of Exhibit 2, Bates 3.

13         MS. POSTERARO:  Right.  Your Honor, the way these

14    photographs were produced, they were produced two photographs

15    per page --

16         THE COURT:  Okay.

17         MS. POSTERARO:  -- and so when you refer back to the

18    exhibits and you look at Exhibit 2, Bates 3, they will both be

19    on that same Bates number page.

20         THE COURT:  All right.  I understand.  Thank you.  I

21    had just skipped ahead to that next photo is the problem.

22         MS. POSTERARO:  Well, let's all skip ahead.

23    BY MS. POSTERARO:

24    Q    Were you able to demonstrate the final rest location?

25    A    Yes, ma'am.  And the diagram shown on the -- on screen

1  right now illustrates the final rest location of the two

2  vehicles with the bicycle in the northbound travel lane of

3  U.S. Highway 1 and the front edge of the Grumman LLV being in

4  the travel lane of U.S. Highway 1, and that's based on the

5  placement as we can observe in the photographs taken at the

6  scene.

7  Q    Were you able to determine the area of impact?

8  A    Yes, ma'am, I was.  That is based upon multiple factors.

9  So we know what the stopping distance of this vehicle would

10 be.  We also have testimony from Mr. Turner as well as

11 Mr. Brisebois as far as the final movements of the vehicle

12 between impact and final rest, and so taking all of that

13 information together with Mr. Turner stating that the vehicle

14 moved perhaps 3 to 5 feet, Mr. Brisebois describing it as

15 about an inch of movement, and then the actual stopping

16 distance that can be calculated for this vehicle being 2 feet,

17 we arrive at an impact location as shown on the next diagram

18 that is 2 feet back --

19 Q    Sorry.

20 A    -- from that location.

21 Q    Does Exhibit 17, Bates No. 235 and -- excuse me -- 2935

22 and 2942, represent the final rest location of the vehicle as

23 reconstructed by you?

24 A    No, ma'am.  That actually represents the impact location.

25 Q    Oh, I see that.  Sorry.

1  A    And Slide 14 would contain the exhibit with final rest

2  location.

3  Q    Okay.  Thank you for that clarification.

4       Now, were you able to reconstruct the movements of the

5  vehicles to impact?

6  A    Yes, ma'am.  Understanding the location of final rest as

7  well as the distance and movement of the vehicle of the --

8  specifically the Grumman LLV between impact and final rest,

9  then taking that into consideration with the testimony of the

10 individuals involved, we were able to determine that the

11 Grumman moved a total of 32.6 feet between beginning its

12 initial acceleration and then reaching a stop at final rest,

13 and that movement's summarized on what is shown as Slide 16,

14 or Exhibit 17(A), Bates 3256.

15      We see that from the moment that the Grumman began its

16 initial acceleration from the stop bar, it -- accelerating up

17 to 5 miles an hour, that took 8.4 feet and 2.3 seconds of

18 time.  Once the Grumman reached a stable 5 miles per hour, it

19 traveled 22.3 feet forward over a period of 3 seconds, and

20 then the braking to stop would require two -- I'm sorry.

21 2 feet in one half second.

22           THE COURT:  That assumes that the truck stopped to a

23 full stop at the stop bar?

24           THE WITNESS:  That is correct, sir.

25 BY MS. POSTERARO:

1  Q    How did you reach your assumption of a stable speed of

2  5 miles per hour?

3  A    So that speed is reached based on a couple of different

4  factors, but the primary one is the visibility to approaching

5  traffic on U.S. Highway 1, so given the very short preview

6  time for a driver to be able to see and appreciate any vehicle

7  that's approaching the intersection prior to that driver

8  committing to enter the intersection.  It's not something that

9  in the traffic safety community we would expect to see a

10 great -- higher numerical speed for someone attempting to

11 enter the road with that little preview time, and, also, that

12 matches and accords with the testimony of Mr. Turner in that

13 he was moving forward in order to see if he had a clear sight

14 picture to approaching traffic.

15 Q    Can you describe the movement of the bicycle to impact?

16 A    Yes, ma'am.  And I believe that's summarized, yes, on

17 this slide.  So based upon the movement of the Grumman, we

18 have an understanding that the bicycle was moving at a

19 comfortable cruising speed, and in terms of bicycle movement,

20 that is typically 10 miles per hour or 14.7 feet per second.

21 So from that what I can do is take for any point in time that

22 the Grumman is moving and understanding how long it took the

23 Grumman to move through that sequence of time, then place the

24 bicycle to show where it was in relation to that.  So the

25 Grumman over the -- over that period of time would have moved

77.9 feet and then also had a total movement time of

5.3 seconds.

Now, what we're not seeing is the movement of the bicycle

from impact to final rest in this table, but at the moment in

time when the Grumman began accelerating away from the stop

sign, based on a comfortable cruising speed of 10 miles an

hour, the bicycle would have been 77.9 feet away from impact,

and at that point in time, it would not have been visible to a

driver at the stop bar.

Then, once the Grumman had began its movement, the

bicycle was 44.5 feet away, and then, once the Grumman was at

a stable speed, then the bicycle was 33.4 feet away.

Q    Based on these vehicle movements, how did the bicycle

approach the area of impact?

A    So I actually examined two different scenarios for how

the bicycle could reach impact, and that's serving as an upper

and lower bounds of the potential path of the bike to impact.

And the bicycle moving to impact as described by Mr. Brisebois

would be on the shoulder traveling at 10 miles an hour, as you

can see on this slide.  This has a -- movement of the vehicles

have already begun in this.

And then, as we move forward into -- the next slide will

show the 4-second position, and at this point in time the

bicycle is 59 feet from impact; the Grumman is 28 feet from

impact.

1   And moving forward again to 3 seconds, we can see that

2   the bicycle by this point had to have begun deviating from the

3   sidewalk and achieving its turn to reach its position at

4   impact.

5   Two seconds, the bicycle has begun to cross over the

6   grass.

7   One second, it has crossed over the shoulder.

8   And then at impact -- impact's occurring at the travel

9   lane of U.S. Highway 1.

10  Q   I'm going to back up to Exhibit 17(P), Bates 2932.  Are

11  you aware, Dr. Morgan, that there is a tree next to this

12  intersection or near this intersection?

13  A   Yes, ma'am.  There are a number of trees that are located

14  in the area that's to the east of the sidewalk.

15  Q   Now, if we had testimony that Mr. Brisebois first saw the

16  mail truck just before the tree nearest the intersection,

17  would you know what tree I'm referring to?

18  A   Yes, ma'am, I believe I would.

19  Q   Did you calculate the distance of that tree to the

20  intersection?

21  MR. BAILEY:  Your Honor, objection.  At this point I

22  think we're going to get into some testimony that was not

23  elicited at the time of the deposition nor in the report that

24  was submitted per Rule 26.  There was a discussion in the

25  deposition about the various locations of trees, whether

1  they'd been measured, and I understood that we could not have

2  those or did not have that information available at the time

3  of the deposition.

4         THE COURT:  Mr. Bailey, do you have a back problem

5  or some reason you can't stand?

6         MR. BAILEY:  No, Your Honor.  I apologize.

7         THE COURT:  I'll just simply -- if you're going to

8  sit down and talk, I'm just not going to listen to you

9  anymore.

10        MR. BAILEY:  I'll remember, Judge.

11        THE COURT:  So what were you saying while you were

12  sitting down?

13        MR. BAILEY:  I was saying that it sounds to me like

14  we're going to get into testimony about the location of a tree

15  that was discussed at deposition, and at the time that

16  information was not available.  It's not in Mr. --

17  Dr. Morgan's report --

18        THE COURT:  Well, here's my problem.  I could drive

19  over there and measure it because I'm interested in it, or we

20  can let him tell me that.

21        MR. BAILEY:  I think we'll let him tell you that,

22  Judge.

23        THE COURT:  All right.  Thank you.

24  BY MS. POSTERARO:

25  Q    Did you conduct a measurement of how far that tree is

1   from New Hampshire Street, Dr. Morgan?

2   A    Yes, ma'am.

3   Q    Okay.  And what is the distance between the tree and

4   the -- and New Hampshire Street?

5   A    The tree is approximately 20 to 30 feet back from the

6   intersection.

7   Q    So under -- can you articulate based on this

8   reconstruction where Mr. Brisebois was when he initially saw

9   the mail truck if he'd testified he saw it right before that

10  tree?

11  A    He would be about 20 to 30 feet back from the

12  intersection at that point in time, ma'am.

13  Q    Okay.

14         THE COURT:  But on these charts, which one in terms

15  of seconds -- where would that put him in terms of seconds?

16         THE WITNESS:  That would be at the approximately

17  two-second position, sir.

18         THE COURT:  Okay.

19         THE WITNESS:  And that's what's shown currently as

20  Exhibit 17(P), Bates No. 2933, sir.

21         THE COURT:  Correct.  Thank you.

22  BY MS. POSTERARO:

23  Q    Could the same accident configuration occur if

24  Mr. Brisebois had been riding southbound on the shoulder of

25  northbound -- of the northbound travel lanes?

1  A    Yes, ma'am, it could have.

2  Q    Okay.  And did you do a reconstruction or prepare slides

3  in support of that reconstruction?

4  A    Yes, ma'am, I did.  And that's what's currently shown

5  starting with Exhibit 17(Q), Bates No. 2937.

6  Q    Can you please explain that scenario as diagrammed by

7  you.

8  A    Yes, ma'am.  This depicts the bicycle being operated on

9  the shoulder -- on the eastern shoulder of northbound

10 U.S. Highway 1 at a position at -- operating on the position

11 of the shoulder of the road as the vehicle is at a stopped

12 position and starting to accelerate forward, after the Grumman

13 has already began moving.  And this shows the bicycle

14 approaching.  At 4 seconds it's 59 feet from impact.  At

15 3 seconds it's 44 feet from impact.  At 2 seconds it's 29 feet

16 from impact, which is in the area where we understand the tree

17 that was indicated in deposition as the point of visibility

18 for Mr. Brisebois was located is depicted here, and then one

19 second, the bicycle's begun steering into northbound U.S. 1,

20 and then impact in the travel lanes of northbound U.S. 1.

21 Q    If Mr. Brisebois had approached the intersection on the

22 sidewalk, when would his steering maneuver need to begin to

23 reach his position in the roadway at impact?

24 A    That's depicted in two diagrams that I have following

25 this.  So that steering maneuver would need to take place

1  between 3 and 4 seconds prior to impact.  So this position, as

2  shown on the diagram, is 4 seconds to impact.  The bicycle is

3  59 feet, and then 3 seconds is 44 feet from impact.  So based

4  on a normal steering path that would keep the bicycle upright

5  at impact, as described by Mr. Brisebois, then that's when the

6  steering maneuver would need to begin.

7  Q    Assuming that Mr. Brisebois was on the sidewalk, can you

8  describe his path between the sidewalk and impact?

9  A    Yes.  It would involve leaving the paved sidewalk,

10 traveling across -- in a diagonal manner across the grass, and

11 then down the curb, across the shoulder, and into travel lanes

12 of U.S. 1.

13 Q    Now, if Mr. Brisebois had approached on the shoulder,

14 when would his steering maneuver have to begin to reach his

15 position in the roadway at impact?

16 A    That steering maneuver would need to take place between 1

17 and 2 seconds prior to collision when the bicycle was about

18 29 feet -- or no more than 29 feet from impact.

19 Q    And would this be consistent when -- would this be

20 consistent with the scenario where Mr. Brisebois saw the mail

21 truck for the first time right before that tree or between 20

22 and 30 feet back from the intersection?

23 A    Yes, ma'am, it would.

24 Q    Dr. Morgan, can you address the scenario where

25 Mr. Brisebois sees the mail truck right before the tree,

1   continues riding his bicycle to the end of the sidewalk at

2   New Hampshire Street, and then is impacted by the mail truck.

3   Is that scenario possible or -- let me rephrase that question.

4   Can you describe what that scenario would look like?

5   A    Well, had Mr. Brisebois continued on the sidewalk without

6   deviating, the impact would have been to the side of the mail

7   truck, to the right side of the vehicle, and that actually is

8   something that Mr. Brisebois has described in his deposition

9   as well.

10  Q    Now, can you describe the maneuver that would be required

11  to ride to the end of the sidewalk and then swerve in front of

12  the mail truck such that the impact is still consistent with

13  your determinations?

14  A    Yes, ma'am.  So understanding that the bicycle was

15  upright at impact, we also can determine that the bicycle was

16  not at a severe lean angle, so it was not tilted over in the

17  process of making a turn.  So for the bicycle to be in an

18  upright position at the point of impact, it would have to make

19  two very severe turns that were over 90 degrees, and so it

20  would have to make an initial right-hand 90-degree turn to

21  deviate from the sidewalk and then actually travel towards

22  northbound U.S. Highway 1, and then almost immediately make a

23  second sharp over-90-degree left-hand turn in order to reach

24  its position at impact on the opposite corner -- opposite

25  front corner of the Grumman LLV.  And so that would be a very

1    destabilizing maneuver for a bicycle that would be very

2    difficult to accomplish with a normal road bike.

3    Q    Is the bicycle likely to have remained upright in that

4    scenario?

5    A    No, ma'am.  If the bicycle was successfully maneuvered to

6    that position without losing control, it would be in a

7    destabilized position and would be very easy to tip over in

8    that scenario.

9    Q    If Mr. Brisebois testified that he saw the mail truck

10   slowing down, would that be consistent with your

11   reconstruction of the events?

12   A    No, ma'am.  The mail truck moved at a -- based on the

13   reconstruction I've put together and the testimony that I've

14   been able to review to date, the mail truck moved at a stable

15   speed and moved so after a position at the stop line.  So at

16   the mail truck's position at the stop line, the bicycle was

17   not in a point where it would have visibility to the mail

18   truck to begin with.  Likewise, the mail truck would not have

19   visibility to the bicyclist when it's at the stop sign.  The

20   bike was simply beyond that 74.6-foot distance on the sidewalk

21   where visibility's supported.

22        So the first point in time when the bicyclist could

23   observe the mail truck or vice versa, the mail truck was

24   moving forward at a slow but steady pace.  Now, that may be

25   something that an individual could perceive as slowing, but it

1   was certainly a consistent pace.

2   Q    Can you discuss how the curvature of that intersection

3   might affect the curve of the road for -- someone taking a

4   right-hand turn onto U.S. Highway 1 might affect the

5   perceptions of a vehicle's acceleration or deceleration?

6   A    Yes, ma'am.  So, as we can see, this is what's referred

7   to as a "skewed intersection," and that's a term that simply

8   means that it's not an intersection that we think of as a

9   traditional T, but instead there's more of an angle -- a

10  sharper angle in between how the roads meet.  So a vehicle

11  that's intending to make a right turn, which is the only

12  permitted turn onto U.S. 1 from New Hampshire Street, would be

13  at an angle as it traveled onto New Hampshire -- or, sorry.

14  From New Hampshire onto U.S. Highway 1.

15      So from someone on a sidewalk or on the shoulder's

16  perspective, the vehicle's going to have more of a forward

17  component than a lateral component to its movement, and that

18  could in turn lead someone to perceive that as a vehicle

19  slowing.

20  Q    Did you conduct any analysis to tell you how quickly --

21  how long it would have taken Mr. Brisebois to stop once he had

22  seen the mail truck based on your reconstruction?

23  A    Yes, ma'am, I did.  The bicycle has an actual stopping

24  time of .9 seconds, and it would require --

25              THE COURT:  From 10 miles an hour?

1    THE WITNESS:  Yes, sir, from 10 miles an hour.  And

2  I apologize for leaving that out.  From 10 miles an hour,

3  braking at .5 g, then the bicycle would be able to reach a

4  full stop in 6.7 feet in .9 seconds.

5    Now, we also have to keep in mind that there has to

6  be a perception involved before someone can begin the brake

7  process.  It takes time for us to see that something is there

8  and that something needs to be responded to.  That's called

9  "perception-reaction time."  And for this, given that the

10  individual operating a bicycle's hands are already on the

11  controls that initiate the response, it's a rather short

12  perception-reaction time.  And so with a one-second

13  perception-reaction time -- so one second after it becomes

14  visible, the response is beginning -- the bicycle would travel

15  14.7 feet.  And so your total time from first seeing it to

16  coming to a complete stop is 21.3 feet in 1.9 seconds, and

17  that could occur at any time after the 74.6 feet of

18  visibility.

19  BY MS. POSTERARO:

20  Q    So total -- is it your testimony that the total stopping

21  time, then, is 1.9 seconds?

22  A    That's correct.  So including perception of the truck

23  first becoming visible to reaching a complete stop is

24  1.9 seconds.

25  Q    Having considered all the evidence, have you reached

1  any -- have you reached opinions about how this accident

2  occurred within a reasonable degree of scientific certainty?

3  A    Yes, ma'am, I have.

4         MS. POSTERARO:  I have no further questions for

5  Dr. Morgan at this time.

6         THE COURT:  All right.  Cross.

7         MR. BAILEY:  May it please the Court.  Thank you,

8  Your Honor.

9         Before we get going, I want to make sure that we can

10 also use the same PowerPoint.  I think it will be helpful, and

11 there are some things I want to point out.  Ms. Pappas will

12 take control of that.

13                     CROSS-EXAMINATION

14 BY MR. BAILEY:

15 Q    Mr. Morgan, let me also bring out some photographs here

16 that are part of that PowerPoint, I believe.  I want you to

17 confirm that, the top one being your BSC0016 that shows

18 Mr. Turner's view looking to his left, to the south, where the

19 thrift store is if he's sitting at the stop bar.

20 A    If you'll give me one second, sir.  I'd like to refer to

21 my hard copy of these photographs as well.  And, also, the

22 photograph should be labeled within my PowerPoint

23 presentation.

24 Q    They are, and we could probably find those to compare

25 them.

1    THE WITNESS:  One more back, ma'am.

2  BY MR. BAILEY:

3  Q    Yes.

4  A    Yes.  So that does appear to be the same photograph, sir.

5  Q    And the bottom one is showing the corresponding view of

6  Mr. Turner's perspective sitting at the stop bar looking to

7  the north, the direction from which Mr. Brisebois was coming;

8  is that correct?

9  A    I'm sorry, sir.

10  Q    Yes, sir.  Your BSC0048.  It's on page 7 of your report.

11  It was also on the PowerPoint.

12  A    Yes.  So that photograph is taken from a distance

13  slightly back from 7 feet and from the opposite travel lane of

14  where the Grumman is simply to include that cone, but, yes,

15  that's roughly the same position overall as would be had from

16  looking in the opposite direction.

17  Q    Yes.  Let me -- how did you refer to it in your report,

18  sir, that particular photograph?

19  A    Sir, if you could ask that question a different way.

20  Q    Yes, sir.  Let me find your report here.  The bottom

21  photograph, the one looking to the north, the direction from

22  which Mr. Brisebois would have been coming -- you say it's

23  Figure 5 in your report -- is it? -- on page 7.

24  A    Yes, sir.  That's labeled "visibility to sidewalk from

25  Grumman position at stop line."

1    Q    Okay.  And as best we can re-create it, those years after

2    the accident, we're trying to show what Mr. Turner could see

3    from the stop bar looking to the right in the bottom

4    photograph?

5    A    Well, sir, I would actually state this is more assessing

6    the overall visibility of the site and not necessarily what

7    any one individual would have specifically seen, but this

8    would allow us to understand when objects would become

9    available to be observed.

10   Q    Well, what's the caption on your Figure 5 that identifies

11   that photograph in your report?  Just read that, please.

12   A    "Visibility to sidewalk from Grumman position at stop

13   line."

14   Q    Okay.  Now, something else I want to ask you about:  In

15   this bottom photograph, the 0048 --

16          MR. BAILEY:  That's part of our Exhibit 51 as well,

17   Judge.

18   BY MR. BAILEY:

19   Q    This bush we see in the left side of the foreground just

20   behind the stop sign pole -- we see that in an earlier

21   photograph taken the day of the accident, don't we?

22   A    As I'm sitting here, I'll need to refer back to some

23   photographs to try to locate that same bush.

24   Q    Okay.  You and I talked about this at your deposition.

25   Find the day-of-the-accident photograph with the Grumman,

1  looking at it from the back.  It's not in the -- I don't think

2  it's in the PowerPoint, but we see a bush here to the right --

3  a bush in your photograph.  Do you recall talking about that

4  in your deposition and agreeing that that was the same bush

5  only some years later in the bottom photograph?

6  A    Yes, sir.  That would certainly be part of the

7  landscaping that I described; however, being that it is much

8  closer than 74.6 feet from the intersection, it would not be

9  something that would pose a significant visual obstruction to

10 a driver.

11 Q    Yes, sir.  And I -- I was going to ask you that same

12 question, but at this juncture my point being, for the judge's

13 understanding, that bush would not have been as big as we see

14 it in the photograph that we looked at in your PowerPoint.  So

15 it -- you know, we can take it out of the equation entirely;

16 true?

17 A    Yes, sir.  I would agree that that bush, being that it is

18 about perhaps 20 to 30 feet from the intersection, would not

19 be something that would be posing a sight line obstruction for

20 a driver or for someone operating in a southbound direction in

21 that area.

22 Q    And just to be crystal clear, at the time of the

23 accident, it was just a little tiny thing.  It wasn't nearly

24 as bushy or big as we see it in the PowerPoint; right?

25 A    Yes, sir.  I would agree with that.

1  Q    The other thing I want to look at with the PowerPoint

2  slides -- let's find the original photographs.

3          MR. BAILEY:  And, Ms. Pappas, I'm directing your

4  attention for this, please.  The Google Earth photographs we

5  used just to orient ourselves to the intersection -- it would

6  have been the January 14 aerial one that we talked about, I

7  think that we said was representative of the scene at the time

8  of the accident.

9          MS. PAPPAS:  Jan 15?

10  BY MR. BAILEY:

11  Q    Do we have that one up?

12  A    Yes, sir.  That's currently shown on the PowerPoint.

13  That is January -- a photograph represented as January 15,

14  2014, by Google, and -- I'm sorry, sir.

15  Q    No.  I'm sorry.  I don't mean to interrupt you, but my

16  question was going to be -- I wrote that you indicated that's

17  how the intersection was configured at the time of the

18  accident.  Is that the correct understanding?

19  A    Yes, sir, that's the same general configuration of the

20  intersection as during the time of the accident.

21  Q    Okay.  The thing I wanted to ask is -- because we talked

22  about some differences that may exist -- we didn't mention the

23  fact that there wasn't a sidewalk on the west side of

24  Ridgewood at the time of the accident; right?

25  A    That's correct, sir.  At the time of the accident.  And

1   an initial look to this photograph, I believe, confirms that,

2   that there was not a sidewalk on the opposite side from where

3   Mr. Brisebois was operating his bicycle.

4   Q    And you and I agreed on that premise as well at your

5   deposition; right?

6   A    Yes, sir.  There's not a sidewalk located on the opposite

7   side; however, there's nothing that would prevent an

8   individual from operating their bike according to any normal

9   practice, whether sidewalk or road.

10  Q    Sure.  All right.

11       Now I want to find the diagrams that you did relevant to

12  your reconstruction analysis.

13       MR. BAILEY:  Let's flip through them, and I'll tell

14  you when to stop, Fay.  Keep going.  Keep going.  Go ahead.

15  All right.  Now go back to the last one, the one before that.

16  BY MR. BAILEY:

17  Q    All right.  Looking at this diagram -- and I think we see

18  a similar diagram when we start talking about the analysis you

19  did, if there was some thought that Mr. Brisebois was not on

20  the sidewalk but on that paved shoulder.  But on this one we

21  see that the front of the LLV, the Grumman, sits back from the

22  stop bar.  There's a distance between it on the diagram.  I

23  understood, when I took your deposition, that this diagram

24  doesn't accurately depict what we're trying to show because of

25  scale.  Is that right?

1  A    Well, sir, as we discussed in my deposition, that would

2  be a potential scaling issue.  I've not done any work to

3  investigate that further.  I have went back to double-check

4  the mathematics of my calculations on the movements of the

5  vehicle and find that there are no issues there.  So this is a

6  simple representation of the location of the vehicles.

7  Q    I understand.

8  A    And so if it does have a scaling issue, like we

9  potentially discussed -- or like we discussed it may

10  potentially have, then that would simply be on the one

11  five-second slide.

12  Q    Sure.  The next slide, though -- because here's my point,

13  and I'll get right to it.  These two slides particularly

14  suggest the relative position of the Grumman's front bumper to

15  the stop bar, and to the extent that they're not scaled

16  properly, would you agree that they are confusing or

17  misleading, and the judge might need to understand that?

18  A    Well, sir, I would simply state that the movement of the

19  vehicles are accurate.  So the path that those vehicles are

20  taking to impact and final rest are all representative of the

21  results of my reconstruction.  The drawing and placement of

22  the vehicles may involve a scaling issue at the earlier

23  points; however, the movement back from impact is accurate.

24  Q    No argument there.  We're going to talk some more about

25  that, obviously, but for the judge's understanding, we don't

1   want to make him think, if we're using that stop bar as a

2   point of reference, that those diagrams are accurate; right?

3   A    No, sir.  I can't state that those are not accurate.

4   There may be a scaling issue in the drawing and placement of

5   the one at 5 seconds; however, that does not mean that the

6   mathematics behind it are incorrect.

7   Q    How about the ones at 4 seconds?  Is that scaled badly

8   too so that we show the front bumper of the LLV being equal to

9   the stop bar when, in fact, it's going to be beyond that at

10  that point?

11  A    No, sir.  You'd have about 1.9 seconds of movement to

12  that point in time.  So the vehicle has begun accelerating;

13  however, its initial accelerative movement is very, very low.

14  Q    Well, and in that diagram we're looking at -- and I'm

15  looking at PowerPoint 19.  It's the one 4 seconds back from

16  the impact -- we're saying it's moving at how fast?

17  A    Four miles an hour at that point, sir.  It's still

18  actually accelerating and has not reached 5 miles an hour and

19  is still 28 feet from impact.

20  Q    Yeah.  But we see it looking like it's sitting at the

21  stop bar going 4 miles an hour; right?

22  A    Yes, sir.

23  Q    Okay.  Well, that's my point.  It wasn't sitting at the

24  stop bar going 4 miles an hour, was it?

25  A    Well, sir -- I'm sorry.  To complete my answer, no, sir.

1  Once the vehicle began moving, it accelerated for 2.3 seconds,

2  and during that period of time, by the time it reached 5 miles

3  an hour, it had moved 8.4 seconds.

4  Q    To the extent these diagrams, at least those initial

5  ones, might give us a point of reference at the stop bar that

6  obviously is not accurate -- let me dispense with those, and

7  we'll move on.

8       Let me, if I can, Dr. Morgan, do this.  We'll move this

9  thing out of the way.  I want to understand the process, and I

10  think -- at least my hope is it'll help Judge Presnell as

11  well.  Am I right in understanding that essentially what you

12  did -- you took a fixed piece of evidence that was accurate

13  and indisputable -- that is, the final rest position of the

14  vehicles -- and sort of worked backwards from there?

15  A    Yes, sir.  That's normal practice in accident

16  reconstruction.  So we start with the known elements in the

17  environment -- that is, the positions of vehicles at final

18  rest -- and work back to where impact occurred and then from

19  that point reconstruct the movements going into impact.

20  Q    Okay.  And from that point you do have to make some

21  assumptions because, otherwise, we don't have any other

22  physical evidence that really gives us any solid clues about

23  how to put that analysis together; true?

24  A    Well, sir, we have to use some values, for example, from

25  testimony of individuals to, for instance, capture speed where

1  otherwise speed data is not available.

2  Q    Sure.

3       Let me see if I can be more specific.  For example, the

4  bicycle.  Nobody gave a precise mile-per-hour estimate of its

5  speed, did they?

6  A    No, sir.  And the speed of 10 miles an hour is simply

7  that of a normal cruising speed for a bicycle operated by an

8  adult.

9  Q    In other words, we assumed a constant speed for the bike;

10  right?

11  A    Yes, sir.  There's no evidence or information that tells

12  us that the bike was moving in an erratically different manner

13  than that.

14  Q    And we didn't factor into the equation one way or the

15  other whether it slowed down a little bit, coasted, put -- you

16  know, any kind of variation in its approach speed.  It was

17  just a constant 10 miles per hour in your analysis.

18  A    Yes, sir.  And the reason being is that, when we use an

19  average speed across a distance, that accommodates any minute

20  changes in speed as the vehicle goes along.  So if this bike

21  was going 11 miles an hour for a couple of feet and then

22  9 miles an hour for a couple of feet, its average speed would

23  still be 10 miles an hour.  So the average is typically the

24  best representation of a vehicle's speed over any given

25  distance.

1  Q    Understood.

2      But did you take into account whether Mr. Brisebois was

3  coasting or pedaling at a various point along the approach?

4  Again, doesn't matter?

5  A    I'm sorry, sir.  Could you repeat the last part of your

6  question there.

7  Q    Sure.

8      Did you see in Mr. Brisebois's deposition where he

9  described his approach as coasting?

10 A    Yes, sir.

11 Q    Okay.  And did you take into consideration the

12 possibility that, when he perceived the vehicle as a potential

13 threat, that he may have pedaled to try to accelerate around

14 it?

15 A    Well, sir, again, that would go back to what I was

16 discussing earlier about the average being the best

17 representation of a vehicle's travel speed through a distance.

18 So the average is the best way to capture a vehicle's speed

19 over a larger distance.

20 Q    That 10-mile-an-hour speed for the bike that you assumed

21 as a constant rate of approach turns out to be 14.67 feet per

22 second?

23 A    Yes, sir.  That's -- 1 mile an hour is 1.467 feet per

24 second.

25 Q    And the speed of the mail truck, by the same token -- did

1  you assume some sort of parameters to derive the speed of the

2  mail truck at the point of impact?

3  A    Yes, sir.  So similar to how I addressed the movement of

4  the bicycle based on the testimony of Mr. Brisebois, I

5  utilized the description provided by Mr. Turner over his

6  movement of the Grumman LLV and then also what we know about

7  the accident site and what a driver -- normal attentive driver

8  faced with that intersection would do in approaching the edge

9  of U.S. Highway 1.

10  Q    Did you have it all as part of the information provided

11  to you, what is Plaintiff's Exhibit -- I believe it's 3, but

12  let me make sure.  I'm sorry.  It's Exhibit 4 that's in

13  evidence.  It's a motor vehicle accident report form, a

14  Government form.  It says "standard form" at the bottom.

15  Again, it's Exhibit 4, Plaintiff, where Mr. Turner says in a

16  statement written the same day that the bicycle -- let's see.

17  I'm sorry.  My eyes are not so good.  "My LLV was at

18  approximately 5 to 10 miles per hour."  And I'm happy to show

19  that to you.  And it's actually in your exhibit book there.

20  A    I'm sorry, sir.  What was your question on that?

21          MR. BAILEY:  May I approach, Your Honor?

22          THE COURT:  Sure.  I think he's just trying to find

23  out what your question is.

24  BY MR. BAILEY:

25  Q    My question is did you have what is Plaintiff's Exhibit 4

1    in evidence, which is this document here, the accident report

2    form, that I was reading from?

3    A    Thank you, sir.

4    Q    Yes, sir.  I'm sorry.  I see you do have some of the

5    Government forms there.

6    A    It might take a moment to find.

7    Q    Look there and see if it's one of the ones provided to

8    you and particularly at Bates --

9    A    Well, sir, as I'm sitting here, I would have to do a

10   comparison to the volume of pages I have in my file, but I

11   would state that I also am primarily relying upon his

12   deposition testimony to determine how his -- he moved his

13   vehicle into the intersection as well as what we know about

14   how a normal, attentive driver approaching the intersection

15   with less than two seconds of visibility to approaching

16   traffic would behave.

17   Q    Yes, sir.  And I appreciate that explanation, but look at

18   that Exhibit 4, page 979, in the bottom right-hand corner that

19   you have in front of you.  Just confirm for me that you do see

20   where Mr. Turner wrote in his own hand that "My LLV was at

21   approximately 5 to 10 miles per hour."

22   A    Yes, sir.  The last line of this does say

23   approximately -- "My LLV was approximately 5 to 10 miles an

24   hour."  So I would read that as being confirmation that

25   5 miles an hour is a reasonable speed to be using.

1  Q   Well, and there's my point.  We -- to the extent that

2  it's reasonable and to the extent that Mr. Turner could give

3  any estimate that's -- that's of any help to us, you used the

4  lower end of that; true?

5  A   Well, sir, what I would state is, to begin with, I would

6  not expect a driver preparing to make a right-hand turn onto a

7  rather busy highway, without having adequate sight picture to

8  approaching traffic, to be looking at their speedometer and,

9  instead, would be making a relevant judgment and not something

10 that would be given in anticipation of someone basing a speed

11 precisely upon that number.  The other thing is, as I alluded

12 to, a driver's not going to be looking to the speedometer but,

13 instead, to where the threat is, and once a driver is beyond

14 the stop bar in line roughly with where the crosswalk is, the

15 threat is approaching traffic.

16        MR. BAILEY:  Judge, I appreciate we're in a bench

17 trial here, and I'm reluctant to interrupt Dr. Morgan, but my

18 cross will go a lot quicker if I just get an answer, and if

19 there's a short explanation, fine.  Otherwise, I'd recommend

20 it be directed on redirect.

21        THE COURT:  Yeah, I agree.

22        He asked you to -- you know, as between 5 and 10, 5

23 is lower than 10.  So, I mean, that's --

24 BY MR. BAILEY:

25 Q   And if you would, Dr. Morgan, I'll give you every

1  opportunity to tell me what you want to tell me within reason,

2  but we'll be here all day.  You know, I won't cut you off if

3  you just answer questions as directly as you know how.

4      And the other thing that you have done in your

5  reconstruction here by virtue of the way you've approached it

6  is that you've assumed the acceleration rate for the mail

7  truck in this case -- I think you used .1 g; is that right?

8  A    Yes, sir, I did.

9  Q    And that translates into what?  3.217 feet per second per

10  second?

11  A    3 point -- well, sir, what I'd refer you to is on the

12  movement stop to a stable velocity.  Yes, .1 acceleration is

13  3.22 feet per second squared.

14  Q    Right.

15  A    And -- yes, sir.

16  Q    Okay.  That's all I'm trying to get at, because we

17  referred to .1 g, and a lot of folks don't understand what

18  that means in terms of feet.  But it's 3.217 feet -- right? --

19  per second per second?

20  A    3.22 feet per second squared, and so, to give you a

21  relative number, that's just barely less than what you would

22  use coming to a stop at a stop sign.

23  Q    At any rate, that's the rate at which the LLV begins to

24  move away from a complete stop?

25  A    Correct, sir.

1  Q    Okay.  Until it reaches the stable speed of 5 miles per

2  hour?

3  A    Yes, sir.

4  Q    All right.  And that's how you've analyzed the scenario

5  here?

6  A    That is correct, sir.

7  Q    And that the LLV then continues at a stable speed of

8  5 miles per hour over the time and distance that you've showed

9  us to the point of impact?

10  A    That's correct, sir.

11  Q    And at impact it's still going 5 miles per hour; true?

12  A    Yes, sir.

13  Q    All right.  Now, that acceleration part of the movement

14  phase of the LLV, the 3.217 or 3.22 feet per second per

15  second, without getting into the second per second, the second

16  squared, which gets into complicated physics, for our

17  purposes, is it reasonable to say that's the rate at which it

18  initially begins moving away from a dead stop, in other words,

19  about 3.2 feet per second?

20  A    No, sir.  That's a little bit of an oversimplication.

21  Q    Let's put it this way:  During its first second of

22  movement, how fast or how much distance does it cover?

23  A    3.22 feet.

24  Q    All right.  That's all I need.

25       Now, if a person was going to -- going to walk at a pace

1  where they're already moving at a reasonable pace, what is a

2  reasonable walking pace, feet per second?

3  A    For pedestrian walking speeds, typically 4 and a half

4  feet per second.

5  Q    Okay.  So initially in its -- in its movement, you've

6  used an acceleration rate that is slower than somebody

7  walking; right?

8         THE COURT:  Yeah.  But you're comparing velocity

9  with acceleration.  They're two different concepts.

10        MR. BAILEY:  Well, sure.  I'm talking about its

11  initial movement away from a dead stop.

12        THE COURT:  Well, there still is a difference

13  between velocity and acceleration.  I don't understand your

14  question.

15        MR. BAILEY:  All right.

16        THE COURT:  I wasn't very good at physics, but I do

17  think I understand that difference.

18        MR. BAILEY:  All right, Judge.

19  BY MR. BAILEY:

20  Q    The other part of your analysis, as I understand it,

21  Dr. Morgan, is that, obviously, once you take into

22  consideration the parameters regarding the vehicle movement --

23  bike and LLV -- now you consider the elements in the landscape

24  that are there and how the -- the two parties might encounter

25  them in the approach to the intersection, yeah?

1  A    Yes, sir, that was considered.

2  Q    All right.  And -- and we talked about some features of

3  the landscape that, obviously, we need to understand.  One of

4  them, the sidewalk on the west side of Ridgewood, only the

5  sidewalk where Mr. Brisebois was riding his bike; right?

6  A    The only sidewalk present at the time was on the eastern

7  edge of the road.

8  Q    Okay.  The side where the accident happened?

9  A    Yes, sir.

10  Q    Okay.  And the other thing we talked about -- and I don't

11  want to belabor it -- is the location of that thrift store on

12  the southeast corner, and you'd agree that that blocked

13  Mr. Turner's view of oncoming northbound traffic beyond a

14  distance of 119 feet if he stopped at the stop bar, as we've

15  described?

16  A    Yes, sir.  I agree that would be a visual obstruction.

17  Q    Okay.  And the trees to the right -- to Mr. Turner's

18  right on that northeast quadrant of the intersection that

19  potentially served as obstructions -- those were the only

20  thing other than you mentioned the presence of a boat

21  somewhere in a photograph off in the distance; true?

22  A    Well, sir, not off in the distance.  There was a boat in

23  the parking lot that was directly adjacent to the Grumman LLV;

24  however, as I believe we discussed in deposition, that would

25  at best be a partial visual obstruction.  The important point

1  here is still 74.6 feet is once clear visibility is

2  established.

3  Q    And that 74.7 feet, I think it was you quoted -- how much

4  time would be involved for the bicycle to cover that distance

5  at 14.67 feet per second, 10 miles an hour?

6  A    Five seconds, sir.

7  Q    Okay.  In your deposition I think we talked about 5.1.

8  Do you remember that being --

9  A    Yes, sir.  Yes, sir.  To give you a complete answer, not

10 rounded, that's 5.0862.

11 Q    Okay.  And just for the sake of consistency, because I

12 told the Court 5.1 when we started -- I don't want to be

13 wrong -- that's what we're saying is the clear distance over

14 which there would have been a view of Mr. Brisebois

15 approaching from the north had Mr. Turner looked -- true? --

16 from the stop bar or anywhere forward of that.

17 A    Yes, sir.  Bidirectional visibility is established at

18 74.6 feet.

19 Q    So all Mr. Turner has to do is look to his right at any

20 point after he's sitting at that stop bar and begins to pull

21 forward, and he's going to be able to see Mr. Brisebois for

22 5.1 seconds before the impact happens?

23 A    Well, sir, that's bidirectional visibility.  So, yes, at

24 that point in time both vehicles are visible to both

25 operators.

1 Q    Okay.  And, again, not to belabor it, but the fence that

2 we see in the photograph here -- it's part of the PowerPoint

3 too.  There's just some remnants of it.  To what extent it

4 existed at the time of the accident, we agree that that didn't

5 pose any obstruction to either party's vision; is that right?

6 A    I would agree with that, sir.  74.6 feet is the point of

7 visibility.

8 Q    Well, and the reason the fence isn't an issue is because

9 it's low enough not to obstruct anything or not there in

10 certain places; right?

11 A    I -- in general, sir.  I don't have a specific answer for

12 that except for, based on my assessment of the site, that

13 would not have been a factor.

14 Q    All right.  Very good.

15      And as part of your reconstruction analysis, I know you

16 did because we talked a bit about it on direct.  Let's go

17 back, though.  You considered the nature of the vehicle that

18 Mr. Turner was driving, the LLV, considered the fact that it

19 was a right-hand drive vehicle; is that right?

20 A    That is correct, sir.

21 Q    And the operator sits closest to the side from which

22 Mr. Brisebois was coming?

23 A    That is correct, sir.

24 Q    Considered the fact that the LLV has these large side

25 windows on the sliding doors that give an unobstructed, clear

1  view to the right?

2  A    Yes, sir.

3  Q    Okay.  How about the weight of that LLV?  What is that,

4  sir?

5  A    Off the top of my head, I don't know.  I do have data

6  that will allow us to answer that question, sir.

7  Q    Okay.  Please find that.

8  A    The curb weight of the vehicle is 3,050 pounds, and the

9  gross vehicle weight rating 4,450 pounds.  I do not have

10  information as to the actual scale weight of the vehicle on

11  the date of the accident.

12  Q    Somewhere between the two, obviously.

13  A    Yes, sir.

14  Q    Okay.  In addition to information about the LLV as part

15  of your analysis, you considered at least to some extent the

16  testimony of the two parties, Mr. Brisebois and Mr. Turner?

17  A    Yes, sir.  That's correct.

18  Q    All right.  And the information you had was from

19  depositions at that point, obviously.

20  A    Yes, sir.

21  Q    All right.  In Mr. Turner's deposition, did you see where

22  he said that he did not see Mr. Brisebois at all before he hit

23  him, before the impact occurred?

24  A    Well, his deposition certainly speaks for itself.  I do

25  recall that matching his testimony.  Yes, sir.

1  Q    Do you recall Mr. Turner also saying that he never saw

2  the bicycle before the impact?

3  A    Same caveat.  Yes, sir.

4  Q    Okay.  And that Mr. Turner said his first awareness of

5  Mr. Brisebois's presence was when he hears a bang and sees

6  Mr. Brisebois clinging to his windshield?

7  A    Yes, sir.

8  Q    Okay.  And that, when Mr. Turner realized what was

9  happening, Mr. Brisebois was in front of the windshield closer

10 to the left side of the truck from center?

11 A    Yes, sir.  He was on the opposite side of the opposite

12 corner of the vehicle at that point.

13 Q    Do you recall also that Mr. Turner testified in his

14 deposition, as he did here in the courtroom, that the last

15 place his direct -- gaze was directed was to his left to see

16 northbound traffic and that he never looked back to his right

17 before he began pulling out?

18 A    That's what I recall in his deposition, and that's where

19 we would expect a driver to be looking prior to entering the

20 travel lanes of U.S. Highway 1, sir.

21 Q    Do you agree with me that what caused Mr. Turner to react

22 and begin to bring the mail truck to a stop was hearing

23 Mr. Brisebois hit the front of his truck and realizing that he

24 had already hit him?

25            MS. POSTERARO:  Objection as to the relevance to

1  Mr. -- excuse me -- Dr. Morgan's testimony.

2       THE COURT:  Overruled.

3       MS. POSTERARO:  Okay.

4       THE WITNESS:  Could you ask that question again

5  please, sir.

6  BY MR. BAILEY:

7  Q    Yes, sir.

8       Would you agree that what caused Mr. Turner to react and

9  begin bringing the LLV to a stop was the recognition of

10 Mr. Brisebois already on the front of his LLV after the impact

11 has occurred?

12 A    I would agree that that's one possibility.

13 Q    That's what he said, isn't it?

14      THE COURT:  Well, now you're just asking him to

15 agree with testimony.  I don't see how that relates to his

16 opinion.

17 BY MR. BAILEY:

18 Q    Dr. Morgan, would you agree with me that the stimulus

19 that began Mr. Turner's perception-reaction time, the same one

20 you talked about Mr. Brisebois needing, was the fact that he

21 realized there's somebody on the front of his truck?

22 A    Well, sir, that's --

23 Q    Yes or no, sir?

24 A    No, sir.  Not necessarily.

25 Q    Okay.  Tell me why.

1  A    Okay.  Because as -- as I was getting ready to explain,

2  sir, the -- Mr. Turner does describe not noticing the bicycle

3  until it is on the front of his vehicle; however, at that

4  point in time, he doesn't describe what he is doing in

5  response.  He's still moving forward, but he's not clear on

6  whether or not he's on the pedal or on the brake.  He

7  describes moving forward slowly.  So for us to treat that in

8  terms of a stimulus for a perception-reaction time, that

9  wouldn't work because we don't necessarily have a response

10 that is clearly beginning or ending.

11 Q    Let's stop on that point.  We need to get clear on that.

12 I apologize for fumbling, but I need to find my reference.

13     Do you have Mr. Turner's deposition there with you as

14 part of the materials you brought today, Doctor?

15 A    Yes, sir, I do.

16 Q    Let's find that, please.  And I apologize.  I haven't got

17 your deposition reference handy, but I will look for that

18 while you're looking for Mr. Turner's.

19         THE COURT:  What's the question?

20 BY MR. BAILEY:

21 Q    Look at page 145 of Mr. Turner's deposition there,

22 line 5.  And if you'd just read lines 5 through 10, please.

23 A    Sure.  He's stating, "Was your -- QUESTION:  Was your

24 foot on the accelerator at the time the collision occurred?

25     "ANSWER:  When I began to pull out into traffic, I put my

1  foot on the accelerator.  At the time the collision occurred,

2  I immediately put my foot on the brake."

3       So that's my best way to explain that.

4  Q    Okay.  So he's saying, at the time the collision

5  occurred, he put his foot on the brake; right?

6  A    That would be a little bit ambiguous, but that suggests

7  that the braking was occurring at or immediately around the

8  point of impact.

9  Q    Your analysis has the truck moving at a stable speed up

10 to the point of impact, doesn't it?

11 A    Yes, sir, it does.

12 Q    Okay.  What about Mr. Turner's testimony that his foot

13 was on the accelerator in your analysis suggests that anything

14 other than the realization that Mr. Brisebois is on the front

15 of his truck began his perception-reaction time?

16 A    Well, sir, again, that's a -- this is not a traditional

17 perception-reaction time scenario.  So while we can capture

18 perception-reaction time in terms of a head turn,

19 perception-reaction time in terms of driving is something that

20 depends on a driver not already being in the process of

21 potentially engaging in a response at the time of stimulus

22 presentation.  In this case his foot, as he describes it, was

23 on the pedal at the time of impact; and so, therefore, brake

24 reaction time is not something that we can look at.

25 Q    Where do you get that?

1  A     That was out of the section of deposition that you just

2  had me read from Mr. Turner, sir.

3  Q     You interpreted what he said to suggest that his foot was

4  on the brake at impact?

5        Let me put it this way:  If Mr. Turner testified here in

6  the courtroom that his foot was still on the accelerator at

7  the time of the impact, would you disagree with that?

8  A     Well, sir, I would not have knowledge of that, but I

9  would have no reason to necessarily disagree, only that

10 braking occurred at or about the point of impact.  And if

11 there is a movement between the accelerator pedal and the

12 brake pedal, then that would result in a movement distance of

13 the truck or Grumman LLV of no more than about 1.8 feet.

14 Q     Let's do this:  Let's talk a little bit about

15 perception-reaction time because you have mentioned that in

16 the context of Mr. Brisebois's actions.

17       Mr. Brisebois was an alert or aware operator in the sense

18 that he was approaching an intersection where he had

19 apparently already seen the LLV, yeah?

20 A     Well, sir, the way you phrased that, I have trouble

21 agreeing with it.

22 Q     All right.  Well, let me rephrase it.  Is there a

23 difference between the perception-reaction time for a driver

24 that is potentially alerted to the need to react and one -- an

25 aware driver and one who is faced with a surprise or startling

1  condition that he's not expecting?

2  A    Yes, sir.  There can be differences in

3  perception-reaction time for those.

4  Q    All right.  And isn't it basic human factors science that

5  the driver who might be expecting to have to react does that

6  more quickly than one who's surprised by the stimulus that

7  they have to react to?

8  A    Yes, sir.  In general, acute or alerted response occurs

9  quicker.

10  Q    And isn't that factor almost double for the driver that's

11  surprised, and that that's the stimulus they're reacting to,

12  as opposed to the driver who is alert and aware of the

13  potential stimulus going to happen?

14  A    No, sir.  That value is not doubled.

15  Q    What is it?

16  A    That's certainly contextually dependent.  It's not a

17  universal adjustment.

18  Q    It's more than it would be for the driver who is aware,

19  the surprised driver's reaction time?  Perception-reaction is

20  longer?

21  A    It can be greater than, yes, sir.  It often is, but

22  there's no universal constant for perception-reaction time.

23  Q    But all of the studies you know about tell us that a

24  surprised driver --

25              THE COURT:  Yes.  To some extent, it's longer.  I

1   got that.

2          MR. BAILEY:  All right.

3   BY MR. BAILEY:

4   Q    Well, in Mr. Turner's case, we certainly can apply a

5   lesser perception-reaction time than we did for Mr. Brisebois,

6   can't we?

7   A    Well, sir, I've not assigned a specific

8   perception-reaction time to Mr. Turner.

9   Q    I know that.  That's why I want to talk about it.

10      He'd have to have had one, didn't he?

11   A    Well, sir, we simply know there was a period where that

12   vehicle reached final rest.  We know how far those vehicles

13   moved during the period between impact and final rest.  So

14   braking was initiated on the part of the Grumman LLV, but,

15   unfortunately, we don't have enough information to say when

16   that would have -- what period of time would have been

17   involved in that.

18   Q    Right.  And here's what I want the Court to understand,

19   and I want to understand it if I don't.  You basically did an

20   analysis here that is dependent upon Mr. Turner bringing the

21   truck to a stop in 2 feet from the time that he realized

22   something was going to happen, didn't you?

23   A    No, sir.  Two feet after impact, not from any point in

24   time when Mr. Turner realized that there was a problem;

25   however, of course, those may be very close together.

1  Q    Yeah.

2  A    But we have testimony from Mr. Turner.  We also have

3  testimony from Mr. Brisebois.  Mr. Brisebois describes this

4  vehicle moving from impact to final rest an inch.  Mr. Turner

5  describes 3 to 5 feet, and we know braking takes about 2 feet.

6  Q    Right.  And we know none of that makes sense if there's a

7  perception-reaction time that begins only when Mr. Turner sees

8  somebody on his windshield; isn't that true?

9  A    Well, sir, again, we are looking at the testimony of

10 individuals as to how far the vehicles moved impact to final

11 rest to determine how far the vehicle moved in braking.

12 Q    I understand.  I get that.  I want to talk about science

13 and theory of the things we can rely on rather than subjective

14 impressions.

15      Mr. Turner's estimate: that the vehicle moved 3 to 5 feet

16 after impact.  Mr. Brisebois says an inch.  An inch can't be

17 right, can it?

18 A    Well, sir, I certainly considered it, but I, again, think

19 that a much more realistic value is about 2 feet.

20 Q    Okay.  And Mr. Turner's estimate of 3 to 5 means that he

21 would have had to have begun his perception-reaction time

22 before the -- the 2-foot distance at some point?

23 A    Yes, sir.  I would agree with that, that the -- the

24 initial move to initiate braking would have occurred before

25 that; however, that's not something that we can necessarily

1  quantify based on the data that we have.  We simply know how

2  far the vehicles moved from impact to final rest.

3  Q    Sure.

4  A    I've not tried to assign any specific perception-reaction

5  time to Mr. Turner.

6  Q    Why not?

7  A    Because there's insufficient data to clearly support

8  that, sir.

9  Q    Isn't that what we do all the time in accident

10 reconstruction?  We have to determine what an appropriate

11 perception-reaction time for any vehicle operator is under any

12 scenario, or we can't do a reconstruction, can we?

13 A    I would not necessarily agree with that, sir.

14 Q    Isn't that something you've done in every reconstruction

15 you've ever done, assume some perception-reaction time for a

16 driver?

17 A    No, sir.  I do reconstructions that do not necessarily

18 involve perception-reaction time, where we're simply looking

19 at the movement of objects in the environment.

20 Q    Is that what you did here, disregarded

21 perception-reaction time on Mr. Turner's part?

22 A    Well, sir, "disregard" is probably not the best word to

23 be using.  Instead, there's simply not sufficient information

24 to be able to describe what the perception-reaction time would

25 have been.

1   Q   We can talk about parameters from science, from studies

2   that you studied when you were getting your degrees, from

3   studies that you know about working in the job you do that

4   give us some reasonable understanding of what

5   perception-reaction times might be under these circumstances,

6   don't we?

7   A   Well, sir, this is a very complex judgment. I'm not

8   aware of studies that looked at specifically a driver with

9   competing stimuli of an approaching bicycle and necessity to

10   survey traffic and perform gap acceptance for a highway.

11   Q   You are aware of all kinds of human factors studies that

12   have evaluated perception-reaction times under all kinds of

13   complicated roadway conditions, though, aren't you?

14   A   Yes, sir. I would agree that research has examined some

15   complex scenarios.

16   Q   What's the lowest perception-reaction time you've ever

17   seen even in a lab, where folks are sitting there waiting for

18   a red light to stomp on a pedal, to react? You know about

19   those studies.

20   A   Well, sir, that's a question that has a very complex

21   answer. I can certainly attempt to answer that for you. In

22   laboratory settings we can see reaction time -- simple

23   reaction times, so press the button when the light occurs, as

24   low as a quarter second. However, we know in the complexities

25   of the real world that those values become much greater.

1   Q   All right. Let me take a different approach with you.

2   Are you familiar with the Florida driver's handbook?

3   A   In general, sir, yes.

4   Q   The one we all are supposed to read when we get a

5   driver's license in Florida, yes?

6   A   Yes, sir. I wasn't aware --

7   Q   Do you have a Florida driver's license?

8   A   Yes, sir, I do.

9   Q   All right. Do you know what the Florida driver's

10   handbook says about perception-reaction time?

11   A   No, sir. As I sit here, I'm not aware of what the

12   Florida's driver's handbook states about perception-reaction

13   time.

14   Q   Would you agree with me that there is that two-part

15   component to somebody's awareness of a hazard before they

16   begin to take action to avoid it -- the perception part and

17   the reaction part?

18   A   Well, sir, there's actually -- it's a little bit more

19   complex than that. So an object has to be able to be

20   perceived, it has to be decided to be a threat, and, also, it

21   has to be decided to be a threat that requires a response, and

22   then the appropriate response has to become initiated.

23   Q   Let's talk about some hypotheticals, then. Let's assume

24   for the sake of argument that Mr. Turner's testimony is his

25   foot's on the accelerator and that the first thing that begins

1  his perception-reaction time is the awareness that

2  Mr. Brisebois is already on his truck and he's already hit

3  him.  Okay?  Do you agree with that at least as a premise for

4  our hypothetical?

5  A    Yes, sir.

6  Q    All right.  Under those circumstances his

7  perception-reaction time would not begin until that stimulus

8  starts it; is that true?

9  A    Yes, sir.  Assuming that there are no other actions that

10 are taking place at that time, the perception-reaction time

11 clock would start on the presentation of the stimulus, that

12 is, the initial impact.

13 Q    And under that hypothetical would you agree with me that

14 that is a startling condition that would put Mr. Turner in

15 that category of drivers whose perception-reaction times are

16 going to be longer than the -- the one who's aware or alert?

17 A    No, sir.  I wouldn't necessarily agree with that.

18 Q    Okay.  But that's sort of how it universally works, isn't

19 it?

20 A    No, sir.  There's not a -- I believe, as I stated

21 earlier, there's not a universal application of

22 perception-reaction time.  So it's very contextually

23 dependent.  So a vehicle making a low-speed maneuver is not

24 necessarily going to have a lot of ambiguity about the

25 scenario that they're facing, and in the case of a driver

1   attempting to make a right-hand turn onto a highway, then it's

2   entirely likely that there is not a lot of ambiguity.

3   However, going back, I'd like to state this isn't an analysis

4   that I've conducted.  So my ability to address your

5   hypothetical is a little bit limited.

6   Q    I understand.

7        But would you grant me at least that Mr. Turner, if his

8   stimulus to begin his perception-reaction time is the

9   awareness of Mr. Brisebois on his truck in front of his

10  windshield, that that's a startling condition for that driver?

11       THE COURT:  Yes.  He's already said that.

12  BY MR. BAILEY:

13  Q    Okay.  And would you agree that puts him into the

14  category of the surprised driver for whom the

15  perception-reaction time is longer or not?

16       THE COURT:  He disagrees with that.

17  BY MR. BAILEY:

18  Q    All right.  For the sake of my hypothetical, Dr. Morgan,

19  if we assumed a one-second perception-reaction time for

20  Mr. Turner, would that be reasonable?

21  A    Well, sir, again, that's not something I've calculated.

22  Q    If we factor in any perception-reaction time to your

23  analysis, that puts the point of this collision back further

24  to the east, doesn't it?

25  A    No, sir.  As I described earlier, I'm not using a

1   perception-reaction time to determine where impact occurred.

2   I'm simply basing the movement of the vehicles based on what

3   we know about how the vehicles brake and the description of

4   the movement of the vehicles between impact and final rest

5   provided by Mr. Brisebois and Mr. Turner.

6   Q    All right.  Let's look back at the PowerPoints together.

7            THE COURT:  How much longer have you got?  Because

8   I'm going to take a lunch recess pretty soon.

9            MR. BAILEY:  Yes, sir.  Probably 15 minutes.

10           THE COURT:  Okay.  If we're not done by 12:30, we're

11  taking a lunch break.

12           MR. BAILEY:  All right, sir.

13           Let's go to the last two.

14  BY MR. BAILEY:

15  Q    All right.  Are we looking at what is the final rest

16  diagram of that particular analysis where he's traveling on

17  the sidewalk?

18  A    Yes, sir, we are -- well, sir, actually, I need the

19  caveat the final rest position is the same whether or not he's

20  on the sidewalk -- or was approaching from the sidewalk or

21  approaching on the shoulder of the road.

22  Q    I get that, but is this diagram depicting final rest for

23  the sidewalk scenario?

24  A    It's depicting final rest, sir.

25  Q    Okay.  Either way?

1    A    It's the same final rest position whether approach was on

2    the sidewalk or shoulder.

3    Q    Right.

4         MR. BAILEY:  Move forward.  Nope.  Go back the other

5    way.  No, no.  There you go.

6    BY MR. BAILEY:

7    Q    All right.  We're back at final rest.

8         MR. BAILEY:  Nope.  There we go.  All right.  The

9    one just before that.  That one.

10   BY MR. BAILEY:

11   Q    Now, this one is the impact location; is that right?

12   A    Yes, sir.  This is the point in time, regardless of the

13   approach path of the bicycle, where impact occurred and

14   braking in that 2-feet distance from impact to final rest was

15   occurring.

16   Q    Okay.  All right.  And that one depicts a point at which

17   Mr. Turner is already applying the brake and the brake is

18   beginning to bring the vehicle to a stop; true?

19   A    No, sir.  The brake would just be initiated; however, the

20   vehicle's still going 5 miles an hour.

21   Q    Okay.  But between this one and the one we just looked

22   at, that's the 2-foot distance over which the brake's being

23   applied and which the vehicle stops?

24   A    That is correct, sir.

25   Q    Okay.  And all of that suggests that he managed to get

1 his foot on the brake by the time of this diagram here we see

2 here and that his perception-reaction time has already lapsed;

3 it's already run?

4 A    Well, sir, again, I've not analyzed this in terms of

5 perception-reaction time.  This is simply in terms of the

6 movement of the vehicles.

7 Q    But if you did, you would have had to have assumed there

8 is some perception-reaction time involved, wouldn't you?

9 A    If I were conducting that hypothetical analysis, sir,

10 which is not the analysis I conducted, then, yes, there would

11 be a perception-reaction time that would have to be assumed

12 based on some information that is not complete enough to

13 actually include.

14 Q    Okay.  And you can't tell us what a reasonable

15 perception-reaction time would have been for Mr. Turner under

16 these circumstances?

17 A    For this scenario, no, sir.

18 Q    Okay.  But you can't tell us if there was any

19 perception-reaction time involved that this collision would

20 have occurred further back to the east; true?

21 A    No, sir, not at all.  Again, we are basing final rest and

22 impact positions based on the photographic evidence and the

23 testimony of the individuals that were the driver and the

24 bicyclist.

25 Q    I get that.

1    But if Mr. Turner's foot was on the accelerator, as it

2   certainly appears from the testimony as he indicated in the

3   courtroom, you'd agree with me he's still got to move the foot

4   from the accelerator to the brake pedal and that that physical

5   movement is in addition to the perception-reaction time?

6   A    Yes, sir.  Given that hypothetical, yes, and it would

7   have to occur before the braking to final rest.

8   Q    Right.

9   A    And if we just assume a normal pedal movement time, that

10  would be just 1.8 seconds -- or 1.8 feet.

11  Q    How many seconds to make that movement?

12  A    About a quarter second, sir.  But, again, that's a

13  hypothetical.  My impact and final rest positions do not

14  utilize that information.

15  Q    I absolutely realize that, and I'm trying to get some

16  understanding, if you had done that analysis, where we might

17  be.  I can't seem to get that, can I?

18  A    Well, sir, it's just not the proper analysis to conduct

19  given the limitations of the information we have.

20  Q    But you won't concede with me that there has to have been

21  some perception-reaction and movement time of foot from the

22  accelerator to the brake pedal in this scenario we're

23  describing for Mr. Turner?

24  A    Well, sir, to very carefully answer your question, there

25  are two issues here.  One is perception-reaction time.  The

1  other is the physical movement times involved in a driver

2  moving their foot from accelerator to brake.  Those are two

3  separate issues.

4  Q    I got that.  And if I'm sounding slow to you, let me -- I

5  hope to clarify that.

6       That movement time is that one we talked about --

7  .25 seconds you just told us about; right?

8  A    That is correct, sir.

9  Q    All right.  We're going to add that to the

10 perception-reaction time, whatever that would be; is that

11 right?

12 A    Well, sir, again, there's not a perception-reaction time

13 that we can assign to this.

14 Q    If we would, if we were to do that as part of the

15 reasonable approach to accident reconstruction, wouldn't we

16 have to add the movement time to the perception-reaction time

17 to come up with a total distance over which the vehicle would

18 cover during that period?

19 A    Sir, that would not be an analysis that would be

20 supported by the data that we have.

21 Q    You made assumptions about a lot of other things.  You

22 made an assumption about Mr. Brisebois's perception-reaction

23 time, didn't you?

24 A    Yes, sir.  However, in that case we have a very clearly

25 defined stimulus.  There are no other objects in the

1   environment that a bicyclist on the shoulder or on the

2   sidewalk would need to monitor.  In the case of a vehicle

3   making a right turn onto a highway, then in that case a

4   driver's needing to monitor two different approaches in this

5   case.

6   Q    And getting back to what we talked about earlier, his

7   perception-reaction time is going to be longer than

8   Mr. Brisebois's at one second; true?

9   A    Sir, I have not assessed the perception-reaction time of

10  the driver in that hypothetical scenario that you're

11  presenting.

12  Q    And you can't tell me at all whether that would be the

13  case, whether his perception-reaction time -- Mr. Turner's

14  would be longer than the one second of Mr. Brisebois's?

15  A    I'm not aware of any evidence or any information in the

16  peer-reviewed literature that gives us an estimate of what

17  that value would be, sir.

18  Q    Okay.  So you can't tell me whether it would be longer;

19  you can't tell me whether it would be shorter than

20  Mr. Brisebois.

21  A    That's correct.  There's not evidence in the

22  peer-reviewed literature to support that assertion.

23  Q    You can tell me, though, that there would be one; right?

24  There would be a perception-reaction time that Mr. Turner has

25  to have.

1  A    Well, sir, again, that would depend on a lot of factors,

2  which I believe we've discussed but include the move -- the

3  presentation of the stimulus as well as whether or not the

4  driver's already involved in the response that would

5  ultimately occur.  So that and the lack of any kind of

6  information to support a perception-reaction time analysis is

7  simply why I did not perform that in this case.

8  Q    I keep hearing that, and, again, I don't want to be

9  thick, but no matter what we assume, no matter what the facts

10  are, what the circumstances are, Mr. Turner has to have some

11  perception-reaction time in this accident scenario; true?

12  A    Sir, perception-reaction time does not apply to this.

13  Q    I understand that.  Will you not grant me that he has to

14  have one regardless of whether you did it or not?

15  A    I'm perhaps not following your line of questioning, then,

16  sir.

17  Q    Okay.  Let me ask you this:  If there was a

18  perception-reaction time on the part of Mr. Turner that

19  initiated -- well, let me back up.  If there was a stimulus

20  that initiated his perception-reaction time, do you know of

21  anything other than Mr. Brisebois appearing on the front

22  windshield of his truck as to what that would have been?

23  A    Could you ask the --

24  Q    It's some stimulus that the driver sees that initiates

25  the perception-reaction time in any accident scenario, isn't

1  it?

2  A     Not necessarily, sir.

3  Q     Okay.  When we're talking about avoidance, that's

4  typically the issue that there's something they perceive in

5  the environment that causes them to take action; right?

6  Usually another vehicle.

7  A     Well, sir, in avoidance scenarios we look at -- that is

8  one factor that could be examined, but we also look at,

9  oftentimes, when drivers pass certain markers, such as begin

10 accelerating.

11 Q     In a collision scenario like this, when we talk about the

12 application of perception-reaction time, aren't we usually

13 talking about the presence or awareness of the other vehicle

14 as being the stimulus that begins the perception-reaction

15 time?

16 A     So -- yes, sir, I would agree with that.  If this was a

17 hypothetical scenario where perception-reaction time could be

18 calculated, then perception-reaction time would begin, as it

19 always does, with the presentation of a stimulus.

20 Q     There you go.

21        And if we assume for the sake of argument, if this Court

22 would believe all the evidence that's been presented here,

23 that the stimulus that started any perception-reaction time

24 that would apply to Mr. Turner was Mr. Brisebois appearing on

25 the front wheel -- front windshield of his truck, wouldn't you

1   agree that this analysis is going to be different?

2   A    Well, sir, again, that's not an analysis I would have

3   conducted given the lack of information.

4   Q    Okay.  But you won't even grant me that if we have to

5   assume there was some perception-reaction time for Mr. Turner

6   that began with a stimulus of Mr. Brisebois appearing on the

7   front windshield of his car when his foot's on the

8   accelerator, that this analysis is going to be way different?

9   A    It would be a completely different form of analysis, sir,

10  and one that I did not conduct given the lack of information

11  to support it.

12  Q    Right.  Right.  Right.

13       Because if you had assumed any perception-reaction time

14  on Mr. Turner's part that began with a stimulus of

15  Mr. Brisebois appearing on the front windshield of

16  Mr. Turner's truck, then this collision's going to occur much

17  further east than we show it; isn't that right?  Because you

18  got to factor in the perception time running and the movement

19  time to move the foot from the accelerator to the brake.  All

20  of those things are going to extend the time involved and move

21  this collision back further east; isn't that right?

22  A    No, sir, it's not.  Because, again, the testimony of the

23  two individuals that were involved in the collision -- they

24  both maintain that the vehicles move an extremely short

25  distance from impact to final rest, whether -- whether or not

1   you accept the inch estimate of Mr. Brisebois or whether you

2   take the 3 to 5 feet of Mr. Turner.

3   Q    I agree with that.

4       Dr. Morgan, isn't it very often the case, when you do

5   reconstructions, that we're trying to apply science to come up

6   with something we can really hold on to because the subjective

7   impressions of the people involved in accidents just aren't

8   very accurate?  Isn't that what you do most times?

9   A    Well, sir, we consider evidence.

10  Q    And here we're relying on subjective impressions over

11  science that says a driver has to have a perception-reaction

12  time, aren't we?

13  A    No, sir.  We're simply taking the evidence available,

14  which is the testimony of two individuals stating that these

15  individuals moved such a short distance that impact would not

16  have been able to occur outside of the travel lanes of U.S. 1.

17  Q    All right.  Do this for me.  If we assume for a second

18  hypothetical that Mr. Turner would have had a minimum

19  perception-reaction time the same as Mr. Brisebois, one

20  second, and that his foot, Mr. Turner's, was on the

21  accelerator at the immediate point of impact and that the

22  stimulus that started the perception-reaction time was the

23  presence of Mr. Brisebois on the truck after he's already hit

24  him -- under those circumstances, would you agree that

25  Mr. Turner has got to be much further east at the point he

1  begins perceiving and reacting for this analysis to be the --

2  the way it is?

3  A     So you'll have to forgive me.  You had a lot of

4  information in your hypothetical.  But if we assume a

5  one-second perception-reaction time, so one second from the

6  presentation of the stimulus -- that is, impact -- to the

7  initiation of the response, which is braking, then at that

8  point we would simply add 7 feet to the distance.

9  Q     Well, if we assume a one-second perception-reaction time

10 and the vehicle is moving at 5 miles per hour, then it goes

11 7.33 feet over a second's time; is that right?

12 A     That is correct, sir.

13 Q     Okay.  And if we add that movement factor, the

14 .25 seconds for moving the foot from the accelerator to the

15 brake, now we come up with how many more feet a quarter of a

16 second?

17 A     Well, sir, I'm sorry.  That's a misapplication of

18 perception-reaction time.  If you remember the definition of

19 perception-reaction time, that begins with the presentation of

20 the stimulus and ends with the beginning of the response, in

21 this case response being braking.  That one-second value you

22 gave me would start with the impact and end with the

23 initiation of braking.

24 Q     Okay.  So we already have the braking in here.  Is that

25 what I'm hearing, or no?

1  A     In your hypothetical example, sir, yes, sir, I've

2  included braking -- the movement time to initiate braking.

3  Q     Well, lets go back, then, and assume the same thing.  If

4  Mr. Turner's perception-reaction time is greater than

5  Mr. Brisebois's at one second because of the fact that he is a

6  surprised driver, for every one second that it increases, he's

7  going to be 7.33 feet further back to the east at the point of

8  collision; is that right?

9  A     Well, sir, perhaps I've not been clear.  This is not a

10 scenario where perception-reaction time applies.  So if your

11 hypothetical is going to include any kind of value, I have no

12 scientific basis to agree or disagree with it.  It's simply an

13 unsupported value.

14 Q     Maybe we can approach it this way:  At the time that

15 Mr. Turner's truck hits Mr. Brisebois, it's going 5 miles an

16 hour, 7.33 feet per second; right?

17 A     Yes, sir.

18 Q     All right.  And so if we assume -- well, let me not

19 assume anything.  If there was a perception-reaction time that

20 you were to apply to Mr. Turner's actions here, would that

21 perception-reaction time have occurred at a -- at a point when

22 he was going 5 miles an hour, 7.33 feet per second?

23 A     Sir, that's an analysis I did not conduct.

24 Q     Okay.  How long was this vehicle, Mr. Turner's LLV,

25 traveling at a steady speed of 5 miles per hour in your

1  analysis, the one you wanted to do?

2  A   So as I described earlier, the analysis I conducted, the

3  vehicle was at a stable speed for three seconds.

4  Q   All right.  So for at least three seconds, no matter how

5  much we extend a perception-reaction time for Mr. Turner,

6  whatever time that would involve, he's traveling at 7.33 feet

7  per second?

8  A   I'm sorry.  Could you ask that question again, please.

9  Q   I can.

10       THE COURT:  Well, I'll tell you what.  Let's take a

11  lunch break.  I've got a 1:30 hearing; so it's going to be

12  sometime later this afternoon when we reconvene.

13       (Recess at 12:30 p.m. until 2:11 p.m.)

14       THE COURT:  I'm just telling you, if we don't finish

15  by 4:30, then we're going to July sometime because I'm in

16  trial the rest of this month.

17       MR. BAILEY:  We'll be done, Judge.

18  BY MR. BAILEY:

19  Q   Mr. Morgan, I have what I hope is a series of final

20  questions for you, and then we're going to let you get out of

21  here.

22       I want to pick up where we left off, though, and ask you:

23  Am I right that your analysis does not consider a scenario

24  where the final rest position is the same one we talked about

25  at 32.6 feet west of the stop bar, where you do use some value

1   for a perception-reaction time for Mr. Turner, where the

2   stimulus that initiates that perception-reaction time for

3   Mr. Turner is the collision itself, and at the time the

4   collision occurs Mr. Turner had his foot on the accelerator

5   and is going 5 miles per hour?

6   A    That is correct, sir.  I did not conduct an analysis

7   using PRT.

8   Q    All right.  The analysis you did doesn't describe any

9   value for PR, or perception-reaction time, to Mr. Turner at

10  all; is that correct?

11  A    That's correct, sir.  It simply analyzes the movement of

12  the vehicles between final rest and the area of impact as

13  described by the two individuals.

14  Q    And the point of impact that you determine in your

15  analysis is derived from the final rest position; is that

16  right?

17  A    Yes, sir.  So starting with the final rest position, we

18  know from the testimony of the individuals as well as the fact

19  that the bicycle was not knocked over in process or overridden

20  by the Grumman, that it was a very short travel path from

21  impact to final rest.

22  Q    And the one that you assume was 2 feet; is that right?

23  A    Yes, sir.

24  Q    All right.  And that essentially just encompasses the

25  distance over which the vehicle would travel when the brakes

1  were actually applied?

2  A    Yes, sir.  That is correct.

3  Q    All right, sir.  Thank you.

4      Now, if you do consider that scenario that I laid out

5  just a second ago, the one where you do use the same final

6  rest but you do use some value for perception-reaction, the

7  stimulus that initiates the perception-reaction is the

8  collision itself, and at the time of the collision Mr. Turner

9  has his foot on the accelerator, is going 5 miles per hour,

10 would you agree with me that this point of impact that you

11 derive is going to be 7.33 feet further east for each second

12 of perception-reaction time?

13 A    No, sir.  Because the impact, we know -- again, the

14 bicycle was not knocked over, so there could not have been a

15 large travel distance from impact to final rest, and we also

16 have the testimony of two individuals.  So we know that,

17 regardless of what additional analyses that may be conducted

18 around this, the actual movement of the vehicles from impact

19 to final rest was no more than 2 to 3 feet.

20 Q    Okay.  If I'm understanding you correctly, instead of

21 applying any perception-reaction time to your analysis, we're

22 going to rely on the subjective impressions of the two people

23 involved rather than the science.  Is that basically what it

24 comes down to?

25 A    No, sir.  That's not what I'm stating at all.  I'm

1    stating that we not only considered the testimony of the two

2    individuals that were involved in the accident, but also the

3    fact that the bicycle was not knocked over in part of the

4    collision, and also the rear hub of the bicycle was not

5    overridden during the collision.  So taken as a whole, the

6    totality of these evidence points tells us that the distance

7    between impact and final rest was very small.

8    Q    And I assume you did not consider a scenario where all of

9    those other things I mentioned happened and Mr. Brisebois was

10   astride the bike but up onto the hood of the truck and is

11   carried and the bike is dragged along with his feet

12   essentially holding it upright, but it still does not get

13   sucked underneath the truck.

14   A    No, sir.  I did not consider that hypothetical scenario;

15   however, given the description provided by Mr. Brisebois,

16   it's -- doesn't match what he described in his deposition.

17   Q    You weren't here in the courtroom when you did hear

18   Mr. Brisebois describe trying to pound on the hood of the

19   truck for a couple of seconds to get the driver's attention;

20   true?

21   A    I am not aware of that testimony, sir.  I simply

22   considered what he stated in deposition.

23   Q    Shift gears with you, Dr. Morgan.  Going back to our

24   photos here that attempt to depict as best we can the vantage

25   point of Mr. Turner from a position sitting with the nose of

1   the vehicle there at the stop bar, the top one looking south

2   to the left, the bottom one looking right to the north, am I

3   correct in understanding that at this position you don't think

4   it's safe for Mr. Turner to try to pull out onto Ridgewood and

5   go north?

6   A    Yes, sir.  I would agree with that.  There's less than

7   two seconds -- actually, 1.8 seconds of visibility assuming

8   traffic is moving at 45.  If it's moving any quicker than

9   that, the period of time you have to see a vehicle before it

10  gets to your position is even less than that.

11          THE COURT:  So the only safe way to proceed is to

12  roll out slowly and look.

13          THE WITNESS:  Yes, sir.  To move forward from the

14  stop bar until you have a clear sight line to approaching

15  traffic.

16  BY MR. BAILEY:

17  Q    And you did make that determination at least with respect

18  to Mr. Turner's view to the south, didn't you?  That if he

19  pulled up 5.5 feet further than the stop bar position, that he

20  would have an unobstructed view of traffic to the south?

21  A    Yes, sir, in my analysis I considered that, if Mr. Turner

22  moved forward, he would have a clear view to approaching

23  traffic.

24  Q    Yesterday Mr. Turner told us that he believes that he

25  pulled up even with a point that would approximate the eastern

1   edge of the sidewalk before continuing to move forward.  Where

2   is that eastern edge of the sidewalk relative to the stop bar?

3   Do you have that dimension?

4   A    Not in front of me, sir; however, I was not here for that

5   testimony, obviously, and would let you know that I've relied

6   upon the deposition testimony of individuals.

7   Q    Sure.

8      Do you have any data in the information you brought with

9   you that tells us what the distance is from the stop bar to

10   the easternmost edge of the sidewalk there?

11   A    Yes, sir.  I believe I do have a number that can give us

12   that information.

13   Q    If you'll find that for us, please.

14   A    The stop line is 17.3 feet east of the road edge and --

15   however, we need to keep in mind that dimension is the

16   projection of the road edge.  So that may not necessarily

17   relate to these at the point you're describing, sir.

18   Q    Well, we can work back.  How wide is the sidewalk?

19   A    I don't believe I have that measurement in front of me,

20   sir.

21   Q    Okay.  Let's approach it this way:  At 5.5 feet further

22   west of the stop bar -- that is, the nose of the vehicle moves

23   that much further west -- Mr. Turner has a clear unobstructed

24   view of traffic to his left coming northbound; true?

25   A    Sir, once he moves, yes, about 5 feet, 5 and a half feet

1  forward, then there would be a supported sight picture to

2  approaching traffic.  If you'll give me one second.  I just

3  want to verify that.

4      Yes, sir.  So that position would be 5.5 feet west of the

5  stop line.  So the driver's eye would actually have to be

6  5.5 feet west, and the front of the vehicle, of course, would

7  be 7 feet further forward from that.

8  Q    Okay.  Is there at least 7 feet distance between the

9  westernmost edge of the stop bar and the easternmost edge of

10 the sidewalk?

11 A    Can you ask that question again, please, sir.  I was

12 trying to take a measurement while you were asking me.

13 Q    Yeah, yeah.  Well, what I'm trying to figure out is this:

14 At the point in time that Mr. Turner has a -- an unobstructed

15 view of that northbound traffic coming from his left, is the

16 front of his LLV encroaching at all onto the extended line of

17 the sidewalk in the intersection?

18 A    Yes, sir, it would be.

19 Q    Bear with me a minute.

20     Dr. Morgan, again, I can do the drill.  You remember when

21 I took your deposition here late last year; true?

22 A    Yes, sir.

23 Q    You read it in preparation for your testimony today;

24 true?

25 A    Yes, sir.

1  Q    At page 106, beginning at line 19, do you recall that I

2  asked you "And just so to -- and so just to give a quick

3  answer" -- or, sorry.  That's your -- give me a minute.

4  A    I believe you're looking on 106, around line 19.

5  Q    Well, yes, sir.  And I may have indexed it poorly here.

6  Let me look.

7       Actually, I may have asked another question, and let me

8  ask the correct one here:  At the point the LLV is 5.5 feet

9  further west of the stop line, that safe position, if you

10 will, at that point does it pose any obstruction to northbound

11 traffic?

12 A    The front of the LLV, if it's 5.5 feet forward of the

13 stop line, would just begin to be touching the eastern edge of

14 the sidewalk projection.

15 Q    Okay.  Well, that's what I thought I remembered.  Yeah.

16 Okay.

17      In other words, you wouldn't really be encroaching into

18 the sidewalk in any significant degree?

19 A    Well, that's if we're talking about the front of the LLV

20 versus if we're accommodating where the driver's sitting in

21 the LLV, knowing there's 7 feet difference between the two.

22 Q    Okay.  I'm sorry.  What were you just talking about that

23 would be at the easternmost edge of the sidewalk?

24 A    So if the driver's eyepoint is 7 feet back from the front

25 of the LLV --

1  Q    Right.

2  A    -- and the clear sight line to approaching traffic is

3  5.5 feet forward of the stop line, then we actually have a

4  total distance that's the combination of those, so 12 and a

5  half feet forward.

6        THE COURT:  In other words, the clear vision relates

7  from the driver's eyes, not from the front of the vehicle.

8        MR. BAILEY:  I understand that.  I may have just

9  misunderstood what I thought Dr. Morgan told me in his

10  deposition.

11  BY MR. BAILEY:

12  Q    Did I misunderstand that if the front of the LLV moves

13  forward 5.5 feet beyond the stop bar, that Mr. Turner has a

14  clear view of -- unobstructed view to his left?

15  A    No, sir.  The eyepoint of the driver.  And I'm sorry if

16  there's a misunderstanding, but the eyepoint of the driver is

17  what determines the visibility, not the front of the vehicle.

18  Q    But you're telling me, as I understand it now, that

19  Mr. Turner's seated eye position would be even with the

20  easternmost edge of the sidewalk line extended at that safe

21  position?

22  A    It would be at a position 5.5 feet forward from the stop

23  line, sir.  And, again, I can give you a rough estimate of

24  that using diagrams similar to how I did in my deposition.

25  Q    Okay.

1  A    However, keep in mind, they're not projections for the

2  lane edge here.  But it would appear 5.5 feet forward puts the

3  position right at the eastern edge of the sidewalk.

4  Q    And that's his eye position rather than the front of the

5  vehicle?

6  A    That's correct, sir.

7  Q    Okay.  Is that the position he needs to get to to safely

8  pull out onto Ridgewood, in your opinion?

9  A    Well, that's -- yes, sir, it is.

10  Q    Okay.  Short of that, can he safely do it?

11  A    Well, sir, that would depend on the gap acceptance.  We

12  know some drivers would accept a smaller gap; some would

13  accept a longer gap.  But that's the point when a clear and

14  unobstructed view to the entirety of U.S. Highway 1's

15  available.

16  Q    Okay.  And at that point does he also have a clear,

17  unobstructed view to the north, the direction from which

18  Mr. Brisebois is coming?

19  A    Yes, sir.  As we've discussed direction, visibility is

20  bidirectional.

21  Q    So if Mr. Turner pulls up to a point where he's got an

22  unobstructed view of the traffic coming from his left

23  northbound, and that's a safe thing to do, he's also got a

24  clear, unobstructed view to the north, the direction that

25  Mr. Brisebois is coming?

1   A   Yes, sir, that would be correct.  There would be clear

2   bidirectional visibility.

3   Q   And if he does that at any point during the last 5.1

4   seconds before this crash occurs, he can see Mr. Brisebois

5   approaching; true?

6   A   Yes, sir.

7   Q   All right.  And if he doesn't do that, as he testified

8   here in the courtroom, he has no chance of seeing him, does

9   he?

10   A   No, sir.  Again, direction -- bidirectional visibility

11   means that, from any point after 74.6 feet, visibility would

12   be supported between both of these individuals.

13           MR. BAILEY:  Thank you, sir.

14           THE COURT:  Let me make sure I understand this last

15   point.  In order to have a clear view of northbound traffic in

16   order to safely turn right off New Hampshire, Mr. Turner's

17   eyes would have had to have been 5.5 feet west of the stop

18   bar, which would put the truck approximately 12 and a half

19   feet west of the stop bar?

20           THE WITNESS:  That's correct, sir.

21           THE COURT:  And does that 12 and a half feet extend

22   into the crosswalk area or not?  That's what I don't

23   understand.

24           THE WITNESS:  I apologize, Your Honor.  I'm doing

25   this as an estimate from a drawing.  12 and a half feet places

1   the front of the Grumman approximately at the western edge of

2   the sidewalk.

3            THE COURT:  Western edge.  So, basically --

4            THE WITNESS:  Yes, sir.  Covering the --

5            THE COURT:  So, basically, the vehicle is taking up

6   the entirety of the crosswalk at that point.

7            THE WITNESS:  Yes, sir.

8            MR. BAILEY:  If I might follow that up, Your Honor.

9   BY MR. BAILEY:

10  Q    And if Mr. Turner chooses to --

11           THE COURT:  Mr. Bailey, yes, you may.  Don't presume

12  that you can just get up and start examining again.

13           MR. BAILEY:  I'm sorry, Your Honor.  I'm anxious to

14  get it done as much as the Court is.

15  BY MR. BAILEY:

16  Q    Dr. Morgan, if Mr. Turner attempts to pull out and make

17  his right turn onto Ridgewood at any point between the stop

18  bar and this clear, unobstructed view location that we've

19  talked about where he has a view of the northbound oncoming

20  traffic, at some point does he also have a clear, unobstructed

21  view of Mr. Brisebois coming from his right?

22  A    Well, sir, that clear, unobstructed view would start

23  before he even got to that position.  Again, bidirectional

24  visibility starts at 74.6 feet from a point in time where the

25  Grumman is at the stop bar.

1  Q    Okay.  So even before the front of the Grumman -- the

2  front bumper begins to encroach significantly into the

3  crosswalk, if you will, the extended line of the sidewalk,

4  Mr. Turner would have a clear, unobstructed view up the

5  sidewalk to his right?

6  A    Yes, sir.  And Mr. Brisebois would have a view of the

7  Grumman in the crosswalk.

8  Q    But if Mr. Turner actually looks to his right before he

9  begins pulling across that extended line of a sidewalk and

10 into the potential path of someone coming down there, he can

11 see what's coming?

12 A    Yes, sir.  I, hopefully, have said it clearly, but both

13 individuals would be able to see one another.

14         MR. BAILEY:  That's all.  Thank you.

15         THE COURT:  Redirect.

16         MS. POSTERARO:  Very briefly, Your Honor.

17                REDIRECT EXAMINATION

18 BY MS. POSTERARO:

19 Q    Dr. Morgan, can you briefly explain the perceived scaling

20 problem or issue with respect to the displayed image, please.

21 A    Yes.  Yes, ma'am.  The placement and scaling of the

22 Grumman LLV at the 5-second position does not depict the

23 distance between the front of the bumper and the stop bar

24 accurately.

25 Q    And what is inaccurate about the way it's pictured?

1  A    At 5 seconds there should be less distance and, actually,

2  the front bumper of the Grumman should be depicted as slightly

3  on top of the stop bar at that point still.

4  Q    Does this change your analysis at all?

5  A    No, ma'am.  The diagrams that I have produced are simply

6  visual demonstratives of the numerical analysis I conducted.

7  Q    Mr. Bailey asked you a question of whether you had

8  considered that his -- the plaintiff, Mr. Brisebois, pedaled

9  faster once he saw the LLV.  Would that be consistent with

10 what one would expect of someone in that position from a human

11 factors perspective?

12 A    No, ma'am.  Actually, with light braking, that the

13 Grumman LLV would have moved through the intersection and

14 allowed Mr. Brisebois to pass behind it.

15      MS. POSTERARO:  Thank you.  I have no further

16 questions.

17      THE COURT:  Okay.  Thank you, Doctor.  Appreciate

18 your time.  Sorry you had to spend more time here than you

19 expected but --

20      All right.  That concludes your witness testimony,

21 Ms. Posteraro?

22      MS. POSTERARO:  Yes, Your Honor.

23      THE COURT:  All right.  What about your exhibits?

24 We haven't introduced your exhibits except, I think, Exhibit 4

25 and 16.

1          MS. POSTERARO:  Yes, Your Honor.  I reviewed the

2   transcript of the pretrial conference where we had discussed

3   Exhibits 1 through 15, and it was suggested by the Court that

4   those exhibits will be admitted, but it was -- did not say

5   they were yet admitted.

6          THE COURT:  Yeah.  And there's no objection noted

7   here on the -- on the list, so I'll -- I'll admit Defendant's

8   Exhibits 1 through 15.

9      (Defendant's Exhibit Nos. 1 through 3 and 5 through 15

10  were admitted into evidence.)

11         MS. POSTERARO:  And then we admitted No. 16.

12         THE COURT:  16's already been admitted.  What about

13  these others?

14         MS. POSTERARO:  Number 17 -- Plaintiff's counsel had

15  objected to the inclusion of only some of the exhibits to

16  Dr. Morgan's deposition.  We've cured that concern and have

17  marked everything -- all of the exhibits from Dr. Morgan's

18  deposition, curing that -- the need for that objection.

19         THE COURT:  Okay.  Unless I hear an objection, 17's

20  admitted as amended.

21         MS. PAPPAS:  We're trying to pull up the exhibit

22  list.  It got moved around.

23      (Defendant's Exhibit No. 17 was admitted into evidence.)

24         THE COURT:  Number 18 of the answers to

25  interrogatories -- I don't see an objection.

1          MR. BAILEY:  There was none, Judge.

2          THE COURT:  It's admitted.

3      (Defendant's Exhibit No. 18 was admitted into evidence.)

4          THE COURT:  19, medical records of Plaintiff from

5   Coastal.  No objection to that, is there.

6          MR. BAILEY:  Judge, I'm not looking at the same

7   list, then.

8          MS. POSTERARO:  We don't have to admit that one,

9   Your Honor.  It's not relevant to our examination.

10         THE COURT:  If you don't want it in, there's no

11  point in putting it in.

12         MS. POSTERARO:  Right.

13         THE COURT:  All right.  19 is withdrawn.

14         20, e-mail exchange.

15         MS. POSTERARO:  We can withdraw that.  The

16  plaintiffs did not bring their accident reconstructionist,

17  Mr. Stephens.  So 19, 20, and 22 were with respect to

18  Mr. Stephens.

19         THE COURT:  So 20, 21, and 22 are all withdrawn?

20         MS. POSTERARO:  Yes.  Yes, sir.

21         THE COURT:  Okay.  You got that, Lisa?

22         THE COURTROOM DEPUTY:  Yes, sir.

23         THE COURT:  All right.  Well, let's look at the

24  plaintiff's list and see if we have that right.  My notes

25  reflect that in Plaintiff's exhibit list we have admitted

1   Exhibits 1, 2, 3, and 4, 6 -- I'm sorry.  Strike that.

2         8, 9, 10, 11, 12, 13, 14, and 15, 18, 19, and 20,

3   22, and 23 and 25 and 26.

4         Do you have any other than that, Lisa?

5         THE COURTROOM DEPUTY:  Yes.  There's a few more

6   pages in the back starting with Exhibit --

7         THE COURT:  I keep missing those pages.  Yes.  31

8   and 37, 38 through 40 -- I'm sorry.  38 through 51 have been

9   admitted.  Is that what you got, Lisa?

10        THE COURTROOM DEPUTY:  Yes, sir.

11        THE COURT:  All right.  So the question is if you

12   have any others that we've missed.

13        MR. BAILEY:  I do, Your Honor.  I'll go down the

14   list from the top.  Exhibit 5 was the route map that I asked

15   Mr. Turner about.  There was a concern about confidentiality.

16   Can it be sealed without a lot of headache to accommodate the

17   concern?

18        THE COURT:  Well, as I heard it, it was posted on

19   the wall in the post office.  How is that confidential?

20        MR. BAILEY:  I think it may be in a private area.

21        MS. POSTERARO:  It's considered proprietary per the

22   United States Postal Service.  Although it may be displayed

23   inside the postal service, it's not widely disseminated.

24        THE COURT:  All right.  Well, I'll admit it under

25   seal.

1          MS. POSTERARO:  Thank you, Your Honor.

2      (Plaintiff's Exhibit No. 5 was admitted into evidence

3   under seal.)

4          MR. BAILEY:  Judge, our No. 6 -- we withdraw the

5   photographs that we want admitted that were admitted under

6   Exhibit 1 and I think under 51, it is.  So we'll withdraw 6.

7          THE COURT:  Okay.

8          MR. BAILEY:  These -- I do want -- these are the

9   police photographs.  There were four of them.  I think they

10  were also on Defendant's exhibit list.

11         THE COURT:  I don't recall these even being

12  discussed.

13         MR. BAILEY:  And I don't know that they were, Judge.

14  They looked very similar to some of the ones that the post

15  office folks took.  I think we used the post office set for

16  the most part because they were better.

17         THE COURT:  Well, so there's no way to authenticate

18  these.  I don't know what I'm dealing with.

19         MR. BAILEY:  Do you have any objection to it?

20         MS. POSTERARO:  No, Your Honor.  The photographs are

21  what they are.

22         THE COURT:  All right.  We'll admit 7.

23      (Plaintiff's Exhibit No. 7 was admitted into evidence.)

24         MR. BAILEY:  The next one at issue, Judge, is

25  Plaintiff's 16.  This was the records of Dr. Brown.  I'll

1    withdraw that.

2              THE COURT:  Okay.

3              MR. BAILEY:  Number 17, records of Dr. Benezette --

4    of Coastal Neurology, actually.  I would like those in

5    evidence.  If there's an objection, then we need to cure it.

6    It's a failure to disclose document during discovery, but I

7    actually took the set that the Government subpoenaed, for the

8    most part, to the extent that they were current through the

9    time of the subpoena.  They all have the Government's Bates

10   number stamped at the bottom of them, and then I supplemented

11   those that had been generated after the subpoena, which was

12   sometime, I think, late last year but --

13             THE COURT:  Well, while Dr. Benezette was

14   testifying, I read a bunch of them.  So is there any objection

15   to admitting those?

16             MS. POSTERARO:  Well, there is, Your Honor, to the

17   extent that the later records from Plaintiff's --

18   Mr. Brisebois's visits to Coastal Neurology were not produced

19   to the United States.  We didn't see them until well after the

20   close of discovery, although the date stamps on the documents

21   themselves indicate that Plaintiff's counsel had the documents

22   from January of 2018.  So although counsel had the documents,

23   he simply didn't turn them over.

24             THE COURT:  From what date did you not get them?

25             MS. POSTERARO:  Initially, the United States

subpoenaed the records from Coastal Neurology -- I believe it
was in April 2017, and so we had, by the time they complied
with the subpoena -- in June 2017 those were the records that
we had.  And so from June 2017 forward, we did not have the
records.  We had issued discovery requests, requests for
production to Plaintiffs early in the case asking specifically
for all medical records related to Plaintiff's care.  So not
only, you know, were these documents responsive to that
particular discovery request, they just simply weren't turned
over by Plaintiff's counsel.

MR. BAILEY:  To the extent that we had them, Judge,
we may not have supplemented as timely as we should have.
Some of them we just obtained literally in the last three days
before we started trial.  We had a hard time getting the
last -- I think since November of '17.  That's the best I can
tell you.  And if there's an objection, that's what happened,
and I'll live with the Court's ruling any way it is, but I
think it would be better to have a complete record of his
treatment.  Obviously, some of it's occurred so recently that
we just got the records Monday.  So --

THE COURT:  Well, I mean, inherently in this with
ongoing treatment there's going to be records that extend past
the discovery period.  Then it becomes a question of
supplementing the prior discovery requests, and so when did
you turn these records from June on over to defense counsel?

1    MR. BAILEY:  Judge, the most recent batch, which

2  would be since November of 2017, just on Monday when I got

3  them, I think was --

4    MS. POSTERARO:  I still haven't received the ones

5  from Monday.  If you put them in the exhibit, it is without my

6  knowledge because --

7    MR. BAILEY:  Oh, yeah.  They're in the exhibit books

8  I gave you.

9    THE COURT:  Well, I'm certainly not going to include

10  in the exhibit any documents that have not yet been produced

11  to defense counsel.  So that would be from November on.

12    I'm now concerned about June to November.  When did

13  you give her those documents?

14    MR. BAILEY:  Judge, I honestly can't tell you, and I

15  won't make any representation I can't support on my own

16  knowledge.  My folks in the office handle those things and --

17    THE COURT:  I understand.

18    When did you -- did you get the ones from June on?

19    MS. POSTERARO:  My recollection, Your Honor, is that

20  they were produced or given to me at the time that the

21  exhibits were marked, and so that's when I raised the

22  objection, although the date stamp on the records indicates

23  that Plaintiff's counsel had them since January of 2018.  So

24  they -- Plaintiff's counsel held onto them for nearly three

25  months before they were turned over.

1      THE COURT:  All right.  Well, I don't -- I don't see

2  that delay being reasonable.  So I'll admit 17, but I want you

3  to include only those documents in 17 up through the June

4  date.

5      MS. POSTERARO:  Thank you, Your Honor.

6      THE COURT:  And somebody's going to have to

7  coordinate that with Lisa so that we have those as an exhibit

8  and not the ones beyond.  But we can mark the ones beyond for

9  identification in case that becomes an appellate issue, but

10 when I review this record, I need to know exactly what's in

11 evidence and what isn't.

12     MR. BAILEY:  Yes, sir.

13   (Plaintiff's Exhibit No. 17 was admitted into evidence.)

14     MR. BAILEY:  I think the next one at issue is 21.

15     MS. POSTERARO:  I'll withdraw the objection.

16     THE COURT:  All right.  21's admitted.

17   (Plaintiff's Exhibit No. 21 was admitted into evidence.)

18     MR. BAILEY:  Next one is 24.  This one I do know

19 about because I was almost certain we had disclosed it and we

20 did send a copy of it.  It's a single date visit note for

21 Kate Canfield.  I think she's a massage gal or something.  She

22 was in with our initial discovery responses.

23     THE COURT:  Who is Kate Canfield?

24     MR. BAILEY:  Well, we didn't really talk about her.

25 As I say, she was a one-time, I want to say, massage therapist

1  or acupuncturist perhaps.  There's just one visit date.  I'm

2  trying to give the Court the comprehensive set of all of

3  Mr. Brisebois's medical records.

4         THE COURT:  Well, I don't -- I don't much care about

5  a massage therapist.  If it wasn't produced on time, I'm not

6  going to consider it.

7         MR. BAILEY:  Well, it was, Judge.  That one I can

8  confirm, because I looked at the production response that we

9  had copied in your computer, and it was among the records that

10  we produced originally.

11        MS. POSTERARO:  When I looked on your computer

12  system, I don't have a record of it, but if the Court would

13  find it helpful to have a record of the massage therapist, we

14  can withdraw the objection.

15        THE COURT:  It's easier to admit it than argue about

16  it.

17      (Plaintiff's Exhibit No. 24 was admitted into evidence.)

18        THE COURT:  And that brings us to 27 and 28.

19        MR. BAILEY:  27, we've withdrawn.

20        28 -- I do have a summary that -- is there still an

21  objection to that?

22        THE COURT:  Well, the -- Mr. Brisebois testified

23  that he reviewed them and it was an accurate summary.  What's

24  your objection?

25        MS. POSTERARO:  My objection, Your Honor, is based

1  on an objection to Exhibit 29, which is the supporting

2  documentation.  Exhibits 29(O) and 29(P) --

3        THE COURT:  Well, wait a minute.  I'm on 28, and

4  you're going to 29.

5        MS. POSTERARO:  I know.  So to the extent that this

6  is an improper summary of medical expenses, it's because it

7  includes expenses that are not properly documented.  So if we

8  cure --

9        THE COURT:  I'll tell you what.  I'm going to admit

10  28 and 29, and in your brief you can point out to me exactly

11  which ones are not supported.

12        MS. POSTERARO:  Thank you, Your Honor.

13        THE COURT:  I'll deal with it on the merits.  And

14  you can attach that as an attachment to your brief, if you

15  want to.

16        MS. POSTERARO:  Thank you, Your Honor.

17     (Plaintiff's Exhibit Nos. 28 and 29 were admitted into

18  evidence.)

19        THE COURT:  30?

20        MR. BAILEY:  Judge, 30, I'll withdraw.

21        31 --

22        THE COURT:  31's already in.

23        MR. BAILEY:  Already admitted.

24        32, I'll withdraw.

25        33, I'll withdraw.

1           34, 35, and 36 were withdrawn.

2           THE COURT:  Okay.

3           MR. BAILEY:  40 is withdrawn.

4           42 is withdrawn.

5           THE COURT:  Wait a minute.  Those are already in

6   evidence.  Do you want to withdraw them now?

7           MR. BAILEY:  Judge, there is nothing in 40 or 42

8   that the Court wants to spend any time with or bulk up the

9   record about.

10          THE COURT:  All right.  We'll withdraw 40 and 42,

11  you said?

12          MR. BAILEY:  Yes, sir.

13          THE COURT:  Okay.

14          MR. BAILEY:  I'm showing 45 withdrawn.  If the Court

15  still has it active, let's pull that one too.

16          THE COURT:  All right.  45's withdrawn.

17          MR. BAILEY:  And then 52, we'll withdraw, if it's

18  not already reflected as such.

19          THE COURT:  Okay.

20          MR. BAILEY:  And, Madam Clerk, by my account we've

21  covered them all.

22          THE COURT:  I think so.

23          MR. BAILEY:  I want to make sure we're on the same

24  page about that.

25          THE COURT:  That's my account as well, but Lisa's

1  the one that counts. So are you okay with that, Lisa?

2         THE COURTROOM DEPUTY: Yes, sir.

3         THE COURT: Okay.

4         All right. So we've agreed no oral closings.

5  Briefs, 30-page limit due 30 days after the official

6  transcript is filed; right?

7         MR. BAILEY: Yes, Judge. I'll express ignorance

8  about how the transcript process works. Do we have to request

9  that as the plaintiff, or what is the process?

10        THE COURT: Yes. You have to make arrangements with

11 the reporter. Usually the parties agree to split the cost of

12 it.

13        Is there anything else?

14        MR. BAILEY: Nothing here, Your Honor.

15        MS. POSTERARO: No, Your Honor.

16        THE COURT: All right. Thank you, all. I'll deal

17 with it probably sometime in August.

18        MR. BAILEY: All right.

19        THE COURT: All right. We're in recess.

20     (Proceedings concluded at 2:56 p.m.)

21

22

23

24

25

1                          -    -    -

2

3                 <u>CERTIFICATE OF REPORTER</u>

4
   I certify that the foregoing is a correct transcript of the
5  record of proceedings in the above-entitled matter.

6

7

8    /s/ Heather Jewett                    07/12/2018
     Heather Jewett, RPR, FCRR             Date
9    Federal Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25